# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | Chapter 11 |
| UNITED GILSONITE LABORATORIES, A PENNSYLVANIA CORPORATION,[1] | Case No. 5:11-bk-02032 (RNO) |
| DEBTOR. | |

## DECLARATION OF THOMAS WHITE IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, Thomas White declares as follows, under penalty of perjury:

1. I am the President of United Gilsonite Laboratories (the "Debtor," the "Company" or "UGL"), a corporation organized under the laws of the Commonwealth of Pennsylvania. In my capacity as the President, I am familiar with the day-to-day operations, financial condition, books and records, and business affairs of the Debtor. I submit this Declaration in support of the Debtor's chapter 11 petition filed as of the date hereof (the "Petition Date") and first-day motions described below (collectively, the "First-Day Motions").

2. Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information and belief and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Company's management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Company's industry, operations and financial condition. I am authorized to submit this Declaration on behalf of the Company, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] The last four digits of the Debtor's federal tax identification number are 7530.

#1615161 v2
110230-71699

3. To minimize any adverse effects on its business as a result of the commencement of the Company's chapter 11 case, the Company has requested various types of relief in the First-Day Motions. The First-Day Motions seek relief, among other things, to: (a) ensure the continuation of the Company's cash management system and other business operations without interruption; (b) preserve customer and vendor relationships; (c) maintain employee morale and confidence; (d) establish certain other administrative procedures to promote a smooth transition into chapter 11; and (e) provide for the service of notices to holders of Asbestos PI Claims (as defined below) through counsel. Gaining and maintaining the support of the Company's employees, customers, vendors and other key constituencies as well as maintaining the day-to-day operations of the Company's business with minimal disruption, will be critical to the Company's reorganization efforts and in maximizing the recovery prospects for all interested constituencies. Moreover, the relief requested in the First-Day Motions is in the best interest of the Company, its creditors and estate and is necessary to avoid immediate and irreparable harm.

4. To familiarize the Court with the Company and the relief requested in the First-Day Pleadings, this Declaration is organized as follows: section I describes the nature of the debtor's business and circumstances leading to the chapter 11 case; and section II incorporates and affirms the facts that support the relief requested in the First-Day Motions.

I. **NATURE OF THE DEBTOR'S BUSINESS AND CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASE**

   A. **HISTORY OF DEBTOR'S BUSINESS AND PRODUCTS**

5. United Gilsonite Laboratories ("UGL") is a small family-owned Pennsylvania corporation which employs approximately 150 employees. UGL is engaged in the manufacturing of wood and masonry finishing products and paint sundries. With headquarters in

2

#1615161 v2
110230-71699

Case 5:11-bk-02032-RNO    Doc 3    Filed 03/23/11    Entered 03/23/11 18:14:34    Desc
Main Document    Page 2 of 17

Scranton, Pennsylvania, the company maintains manufacturing facilities in Illinois, Mississippi, Nevada and Pennsylvania. The company sells to customers nationwide and internationally.

6. Founded in 1932 by Gerald Payne, UGL quickly expanded in terms of sales and product lines. These product lines included the first asphalt aluminum paint "Gilsalume," drain openers, furniture polish and wall sizing. As the company grew after the Second World War, it developed additional products such as glazing, caulking compounds, patching and repair products. It was in 1953 that UGL introduced the "DRYLOK®" line for waterproofing basements and stopping masonry leaks, which continues to be the primary product line today. Around the same time, the "ZAR®" line was introduced in the form of a polyurethane clear finish for wood. ZAR® is UGL's second largest source of revenue. Overall, UGL manufactures over 80 paint specialty and home maintenance products which are sold at hardware stores, home centers, paint stores and lumberyards. In 2010, UGL had sales of approximately $49,000,000.

7. UGL has not sought the protection of the Court because it is in need of financial restructuring. Instead, it has been forced into chapter 11 as a result of a flood of asbestos-related complaints asserting personal injury and wrongful death claims against UGL, among others ("Asbestos PI Claims"), which have been filed against UGL in several state courts across the country.

8. UGL eliminated asbestos from all products between 1975 and 1978. The first asbestos-related suit was received by the company in 1983. Between 2002-2005, the pace of claims quickened until the present date when an inordinate number of suits have been filed and remain pending.

