## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : Chapter 11 |
| | : |
| UNITED GILSONITE LABORATORIES, | : Case No. 5:11-bk-02032 (RNO) |
| A PENNSYLVANIA CORPORATION,[1] | : |
| | : |
| DEBTOR. | : |
| | : |

### MOTION FOR AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO: (A) PAY ALL PREPETITION WAGES, SALARIES, COMMISSIONS AND OTHER COMPENSATION OWED TO THE DEBTOR'S EMPLOYEES; (B) REIMBURSE ALL PREPETITION BUSINESS EXPENSES TO EMPLOYEES; (C) MAKE ALL PAYMENTS FOR WHICH PREPETITION PAYROLL AND TAX DEDUCTIONS WERE MADE; (D) HONOR PREPETITION OBLIGATIONS UNDER CERTAIN EMPLOYEE BENEFIT PROGRAMS AND CONTINUE SUCH PROGRAMS IN THE ORDINARY COURSE; (E) HONOR WORKERS' COMPENSATION OBLIGATIONS; (F) MAKE ALL PAYMENTS TO THIRD PARTIES RELATING TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS; AND (II) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PAY ALL CHECKS AND TRANSFERS DRAWN ON THE DEBTOR'S PAYROLL AND RELATED ACCOUNTS TO <u>MAKE THE FOREGOING PAYMENTS</u>

United Gilsonite Laboratories, a Pennsylvania corporation, the above-captioned debtor and debtor in possession (the "<u>Debtor</u>" or "<u>UGL</u>"), by and through its proposed undersigned counsel, hereby submits this motion (the "<u>Motion</u>") seeking entry of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Order</u>"), pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(4) and 507(a)(5) and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"): (i) authorizing, but not directing, the Debtor to (a) pay all prepetition wages, salaries, commissions and other compensation owed to the Debtor's Employees (as defined below), (b) make all payments for which prepetition payroll and tax deductions were

---

[1] The last four digits of the Debtor's federal tax identification number are 7530.

#1614642 v3
110230-71699

made, (c) reimburse all prepetition business expenses to Employees, (d) honor prepetition

obligations under certain employee benefit programs and continue such programs in the ordinary

course, (e) honor workers' compensation obligations, and (f) make all payments to third parties

relating to the foregoing payments and contributions, and (ii) authorizing and directing

applicable banks and other financial institutions to honor and pay all checks and transfers drawn

on the Debtor's payroll and related accounts to make the foregoing payments.  The facts and

circumstances supporting this Motion are set forth in the concurrently filed *Declaration of

Thomas White in Support of Chapter 11 Petition and First-Day Motions*.  In support of this

Motion, the Debtor respectfully represents as follows:

JURISDICTION

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334 and the Order of Referral of Bankruptcy Matters of the United States District Court for the

Middle District of Pennsylvania dated July 26, 1984, Misc. No. 84-0203.  This is a core

proceeding under 28 U.S.C. § 157(b)(2).

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief requested herein are sections 105(a), 363(b),

507(a)(4) and 507(a)(5) of the Bankruptcy Code and Bankruptcy Rule 6003(b).

BACKGROUND

**A.     THE CHAPTER 11 CASE**

4.     On the date hereof (the "Petition Date"), UGL commenced its bankruptcy case by

a filing of a voluntary petition for relief under chapter 11, title 11, United States Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code").  No trustee, examiner or creditors' committee has been

appointed in this case.

#1614642 v3
110230-71699

## B.  THE DEBTOR AND ITS BUSINESS OPERATIONS

5.      UGL is a small family-owned Pennsylvania corporation which employs approximately 150 employees.  UGL is engaged in the manufacturing of wood and masonry finishing products and paint sundries.  With headquarters in Scranton, Pennsylvania, the company maintains manufacturing facilities in Illinois, Mississippi, Nevada and Pennsylvania. The company sells to customers nationwide and internationally.

