## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | Chapter 11 |
| UNITED GILSONITE LABORATORIES, A PENNSYLVANIA CORPORATION[1] | Case No. 11-02032 (RNO) |
| DEBTOR. | |

## MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 361, 362, 363 AND 364, (I) APPROVING A DIP CREDIT AGREEMENT, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING SUPERPRIORITY CLAIMS AND LIENS TO POSTPETITION LENDER, AND (IV) SCHEDULING A FINAL HEARING

United Gilsonite Laboratories, a Pennsylvania corporation, the above-captioned debtor and debtor in possession ("UGL" or the "Debtor") in the above-captioned case ("Chapter 11 Case"), hereby moves this Court for the entry of interim and final orders, pursuant to Bankruptcy Code sections 105(a), 361, 362, 363 and 364: (i) approving a postpetition credit agreement, (ii) authorizing use of cash collateral, (iii) granting superpriority claims and liens to postpetition lender, and (iv) scheduling a final hearing (the "Motion"). In support of the Motion, the Debtor respectfully represents as follows:

### JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Referral of Bankruptcy Matters of the United States District Court for the Middle District of Pennsylvania dated July 26, 1984, Misc. No. 84-0203. This is a core proceeding under 28 U.S.C. § 157(b)(2).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The last four digits of the Debtor's federal tax identification number are 7530.

#1614518 v4
110230-73303

3.      The statutory predicates for the relief requested herein are sections 105(a), 362 and 364 of the Bankruptcy Code.

**BACKGROUND**

**A.      THE CHAPTER 11 CASE**

4.      On March 23, 2011 (the "Petition Date"), UGL commenced its bankruptcy case by a filing of a voluntary petition for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). No trustee, examiner or creditors' committee has been appointed in this case.

**B.      THE DEBTOR AND ITS BUSINESS OPERATIONS**

5.      UGL is a small family-owned Pennsylvania corporation which employs approximately 150 employees. UGL is engaged in the manufacturing of wood and masonry finishing products and paint sundries. With headquarters in Scranton, Pennsylvania, the company maintains manufacturing facilities in Illinois, Mississippi, Nevada and Pennsylvania. The company sells to customers nationwide and internationally.

6.      Founded in 1932 by Gerald Payne, UGL quickly expanded in terms of sales and product lines. These product lines included the first asphalt aluminum paint "Gilsalume," drain openers, furniture polish and wall sizing. As the company grew after the Second World War, it developed additional products such as glazing, caulking compounds, patching and repair products. It was in 1953 that UGL introduced the "DRYLOK®" line for waterproofing basements and stopping masonry leaks, which continues to be the primary product line today. Around the same time, the "ZAR®" line was introduced in the form of a polyurethane clear finish for wood. ZAR® is UGL's second largest source of revenue. Overall, UGL manufactures over 80 paint specialty and home maintenance products which are sold at hardware stores, home centers, paint stores and lumberyards. In 2010, UGL had sales of approximately $49,000,000.

2

#1614518 v4
110230-73303

7.     UGL has been forced into Chapter 11 primarily as a result of a flood of asbestos-related complaints asserting personal injury and wrongful death claims against UGL, among others ("Asbestos PI Claims"), which have been filed against UGL in several state courts across the country.

8.     UGL eliminated asbestos from all products between 1975 and 1978.  The first asbestos-related suit was received by the company in 1983.  Between 2002-2005, the pace of claims quickened until the present date when an inordinate number of suits have been filed and remain pending.

9.     UGL began manufacturing joint compound (a/k/a joint cement) in 1954 with asbestos and discontinued manufacturing the product with asbestos in 1975.  UGL did not compete in the larger "joint compound" business arena.  Instead, it sold small quantities of that product to lumber, hardware and paint stores.  During that time, total revenue of joint compound was $965,000.  To date, UGL and its insurance carriers have paid out over $25 million in settlements and continue to face a barrage of pending and newly filed lawsuits.