9. UGL began manufacturing joint compound (a/k/a joint cement) in 1954 with asbestos and discontinued manufacturing the product with asbestos in 1975. UGL did not

compete in the larger "joint compound" business arena. Instead, it sold small quantities of that product to lumber, hardware and paint stores. During that time, total revenue of joint compound was $965,000. To date, UGL and its insurance carriers have paid out over $25 million in settlements and continue to face a barrage of pending and newly filed lawsuits.

### B. PREPETITION CAPITAL STRUCTURE

10. UGL's principal capital structure consists of cash, equity and a $200,000 line of credit with PNC Bank ("PNC LOC"). As of the Petition Date, UGL owed approximately $2,800 on the PNC LOC, had little secured debt, and outstanding payables of approximately $1,550,000.

### C. EQUITY

11. UGL has two classes of stock. There are 4,044 issued shares of Voting Class A stock and 12,134 shares of issued Non-Voting Class B stock, for a total of 16,178 issued shares.

### D. INSURANCE COVERAGE

12. Beginning at least as early as 1972, UGL maintained primary comprehensive general liability ("CGL") insurance coverage applicable to Asbestos PI Claims. That primary coverage was issued at least by Commercial Union Insurance Company ("Commercial Union) from 1972 to 1977, Pennsylvania Manufacturers' Association Insurance Company ("PMA") from 1977 to 1982 and from 1984 to 1987, and Fireman's Fund Insurance Company ("FFIC") from 1982 to 1984 (collectively, the "Primary Policies"). There is evidence that insurers issued additional CGL coverage to UGL prior to 1972. Beginning in approximately 1988, UGL's CGL insurance policies appear to contain policy exclusions generally barring coverage for liabilities resulting from asbestos-related injuries or damage.

13. The Primary Policies include a duty on the part of the insurers to defend claims that are potentially covered under their policies and in addition a duty to indemnify UGL with respect to claims up to properly specified applicable limits of liability. The Primary Policies are

"occurrence-based" policies, which, subject to other policy terms, generally insure against "occurrences" that result in bodily injury or property damage that trigger the applicable policy period, even if the injury or damage does not manifest itself until after the policy period. By their terms, UGL's CGL policies provide insurance coverage for asbestos and other "long-tail" claims, which are commonly asserted years or decades after the underlying injuries are alleged to have occurred. Commercial Union, PMA and FFIC have each taken the position that coverage for Asbestos PI Claims under their respective Primary Policies has been exhausted by the payment of claims prior to the Petition Date.

14. UGL also maintained excess liability coverage applicable to Asbestos PI Claims from various insurers from at least 1976 through 1985. After 1988, UGL's umbrella and excess insurance policies appear to contain policy exclusions generally barring coverage for liabilities resulting from asbestos-related injuries or damage. At least two insurers that issued umbrella coverage to UGL prior to 1988 likewise have taken the position that their policies contain similar "asbestos exclusions." In addition, certain UGL umbrella policies may arguably contain policy exclusions generally barring coverage for claims arising out of the products hazard.

15. In total, from 1972 to 1988, UGL purchased primary CGL, umbrella, and/or excess liability policies with undisputed combined per-occurrence limits of more than $42 million. Some of that coverage was allegedly exhausted by the resolution of UGL's asbestos liabilities prior to the Petition Date. Insurers who issued some of the undisputably unexhausted policies have contested coverage for UGL's asbestos-related liabilities. Prior to the Petition Date, UGL was engaged in litigation with its historical liability insurers in Connecticut Superior Court regarding coverage for those liabilities.

16. Additionally, UGL, through two of its umbrella insurance carriers, has settled approximately seven Asbestos PI Claims and paid settlements totaling $2,012,500 during the 90 days preceding the Petition Date that my counsel informs me may be avoidable and recoverable to the Debtor's estate as preferential payments under section 547(b) of the Bankruptcy Code (as defined below).