6.      Founded in 1932 by Gerald Payne, UGL quickly expanded in terms of sales and product lines.  These product lines included the first asphalt aluminum paint "Gilsalume," drain openers, furniture polish and wall sizing.  As the company grew after the Second World War, it developed additional products such as glazing, caulking compounds, patching and repair products.  It was in 1953 that UGL introduced the "DRYLOK®" line for waterproofing basements and stopping masonry leaks, which continues to be the primary product line today. Around the same time, the "ZAR®" line was introduced in the form of a polyurethane clear finish for wood.  ZAR® is UGL's second largest source of revenue.  Overall, UGL manufactures over 80 paint specialty and home maintenance products which are sold at hardware stores, home centers, paint stores and lumberyards.  In 2010, UGL had sales of approximately $49,000,000.

7.      UGL has not sought the protection of the Court because it is in need of financial restructuring.  Instead, it has been forced into Chapter 11 as a result of a flood of asbestos-related complaints asserting personal injury and wrongful death claims against UGL, among others ("Asbestos PI Claims"), which have been filed against UGL in several state courts across the country.

8.      UGL eliminated asbestos from all products between 1975 and 1978.  The first asbestos-related suit was received by the company in 1983.  Between 2002-2005, the pace of

#1614642 v3
110230-71699

claims quickened until the present date when an inordinate number of suits have been filed and remain pending.

9.      UGL began manufacturing joint compound (a/k/a joint cement) in 1954 with asbestos and discontinued manufacturing the product with asbestos in 1975. UGL did not compete in the larger "joint compound" business arena. Instead, it sold small quantities of that product to lumber, hardware and paint stores. During that time, total revenue of joint compound was $965,000. To date, UGL and its insurance carriers have paid out over $25 million in settlements and continue to face a barrage of pending and newly filed lawsuits.

<u>RELIEF REQUESTED</u>

10.     The Debtor employs approximately 150 employees in the United States (the "<u>Employees</u>"), of which approximately 100 are hourly or salary Employees paid on a weekly basis and 50 are Employees who receive commission-based compensation and receive draws against their commission, which are reconciled against their actual commissions earned twice per year (July and January). Employees are paid directly from the Debtor's disbursement/payroll account with First National Bank, account number xxxxxx4061 (the "<u>Payroll Account</u>").

11.     The Debtor seeks the relief requested in this Motion because any delay in paying the Employee-related compensation, reimbursements, payroll taxes, deductions, benefit plans, workers' compensation obligations and/or any other payment requested herein (collectively, the "<u>Employee Obligations</u>") will greatly impair the Debtor's ability to reorganize. The continued, uninterrupted, faithful and diligent services of the Employees are absolutely essential to the Debtor's continuing operations. To minimize the personal hardship the Employees will suffer if prepetition Employee Obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtor, by this Motion, seeks authority, but not the obligation to:

#1614642 v3
110230-71699

(i) pay all prepetition Employee wages, salaries, contractual compensation, and other accrued compensation, and all prepetition compensation owed to the Independent Contractors (as defined below) and temporary workers as of the Petition Date, up to the $11,725 priority claim limits established under sections 507(a)(4) and (5) of the Bankruptcy Code; (ii) make all payments related to any Employee payroll deductions; (iii) reimburse all prepetition business expenses incurred by any Employee; (iv) make prepetition contributions and pay benefits under certain Employee benefit plans; (v) honor workers' compensation programs; (vi) pay other miscellaneous Employee-related costs; (vii) continue, in the ordinary course of business, Employee programs with respect to vacation, sick, personal and holiday leave; and (viii) continue certain health, welfare, savings and other benefit programs, as described more fully below.

12.    The Debtor also requests that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all prepetition checks and transfers drawn on the Debtor's Payroll Accounts to make the foregoing payments, and seeks authority to pay all processing costs and administrative expenses related to the foregoing payments.