### RELIEF REQUESTED

10.     By this Motion, pursuant to sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-3 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Local Rules"), the Debtor seeks entry of an interim order substantially in the form annexed hereto as Exhibit A (the "Interim Order"), (i) authorizing the Debtor to obtain postpetition financing on a senior secured and superpriority basis, in the form of a revolving credit facility in an aggregate principal amount at any time outstanding not to exceed $8.2 million (inclusive of the $200,000 PCard Facility described below), including an initial draw of not more than $1.5 million upon or after interim approval of the relief sought

#1614518 v4
110230-73303

herein, pursuant to the terms and conditions of a certain Debtor-in-Possession Financing

Agreement, by and between the Debtor, as borrower, and PNC Bank, National Association

("PNC Bank"), as agent and lender in the form annexed hereto as Exhibit B (the "DIP Credit

Agreement") and ratification and approval of the continuation of the PCard Agreement(defined

below) and attached hereto as Exhibit C; (ii) authorizing the use of cash collateral; (iii) granting

senior secured liens and superpriority claims to PNC Bank, as postpetition lender and as

adequate protection for the use of cash collateral; (iv) granting relief from the automatic stay to

implement the terms of the Interim and Final Order; (v) scheduling a final hearing to consider

approval of the relief requested herein on a final basis (the "Final Hearing"); and (vi) granting

related relief.

11.     Pending the Final Hearing and the entry of an order granting the relief requested

herein on a final basis (the "Final Order," and together with the Interim Order the "DIP Orders"),

the Debtor will use the proceeds of the DIP Credit Agreement to (a) fund, among other things,

ongoing working capital and general corporate needs of the Debtor[2], (b) pay certain fees, costs

and expenses related to the administration of the Chapter 11 Case, (c) pay off the outstanding

balance under the PCard Facility, and (d) pay fees and expenses arising under and related to the

DIP Credit Agreement.  In exchange for making these proceeds available to the Debtor, PNC

Bank will be granted a superpriority administrative expense claim and a senior, first priority lien

on, and security interest in, the Collateral (as defined in the DIP Credit Agreement and

summarized below).

12.     The Debtor has a need to obtain post petition financing to ensure its ability to

operate through the pendency of this Chapter 11 Case and to successfully reorganize.  The relief

---

[2] The Interim Financing has been made necessary by the extra demands made by suppliers for cash in advance, cash on delivery, etc., which the Debtor expects will case to be made after the entry of the Final Order approving the DIP Credit Agreement.

#1614518 v4
110230-73303

sought herein is in the best interests of the Debtor, its creditors, its equity holder and all parties in interest.

13.     Without obtaining a postpetition credit facility, the Debtor anticipates that cash on hand and anticipated operating revenues may not provide sufficient liquidity to satisfy its operating and administrative expenses during the pendency of this Chapter 11 Case. Accordingly, the Debtor needs access to the line of postpetition financing provided by the DIP Credit Agreement to conduct this Chapter 11 Case in a manner that will maximize the value of the Debtor's estate for the benefit of its creditors.

14.     As demonstrated herein, the terms of the DIP Credit Agreement are extremely favorable to the Debtor. The financing offered by PNC Bank contemplates a low interest rate (as further described below). Prior to the Petition Date, the Debtor contacted PNC Bank and Wells Fargo Bank, N.A. as potential sources for postpetition financing. The Debtor received term sheets from both lenders. After reviewing and comparing the two term sheets, the Debtor determined that the terms offered by PNC Bank were the most favorable. The Debtor's desire to enter into the DIP Credit Agreement reflects sound business judgment and is in the best interest of its estate. The Court should grant the Motion in all respects.

A.     **PNC RELATIONSHIP - P CARD AND PRELIMINARY TERM SHEET**

15.     On June 12, 2007, Debtor entered into a Visa Purchasing Card Agreement with PNC Bank, National Association (the "PCard Agreement") which provided Debtor and its employees with credit cards for business purchases with a maximum credit limit of $200,000 (the "PCard Facility"). On the Petition Date, the outstanding balance under the PCard Facility was approximately $953.23 and total obligations incurred and payments made under the PCard Facility in the ninety (90) days preceding the Petition were approximately $4,643.32 and the average daily balance for the one hundred days before the Petition Date was approximately

#1614518 v4
110230-73303

$1,200.00. A copy of the PCard Agreement is attached hereto as <u>Exhibit C</u>. Consequently, the pre-petition PCard Facility was a deminimis facility and relationship. The Debtor has requested that Agent and Lenders continue to permit Debtor and its employees to use the PC Card Facility and Agent and Lenders have agreed to permit such continuation subject to the terms of the Interim Order and Final Order. Accordingly, the DIP Financing Documents will include, and shall be deemed to include for all purposes a ratification of the documents evidencing the PCard Facility, the obligations of which shall be secured on a post-petition basis by the DIP Collateral upon entry of the Interim Order.