E. CIRCUMSTANCES LEADING TO THE COMPANY'S CHAPTER 11 CASE

17. The cost of defending and resolving Asbestos PI Claims asserted against UGL has been and continues to be substantial. In addition, the amount of insurance coverage remaining to UGL has continued to decline. These events have placed significant pressure on UGL's ability to manage its liabilities. As of the Petition Date, UGL's network of counsel are defending approximately 900 pending Asbestos PI Claims.

18. UGL currently estimates that the remaining coverage available to it under the insurance policies and various insurance settlement agreements will not be sufficient to satisfy in full the pending and future Asbestos PI Claims asserted against it.

19. In light of these circumstances, UGL determined that it was necessary to commence a case under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101 - 1532 (the "Bankruptcy Code") to preserve its remaining assets and to confirm a plan of reorganization that would allow UGL to satisfy its asbestos-related liabilities in accordance with the requirements of section 524(g) of the Bankruptcy Code to obtain a channeling injunction. I believe that it is necessary for any such channeling injunction to cover all Asbestos PI Claims based on the conduct or products of UGL, against UGL and parties related to UGL including, but not limited to, past and present officers and directors of UGL.

## II. FIRST-DAY MOTIONS

20. Concurrently with the filing of this chapter 11 case, the Debtor filed a number of First-Day Motions.[2] The Debtor anticipates that the Court will conduct a hearing soon after the commencement of this case (the "First-Day Hearing"), at which the Court will hear the First-Day Motions.

21. An important and critical element of the success of this chapter 11 case will be the entry of orders granting the relief requested in each of the First-Day Motions. Generally the First-Day Motions are designed to facilitate: (a) the continuation of the Debtor's existing cash management systems and other business operations without interruption, (b) preservation of customer and vendor relationships, (c) maintenance of employee morale and confidence, and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11. The factual background in support of each First-Day Motion is provided below.

### A. DEBTOR'S MOTION FOR AN EXTENSION OF TIME TO FILE STATEMENTS AND SCHEDULES

22. The Debtor's operate facilities in four states, deal with a broad range of suppliers and customers and are also defending asbestos claims asserted by a large number of defendants. Given the resultant size and complexity of its business, the fact that certain prepetition invoices have not yet been received or entered into the Debtor's financial systems, and the breadth of asbestos litigation confronting the Debtor, the Debtor has not had the opportunity to gather all of the information necessary to prepare and file its Schedules and Statements.

23. Although the Schedules and Statements were not filed with the Debtor's petition, annexed to the petition is a list containing the names and addresses of the Debtor's 20 largest unsecured creditors.

---

[2] Capitalized terms not defined in the sections below have the meanings ascribed to them in the applicable First-Day pleadings.

24. The Debtor has already commenced the extensive process of gathering the information necessary to prepare and finalize their Schedules and Statements, but I believe that the fourteen-day automatic extension of time to file schedules provided by Fed. R. Bankr. P. 1007(c) will not be sufficient to permit completion and submission of the accurate Schedules and Statements.

25. At this juncture, I believe that an extension of 30 additional days (for a total of 44 days), will provide sufficient time to prepare and file the Schedules and Statements.

    **B.**    **MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(A) AND 366 (I) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES, (II) DEEMING UTILITY PROVIDERS ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

26. The Debtor seeks entry of interim and final orders, (i) prohibiting utility providers from altering, refusing or discontinuing service to the Debtor on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) deeming that the utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtor's establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtor's estimated average monthly cost of utility service of approximately $30,000 (or $15,000), which may be adjusted by the Debtor for reasons specified herein following the final hearing on this motion; and (iii) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtor to provide adequate assurance of future payment to the utility providers.

27. Uninterrupted utility services are essential to the Debtor's ongoing operations and the success of the Debtor's reorganization efforts. A disruption of the utility services at any of the Debtor's facilities would likely be costly to the Debtor and harmful to its business, as the

Debtor would be forced from the outset of this chapter 11 case to focus on finding replacement utility providers and services, rather than focusing on the operation and restructuring of its business. Moreover, the business disruption that would likely result from interruption of the utility services would damage the Debtor's customer relationships, revenues, and profits and would adversely affect the Debtor's restructuring efforts, to the detriment of its estate, creditors, and employees. It is my belief' therefore, that it is critical that the relief requested in the motion be granted and that the Debtor's utility services continue uninterrupted.