PREPETITION EMPLOYEE OBLIGATIONS

A.    WAGES, SALARIES, AND OTHER COMPENSATION

13.    The Debtor's average gross weekly compensation for its Employees, including wages, salaries, and other compensation is approximately $145,000 - $155,000. Payroll payments are made by check or via direct deposit through electronic transfer of funds directly to the Employees' bank accounts. The Employees are paid every Friday in arrears, for the week ending on the previous Saturday.

#1614642 v3
110230-71699

14.     Because the Employees are paid in arrears, as of the Petition Date, the Employees have not been paid all of their prepetition wages for the week preceding the Petition Date. Additionally, compensation may be due and owing as of the Petition Date because some checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, may not have been honored and paid as of the Petition Date.

15.     Payroll for the Debtor's Employees for the one-week period ending Saturday, March 12, 2011 were paid on Friday, March 18, 2011.  The Debtor's Employees have since accrued unpaid prepetition wages, excluding the Payroll Taxes and Deductions (each as defined below) in the net amount of approximately $95,000 ("Unpaid Wages").

16.     Approximately 50 of the Debtor's Employees are sales people that are  paid on a commission-only basis (the "Sales Representatives").  The Sales Representatives receive weekly draws against their commissions, which are reconciled against their actual commissions earned twice per year, once in July for commissions earned from January through June and again in January for commissions earned from July through December.

17.     It is essential to the Debtor's successful reorganization and to the enterprise as a whole that the Debtor's sales efforts continue unimpeded.  Accordingly, the Debtor's Sales Representatives require assurance that their outstanding earned commissions and reimbursable expenses will be paid timely and in full.  The Debtor's Sales Representatives have earned and accrued unpaid prepetition commissions for the period beginning on January 1, 2011 which will not be reconciled against draws until July 2011.  The Debtor estimates that as of March 31, 2011, the prepetition amount due the commission-based Sales Representatives, net of draws previously paid, will be approximately $85,000.

#1614642 v3
110230-71699

18.     In the ordinary course of its business, the Debtor also utilizes the services of three independent contractors (the "Independent Contractors") to perform marketing related services. The Independent Contractors are paid monthly draws against their actual earned commissions. The Debtor estimates that as of March 31, 2011, these Independent Contracts will be owed approximately $2,000.

19.     By this Motion, the Debtor seeks entry of an order authorizing, but not directing, it to pay all outstanding accrued compensation owed to the Employees and Independent Contractors as of the Petition Date, in an amount not exceeding the sum of $11,725 per employee.

B.     PREPETITION WITHHOLDINGS AND DEDUCTIONS

20.     The Debtor is required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities.  The Debtor must then match from its own funds social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively, the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").

21.     As of the Petition Date, the Debtor estimates that the amount of accrued and outstanding prepetition obligations with respect to Payroll Taxes to be approximately $38,000. Taxes are generally regarded as held in trust for the taxing authorities and are not property of the Debtor's estate.  *See Mira v. United States, IRS (In re Mira),* 245 B.R. 788, 793 (Bankr. D. Pa. 1999) ("Taxes withheld from the wages of employees constitute a special fund held in trust for the benefit of the United States.").  Nonetheless, out of an abundance of caution, the Debtor

#1614642 v3
110230-71699

seeks an order authorizing, but not directing, it to remit any accrued and unpaid Payroll Taxes and continue to forward all postpetition Payroll Taxes to the appropriate federal, state or local taxing authority. 28 U.S.C. §§ 959(b), 960. Expressly permitting the Debtor to remit such taxes accrued prior to the Petition Date will help avoid costly disputes with taxing authorities, prevent penalties for violating tax laws, and facilitate the reorganization process.

22. During each applicable pay period, the Debtor routinely deducts certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits, insurance premiums, 401(k) plan contributions, legally ordered deductions and other miscellaneous deductions) (collectively, the "Deductions") and forwards those amounts to various third party recipients. Included in the Deductions are certain amounts each Employee may set aside in the Debtor's flexible spending account program administered by Health Equity (the "FSA Program"), which allows Employees to designate a portion of pre-tax earnings to pay for qualified expenses as established by the plan including medical expenses and child care.