16.     Pursuant to that certain letter agreement and Preliminary Term Sheet dated March 11, 2011 by and between the Debtor, as Borrower, and PNC Bank, as Lender (the "<u>Prepetition Letter Agreement</u>"), PNC Bank agreed to proceed with the credit due diligence investigation in connection with arranging a post petition DIP Facility, and the Debtor agreed to pay PNC Bank $35,000 plus to indemnify and reimburse PNC Bank additional sums, costs and expenses, including fees and disbursements of outside counsel, incurred by PNC Bank in connection with documenting and negotiating the transaction as well as any due diligence investigation, which fees, costs and expenses are to be paid at closing of the DIP Facility (the "<u>Reimbursement Obligation</u>").

17.     To secure the Reimbursement Obligation under the Prepetition Letter Agreement, the Debtor granted PNC Bank a security interest in, and a continuing lien on, all Collateral. The Prepetition Letter Agreement defines Collateral as (i) all of the Debtor's real and personal property including all present and future and wherever located accounts, general intangibles, contract rights, all rights to the payment of money, instruments, documents, chattel paper, inventory, machinery, equipment, furniture, fixtures, property and plant, licenses, trademarks,

#1614518 v4
110230-73303

tradenames, patents, copyrights and other assets; and (ii) all proceeds and products thereof (the "Prepetition Collateral"). The Reimbursement Obligations are part of the Obligations under the DIP Facility and will be authorized to be paid at closing of the DIP Facility by the Interim Order and any prepetition liens on the Prepetition Collateral will be released.

**B.** **NEGOTIATION OF THE DIP CREDIT AGREEMENT**

18. Prior to the Petition Date, the Debtor prepared a budget and determined that its available cash and projected revenues from operations may not be sufficient to fund its operational and restructuring activities during the course of the Chapter 11 Case. In light of this determination and to assure the marketplace of the Debtor's continued viability as a going concern, the Debtor sought to secure sources of additional funding that could provide the liquidity, flexibility, and low capital costs required to allow the Debtor to successfully implement its operational and restructuring plan, and to successfully emerge from chapter 11 protection.

19. Based on the Debtor's experience in the credit markets, the Debtor has reasonably concluded that it cannot obtain financing sufficient to support its operations and restructuring initiatives on an unsecured or administrative expense priority basis with terms that are equal to or better than the financing to be provided by PNC Bank. The revenues produced by the Debtor's operations, and the assets available to be pledged as security, compared with its exposure to potentially enormous asbestos-related liabilities, effectively make postpetition credit unavailable to the Debtor, except through loans with superpriority status and secured by senior liens on the Debtor's assets as provided for in sections 364(c) and (d) of the Bankruptcy Code. Moreover, the recent tightening of the global credit markets and the corresponding difficulties commercial borrowers of all types have found in obtaining extensions of credit have further limited the Debtor's ability to obtain credit on an unsecured or administrative priority basis.

#1614518 v4
110230-73303

20.     As such, the Debtor's management, proposed counsel and other professionals evaluated alternative sources of credit on a superpriority and senior secured basis.  Having reviewed possible borrowing sources conceivable in the current credit market, the Debtor determined that its best opportunity to obtain the credit it needs to successfully reorganize on terms favorable to the Debtor is through the DIP Credit Facility to be provided by PNC Bank.

21.     The DIP Credit Agreement with PNC Bank reflects good faith, arm's length negotiations that spanned several weeks when the Debtor was actively represented by outside counsel.  The DIP Credit Agreement contemplates that PNC Bank will provide a postpetition revolving line of credit in an amount not to exceed an aggregate principal amount at any time outstanding not to exceed $8,200,000 (the "Revolver Commitment") (inclusive of the $200,000 PCard Facility), subject to the terms of the DIP Credit Agreement and the PCard Agreement, as applicable, and approval by the Court.  No other lender has offered terms for postpetition financing that are equal to or superior to the terms offered by PNC Bank.