   **C. MOTION FOR AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO: (A) PAY ALL PREPETITION EMPLOYEE WAGES, SALARIES, COMMISSIONS AND OTHER COMPENSATION; (B) REIMBURSE ALL PREPETITION BUSINESS EXPENSES TO EMPLOYEES; (C) MAKE ALL PAYMENTS FOR WHICH PREPETITION PAYROLL AND TAX DEDUCTIONS WERE MADE; (D) HONOR PREPETITION OBLIGATIONS UNDER CERTAIN EMPLOYEE BENEFIT PROGRAMS AND CONTINUE SUCH PROGRAMS IN THE ORDINARY COURSE; (E) HONOR WORKERS' COMPENSATION OBLIGATIONS; AND (F) MAKE ALL PAYMENTS TO THIRD PARTIES RELATING TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS; AND (II) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PAY ALL CHECKS AND TRANSFERS DRAWN ON THE DEBTOR'S PAYROLL AND RELATED ACCOUNTS TO MAKE THE FOREGOING PAYMENTS**

  28. To minimize the personal hardship that these individuals would suffer if prepetition employee-related obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtor seeks entry of an order (i) authorizing, but not directing, the Debtor, in accordance with its stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Employees; (b) pay all prepetition compensation owed to individuals who work for the Debtor, including Independent Contractors and temporary workers; (c) reimburse all prepetition business expenses to Employees; (d) make all payments for which prepetition payroll and tax deductions were made; (e) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course; (f) honor workers' compensation obligations; and (g) make all

payments to third parties relating to the foregoing payments and contributions (collectively, and as more fully in the motion, the "Unpaid Wages" and "Employees Benefits"); and (ii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtor's payroll and related accounts to make the foregoing payments.

29. As of the Petition Date: (i) the aggregate amount of Unpaid Wages is approximately $150,000; (ii) up to approximately $50,000 in Reimbursable Expenses have been incurred but remain unpaid; (iii) the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes is approximately $38,000; (iv) the Debtor does not believe that all amounts previously deducted from Employees' earnings have been forwarded to the appropriate third party recipients; (v) the Debtor owes approximately $12,000 on account of 401(k) Plan and approximately $40,000 on account of Pension Plan contributions; and (vi) the Debtor owes approximately $15,000 to the PMA Companies for unpaid the Workers' Compensation Policy. Additionally, the Debtor has accrued, but unpaid amounts due its Employees for vacation, sick pay benefits, personal days and paid holidays in the ordinary course of business. Because the Health Care Program and Life Insurance are paid in advance, I am not aware of any prepetition amounts due and owing on the Petition Date.

30. The Debtor seeks this relief because any delay in paying the Unpaid Wages and Employee Benefits (including, without limitation, the wages owed to Independent Contractors and temporary workers) could severely disrupt the Debtor's relationship with its Employees and dedicated non-employee personnel and irreparably impair the Employees' morale at the very time that their dedication, confidence arid cooperation are most critical. The Debtor faces the risk that its operations may be severely impaired if the Debtor is not immediately granted

authority to pay the Unpaid Wages and Employee Benefits. At this critical stage, it is my belief that the Debtor simply cannot risk the substantial disruption of its business operations that would attend any decline in workforce morale attributable to the Debtor's failure to pay the Unpaid Wages and Employee Benefits in the ordinary course of its business.

31. If the relief requested herein is not granted, I believe that the Employees, Independent Contractors and temporary workers would suffer hardship and, in many instances, financial difficulties, because these monies are needed to enable them to meet their personal obligations. In addition, without the requested relief, I believe that the Debtor's stability would be undermined by the potential threat that otherwise loyal employees at all levels would seek other employment.

D. **MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS AND TO OTHERWISE CONTINUE PREPETITION CUSTOMER PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS**

32. The Debtor requests the entry of an order granting the Debtor authority to: (i) perform its prepetition obligations related to its customer programs as it determines advisable, and (ii) continue, renew, replace, modify and/or terminate any of its customer programs, as the Debtor determines advisable, in the ordinary course of business and without further application to this Court.