23. On average, the Debtor typically deducts approximately $45,000 in total Deductions from the Employees' paychecks per week. As of the Petition Date, the Debtor was holding approximately $20,000 in Deductions that had not yet been forwarded to the appropriate third party recipients. Accordingly, the Debtor seeks an order authorizing, but not directing, it to forward these prepetition Deductions to the applicable third party recipients and to continue to forward Deductions on a postpetition bases in the ordinary course of business and in accordance with its past practices.

#1614642 v3
110230-71699

C.    <u>REIMBURSEMENT OF PREPETITION EMPLOYEE BUSINESS EXPENSES</u>

24.    The Debtor customarily reimburses its Employees who incur a variety of business expenses in the ordinary course of performing their duties on behalf of the Debtor (the "<u>Reimbursable Expenses</u>").  The Reimbursable Expenses are for business related air travel, lodging, ground transportation, meals, and other business-related expenses.  The Debtor has also authorized the issuance of corporate credit cards to certain Employees that can be used for business and travel-related expenses, which expenses the Debtor pays in the ordinary course of business.  The Debtor's believes that its failure to pay any amounts due on account of the Reimbursable Expenses when due may cause Employees to suffer undue hardship and lower the Employees' morale during this critical time.

25.    As of the Petition Date, the Debtor estimates that the Employees collectively accrued Reimbursable Expenses in the total amount of up to approximately $50,000.  By this Motion, the Debtor seeks an order authorizing, but not directing, it to pay all Reimbursable Business Expenses accrued and outstanding as of the Petition Date in the ordinary course of business and to continue its prepetition policies with respect to the same going forward.

D.    <u>PREPETITION OBLIGATIONS UNDER EMPLOYEE BENEFIT PROGRAMS</u>

26.    The Debtor provides its Employees, directly or indirectly, and in the ordinary course of business, with a number of employee benefits, including, but not limited to (1) a broad range of medical and healthcare programs, (2) life and disability insurance programs, (3) pension and 401(k) plan, and (4) vacation, holiday and leave benefits, described in greater detail below (collectively, the "<u>Employee Benefits</u>").

#1614642 v3
110230-71699

(i)     *MEDICAL AND HEALTHCARE PROGRAMS*

27.     In the ordinary course of its business, the Debtor provides medical insurance to its eligible Employees  (collectively, the "Health Benefits") through a group plan administered by Blue Cross NEPA (the "Health Care Program").  The Health Benefits also include prescription drug insurance, a program provided to former Employees who elect coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), and a senior plan for certain of the Debtor's retired management.

28.     Pursuant to the COBRA program the Debtor bills individuals opting to collect benefits for 102% of the Debtor's actual Health Benefit cost and the Debtor then  remits payment to Blue Cross NEPA.  As of the Petition Date, the Debtor may have received funds from COBRA participants that have not yet been paid to Blue Cross NEPA.  Additional payments made to Blue Cross NEPA for the Health Care Program are prepaid at the beginning of the month for the current month's coverage.

29.     The Debtor pays Blue Cross NEPA for the Health Care Program in advance and believes that as of the Petition Date, there are no accrued and outstanding prepetition obligations with respect to the Health Care Program.  Nevertheless, out of an abundance of caution, by this Motion, the Debtor seeks authority to (a) pay unpaid prepetition amounts due under the Health Care Program, if any, (b) continue to provide the Health Care Program for its Employees in the ordinary course of business, and (c) continue to honor obligations under such benefit programs, including any premiums and administrative fees.

(ii)     *LIFE AND DISABILITY INSURANCE PROGRAMS*

30.     All full time Employees receive group life insurance coverage under a plan administered by First Priority Life (the "Life Insurance"), with an estimated average total

#1614642 v3
110230-71699

monthly cost to the Debtor of approximately $1,100. The Debtor pays for the Life Insurance in advance and believes that as of the Petition Date, there are no accrued and outstanding amounts due on account of Life Insurance.