## C.     CONCISE STATEMENT REQUIRED BY FED. R. BANKR. P. 4001(C)(1)(B)

22.     In accordance with Bankruptcy Rule 4001 and Local Rule 4001-3(c) and (d), the following is a summary of the material terms of the DIP Credit Agreement:[3]

| | |
|---|---|
| **Parties:** | United Gilsonite Laboratories, a debtor in possession under chapter 11 of the Bankruptcy Code, as borrower, and PNC Bank, National Association as agent and lender.  *See* DIP Credit Agreement, preamble. |
| **Purpose:** | To (a) provide for the ongoing working capital and letter of credit needs of Debtor, (b) pay legal fees and expenses related to and during the Bankruptcy Case and (c) pay fees and expenses related to the financing transactions contemplated hereunder**.** |

---

[3]  To the extent that there are any inconsistencies between the summary contained  herein of the DIP Credit Agreement and the terms and conditions of the DIP Credit Agreement, the terms of the DIP Credit Agreement control.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.  To the extent there is any inconsistency between the DIP Credit Agreement and the Interim Order, the Interim Order will control.

#1614518 v4
110230-73303

| | |
|---|---|
| **Revolving Credit Facility:** | Revolving credit facility in an amount up to $8,200,000, which amount may be increased with the consent of Lender and the Court. |

Advances as follows, with criteria of eligibility as determined by PNC Bank:

- Up to 85% of eligible domestic accounts receivable, aged up to 90 days from invoice date, and cross aged on the basis of 50% or more past due; plus

- Up to 50% of eligible FIFO based raw and finished goods inventory, but not to exceed 85% of the appraised net recovery value of said inventory.

Sublimits:

    (i)    **Up to $3,000,000 available for Letters of Credit, with any issuance fully reserved from availability.**

    (ii)    **Up to $200,000 PCard Facility to be used by employees for Debtor related expenses**

The Revolving Credit Facility and the PCard Facility are available for borrowing and re-borrowing until maturity, subject to borrowing base and the terms of the PCard Agreement as applicable. To the extent there are no borrowings under the DIP Credit Agreement or the PCard Facility and the Debtor has Cash Collateral in the operating account, the Interim Order will authorize the Debtor's use of Cash Collateral in accordance with the Budget.

| | |
|---|---|
| **Interim Borrowing:** | Up to $1.5 million upon or after interim approval of the DIP Credit Agreement. *See* Interim Order ¶ 1.2. |
| **Maturity/ Termination:** | The earlier of (a) two (2) years from the closing date, (b) the conversion of the Bankruptcy Case to a chapter 7 case, the filing of any bid procedures or the commencement of any sale or liquidation of any material portion of Debtor's assets under section 363 of the Bankruptcy Code or otherwise or a dismissal of the Bankruptcy Case, (c) acceleration upon the occurrence of an event of default under the DIP Credit Agreement or (d) substantial consummation or effective date of a plan of reorganization of Debtor. *See* DIP Credit Agreement, § 14.1. |
| **Interest:** | Revolving Credit Facility: PNC Base Rate, floating plus 1.5%, or 30, 60 or 90 day PNC Eurodollar Rate plus 3%. DIP Credit Agreement, § 3.1. |

The "Base Rate" shall mean, for any day, a fluctuating per annum rate of interest equal to the highest of (i) the interest rate per annum announced from time to time by PNC at its principal office as its then prime rate, which rate may not be the lowest rate then being charged commercial Debtors by PNC, (ii) the Federal Funds Open Rate plus one-half of one percent (.50%) and (iii) the Daily LIBOR Rate plus one percent (1.00%). DIP Credit Agreement, § 3.1.

| | |
|---|---|
| **Security and Liens on Avoidance Actions** | DIP Collateral shall include, without limitation, (i) all of Debtor's real and personal property including all present and future and wherever located accounts, general intangibles, contract rights, all rights to the payment of money, instruments, documents, chattel paper, inventory, machinery, equipment, furniture, fixtures, property and plant, licenses, trademarks, tradenames, patents, copyrights and other assets; and (ii) all proceeds and products thereof, and as to |