33. Prior to the Petition Date and in the ordinary course of its business, to support its sales efforts, the Debtor engages in marketing and sales practices that are targeted to develop and sustain positive reputations for its products with its customers and in the marketplace for its products (collectively, the "Customer Programs"). The Customer Programs, include, among others, supplier marketing and Rebates Programs, customer credits, Warranty Programs and Coupon Programs. The common goals of the Customer Programs have been to meet competitive

pressures, ensure customer satisfaction, and generate goodwill for the Debtor, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability.

34. The Debtor needs to continue the Customer Programs during the postpetition period because they are beneficial to its business and cost effective. I believe that such relief is necessary to preserve UGL's goodwill, brand loyalty, and critical business relationships. Indeed, I also believe that the total operational and administrative cost to the Debtor to continue the Customer Programs is relatively insignificant in comparison to the revenue that the Debtor generates from its customers. Accordingly, it is my belief that it is necessary and appropriate for the Debtor to obtain the authority to continue the Customer Programs on a postpetition basis in the ordinary course of business.

35. In addition, in light of the fact that some of the Customer Programs, as they relate to prepetition arrangements between the Debtor and its customers, may represent unperformed prepetition obligations, the Debtor seeks this Court's authorization to perform all prepetition obligations under the Customer Programs.

36. Accordingly, I believe that it is in the best interests of the Debtor and its estate to maintain and continue the Customer Programs in the ordinary course of business.

E. **MOTION OF DEBTOR FOR ENTRY OF ORDER: (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (II) AUTHORIZING MAINTENANCE AND USE OF EXISTING BANK ACCOUNTS AND BUSINESS FORMS; AND (III) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(B) ON AN INTERIM BASIS**

37. The Debtor seeks entry of an order (i) authorizing and approving the Debtor's continued use of its existing cash management system, (ii) authorizing the Debtor to continue using its pre-petition bank accounts and business forms, and (iii) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtor's deposit practices.

38. In connection with this relief, the Debtor seeks a waiver of certain of the operating guidelines established by the Office of the United States Trustee for Region Three that generally require a debtor to close all prepetition bank accounts, open new accounts designated as debtor in possession accounts, and obtain new business forms and stationery reflecting a debtor's status as debtor in possession.

### i. CASH MANAGEMENT SYSTEM

39. In the ordinary course of its business, the Debtor utilizes a comprehensive system to collect funds from its operations and to pay operating expenses in connection therewith (the "Cash Management System"). The Debtor's financial personnel administer the Cash Management System from its principal executive office in Scranton, Pennsylvania. The Cash Management System is similar to cash management systems used by other companies to collect, transfer, and disburse funds in a cost effective and efficient manner.

40. The Cash Management System utilizes six bank accounts (the "Bank Accounts") to collect, transfer, and disburse funds as needed in the Debtor's general business operations. The Cash Management System has three main components: (i) cash collection; (ii) cash disbursement; and (iii) investments. The Cash Management System provides significant benefits to the Debtor, including the ability to: (i) control and monitor corporate funds centrally; (ii) ensure cash availability and liquidity, to invest excess cash; (iii) reduce administrative expenses by facilitating the movement of funds; and (iv) enhance the development of accurate account balances and presentment information. It is my belief that that any disruption in UGL's Cash Management System would likely cause delays in the collection and disbursement of funds, thus impeding UGL's ability to carry out its normal business operations to the detriment of UGL's employees, customers and suppliers.

41. The Cash Management System allows UGL to manage centrally all of its cash flow needs and includes the necessary accounting controls to enable UGL, as well as its creditors and this Court, to trace funds through the system and to ensure that all transactions are adequately documented and readily ascertainable. The Debtor will continue to maintain all records relating to receipts, disbursements, and transfers in accordance with its rigorous pre-Petition Date practices. Any changes to the Debtor's Bank Accounts or its Cash Management Systems would be disruptive to the Debtor's business operations and could undermine the effectiveness of such systems.

42. It is therefore both essential and in the best interests of the Debtor's estate and creditors that the Cash Management System be maintained. Furthermore, the Debtor's reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would be associated with disruptions in the Cash Management System.