31.     The Debtor also maintains a self-funding disability policy (the "Disability Policy"). The Disability Policy provides disabled Employees with compensation for a period of up to 26 weeks. Presently, the Debtor does not have any Employees on disability.

32.     By this Motion, the Debtor seeks an order authorizing, but not directing, it to (a) continue to provide the Life Insurance and Disability Insurance benefits to its Employees in the ordinary course of business, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees, and (c) pay all unpaid amounts due with respect to the Life Insurance and Disability Insurance benefits on the Petition Date, if any.

### (iii)    *401(K) AND PENSION PLAN*

33.     Prior to the Petition Date, and in the ordinary course of business, the Debtor maintained a defined savings plan for the benefit of its salaried Employees and managers, which is qualified under section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The Debtor is responsible for the day-to-day administration of the 401(k) Plan and the Vanguard Fiduciary Trust Company acts as the trustee. Pursuant to the 401(k) Plan, the Debtor deducts the appropriate amounts from each participating salaried Employee's payroll check and transfers the withheld funds to the trustee of the 401(k) Plan. Employees are eligible to participate in the 401(k) Plan as soon as they are hired and as of the Petition Date approximately 100 Employees were eligible. To become eligible to receive matching and profit sharing contributions from the Debtor an Employee must complete one year of service, during which time 1,000 hours or more of service are completed. Under the 401(k) Plan, the Debtor is obligated to make a matching

11

#1614642 v3
110230-71699

contribution of 100% for Employees that contribute between 1% and 5% of their compensation as a pre-tax contribution.

34.     The amounts withheld from the Employees' pay and supplemented by the Debtor's matching obligation under the 401(k) Plan total approximately $12,000 per week.  By this Motion, the Debtor seeks authority to remit and pay all prepetition amounts withheld and due under the 401(k) Plan and to continue to perform all of its obligations under the 401(k) Plan.

35.     Prior to the Petition Date, and in the ordinary course of business, the Debtor also maintained and administered a pension plan for the benefit of its eligible hourly Employees (the "Pension Plan").  Hourly Employees are eligible for the plan after one year of employment in which 1,000 or more hours of service are completed and as of the Petition Date approximately 47 Employees are active in the Pension Plan.  The Pension Plan is a defined benefit plan under which the benefit is based on the years of an Employee's credited service as an employee.  An employee is vested or has a nonforfeitable interest in the Pension benefit after seven years of service, for which 1,000 or more hours of service are completed per year.  Aetna Life Insurance Company is the Pension Plan's Group Annuity Contract Issuer.

36.     The Debtor makes quarterly contributions to the Pension Plan at an estimated cost of $40,000 per quarter.  By this Motion, the Debtor seeks authority to pay all prepetition amounts due under the Pension Plan in the amount up to $40,000, and to continue to perform all of its obligations under the Pension Plan postpetition.

### (iv)     VACATION, HOLIDAY, AND LEAVE BENEFITS

37.     The Employees are covered by the Debtor's vacation policy (the "Vacation Policy") which provides the Employees with a paid time-off benefit (the "Vacation Time").  Under the Vacation Policy, Employees are generally eligible for up to four weeks of paid

#1614642 v3
110230-71699

vacation annually, generally depending on the number of years of credited service. Vacation time accrues to the Employees on January 1. The Debtor's Vacation Policy does not permit Employees to carry over vacation time from one year to the next or compensate Employees for any unused vacation, except in case of termination or where mandated by applicable state law.

38.     The Debtor also provides its salaried Employees with sick pay benefits and its eligible full-time salaried employees with twelve (12) paid holidays.

39.     By this Motion, the Debtor seeks an order authorizing, but not directing, it to honor all prepetition liabilities to its Employees in the ordinary course of business with respect to vacation, sick pay benefits, personal days and paid holidays that accrued prior to the Petition Date and to continue its prepetition policies with respect to same going forward.