#1614518 v4
110230-73303

|  | (i) and (ii) whether arising pre-petition or post-petition; **provided however, that Agent and Lender's liens and security interests in all causes of action arising under or related to Chapter 5 of the Bankruptcy Code shall not be effective until entry of the Final Order.** All obligations to PNC Bank under the DIP Facility and PCard Facility shall be completely cross-collateralized and cross-defaulted and secured by all DIP Collateral in all respects, and co-terminus. Interim Order ¶ 2.1.1. |
|---|---|
| **Priority** | All obligations of Debtor to Agent and Lenders shall be secured by a first priority, perfected lien on all Collateral pursuant to Sections 364(c) and (d) of the Bankruptcy Code. Interim Order ¶ 2.1.1. |
| **Fees** | Facility Fee equal to 0.375% per annum on the unused portion of the Revolving Credit Facility. This fee shall be calculated on the basis of a 360-day year for the actual number of days elapsed and will be payable quarterly in arrears. *See* DIP Credit Agreement, § 3.3. |
|  | Closing Fee equal to 0.50% of the Total Financing payable at closing. A $35,000 deposit paid upon execution of a term sheet, shall be credited to the Closing Fee at closing. *See* DIP Credit Agreement, § 3.3. |
|  | Collateral Management Fee equal to $2,500 per month (audits are an additional $850 per person-day plus expenses). *See* DIP Credit Agreement, § 3.4. |
|  | Prepayment Fee equal to 1.0% of the Total Financing if prepaid before the second anniversary of the Closing Date; provided that the prepayment fee shall be waived in the event that PNC provides replacement or exit financing. *See* DIP Credit Agreement, § 3.3. |
| **Carve-Out Expenses:** | The Agent's and the Lenders' liens, claims and security interests in the DIP Collateral and their Superpriority Claim shall be subject only to the following expenses (the "**Carve-Out**"): (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. Section 1930(a)(6) ("**Statutory Fees**"); and (ii) upon the occurrence of any Event of Default and delivery of a written notice to counsel for the Debtor, the U.S. Trustee and counsel for the Committee, which expressly states that the application of the Carve-Out has occurred (a "**Carve-Out Trigger Notice**"), subject to the terms and conditions of this Interim Order, (solely to the extent set forth in the Budget and to the extent that such fees and disbursements remain unpaid following the application of all retainers held by Case Professionals (as defined below)) and up to aggregate amount of the Carve-Out Cap (as defined below): (x) allowed and unpaid professional fees and disbursements incurred by the Debtor and the Committee accruing after the date of the Carve-Out Trigger Notice for any professionals retained by either of them by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**") to the extent allowed and payable by the Debtor or the Committee pursuant to an order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) ("**Professional Fees**") under Sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order, and (y) the "**Committee Expenses**," comprising allowed and unreimbursed expenses incurred by the members of the Committee accruing after the date of the Carve-Out Trigger Notice in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) by final order of the Court |

#1614518 v4
110230-73303

(which order has not been reversed, vacated or stayed unless such stay is no longer effective). Without limiting the foregoing, the Professional Fees and Committee Expenses described in clause (ii) of this paragraph 2.3a (such amounts, the "**Case Professionals Carve-Out)** shall be subject to a cap in an aggregate amount not to exceed $350,000 (the "**Carve-Out Cap**") provided, however, that if at the time the Court has approved the allowance and payment of the Professional Fees and Committee Expenses, the Carve Out will not be available to the extent that the Debtor has other unencumbered or less than fully encumbered assets consisting of cash and cash equivalents out of which Professional Fees, Committee Expenses and Statutory Fees can be paid; and provided further, however, that if the Carve Out is used at any time as set forth herein and subsequently unencumbered assets of Debtor becomes available, the Agent and the Lenders shall be immediately reimbursed from such unencumbered assets for the release of their DIP Collateral proceeds for the purpose of funding the Carve Out prior to the use of such funds. *See* Interim Order ¶ 2.2(a).

**506(c) Claims:** Effective upon the earlier of (a) entry of a Final Order approving the Motion, or (b) entry of an order extending Interim Financing Period beyond 30 calendar days after the date of the Interim Order, no costs or expenses of administration which have or may be incurred in the case at any time shall be charged against the Agent (PNC Bank), their claims or the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of PNC Bank. See Interim Order at 4.2.

**Conditions Precedent:** In addition to the usual and customary conditions for debtor-in-possession facilities of this type, the obligation of Agent and Lenders shall be subject, but not limited, to satisfaction of the following conditions, among others:

a. The Bankruptcy Case shall have been commenced in the Middle District of Pennsylvania, all of the "first day motions" filed at the time of the commencement of the Chapter 11 Case shall be in form and substance satisfactory to Agent and Lenders and all of the "first day orders" entered in connection with the Chapter 11 Case shall be in form and substance satisfactory to Agent and Lenders.

b. Entry by the Bankruptcy Court of an interim order in form and substance satisfactory to Agent and Lenders ("Interim Order").

c. Bankruptcy Court approval of this Motion approving the DIP Credit Agreement, on final basis.