### ii. MAINTENANCE OF EXISTING BANK ACCOUNTS AND BUSINESS FORMS

43. As described in detail above, the Bank Accounts comprise an established Cash Management System that UGL needs to maintain to ensure smooth collections and disbursements in the ordinary course of its business. To avoid delays in paying debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, it is my belief that UGL should be permitted to continue to maintain its existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of its business operations. Otherwise, transferring the Bank Accounts will be disruptive, time consuming, and expensive.

44. I believe that if UGL were required to change its correspondence, business forms and checks, UGL may be forced to choose standard forms rather than the current forms with which the Debtor's employees, customers and vendors are familiar. Such a change in operations

could potentially create a sense of disruption and confusion within the Debtor's organization and could result in confusion for the Debtor's customers and vendors. It is my belief that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, business forms and checks. To do so would be unnecessary given that UGL can take appropriate care to ensure the proper use of the existing business forms.

### iii. INTERIM WAIVER OF REQUIREMENT OF 11 U.S.C. § 345(b)

45. Prior to the Petition Date, all of UGL's funds flow through the Bank Accounts as part of the Cash Management System. UGL does not invest or deposit funds in any other accounts. Moreover, the Banks at which UGL's Bank Accounts are held are federally insured, but at any given time it is possible that the balance of a given Bank Account may exceed the amounts insured by the Federal Deposit Insurance Corporation. Given that the Bank Accounts are business accounts and considering the relative stability of UGL's Banks, UGL does not believe that such funds are at risk. Accordingly, to the extent applicable, UGL requests that the Court waive the requirements of section 345(b) on an interim basis and permit it to continue deposit customer payments into the Bank Accounts, as described in detail above.

46. Accordingly, I believe the relief requested in the motion is necessary and appropriate.

### F. MOTION FOR ORDER AUTHORIZING (I) THE FILING OF A CONSOLIDATED LIST OF THE TWENTY ASBESTOS PLAINTIFFS FIRMS REPRESENTING THE LARGEST NUMBER OR SCOPE OF ASBESTOS CASES AGAINST THE DEBTOR, AND (II) APPROVING NOTICE PROCEDURES FOR INDIVIDUAL ASBESTOS CLAIMANTS

47. The Debtor seeks entry of an order authorizing it (i) to file a list of the twenty asbestos plaintiff firms with the largest number or scope of asbestos cases against the Debtor and (ii) approving notice procedures for Individual Asbestos Claimants as defined in the Motion.

48. The Debtor believes that providing the U.S. Trustee with a list of the twenty asbestos plaintiff firms with the largest number or scope of asbestos cases against the Debtor instead of listing the individual asbestos claimants with the largest unsecured claims would better assist the U.S. Trustee in forming an asbestos creditors' committee.

49. Furthermore, while preparing for filing, the Debtor ascertained that it could not reasonably obtain the actual names and addresses of many of the individual asbestos claimants. The Debtor's address information is in many instances limited to counsel of record for the asbestos claimants because all communications regarding the asbestos claims and the various pending lawsuits has been through and with the applicable plaintiff's attorney. Thus, the Debtor seeks approval to serve all notices, mailings and other communications related to this chapter 11 case on the holders of Asbestos PI Claims care of their counsel of record at such counsels' addresses. To implement these notice procedures, the Debtor will seek approval to list the names and addresses of the asbestos plaintiffs firms in the Debtor's creditor matrix in lieu of listing the individual asbestos creditors' addresses.

50. Without the above notice procedures, the Debtor would be required to undertake a massive manual review of the actual hard-copy files (both on-site and at numerous storage facilities) maintained by various past and current counsel representing the Debtor across the nation with respect to the asbestos litigation. Accordingly, I believe that the relief requested in the motion is necessary and appropriate.

## CONCLUSION

Approval of the First-Day Motions filed by the Company is a critical step for the Company to achieve a successful chapter 11 case as such approval would (a) ensure the continuation of the Company's cash management system and other business operations without interruption; (b) preserve customer and vendor relationships; (c) maintain employee morale and confidence; (d) establish certain other administrative procedures to promote a smooth transition into chapter 11; and (e) provide for the service of notices to holders of Asbestos PI Claims through counsel.

Dated: March 23, 2011

/s/ Thomas White
Thomas White
President