E.     **WORKERS' COMPENSATION OBLIGATIONS**

40.     Under the laws of the various jurisdictions in which the Debtor operates, it is required to maintain workers' compensation insurance policy (the "Workers' Compensation Policy"). Accordingly, the Debtor currently insures its workers' compensation liabilities pursuant to a policy with the PMA Companies. The Debtor estimates that its cost for workers' compensation premiums is $160,000 per year, paid at the rate of approximately $16,000 per month for the first ten months of the coverage year. As of the Petition Date, the estimated amount owed to PMA Companies for accrued and unpaid workers' compensation premiums is approximately $15,000.

41.     By this Motion, the Debtor seeks authority to maintain and continue its prepetition practices with respect to the Workers' Compensation Policy, including, among other things, allowing workers' compensation claimants, to the extent they hold valid claims, to proceed with their claims under the applicable Workers' Compensation Policy. In addition, the

13

#1614642 v3
110230-71699

Debtor requests authority to pay any workers' compensation premiums that accrued and remained unpaid as of the Petition Date.

**F.**     **PAYMENTS TO THIRD-PARTIES RELATED TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS**

42.     As is customary in the case of most large companies, the Debtor in the ordinary course of its business has contractual relationships with third parties to outsource the administration of the foregoing Employee benefit plans and programs. The Debtor requests authorization to pay the various costs incident to maintaining or paying third parties to maintain and provide record keeping and other administrative services relating to the various Employee benefits programs identified in this Motion. The Debtor estimates that $35,000 was accrued and unpaid with respect to such administrative services prior to the Petition Date, which amount the Debtor seeks authority to pay.

**G.**     **AUTHORITY FOR BANKS TO HONOR AND/OR REISSUE CHECKS**

43.     The Debtor further requests that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all checks and transfers drawn on the Debtor's dedicated Payroll Account and other accounts related to any of the foregoing obligations, whether such checks were presented before, or after, the Petition Date.

44.     Accordingly, by this Motion, the Debtor seeks (a) authorization for its banks to honor all prepetition payroll and employee benefit checks and transfers drawn on the Payroll Account on or after the Petition Date, (b) authorization for its banks to process and honor all other checks issued for payments approved by this Motion, and (c) authorization to reissue checks for payments approved by this Motion where the check is dishonored postpetition.

#1614642 v3
110230-71699

<u>BASIS FOR RELIEF REQUESTED</u>

45.     Any delay in paying the Employee Obligations could severely disrupt the Debtor's relationship with its Employees and irreparably impair the Debtor's ability to successfully reorganize.  At this critical stage, the Debtor simply cannot risk the substantial disruption of its business operations that would result from decline in workforce morale attributable to the Debtor's failure to pay the Employee Obligations in the ordinary course of business during the pendency of this reorganization.

46.     The Debtor submits that the relief requested in this Motion is warranted under sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  If the relief requested herein is not granted, the Employees and Independent Contractors will suffer undue hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations.  In addition, without the requested relief, the Debtor's stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

47.     Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  "[S]ection 105(a) gives the court general equitable powers to further the substantive provisions of the code." *United States, IRS v. Farrell (In re Farrell)*, 241 B.R. 348, 349 (Bankr. M.D. Pa. 1999) (quotations omitted); *In re Am. Family Enters.*, 256 B.R. 377, 405 (D.N.J. 2000) ("Section 105 of the Bankruptcy Code grants the Court broad equitable power to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of Title 11.").  Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee [debtor in

15

possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate …" 11 U.S.C. § 363(b)(1).

48.     Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee and

Independent Contractor may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $11,725 for
> each individual or corporation, as the case may be, earned within
> 180 days before the date of the filing of the petition or the date of
> the cessation of the debtor's business, whichever occurs first, for—
>
> > (A) wages, salaries, or commissions, including vacation,
> > severance, and sick leave pay earned by an individual; or
> >
> > (B) sales commissions earned by an individual or by a
> > corporation with only 1 employee, acting as an independent
> > contractor in the sale of goods or services for the debtor in
> > the ordinary course of the debtor's business if, and only if,
> > during the 12 months preceding that date, at least 75
> > percent of the amount that the individual or corporation
> > earned by acting as an independent contractor in the sale of
> > goods or services was earned from the debtor.