d. All indebtedness of the Debtor to Agent and Lenders under the DIP Credit Agreement and otherwise in respect of the credit facilities shall have been: (a) adjudicated to have superpriority claim status pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code in the Chapter 11 Case senior to all other administrative expenses and other claims of the Debtor and any successor trustee; (b) adjudicated to have been entered into in good faith and that all extensions of credit under the DIP Credit Agreement shall be deemed to have been made in good faith; (c) adjudicated to be secured pursuant to section 364(c)(2) of the Bankruptcy Code by all of the Collateral and further adjudicated to be secured by a first and prior priming lien on and security interest in all of the collateral pursuant to section 364(d) of the Bankruptcy Code (whether or not section 364(d) relief is actually needed to ensure first lien priority of Lenders' post-petition financing); and (d) adjudicated to have

#1614518 v4
110230-73303

relief from the automatic stay pursuant to section 362(a) of the Bankruptcy Code and any other injunctive orders as described below. All provisions of the Interim and Final Order shall be in form and substance satisfactory to Agent and Lenders.

e. Debtor will have a minimum revolving credit availability of $5,000,000 at closing after all transaction fees, expenses, and subtraction of trade payables 60 days or more past due, such availability to be evidenced by a Borrowing Base Certificate satisfactory to Agent.

| | |
|---|---|
| **Relief From Stay Prior to Event of Default**<br><br>**And Relief from Stay upon an Event of Default:** | The automatic stay provisions are modified to permit Agent and Lenders to perform any act authorized or permitted: (a) to implement the DIP facility, (b) to take any act to validate or perfect any lien, (c) to assess, charge, collect, advance and receive payments under the DIP Credit Agreement. *See* Interim Order ¶ 3.3.<br><br>Upon an Event of Default, Agent and Lenders will have relief from the automatic stay provisions of section 362(a) of the Bankruptcy Code and from any other injunction of any kind as to the Collateral, so that Agent and Lenders can enforce its rights against the Collateral in the event of a default without having to obtain any other or further court order lifting any stay or injunction, provided, however, that Agent shall first provide three business days (3) days' notice to Debtor prior to exercising all rights and remedies against the Collateral. Notwithstanding the foregoing, during such three (3) business day-period, the Debtor can cure the Event of Default (to the extent curable), and the Debtor and/or any Committee shall be entitled to seek an emergency hearing with the Court, at which the only issue the Debtor and/or any Committee shall be allowed to assert is whether an Event of Default actually occurred. |
| **Lockbox:** | All customers shall be directed to make remittances to a lockbox or blocked account approved and controlled by Agent. Customer remittances shall be credited to Debtor's account one (1) business day following the business day after Agent's Bank receipt of such remittance via check, wire transfer or electronic depository check. |

## BASIS FOR RELIEF REQUESTED

**A. ENTERING INTO THE DIP CREDIT AGREEMENT IS AN EXERCISE OF THE DEBTOR'S SOUND BUSINESS JUDGMENT**

23. For the reasons set forth in greater detail below, the Court should authorize the Debtor to enter into the DIP Credit Agreement and ratify and approve the continuation of the PCard Agreement with Agent and Lenders in the sound exercise of the Debtor's business judgment.

24. At their core, the statutory predicates for the Debtor's entry into the DIP Credit Agreement and the ratification of the PCard Agreement require the exercise of the Debtor's

#1614518 v4
110230-73303

sound business judgment.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its reasonable business judgment in obtaining such credit.  *See Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085,1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

25.     In addition, section 105(a) of the Bankruptcy Code grants the Court authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

26.     Entry into the DIP Credit Agreement and ratification of the PCard Agreement are an exercise of the Debtor's sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtor entered into negotiations with Agent, among others, advised and assisted by its outside counsel, for postpetition financing after undertaking a detailed investigation as to the Debtor's projected financing needs during the pendency of this Chapter 11 Case, and considering the advice of its experienced professional advisors.  The Debtor negotiated with Agent in good faith, at arm's-length, and with the assistance of Agent's outside counsel, in order to obtain postpetition financing on terms favorable to the Debtor that satisfy the Debtor's needs with respect to its restructuring and ongoing business operations.  The Debtor needs the

#1614518 v4
110230-73303

funds to be provided pursuant to the DIP Credit Agreement in order to ensure the Debtor's ability to operate through the pendency of this Chapter 11 Case. Based on the advice of counsel and other professionals, and the Debtor's own analysis, the Debtor has determined that the DIP Credit Agreement and the PCard Agreement provide a greater amount of financing on more flexible terms and at lower cost than any other reasonably available alternative.