11 U.S.C. § 507(a)(4).

49.     Likewise, under section 507(a)(5) of the Bankruptcy Code, Employees may

ultimately be granted a priority claim for:

> allowed unsecured claims for contributions to an employee benefit
> plan -
>
> > (A) arising from services rendered within 180 days before
> > the date of the filing of the petition or the date of the
> > cessation of the debtor's business, whichever occurs first;
> > but only
> >
> > (B) for each such plan, to the extent of -
> >
> > > (i) the number of employees covered by each such plan
> > > multiplied by $11,725.00; less
> > >
> > > (ii) the aggregate amount paid to such employees under
> > > paragraph (4) of this subsection, plus the aggregate amount

#1614642 v3
110230-71699

> paid by the estate on behalf of such employees to any other
> employee benefit plan.

11 U.S.C. § 507(a)(5).

50.     The Debtor believes that the prepetition Unpaid Wages and other Employee

Obligations are entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the

Bankruptcy Code and do not exceed $11,725 for each individual.  As priority claims, the Debtor

is required to pay these claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. 1129(a)(9)(B)

(requiring the payment of certain allowed unsecured claims for wages, salaries, and commissions

for contributions to an employee benefit plan).  Thus, to the extent that they constitute priority

claims, granting the relief requested herein would only affect the timing, and not the amount, of

the payment of the Employee Obligations.

51.     The paramount policy and goal of reorganization under chapter 11 of the

Bankruptcy Code is the rehabilitation of the debtor: "'the fundamental purpose of reorganization

is to prevent the debtor from going into liquidation, with attendant loss of jobs and possible

misuse of economic resources.'"  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176-77 (Bankr.

S.D.N.Y. 1989) (quoting *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984)).  Payment of pre-

petition obligations, "when such payment is needed to facilitate the rehabilitation of the debtor[,]

is not a novel concept."  *Ionosphere Clubs*, 98 B.R. at 175 (citations omitted).  The Debtor

believes that the payment of the Employee Obligations is critical, especially in light of the need

to maintain the morale of the Debtor's Employees during the pendency of the chapter 11 case.

52.     Moreover, the relief requested in the Motion is specifically supported by the well

established "necessity of payment" rule, or the "doctrine of necessity."  *See In re Chateaugay

Corp.*, 80 B.R. 279, 281 (S.D.N.Y. 1987).  The "necessity of payment" rule is a narrow

exception to the prohibition on payment of pre-petition obligations derived from bankruptcy

17

#1614642 v3
110230-71699

common law. *See, e.g., In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989); see also Russell A. Eisenberg & Frances F. Gecker, The Doctrine of Necessity and Its Parameters, 73 MARQ. L. REV. 1 (1989).

53.    As this Court is aware, both the Third Circuit Court of Appeals and the courts within the Third Circuit have endorsed the "necessity of payment" rule. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581-82 (3d Cir. 1981); *In re Columbia Gas Syst., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992); *In re Sharon Steel Corp., et al.*, 159 B.R. 730, 736-37 (Bankr. W.D. Pa. 1993). The "necessity of payment" rule recognizes the existence of the court's power to approve of a debtor's payment of pre-petition claims in a chapter 11 proceeding where such payment is essential to the continued operation of the debtor. *See Ionosphere Clubs*, 98 B.R. at 176. The rationale for this rule is consistent with the paramount goal of chapter 11, *i.e.*, "facilitating the continued operation and rehabilitation of the debtor … " *Id.*

54.    Here, again, it is essential to the success of the rehabilitation process and the proper functioning of the Debtor post-petition to enable the continuous payment of Employees' wages, salaries and benefits. The Employees' support for the Debtor's reorganization efforts, including their critical sales staff whose continued efforts will generate post-petition revenue for the Debtor, is critical and cannot be jeopardized. Allowing the Debtor to satisfy these payments is necessary to prevent irreparable harm to the Debtor at the very time cooperation and confidence are most critical to the Debtor's initial reorganization efforts.