27.     Specifically, as set forth above, the DIP Credit Agreement will provide the Debtor with a revolving line of credit up to a maximum principal amount of $8,200,000 (inclusive of the $200,000 PCard Facility) that the Debtor has determined should be sufficient to support its reorganization and operations activities. Further, the interest rate to be charged under the DIP Credit Agreement is significantly lower than the rate the Debtor could reasonably expect to obtain from any other lender, and represents, in the informed judgment of the Debtor, the best rate available to the Debtor for postpetition financing. No other lender has offered financing terms that are comparable to the terms offered by Agent. As such, entering into the DIP Credit Agreement and the ratification of the PCard Agreement are an exercise of the Debtor's sound business judgment and should be approved by the Court.

**B.     THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED AND SUPERPRIORITY BASIS**

28.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis. Specifically, section 364(d) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code to obtain credit or incur debt:

> (a)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [Bankruptcy Code];

14

#1614518 v4
110230-73303

(b)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(c)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

29.     Under section 364 a Court may authorize a debtor-in-possession to obtain credit secured by a lien, senior or equal to a lien on property of the estate if: (1) such credit can not otherwise be obtained; and (2) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. The debtor must satisfy both prongs of the two-prong test set forth in section 364(d)(1) before the court will authorize the type of funding contemplated." *In re Reading Tube Industries*, 72 B.R. 329, 331-322 (Bankr. E.D. Pa. 1987). Under the first prong of this test the debtor is required to show that "less onerous post-petition financing was unavailable." *Id.* at 322 (citing *In re Beker Industries Corp.*, 58 B.R. 725, 736 (Bankr. S.D. N.Y. 1986); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984)). Section 364 does not "explicitly provide how extensive the debtor's efforts to obtain credit must be; therefore, the court must make its decisions on a case by case basis." *In re Reading Tube Industries*, 72 B.R. at 322. "[T]here is no duty to seek credit from every possible lender." *Id.* (quoting *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986)). "Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders. We do, however, require the debtor to make an effort to carry the burden established in Section 364(d)." *In re Reading Tube Industries*, 72 B.R. at 332. This is a fact sensitive analysis and has been determined on a case by case basis. *In re Reading Tube Industries*, 72 B.R. at 332 (holding that a debtor had an obligation to contact more than one financial institution); *In re Snowshoe Co.,*

#1614518 v4
110230-73303

*Inc.*, 789 F.2d at 1088 (holding that a debtor's efforts to obtain credit were sufficiently extensive, when the trustee contacted other institutions in the immediate geographic area).

30.     The Debtor's limited revenues from operations and its exposure to potentially large asbestos-related and other liabilities preclude it from obtaining credit on an unsecured or administrative expense basis. Agent has refused to provide the Debtor with postpetition financing on terms other than a senior secured and superpriority basis and other than on the terms of the Interim Order.  In order to obtain the benefits to be provided under the DIP Credit Agreement and the PCard Agreement, therefore, the Debtor must be allowed to provide Agent and Lenders with the senior liens and security interests, described above, securing the Debtor's repayment obligations under the DIP Credit Agreement and the PCard Agreement, as provided in section 364(c) and (d) of the Bankruptcy Code[4], as well as to grant those repayment obligations superpriority administrative expense status as provided for in section 364(c)(l) of the Bankruptcy Code.

31.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  *See In re Snowshoe Co.*, 789 F.2d at 1088; *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Banks. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources and explained that most sources "lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 197 (Bankr. D. Pa. 1991) (debtor adequately established that a certain degree of priming loan was necessary if debtor were to obtain financing).

---

[4]  Except for the security interest granted PNC Bank in the Prepetition Collateral under the Prepetition Letter Agreement, the Debtor is not aware of any liens on or security interests in any of the Collateral on and in which PNC Bank will be granted liens and security interests under the DIP Credit Agreement.

#1614518 v4
110230-73303

32.     Although the DIP Credit Agreement requires the Debtor to grant Agent and

Lenders a senior lien, the Debtor is not aware of any junior liens, so the provision of adequate

protection is unnecessary in this case.  The Debtor has demonstrated through the White Decl.

that it has been unable to obtain credit without granting a senior lien and there are no junior

lienholders whose interests will be impacted by the Court's approval of the DIP Credit

Agreement.