55.    Equally important, absent the relief requested herein, the Employees and their families will suffer undue hardship because these amounts are needed to enable them to meet their financial obligations and to maintain their life and health insurance. Thus, if the requested relief is not granted, many of the Employees may seek other employment alternatives.

#1614642 v3
110230-71699

Moreover, the Debtor's ability to preserve its business and assets and ultimately reorganize will be adversely affected if it is unable to retain the confidence and dedication of its employees. Accordingly, it is critical that the hardship and disruption caused by the chapter 11 filing be minimized so as to preserve morale and maintain the Debtor's workforce.

56. Additionally, as set forth above, payment of the Debtor's Unpaid Wages, salaries, and Employee Obligations will not prejudice other creditors of the Debtor's estate as these payments, in any event, are entitled to a priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As such, these claims would be entitled to payment in full under any plan of reorganization, and, thus, payment does not constitute subordination of other junior unsecured creditors. *See* 11 U.S.C. § 1129(a).

57. For all reasons outlined above, the Debtor respectfully submits that granting the relief requested herein is appropriate and in the best interests of its estate and creditors.

58. Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence or relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001). As described above, the Debtor's Employees are integral to its business operations and satisfying the Employee Obligations in the ordinary course of business is essential to the continued, uninterrupted operation of the Debtor's businesses. The Debtor submits that because the relief requested in this Motion is necessary to avoid immediate and

#1614642 v3
110230-71699

irreparable harm to the Debtor, for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

59.     Because the Debtor will suffer irreparable harm if the relief requested herein is delayed or if the Order granting this Motion is stayed until 14 days after its entry, the Debtor also seeks a waiver of the fourteen-day stay under Fed. R. Bankr. P. 6004(h).

60.     Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  The Debtor expressly reserves its rights to contest any demand for payment made with respect to the subject matter of this Motion under applicable non-bankruptcy law. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to and should not be construed as an admission of the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

<u>**NOTICE**</u>

61.     No trustee, examiner or creditors' committee has been appointed in this chapter 11 case.  Notice of this Motion has been provided to: (i) the Office of the United States Trustee for Region Three; (ii) the Debtor's twenty (20) largest unsecured creditors as identified in the Debtor's chapter 11 petition; (iii) counsel to PNC Bank, the proposed postpetition lender; (iv) each of the Debtor's Cash Management Banks; (v) the United States Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the Office of the United States Attorney General for the Middle District of Pennsylvania; (viii) those asbestos plaintiff firms asserting the 20 highest number of asbestos-related claims against the Debtor; and (ix) those parties requesting notice pursuant to Bankruptcy Rule 2002 in accordance with Local Rule 2002-1(b) (collectively,

#1614642 v3
110230-71699

the "Notice Parties").  Notice hereof and any order entered hereon will be served in accordance with Local Rule 9013-1(c).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

**N<small>O</small> P<small>RIOR</small> R<small>EQUEST</small>**

62.    No prior request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court: (a) enter an order, in substantially the form of the order attached hereto as Exhibit A; and (b) grant to the Debtor such other and further relief as the Court may deem just and proper.

Dated:  March 23, 2011          **G<small>IBBONS</small> P.C.**

By:    /s/ Mark B. Conlan
          Mark B. Conlan, Esq. (PA No. 86559)
          Karen A. Giannelli, Esq.
          Frank J. Vecchione, Esq.
          One Gateway Center
          Newark, NJ 07102-5310
          Tel.  973-596-4500
          Fax.  973-596-0545
          E-mail:  mconlan@gibbonslaw.com
                    kgiannelli@gibbonslaw.com
                    fvecchione@gibbonslaw.com

          *Proposed Attorneys for the Debtor and*
          *Debtor-in-Possession*

#1614642 v3
110230-71699