C.     **PNC BANK SHOULD BE DEEMED A GOOD FAITH LENDER UNDER SECTION 364(e)**

33.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under
> [section 364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not
> affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

34.     The DIP Credit Agreement and the ratification of the PCard Agreement  is the

result of the Debtor's reasonable and informed determination that Agent offered the Debtor the

most favorable terms available on which to obtain needed postpetition financing, and of extended

arm's-length, good faith negotiations between the Debtor and Agent.  The Debtor was advised

throughout these negotiations by its outside professionals.  The terms and conditions of the DIP

Credit Agreement and the PCard Agreement are fair and reasonable, and the proceeds from the

DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.

17

#1614518 v4
110230-73303

Accordingly, the Court should find that Agent and Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

D.      **THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS**

35.      As set forth above, the relief requested herein contemplates a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary (a) to implement and effectuate the terms and provisions of the DIP Credit Agreement and the PCard Agreement, and (b) to permit PNC Bank to enforce the security interest in the DIP Collateral and to pursue the rights and remedies contemplated by the DIP Credit Agreement with the priority described herein and on the terms set forth in the Interim Order.

36.      Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

E.      **INTERIM APPROVAL SHOULD BE GRANTED**

37.      Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. *See also* Local Rule 4001-3(f).

38.      Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-3(f), the Debtor requests that the Court conduct a preliminary expedited hearing on this Motion and (a) authorize the Debtor to borrow up to $1.5 million on an interim basis, pending entry of a Final Order, in order to maintain and finance the Debtor's ongoing operations and avoid

#1614518 v4
110230-73303

immediate and irreparable harm to the Debtor's estate and all parties in interest, and (b) schedule the Final Hearing.

39. The availability of interim loans under the DIP Credit Agreement and the PCard Agreement will provide necessary assurance to the Debtor's vendors, employees, and clients of the Debtor's ability to meet its near-term obligations. Failure to meet these obligations would likely have a long-term negative impact on the value of the Debtor's business to the detriment of all parties in interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitation its reorganization efforts.

40. The twenty-one (21) day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a) and the 14-day stay of 6004(h) are hereby waived.

## F. REQUEST FOR FINAL HEARING

41. Finally, the Debtor requests a date for the Court to hold a hearing to determine whether to finally approve the relief requested in this Motion. Further, the Debtor respectfully requests that the Court authorize the Debtor to mail to within three (3) business days after the Court's entry of the Interim Order, copies of the Interim Order and notice of the Final Hearing on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rules 2002 and 4001 and Local Rules 2002-1 and 4001-6.

## NOTICE

42. No trustee, examiner or creditors' committee has been appointed in this chapter 11 case. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for Region Three; (ii) the Debtor's twenty (20) largest unsecured creditors; (iii) counsel

#1614518 v4
110230-73303

Case 5:11-bk-02032-RNO    Doc 57    Filed 04/01/11    Entered 04/01/11 11:09:27    Desc
Main Document    Page 19 of 21

to Agent (iv) each of the Debtor's Cash Management Banks; (v) the United States Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the Office of the United States Attorney General for the Middle District of Pennsylvania; (viii) those asbestos plaintiff firms asserting the 20 highest number of asbestos-related claims against the Debtor; and (ix) and those parties requesting notice pursuant to Bankruptcy Rule 2002 in accordance with Local Rule 2002-1(b) (collectively, the "Notice Parties").  Notice hereof and any order entered hereon will be served in accordance with Local Rule 9013-1(c).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## NO PRIOR REQUEST

43.     No previous motion for the relief sought herein has been made to this or any other Court.

#1614518 v4
110230-73303

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order attached hereto as Exhibit A: (i) authorizing the Debtor to obtain postpetition financing and use of cash collateral on a senior secured and superpriority basis, pursuant to the terms and conditions of the Interim Order, DIP Credit Agreement attached hereto as Exhibit B and the terms of the PCard Agreement attached hereto as Exhibit C; (ii) schedule the Final Hearing, and (iii) granting related relief.

Dated: March 31, 2011   **GIBBONS P.C.**

By: */s/ Mark B. Conlan*
   Mark B. Conlan, Esq. (PA No. 86559)
   Karen A. Giannelli, Esq.
   Frank J. Vecchione, Esq.
   One Gateway Center
   Newark, NJ 07102-5310
   Tel.  973-596-4500
   Fax.  973-596-0545
   E-mail: mconlan@gibbonslaw.com
      kgiannelli@gibbonslaw.com
      fvecchione@gibbonslaw.com

   *Proposed Attorneys for the Debtor and*
   *Debtor-in-Possession*

#1614518 v4
110230-73303