# E<span style="font-variant: small-caps;">XHIBIT</span> B

**DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

**PNC BANK, NATIONAL ASSOCIATION**

**(AS LENDER AND AS AGENT)**

**WITH**

**UNITED GILSONITE LABORATORIES**

and

**EACH OTHER PERSON THAT MAY BE JOINED AS A BORROWER HERETO**

**(as BORROWERS)**

**March __, 2011**

074658.01343/22000590v.9

# TABLE OF CONTENTS

I.     DEFINITIONS AND ACKNOWLEDGMENT.................................................1
      1.1.   Accounting Terms .................................................................................1
      1.2.   General Terms .......................................................................................2
      1.3.   Uniform Commercial Code Terms.......................................................25
      1.4.   Certain Matters of Construction .........................................................25

II.    ADVANCES, PAYMENTS..................................................................26
      2.1.   Revolving Advances. .........................................................................26
      2.2.   Procedure for Revolving Advances Borrowing. .................................27
      2.3.   Disbursement of Advance Proceeds ...................................................29
      2.4.   Reserved. ............................................................................................29
      2.5.   Maximum Advances ...........................................................................30
      2.6.   Repayment of Advances......................................................................30
      2.7.   Repayment of Excess Advances .........................................................30
      2.8.   Statement of Account .........................................................................30
      2.9.   Letters of Credit .................................................................................31
      2.10.  Issuance of Letters of Credit..............................................................31
      2.11.  Requirements For Issuance of Letters of Credit..................................31
      2.12.  Disbursements, Reimbursement..........................................................32
      2.13.  Repayment of Participation Advances. ...............................................33
      2.14.  Documentation ...................................................................................34
      2.15.  Determination to Honor Drawing Request...........................................34
      2.16.  Nature of Participation and Reimbursement Obligations ....................34
      2.17.  Indemnity ...........................................................................................35
      2.18.  Liability for Acts and Omissions .......................................................36
      2.19.  Additional Payments ..........................................................................37
      2.20.  Manner of Borrowing and Payment. ...................................................37
      2.21.  Mandatory Prepayments.....................................................................39
      2.22.  Use of Proceeds..................................................................................39
      2.23.  Defaulting Lender. .............................................................................40

III.   INTEREST AND FEES. ....................................................................40
      3.1.   Interest ................................................................................................41
      3.2.   Letter of Credit Fees...........................................................................41
      3.3.   Commitment Fee, Facility Fee and Termination Fee...........................42
      3.4.   Collateral Evaluation Fee, Collateral Monitoring Fee and Appraisals. ..........42
      3.5.   Computation of Interest and Fees........................................................43
      3.6.   Maximum Charges ..............................................................................43
      3.7.   Increased Costs...................................................................................43
      3.8.   Basis For Determining Interest Rate Inadequate or Unfair.................44
      3.9.   Capital Adequacy. ..............................................................................44
      3.10.  Gross Up for Taxes ............................................................................45
      3.11.  Withholding Tax Exemption................................................................45

IV.    COLLATERAL:  GENERAL TERMS ................................................46

074658.01343/22000590v.9

| | | |
|---|---|---|
| 4.1. | Security Interest in the Collateral | 46 |
| 4.2. | Perfection of Security Interest | 47 |
| 4.3. | Disposition of Collateral | 47 |
| 4.4. | Preservation of Collateral | 47 |
| 4.5. | Ownership of Collateral. | 48 |
| 4.6. | Defense of Agent's and Lenders' Interests | 48 |
| 4.7. | Books and Records | 49 |
| 4.8. | Financial Disclosure | 49 |
| 4.9. | Compliance with Laws | 49 |
| 4.10. | Inspection of Premises | 49 |
| 4.11. | Insurance | 50 |
| 4.12. | Failure to Pay Insurance | 51 |
| 4.13. | Payment of Taxes | 51 |
| 4.14. | Payment of Leasehold Obligations | 51 |
| 4.15. | Receivables. | 52 |
| 4.16. | Inventory | 54 |
| 4.17. | Maintenance of Equipment | 54 |
| 4.18. | Exculpation of Liability | 54 |
| 4.19. | Environmental Matters. | 54 |
| 4.20. | Financing Statements | 56 |
| V. | SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC. | 57 |
| 5.1. | Superpriority Claims and Collateral Security | 57 |
| 5.2. | No Filings Required | 57 |
| 5.3. | Grants, Rights and Remedies | 57 |
| 5.4. | No Discharge; Survival of Claims | 57 |
| 5.5. | Survival | 58 |
| 5.6. | Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances | 58 |
| 5.7. | Exclusive Remedy For Any Alleged Post-Petition Claim | 59 |
| 5.8. | Prohibition on Surcharge; Etc | 59 |
| 5.9. | Marshalling Obligations | 60 |
| 5.10. | Bankruptcy Notices | 60 |
| VI. | REPRESENTATIONS AND WARRANTIES. | 60 |
| 6.1. | Authority | 60 |
| 6.2. | Formation and Qualification. | 60 |
| 6.3. | Survival of Representations and Warranties | 61 |
| 6.4. | Tax Returns | 61 |
| 6.5. | Financial Statements. | 61 |
| 6.6. | Entity Names | 61 |
| 6.7. | O.S.H.A. and Environmental Compliance. | 62 |
| 6.8. | No Litigation, Violation, Indebtedness or Default. | 62 |
| 6.9. | Patents, Trademarks, Copyrights and Licenses | 63 |
| 6.10. | Licenses and Permits | 64 |
| 6.11. | Default of Indebtedness | 64 |
| 6.12. | No Default | 64 |

074658.01343/22000590v.9

| | | |
|---|---|---|
| 6.13. | No Burdensome Restrictions | 64 |
| 6.14. | No Labor Disputes | 64 |
| 6.15. | Margin Regulations | 64 |
| 6.16. | Investment Company Act | 65 |
| 6.17. | Disclosure | 65 |
| 6.18. | Swaps | 65 |
| 6.19. | Conflicting Agreements | 65 |
| 6.20. | Application of Certain Laws and Regulations | 65 |
| 6.21. | Business and Property of Borrowers | 65 |
| 6.22. | Section 20 Subsidiaries | 65 |
| 6.23. | Anti-Terrorism Laws. | 65 |
| 6.24. | Trading with the Enemy | 66 |
| 6.25. | Federal Securities Laws | 66 |
| 6.26. | Equity Interests | 66 |
| 6.27. | Bankruptcy Matters. | 67 |
| VII. | AFFIRMATIVE COVENANTS. | 67 |
| 7.1. | Payment of Fees | 67 |
| 7.2. | Conduct of Business and Maintenance of Existence and Assets | 67 |
| 7.3. | Violations | 68 |
| 7.4. | Government Receivables | 68 |
| 7.5. | Fixed Charge Coverage Ratio | 68 |
| 7.6. | Execution of Supplemental Instruments | 68 |
| 7.7. | Payment of Indebtedness | 68 |
| 7.8. | Standards of Financial Statements | 69 |
| 7.9. | Federal Securities Laws | 69 |
| 7.10. | Bankruptcy Schedules. | 69 |
| VIII. | NEGATIVE COVENANTS. | 69 |
| 8.1. | Merger, Consolidation, Acquisition and Sale of Assets | 69 |
| 8.2. | Creation of Liens | 69 |
| 8.3. | Guaranties | 69 |
| 8.4. | Investments | 70 |
| 8.5. | Loans | 70 |
| 8.6. | Capital Expenditures | 70 |
| 8.7. | Dividends / Distributions | 70 |
| 8.8. | Indebtedness | 70 |
| 8.9. | Nature of Business | 70 |
| 8.10. | Transactions with Affiliates | 70 |
| 8.11. | Leases | 70 |
| 8.12. | Subsidiaries. | 70 |
| 8.13. | Fiscal Year and Accounting Changes | 71 |
| 8.14. | Pledge of Credit | 71 |
| 8.15. | Amendment of Articles of Incorporation, By-Laws, Certificate of Formation or Operating Agreement | 71 |
| 8.16. | Compliance with ERISA | 71 |
| 8.17. | Prepayment of Indebtedness | 71 |

074658.01343/22000590v.9

| | | |
|---|---|---|
| 8.18. | Anti-Terrorism Laws | 71 |
| 8.19. | Trading with the Enemy Act | 72 |
| 8.20. | Bankruptcy Matters. | 72 |
| **IX.** | **CONDITIONS PRECEDENT** | **72** |
| 9.1. | Conditions to Initial Advances | 72 |
| 9.2. | Conditions to Each Advance | 76 |
| **X.** | **INFORMATION AS TO BORROWERS** | **77** |
| 10.1. | Disclosure of Material Matters | 77 |
| 10.2. | Schedules | 77 |
| 10.3. | Environmental Reports | 77 |
| 10.4. | Litigation | 77 |
| 10.5. | Material Occurrences | 78 |
| 10.6. | Government Receivables | 78 |
| 10.7. | Annual Financial Statements | 78 |
| 10.8. | Quarterly Financial Statements | 78 |
| 10.9. | Monthly Financial Statements | 79 |
| 10.10. | Other Reports | 79 |
| 10.11. | Additional Information | 79 |
| 10.12. | Budget | 79 |
| 10.13. | Variances From Operating Budget | **Error! Bookmark not defined.** |
| 10.14. | Notice of Suits, Adverse Events | 80 |
| 10.15. | ERISA Notices and Requests | 80 |
| 10.16. | Other Bankruptcy Documents | 80 |
| 10.17. | Additional Documents | 81 |
| **XI.** | **EVENTS OF DEFAULT** | **81** |
| 11.1. | Nonpayment | 81 |
| 11.2. | Breach of Representation | 81 |
| 11.3. | Financial Information | 81 |
| 11.4. | Judicial Actions | 81 |
| 11.5. | Noncompliance | 81 |
| 11.6. | Judgments | 81 |
| 11.7. | Purchase Card Agreement Default | 82 |
| 11.8. | Material Adverse Effect. The occurrence of any Material Adverse Effect; | 82 |
| 11.9. | Lien Priority | 82 |
| 11.10. | Cross Default | 82 |
| 11.11. | Change of Ownership | 82 |
| 11.12. | Invalidity | 82 |
| 11.13. | Licenses | 82 |
| 11.14. | Seizures | 82 |
| 11.15. | Pension Plans | 83 |
| 11.16. | Bankruptcy Defaults and Events of Default. | 83 |
| **XII.** | **LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.** | **84** |
| 12.1. | Rights and Remedies. | 84 |

iv

| | | |
|---|---|---|
| 12.2. | Agent's Discretion | 86 |
| 12.3. | Setoff | 86 |
| 12.4. | Rights and Remedies not Exclusive | 86 |
| 12.5. | Allocation of Payments After Event of Default | 86 |
| **XIII.** | **WAIVERS AND JUDICIAL PROCEEDINGS.** | **87** |
| 13.1. | Waiver of Notice | 87 |
| 13.2. | Delay | 87 |
| 13.3. | Jury Waiver | 88 |
| **XIV.** | **EFFECTIVE DATE AND TERMINATION.** | **88** |
| 14.1. | Term | 88 |
| 14.2. | Termination | 88 |
| **XV.** | **REGARDING AGENT.** | **88** |
| 15.1. | Appointment | 88 |
| 15.2. | Nature of Duties | 89 |
| 15.3. | Lack of Reliance on Agent and Resignation | 89 |
| 15.4. | Certain Rights of Agent | 90 |
| 15.5. | Reliance | 90 |
| 15.6. | Notice of Default | 90 |
| 15.7. | Indemnification | 91 |
| 15.8. | Agent in its Individual Capacity | 91 |
| 15.9. | Delivery of Documents | 91 |
| 15.10. | Borrowers' Undertaking to Agent | 91 |
| 15.11. | No Reliance on Agent's Customer Identification Program | 91 |
| 15.12. | Other Agreements | 92 |
| **XVI.** | **BORROWING AGENCY.** | **92** |
| 16.1. | Borrowing Agency Provisions. | 92 |
| 16.2. | Waiver of Subrogation | 92 |
| **XVII.** | **MISCELLANEOUS.** | **93** |
| 17.1. | Governing Law. | 93 |
| 17.2. | Entire Understanding. | 94 |
| 17.3. | Successors and Assigns; Participations; New Lenders. | 96 |
| 17.4. | Application of Payments | 98 |
| 17.5. | Indemnity | 98 |
| 17.6. | Notice | 99 |
| 17.7. | Survival | 101 |
| 17.8. | Severability | 101 |
| 17.9. | Expenses | 101 |
| 17.10. | Injunctive Relief | 101 |
| 17.11. | Consequential Damages | 101 |
| 17.12. | Captions | 101 |
| 17.13. | Counterparts; Facsimile Signatures | 102 |
| 17.14. | Construction | 102 |

074658.01343/22000590v.9

17.15. Confidentiality; Sharing Information .......................................................... 102

17.16. Publicity ................................................................................................... 102

17.17. Certifications From Banks and Participants; USA PATRIOT Act .............................. 102

074658.01343/22000590v.9

Case 5:11-bk-02032-RNO    Doc 57-2    Filed 04/01/11    Entered 04/01/11 11:09:27    Desc
Exhibit B    Page 8 of 113

# LIST OF EXHIBITS AND SCHEDULES

Exhibits

| | |
|---|---|
| Exhibit 1.2 | Borrowing Base Certificate |
| Exhibit 2.1(a) | Revolving Credit Note |
| Exhibit 6.5(a) | Financial Projections |
| Exhibit 7.1(k) | Financial Condition Certificate |
| Exhibit 17.3 | Commitment Transfer Supplement |

Schedules

| | |
|---|---|
| Schedule 1.2(a) | Permitted Encumbrances |
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.15(h) | Deposit and Investment Accounts |
| Schedule 4.19 | Real Property |
| Schedule 6.1 | Consents |
| Schedule 6.2(a) | States of Qualification and Good Standing |
| Schedule 6.2(b) | Subsidiaries |
| Schedule 6.4 | Federal Tax Identification Number |
| Schedule 6.6 | Prior Names |
| Schedule 6.7(c) | Environmental Releases |
| Schedule 6.8(b) | Litigation |
| Schedule 6.8(d) | Plans |
| Schedule 6.9 | Intellectual Property, Source Code Escrow Agreements |
| Schedule 6.10 | Licenses and Permits |
| Schedule 6.14 | Labor Disputes |
| Schedule 6.26 | Capitalization Chart |
| Schedule 8.3 | Guarantees |

074658.01343/22000590v.9

# DEBTOR-IN POSSESSION FINANCING AGREEMENT

Pursuant to Section 364(c) and (d) of the Bankruptcy Code, this DEBTOR-IN-POSSESSION FINANCING AGREEMENT ("Agreement") is made as of March __, 2011 among **UNITED GILSONITE LABORATORIES,** a Pennsylvania corporation ("UGL") and **EACH OTHER PERSON THAT MAY BE JOINED AS A BORROWER HERETO** (collectively, the "Borrowers" and each a "Borrower"), the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and each individually a "Lender") and **PNC BANK, NATIONAL ASSOCIATION** ("PNC"), as agent for Lenders (PNC, in such capacity, the "Agent").

## RECITALS

A**.**     UGL filed a voluntary petition for relief on March 23, 2011 (the "Petition Date") under Chapter 11 of the Bankruptcy Code (as defined below), which petition was identified as Bankruptcy Case No. 11-02032 (RNO) (the "Case") before the Bankruptcy Court (as defined below).  UGL remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

B.     UGL has requested that during the Case, Agent and Lenders make loans, advances and extensions of credit in an amount up to $8,200,000 on a senior secured, superpriority basis, pursuant to Section 364(c) and (d) of the Bankruptcy Code.

C.     Agent and Lenders are willing to provide loans and advances to UGL on a senior secured, superpriority basis, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, on the terms and subject to the conditions of this Agreement, so long as such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Borrowers, whether now owned or hereafter acquired, which liens are superior to all other liens; and (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code as provided in the Interim Order.

IN CONSIDERATION of the foregoing Recitals, which are incorporated into the operative provisions of this Agreement by this reference, the mutual covenants and undertakings herein contained, Borrowers (acting for themselves and as debtors-in-possession in the Case), Lenders and Agent hereby agree as follows:

I.     DEFINITIONS AND ACKNOWLEDGMENT.

1.1.     <u>Accounting Terms</u>.  As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP; provided, however, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited financial statements of Borrowers for the fiscal year ended December 31, 2009.

1.2.  <u>General Terms</u>.  For purposes of this Agreement the following terms shall have the following meanings:

"<u>Accountants</u>" shall have the meaning set forth in Section 10.7 hereof.

"<u>Advance Rates</u>" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"<u>Advances</u>" shall mean and include the Revolving Advances and Letters of Credit.

"<u>Affiliate</u>" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"<u>Agent</u>" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"<u>Agreement</u>" shall mean this Debtor-in-Possession Financing Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Alternate Base Rate</u>" shall mean, for any day, a rate per annum equal to the higher of (i) the Base Rate in effect on such day, (ii) the sum of the Federal Funds Open Rate in effect on such day plus one half of one-percent (1/2 of 1%), and (iii) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.0%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

"<u>Alternate Source</u>"  shall have the meaning set forth in the definition of "Eurodollar Rate".

"<u>Anti-Terrorism Laws</u>" shall mean any Applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA PATRIOT Act, the Applicable Laws comprising or implementing the Bank Secrecy Act, and the Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Applicable Laws may from time to time be amended, renewed, extended, or replaced).

"<u>Applicable Law</u>" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"<u>Authority</u>" shall have the meaning set forth in Section 4.19(d) hereof.

074658.01343/22000590v.9

"<u>Avoidance Actions</u>" means all actions of Borrowers or their estates under Chapter 5 or Section 724(a) of the Bankruptcy Code and all proceeds thereof.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Middle District of Pennsylvania, or such other court having jurisdiction over the Case.

"<u>Base Rate</u>" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"<u>Benefited Lender</u>" shall have the meaning set forth in Section 2.20(d) hereof.

"<u>Blocked Accounts</u>" shall have the meaning set forth in Section 4.15(h) hereof.

"<u>Blocked Account Bank</u>" shall have the meaning set forth in Section 4.15(h) hereof.

"<u>Blocked Person</u>" shall have the meaning set forth in Section 6.24(b) hereof.

"<u>Borrower</u>" or "<u>Borrowers</u>" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"<u>Borrowers on a Consolidated Basis</u>" shall mean the consolidation in accordance with GAAP of the accounts or other items of the Borrowers and their respective Subsidiaries.

"<u>Borrowers' Account</u>" shall have the meaning set forth in Section 2.8 hereof.

"<u>Borrowing Agent</u>" shall mean UGL.

"<u>Borrowing Base Certificate</u>" shall mean a certificate in substantially the form of Exhibit 1.2 duly executed by the President, Vice President, Chief Financial Officer or Controller of the Borrowing Agent and delivered to the Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"<u>Borrowing Base Reserves</u>" means, as of any date of determination, such amounts (expressed as either a specified amount or as a percentage of a specified category or item) as the Agent may from time to time reasonably establish and adjust upon at least five (5) days prior notice to Borrowers (a) to reflect events, conditions, contingencies or risks arising after the Closing Date which, as reasonably determined by the Agent in good faith, do or may affect (i) the Receivables or Inventory or its respective value, (ii) the assets, business or prospects of the Borrowers, or (iii) the security interests and other rights of the Agent in the Collateral (including

3

the enforceability, perfection and priority thereof), or (b) to reflect the Agent's good faith judgment that any collateral report or financial information furnished by or on behalf of a Borrower to the Agent is or may have been incomplete, inaccurate or misleading in any material respect, or (c) in respect of any state of facts that the Lender determines constitutes an Event of Default.

"Budget" shall mean a budget prepared by Borrowers in good faith based upon assumptions which the Borrowers believe to be reasonable and delivered to Agent on or before the Closing Date and attached hereto as Exhibit A, setting forth Borrowers' cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability for the period commencing March 25, 2011 through and including June 24, 2011 (the "Initial Period"), and at the end of the Initial Period and at the end of each month thereafter, shall mean a budget prepared by Borrowers in good faith based upon assumptions which the Borrowers believe to be reasonable setting forth Borrowers' cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability for the immediately succeeding three (3) month period.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in East Brunswick, New Jersey and, if the applicable Business Day relates to any Eurodollar Rate Loans, such day must also be a day on which dealings are carried on in the London interbank market.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations, which, in accordance with GAAP, would be classified as capital expenditures.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" shall have the meaning given to the term "Carve-Out" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Carve-Out Cap" shall have the meaning given to the term "Carve-Out" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Case" shall have the meaning set forth in the Recitals to this Agreement.

"Cash Management Order" shall have the meaning set forth in Section 9.1(g) hereof

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Control" shall mean (a) the occurrence of any event (whether in one or more transactions) which results in a transfer of control of any Borrower to a Person who is not an

Original Owner or (b) any merger or consolidation of or with any Borrower or sale of all or substantially all of the property or assets of any Borrower. For purposes of this definition, "control of Borrower" shall mean the power, direct or indirect (x) to vote 35% or more of the Equity Interests having ordinary voting power for the election of directors (or the individuals performing similar functions) of any Borrower or (y) to direct or cause the direction of the management and policies of any Borrower by contract or otherwise.

"Change of Ownership" shall mean (a) 100% of the Equity Interests of any Borrower is no longer owned or controlled by (including for the purposes of the calculation of percentage ownership, any Equity Interests into which any Equity Interests of any Borrower held by any of the Original Owners are convertible or for which any such Equity Interests of any Borrower or of any other Person may be exchanged and any Equity Interests issuable to such Original Owners upon exercise of any warrants, options or similar rights which may at the time of calculation be held by such Original Owners) a Person who is an Original Owner, or (b) any merger, consolidation or sale of substantially all of the property or assets of any Borrower or Holdings.

"Changed Circumstances" shall have the meaning set forth in Section 5.6 hereof.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean March __, 2011 or such other date as may be agreed to by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean and include:

      (a)      all Receivables;

      (b)      all Equipment;

      (c)      all General Intangibles;

      (d)      all Inventory;

      (e)      all Investment Property;

      (f)      all Avoidance Actions;

5

(g)     all Real Property;

(h)     all of each Borrower's right, title and interest in and to, whether now owned or hereafter acquired and wherever located; (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the Obligations; (v) all of each Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by any Borrower, all real and personal property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(i)     all property and assets described in the Interim Order and the Final Order;

(j)     all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g), (h) or (i) of this paragraph; and

(k)     all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h), (i) and (j) in whatever form, including, but not limited to:  cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"Commitment Percentage" of any Lender shall mean the percentage set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by a Lender pursuant to Section 17.3(c) or (d) hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 17.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances under this Agreement.

6

"Committee Expenses" shall have the meaning given to the term "Committee Expenses" in the Final Order, or, prior to the entry of the Final Order, the Interim Order, less the amount of any retainers, if any, then held by such persons.

"Compliance Certificate" shall mean a compliance certificate to be signed by the Vice President, Chief Financial Officer or Controller of Borrowing Agent, which shall state that, based on an examination sufficient to permit such officer to make an informed statement, no Default or Event of Default exists, or if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such default and, such certificate shall have appended thereto calculations which set forth Borrowers' compliance with the requirements or restrictions imposed by Sections 7.5, 8.4, 8.5, 8.6, 8.7, 8.8 and 8.11 hereof.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement and the Other Documents, including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of any Borrower that is in the possession of another Person on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Contract Rate" shall have the meaning set forth in Section 3.1 hereof.

"Controlled Group" shall mean, at any time, each Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Creditors Committee" means the official unsecured creditors' committee appointed in the Case.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.11(b) hereof.

"Daily LIBOR Rate" shall mean, for any day, the rate per annum determined by the Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the percentage prescribed by the Federal Reserve for determining the maximum reserve requirements with respect to any Eurocurrency funding by banks on such day.

074658.01343/22000590v.9

"Damage Lawsuit" shall have the meaning set forth in Section 5.7 hereof.

"Debt Payments" shall mean and include (a) all cash actually expended by any Borrower to make interest payments on any Advances under this Agreement, plus (b) accrued but unpaid interest on account of Eurodollar Rate Loans under this Agreement, plus (c) scheduled principal payments on any term loans payable to Agent and Lender, plus (d) all cash actually expended by any Borrower to make payments for all fees, commissions and charges set forth herein and with respect to any Advances under this Agreement, plus (e) all cash actually expended by any Borrower to make payments on Capitalized Lease Obligations, plus (f) all cash actually expended by any Borrower to make payments with respect to any other Indebtedness for borrowed money plus the out of pocket costs and expenses to be paid by Borrowers at or prior to the Closing Date to the Agent for the ratable benefit of the Lenders hereunder (excluding the sum of the fees payable under Section 3.3(a) hereof).

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall have the meaning set forth in Section 2.23(a) hereof.

"Depository Accounts" shall have the meaning set forth in Section 4.15(h) hereof.

"Documents" shall have the meaning set forth in Section 9.1(c) hereof.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Drawing Date" shall have the meaning set forth in Section 2.12(b) hereof.

"Earnings Before Interest and Taxes" shall mean for any period the sum of (i) net income (or loss) of Borrowers on a Consolidated Basis for such period (excluding extraordinary gains and losses), plus (ii) all interest expense of Borrowers on a Consolidated Basis for such period, plus (iii) all charges against income of Borrowers on a Consolidated Basis for such period for federal, state and local taxes.

"EBITDA" shall mean for any period the sum of (i) Earnings Before Interest and Taxes for such period, plus (ii) depreciation expenses for such period, plus (iii) amortization expenses for such period.

"Eligible Inventory" shall mean and include finished goods and raw material Inventory, but excluding work-in-process Inventory, with respect to each Borrower, valued at the lower of cost or market value, determined on a first-in-first-out basis, which is not, in Agent's opinion, obsolete, slow moving or unmerchantable and which Agent, in its reasonable discretion, shall not deem ineligible Inventory, based on such considerations as Agent may in its reasonable discretion from time to time deem appropriate including whether the Inventory is subject to a

perfected, first priority security interest in favor of Agent and no other Lien (other than a Permitted Encumbrance). Eligible Inventory shall include all Inventory in-transit between locations owned or leased by the Borrowers and inventory classified as exchanges, which is insured to the full value thereof and for which Agent shall have in its possession (a) all negotiable bills of lading properly endorsed and (b) all non-negotiable bills of lading issued in Agent's name. In addition, Inventory shall not be Eligible Inventory if it: (i) does not conform to all standards imposed by any Governmental Body which has regulatory authority over such goods or the use or sale thereof; (ii) except as set forth above, is in transit; (iii) is located outside the continental United States; (iv) constitutes Consigned Inventory; (v) is the subject of an Intellectual Property Claim; (vi) is subject to a License Agreement or other agreement that limits, conditions or restricts any Borrower's or Agent's right to sell or otherwise dispose of such Inventory, unless Agent is a party to a Licensor/Agent Agreement with the Licensor under such License Agreement; or (vii) or is situated at a location not owned by a Borrower unless the owner or occupier of such location has executed in favor of Agent a Lien Waiver Agreement.

"Eligible Receivables" shall mean and include with respect to each Borrower, each Receivable of such Borrower arising in the Ordinary Course of Business and which Agent, in its sole credit judgment, shall deem to be an Eligible Receivable, based on the criteria set forth below and such other considerations as Agent may from time to time deem appropriate in its reasonable discretion and after providing Borrowers with not less than five (5) days prior notice of any new criteria. A Receivable shall not be deemed eligible unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by an invoice or other documentary evidence satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

(a)    it arises out of a sale made by any Borrower to an Affiliate of any Borrower or to a Person controlled by an Affiliate of any Borrower;

(b)    it is due or unpaid more than ninety (90) days after the original invoice date;

(c)    fifty percent (50%) or more of the Receivables from such Customer are not deemed Eligible Receivables hereunder. Such percentage may, in Agent's reasonable discretion, be increased or decreased from time to time upon at least five (5) days prior written notice to Borrowers;

(d)    any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

(e)    the Customer shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed

9

Case 5:11-bk-02032-RNO    Doc 57-2    Filed 04/01/11    Entered 04/01/11 11:09:27    Desc
Exhibit B    Page 18 of 113

against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)     the sale is to a Customer outside the continental United States of America, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its sole discretion;

(g)     the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(h)     after consultation with Borrowers, Agent in good faith reasonably determines that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay;

(i)     the Customer is the United States of America, any state or any department, agency or instrumentality of any of them, unless the applicable Borrower assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances;

(j)     the goods giving rise to such Receivable have not been delivered to and accepted by the Customer or the services giving rise to such Receivable have not been performed by the applicable Borrower and accepted by the Customer or the Receivable otherwise does not represent a final sale;

(k)     the Receivables of the Customer exceed a credit limit determined by Agent, in its reasonable discretion, after consultation with Borrowing Agent and notice to Borrowing Agent of such credit limit, to the extent such Receivable exceeds such limit;

(l)     the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim (to the extent of such offset, deduction, defense or counterclaim), the Customer is also a creditor or supplier of a Borrower (to the extent of monies owed by Borrowers to such customer) or the Receivable is contingent in any respect or for any reason;

(m)     the applicable Borrower has made any agreement with any Customer for any deduction therefrom, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(n)     any return, rejection or repossession of the merchandise has occurred or the rendition of services has been disputed;

(o)     such Receivable is not payable to a Borrower; or

(p)     such Receivable is not otherwise reasonably satisfactory to Agent.

"Environmental Complaint" shall have the meaning set forth in Section 4.19(d) hereof.

10

074658.01343/22000590v.9

"Environmental Laws" shall mean all federal, state and local environmental laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's tangible personal property (other than Inventory) whether now owned or hereafter acquired and wherever located including: all equipment; machinery; manufacturing; distribution; selling; data processing and office equipment; assembly systems, tools; molds; dies; fixtures; appliances; apparatus; motor vehicles; fittings; furniture; furnishings; fixtures; parts; accessories; and any and all accessions, parts, appurtenances attached to any of the foregoing or used in connection therewith; and any replacements, products, proceeds, and substitutions therefor or accessions thereto.

"Equity Interests" of any Person shall mean any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"Eurodollar Rate" shall mean for any Eurodollar Rate Loan for the then current Interest Period relating thereto, the interest rate per annum determined by Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (i) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which US dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Agent which has been approved by the British Bankers' Association as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (an "Alternate Source"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such Eurodollar Rate Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any Alternate Source, a comparable replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error)), by (ii) a number equal 1.00 minus the Reserve Percentage. The Eurodollar Rate may also be expressed by the following formula:

Average of London interbank offered rates quoted by Bloomberg or appropriate Successor as shown on

Eurodollar Rate =          Bloomberg Page BBAM1

074658.01343/22000590v.9

The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date. The Agent shall give prompt notice to the Borrowing Agent of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

"Eurodollar Rate Loan" shall mean an Advance at any time that bears interest based on the Eurodollar Rate.

"Event of Default" shall have the meaning set forth in Article XI hereof.

"Exchange Act" shall have the mean the Securities Exchange Act of 1934, as amended.

"Executive Order No. 13224" shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" shall mean the rate per annum determined by the Agent in accordance with its usual procedures (which determination shall be conclusive absent manifest error) to be the "open" rate for federal funds transactions as of the opening of business for federal funds transactions among members of the Federal Reserve System arranged by federal funds brokers on such day, as quoted by Garvin Guybutler Corporation, any successor entity thereto, or any other broker selected by the Agent, as set forth on the applicable Telerate display page; provided, however; that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day, or if no such rate shall be quoted by a Federal funds broker at such time, such other rate as determined by the Agent in accordance with its usual procedures.

"Final Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to Agent. The Final Order shall, among other things, have:

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Loan Amount provided for herein;

(b)     granted the claim and Lien status and Liens described in Section 5.1, and prohibited the granting of additional Liens on the assets of Borrowers except for any Liens specifically provided for in such order;

(c)     provided that such Liens are automatically perfected as of the Petition Date by the entry of the Final Order and also granted to the Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law;

(d)     provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out; and

(e)     provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 12.1.

"Fixed Charge Coverage Ratio" shall mean and include, with respect to any fiscal period, the ratio of (a) EBITDA, plus [bankruptcy related expenses TBD], minus twenty percent (20%) of all Capital Expenditures made during such period, minus distributions (including tax distributions) and dividends made during such period, minus cash taxes paid during such period to (b) all Debt Payments made during such period.

"Foreign Subsidiary" of any Person, shall mean any Subsidiary of such Person that is not organized or incorporated in the United States or any State or territory thereof.

"Formula Amount" shall have the meaning set forth in Section 2.1(a) hereof.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired, including all present and future: (i) general intangibles; (ii) rights, interests, payment intangibles, choses in action, causes of action, claims and other intangible property of every kind and nature (other than Receivables); (iii) corporate and other business records; (iv) loans, royalties, and other obligations receivable; (v) trademarks, registered trademarks, trademark applications, service marks, registered service marks, service mark applications, patents, registered patents, patent applications, trade names, rights of use of any name, labels, fictitious names, inventions, designs, design rights, trade secrets, computer programs, software, printouts, computer information, source codes, codes, records and updates, registrations, and other computer materials, equipment formulations, manufacturing procedures, quality control procedures, goodwill, copyrights, copyright applications, permits, licenses, franchises, customer lists, credit files, correspondence, and

074658.01343/22000590v.9

advertising materials; (vi) customer and supplier contracts, firm sale orders, rights under license and franchise agreements, rights under tax sharing agreements, rights under non-compete agreements, and other contracts and contract rights; (vii) interests in partnerships and joint ventures; (viii) tax refunds and tax refund claims; (ix) right, title and other agreements relating to property; (x) deposit accounts (general or special with any bank or other financial institution; (xi) credits with and other claims against third parties (including carriers and shippers); (xii) rights to indemnification and with respect to support and keep-well agreements; (xiii) reversionary interests in pension and profit sharing plans and reversionary, beneficial and residual interest in trusts; (xiv) letters of credit, guarantees, Liens, security interests and other security held by or granted to such Person; (xvi) uncertificated securities; (xvii) investment property; (xviii) all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables) all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"<u>Governmental Acts</u>" shall have the meaning set forth in Section 2.17 hereof.

"<u>Governmental Body</u>" shall mean any nation or government, any federal, state, local or other political subdivision thereof and any entity, authority, agency, division or department exercising the executive, legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"<u>Guarantor</u>" shall mean any Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"<u>Guarantor Security Agreement</u>" shall mean any Security Agreement executed by any Guarantor in favor of Agent securing the Guaranty of such Guarantor.

"<u>Guaranty</u>" shall mean any guaranty of the obligations of Borrowers executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders.

"<u>Hazardous Discharge</u>" shall have the meaning set forth in Section 4.19(d) hereof.

"<u>Hazardous Substance</u>" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"<u>Hazardous Wastes</u>" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"<u>Hedge Liabilities</u>" shall have the meaning provided in the definition of "Lender-Provided Interest Rate Hedge".

14

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise) and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Ineligible Professional Expenses" shall mean fees or expenses incurred by any Person, including the Creditors' Committee, in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief preventing, hindering or delaying the Agent's or the Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any in accordance with the terms and conditions of the Interim Order or Final Order, (b) a request to use the cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of the Agent, (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the Agent or the Lenders without the prior written consent of the Agent, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the Agent, any Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the Agent or any Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of the Agent or any Lender, or which is contrary, in a manner that is material and adverse to the Agent or any Lender, to any term or condition set forth in or acknowledged by this Agreement, the Other Documents or the Interim Order and which results in the occurrence of an Event of Default under this Agreement, the Interim Order or the Final Order.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Initial Period" shall have the meaning set forth in the definition of "Budget" herein.

"Intellectual Property" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"Intellectual Property Claim" shall mean the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that any Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other

074658.01343/22000590v.9

property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Interest Period" shall mean the period provided for any Eurodollar Rate Loan pursuant to Section 2.2(b) hereof.

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, interest rate future or option, currency swap, currency future, forward, or option, adjustable strike cap, adjustable strike corridor or similar agreements entered into by any Borrower or its Subsidiaries in order to provide protection to, or minimize the impact upon, such Borrower, any Guarantor and/or their respective Subsidiaries of fluctuation in interests rates or increasing floating rates of interest applicable to Indebtedness, and/or foreign exchange rates or conversion rates for conversion of foreign currencies to Dollars.

"Interim Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents, for an interim period, under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance satisfactory to Agent. The Interim Order shall, among other things, have:

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Loan Amount provided for herein;

(b)     granted the claim and Lien status and Liens described in Section 5.1, and prohibited the granting of additional Liens on the assets of Borrowers except for any Liens specifically provided for in such order;

(c)     provided that such Liens are automatically perfected as of the Petition Date by the entry of the Interim Order and also granted to the Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law; and

(e)     provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 12.1.

"Inventory" shall mean and include as to each Borrower all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

074658.01343/22000590v.9

"<u>Investment Property</u>" shall mean and include as to each Borrower, all of such Borrower's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"<u>Issuer</u>" shall mean any Person who issues a Letter of Credit and/or accepts a draft pursuant to the terms hereof.

"<u>Lender</u>" and "<u>Lenders</u>" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.

"<u>Lender-Provided Interest Rate Hedge</u>" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which the Agent confirms meets the following requirements: such Interest Rate Hedge (i) is documented in a standard International Swap Dealer Association Agreement, (ii) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner, and (iii) is entered into for hedging (rather than speculative) purposes. The liabilities of any Borrower to the provider of any Lender-Provided Interest Rate Hedge (the "Hedge Liabilities") shall be "Obligations" hereunder, guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement and otherwise treated as Obligations for purposes of each of the Other Documents. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents.

"<u>Letter of Credit Fees</u>" shall have the meaning set forth in Section 3.2 hereof.

"<u>Letter of Credit Borrowing</u>" shall have the meaning set forth in Section 2.12(d) hereof.

"<u>Letter of Credit Sublimit</u>" shall mean $3,000,000.

"<u>Letters of Credit</u>" shall have the meaning set forth in Section 2.9 hereof.

"<u>License Agreement</u>" shall mean any agreement between any Borrower and a Licensor pursuant to which such Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of such Borrower or otherwise in connection with such Borrower's business operations.

"<u>Licensor</u>" shall mean any Person from whom any Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Borrower's manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with such Borrower's business operations.

"<u>Licensor/Agent Agreement</u>" shall mean an agreement between Agent and a Licensor, in form and content satisfactory to Agent, by which Agent is given the unqualified right, vis-a-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of any Borrower's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of such Borrower's default under any License Agreement with such Licensor.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Waiver Agreement" shall mean an agreement which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall authorize Agent from time to time to enter upon the premises to inspect or remove the Collateral from such premises or to use such premises to store or dispose of such Inventory.

"Material Adverse Effect" shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets, business, properties or prospects of the Borrowers and Guarantor on a consolidated basis, (b) any Borrower's ability to duly and punctually pay or perform the Obligations in accordance with the terms thereof, (c) Agent's Liens on the Collateral or the priority of any such Lien, or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents.

"Maximum Face Amount" shall mean, with respect to any outstanding Letter of Credit, the face amount of such Letter of Credit including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Maximum Loan Amount" shall mean $8,200,000.

"Maximum Revolving Advance Amount" shall mean $8,000,000.

"Maximum Undrawn Amount" shall mean with respect to any outstanding Letter of Credit, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Modified Commitment Transfer Supplement" shall have the meaning set forth in Section 17.3(d).

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Note" shall mean the Revolving Credit Note.

074658.01343/22000590v.9

"Notice of Borrowing" shall have the meaning set forth in Section 9.2(d) hereof.

"Obligations" shall mean and include any and all loans (including without limitation, all Advances and all obligations under the Purchase Card Agreement), advances, debts, liabilities, obligations, covenants and duties owing by any Borrower to Lenders or Agent or to any other direct or indirect subsidiary or affiliate of Agent or any Lender of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, (including without limitation this Agreement and the Other Documents or the Interim Order or Final Order, whether or not for the payment of money, whether arising by reason of an extension of credit, opening or amendment of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Agent's or any Lenders non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, any and all of any Borrower's Indebtedness and/or liabilities under this Agreement, the Other Documents or under any other agreement between Agent or Lenders and any Borrower and any amendments, extensions, renewals or increases and all costs and expenses of Agent and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of any Borrower to Agent or Lenders to perform acts or refrain from taking any action.

"Ordinary Course of Business" shall mean with respect to any Borrower, the ordinary course of such Borrower's business as conducted on the Closing Date.

"Original Owners" shall mean Susan Y. Kindelan Trust, Richard P. Yates, Patricia Payne Atkins, Karen MacKinnon Legan, Douglas MacKinnon, Timothy Atkins, Carter Atkins, M C M UGL Share Trust f/b/o Elizabeth H. Legan, M C M UGL Share Trust f/b/o Caroline R. Legan, M C M UGL Share Trust f/b/o Katherine M. Legan, M C M UGL Share Trust f/b/o Grace E. Legan, M C M UGL Share Trust f/b/o Lauren R. MacKinnon, M C M UGL Trust f/b/o Emily B. MacKinnon, M C M UGL Share Trust f/b/o Matthew C. MacKinnon, and M C M UGL Share Trust f/b/o Rebecca C. MacKinnon.

"Other Documents" shall mean the Note, the Interim Order, the Final Order, the Guaranty, any Guarantor Security Agreement, any Lender-Provided Interest Rate Hedge and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by any Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement.

"Out-of-Formula Loans" shall have the meaning set forth in Section 17.2(b).

074658.01343/22000590v.9

"<u>Parent</u>" of any Person shall mean a corporation or other entity owning, directly or indirectly at least 50% of the shares of stock or other ownership interests having ordinary voting power to elect a majority of the directors of the Person, or other Persons performing similar functions for any such Person.

"<u>Participant</u>" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender as set forth in Section 17.3(b) hereof.

"<u>Participation Advance</u>" shall have the meaning set forth in Section 2.12(d) hereof.

"<u>Participation Commitment</u>" shall mean each Lender's obligation to buy a participation of the Letters of Credit issued hereunder.

"<u>Payment Office</u>" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"<u>Pension Benefit Plan</u>" shall mean at any time any employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained by any member of the Controlled Group for employees of any member of the Controlled Group; or (ii) has at any time within the preceding five years been maintained by any entity which was at such time a member of the Controlled Group for employees of any entity which was at such time a member of the Controlled Group.

"<u>Permitted Encumbrances</u>" shall mean: (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrowers; provided, that, the Lien shall have no effect on the priority of the Liens in favor of Agent or the value of the assets in which Agent has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) Liens disclosed in the financial statements referred to in Section 5.5, the existence of which Agent has consented to in writing; (d) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (e) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (f) Liens placed upon fixed assets hereafter acquired to secure a portion of the purchase price thereof, provided that (x) any such lien shall not encumber any other property of any Borrower and (y) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; and (g) carriers', warehousemen's, mechanics', materialmen's, suppliers' repairmen's, landlord's or other similar Liens arising in the Ordinary Course of Business for amounts which are not overdue or that are being contested in good faith by appropriate

074658.01343/22000590v.9

proceedings (in any event, so long as no foreclosure proceedings have been commenced with respect thereto or if commenced, such proceedings are stayed during the pendency of such contest); provided, that adequate reserves with respect to such obligations contested in good faith are maintained on the books of the applicable Borrower, to the extent required by GAAP; (h) easements, covenants, rights-of-way, restrictions, subdivisions, parcelizations, encroachments and other similar encumbrances and other minor defects and irregularities in title affecting any Real Property that, in the aggregate, are not substantial in amount and do not materially detract from the value of any such Real Property; (i) Liens of sellers of goods to any Borrower arising under Article 2 of the Uniform Commercial Code or similar provisions of applicable law in the Ordinary Course of Business, which shall be junior to the liens of the Agent on such goods and which shall cover only the goods sold and securing only the unpaid purchase price for such goods and related expenses; and (j) Liens disclosed on Schedule 1.2(a).

"Person" shall mean any natural person, individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" has the meaning set forth in the Recitals.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan), maintained for employees of any Borrower or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Professional Fees" shall have the meaning given to the term "Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order, less the amount of any retainers, if any, then held by such persons.

"Properly Contested" shall mean, in the case of any Indebtedness or Lien, as applicable, of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness or Lien, as applicable, is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment,

21

writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Projections" shall have the meaning set forth in Section 6.5(a) hereof.

"Published Rate" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the Eurodollar rate for a one month period as published in another publication selected by the Agent).

"Purchase Card Agreement" shall mean that certain Visa Purchasing Card Agreement entered into effective as of June 12, 2007 by and between PNC and UGL or any similar agreement entered into by and among Borrowers and PNC as the same may be amended, supplemented or restated from time to time.

"Purchasing CLO" shall have the meaning set forth in Section 17.3(d) hereof.

"Purchasing Lender" shall have the meaning set forth in Section 17.3(c) hereof.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to the owned and leased premises identified on Schedule 4.19 hereto.

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's present and future: (i) accounts; (ii) contract rights, chattel paper (including electronic chattel paper), instruments (including those evidencing indebtedness owed to such Borrower by its Affiliates), documents, general intangibles relating to accounts, drafts and acceptances, credit card receivables, deposit accounts, and other rights to payment of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, and whether or not earned by performance; (iii) any of the foregoing which are not evidenced by instruments or chattel paper; (iv) inter-company receivables, and any security documents executed in connection therewith; (v) proceeds of any letters of credit or insurance policies on which such Borrower is named as beneficiary; (vi) claims against third parties for advances and other financial accommodations and any other obligations whatsoever owing to such Borrower; (vii) rights in and to all security agreements, leases, guarantees, instruments, securities, documents of title and other contracts securing, evidencing, supporting or otherwise relating to any of the foregoing, together with all rights in any goods, merchandise or Inventory which any of the foregoing may represent: (viii) rights in returned and repossessed goods, merchandise and Inventory which any of the same may represent, including, without limitation, any right of stoppage in transit; and (ix) and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured,

now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(i) hereof.

"Register" shall have the meaning set forth in Section 17.3(e) hereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.12(b)hereof.

"Release" shall have the meaning set forth in Section 6.7(c)(i) hereof.

"Reorganization Plan" means a plan or plans of reorganization in the Case.

"Reportable Event" shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder.

"Required Lenders" shall mean Lenders holding at least sixty-six and two thirds percent (66.6667%) of the Advances and, if no Advances are outstanding, shall mean Lenders holding sixty-six and two thirds percent (66.6667%) of the Commitment Percentages; provided, however, if there are fewer than three (3) Lenders, Required Lenders shall mean all Lenders.

"Reserve Percentage" shall mean as of any day the maximum percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities".

"Revolving Advances" shall mean Advances made other than Letters of Credit.

"Revolving Credit Note" shall mean, collectively, the promissory notes referred to in Section 2.1(a) hereof.

"Revolving Interest Rate" shall mean an interest rate per annum equal to (a) the sum of the Alternate Base Rate plus one and one-half of one percent (1.50%) with respect to Domestic Rate Loans and (b) the sum of the Eurodollar Rate plus three percent (3.00%) with respect to Eurodollar Rate Loans.

"Schedules" shall mean all schedules and statement of financial affairs required to be filed with the Bankruptcy Court under the Federal Rules of Bankruptcy Procedure with respect to the Borrowers and the other debtors in the Case.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Section 20 Subsidiary" shall mean the Subsidiary of the bank holding company controlling PNC, which Subsidiary has been granted authority by the Federal Reserve Board to underwrite and deal in certain Ineligible Securities.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Settlement Date" shall mean the Closing Date and thereafter Wednesday or Thursday of each week or more frequently if Agent deems appropriate unless such day is not a Business Day in which case it shall be the next succeeding Business Day.

"Standby Letters of Credit" shall mean letters of credit constituted with all the documents complying with the Uniform Customs and Practice for International Standby Practices as most recently published by the International Chamber of Commerce at the time the letter of credit is issued.

"Statutory Fees" shall have the meaning given to the term "Statutory Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Subsidiary" of any Person shall mean a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person, one or more of the other Subsidiaries of such Person or any combination thereof.

"Superpriority Claim" means an allowed claim against any Borrower or such Borrower's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"Term" shall have the meaning set forth in Section 14.1 hereof.

"Termination Date" means the earliest to occur of: (a) the date that is two (2) years after the Petition Date; (b) the effective date or substantial consummation of a Reorganization Plan that has been confirmed by an order of the Bankruptcy Court; (c) the closing of a sale of all or substantially all of the Borrowers' or any Borrower's assets or business pursuant to Section 363 of the Bankruptcy Code; (d) the date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (e) the date of the dismissal of the Case; (f) such earlier date on which all Obligations shall become due and payable, in whole, in accordance with the terms of this Agreement (including by acceleration by Agent); and (g) the date that is twenty one (21) days after the entry of the Interim Order if the Final Order has not been entered.

"Termination Event" shall mean: (i) a Reportable Event with respect to any Plan or Multiemployer Plan; (ii) the withdrawal of any Borrower or any member of the Controlled Group from a Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (v) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA;

24

074658.01343/22000590v.9

or (vi) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of any Borrower or any member of the Controlled Group from a Multiemployer Plan.

"<u>Toxic Substance</u>" shall mean and include any material present on the Real Property or the Leasehold Interests which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"<u>Trading with the Enemy Act</u>" shall mean the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"<u>Transactions</u>" shall mean the transactions contemplated by this Agreement.

"<u>Transferee</u>" shall have the meaning set forth in Section 17.3(d) hereof.

"<u>Uniform Commercial Code</u>" shall have the meaning set forth in Section 1.3 hereof.

"<u>USA PATRIOT Act</u>" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"<u>Week</u>" shall mean the time period commencing with the opening of business on a Wednesday and ending on the end of business the following Tuesday.

1.3.     <u>Uniform Commercial Code Terms</u>.  All terms used herein and defined in the Uniform Commercial Code as adopted in the State of Pennsylvania from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein.  Without limiting the foregoing, the terms "accounts", "chattel paper", "instruments", "general intangibles", "payment intangibles", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4.     <u>Certain Matters of Construction</u>.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents,

074658.01343/22000590v.9

shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof. All references herein to the time of day shall mean the time in Philadelphia, Pennsylvania. Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first-in, first-out basis. Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation". A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders. Wherever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

## II.   ADVANCES, PAYMENTS.

### 2.1.   <u>Revolving Advances</u>.

(a)   <u>Amount of Revolving Advances</u>. Subject to the terms and conditions set forth in this Agreement including Section 2.1(b), each Lender, severally and not jointly, will make Revolving Advances to Borrowers in aggregate amounts outstanding at any time equal to such Lender's Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount <u>less</u> the aggregate Maximum Undrawn Amount or (y) an amount equal to the sum of:

(i)   up to 85%, subject to the provisions of Section 2.1(b) hereof ("Receivables Advance Rate"), of Eligible Receivables, <u>plus</u>

(ii)   subject to the provision of Section 2.1(b) hereof, up to the lesser of (A) 50% of the value of Eligible Inventory (but not to exceed 85% of the appraised net recovery

074658.01343/22000590v.9

value of such Inventory based on appraisal prepared by an appraiser acceptable to Agent and in form and substance acceptable to Agent) ("Inventory Advance Rate") or (B) $4,500,000, <u>minus</u>

        (iii)      the aggregate Maximum Undrawn Amount, <u>minus</u>

        (iv)      the Carve-Out Cap; <u>minus</u>

        (v)      any applicable Borrowing Base Reserves.

The amount derived from the sum of (x) Sections 2.1(a)(y)(i) and (ii) <u>minus</u> (y) Sections 2.1(a)(y)(iii), (iv) and (v) at any time and from time to time shall be referred to as the "Formula Amount". The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a).

        (b)      <u>Discretionary Rights</u>. Based on a material change in the composition, or performance, of the collateral base as determined by Agent from the results of field examinations and/or other collateral evaluations performed after the Closing Date, the Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its reasonable discretion after reasonable prior notice to Borrowers. Each Borrower consents to any such increases or decreases and acknowledges that decreasing the Advance Rates or increasing or imposing reserves may limit or restrict Advances requested by Borrowing Agent. The rights of Agent under this subsection are subject to the provisions of Section 17.2(b).

        2.2.      <u>Procedure for Revolving Advances Borrowing</u>.

        (a)      Borrowing Agent on behalf of any Borrower may notify Agent prior to 12:00 p.m. on a Business Day of a Borrower's request to incur, on that day, a Revolving Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation, become due, same shall be deemed a request for a Revolving Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent or Lenders, and such request shall be irrevocable.

        (b)      Notwithstanding the provisions of subsection (a) above, in the event any Borrower desires to obtain a Eurodollar Rate Loan, Borrowing Agent shall, give Agent written notice by no later than 1:00 p.m. on the day which is three (3) Business Days prior to the date such Eurodollar Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount on the date of such Advance to be borrowed, which amount shall be in a minimum amount of $500,000 and in integral multiples of $100,000 thereafter, and (iii) the duration of the first Interest Period therefor. Interest Periods for Eurodollar Rate Loans shall be for one, two or three months; provided, if an Interest Period would end on a day that is not a Business Day, it shall end on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day. No Eurodollar Rate Loan shall be made available to any Borrower during the continuance of a Default or an Event of Default. After giving effect to each requested Eurodollar Rate Loan, including those

074658.01343/22000590v.9

which are converted from a Domestic Rate Loan under Section 2.2(d), there shall not be outstanding more than three (3) Eurodollar Rate Loans, in the aggregate.

(c)     Each Interest Period of a Eurodollar Rate Loan shall commence on the date such Eurodollar Rate Loan is made and shall end on such date as Borrowing Agent may elect as set forth in subsection (b)(iii) above provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore Dollar deposits and no Interest Period shall end after the last day of the Term.

Borrowing Agent shall elect the initial Interest Period applicable to a Eurodollar Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.2(b) or by its notice of conversion given to Agent pursuant to Section 2.2(d), as the case may be.  Borrowing Agent shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 11:00 a.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Agent does not receive timely notice of the Interest Period elected by Borrowing Agent, Borrowing Agent shall be deemed to have elected to convert to a Domestic Rate Loan subject to Section 2.2(d) herein below.

(d)     Provided that no Event of Default shall have occurred and be continuing, Borrowing Agent may, on the last Business Day of the then current Interest Period applicable to any outstanding Eurodollar Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such loan into a loan of another type in the same aggregate principal amount provided that any conversion of a Eurodollar Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Eurodollar Rate Loan.  If Borrowing Agent desires to convert a loan, Borrowing Agent shall give Agent written notice by no later than 11:00 a.m. (i) on the day which is three (3) Business Days' prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a Eurodollar Rate Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur with respect to a conversion from a Eurodollar Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the loans to be converted and if the conversion is from a Domestic Rate Loan to any other type of loan, the duration of the first Interest Period therefor.

(e)     At its option and upon written notice given prior to 11:00 a.m. (New York time) at least three (3) Business Days' prior to the date of such prepayment, any Borrower may prepay the Eurodollar Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being prepaid to the date of such repayment.  Such Borrower shall specify the date of prepayment of Advances which are Eurodollar Rate Loans and the amount of such prepayment.  In the event that any prepayment of a Eurodollar Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto, such Borrower shall indemnify Agent and Lenders therefor in accordance with Section 2.2(f) hereof.

(f)     Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any

Borrower in the payment of the principal of or interest on any Eurodollar Rate Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Eurodollar Rate Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Eurodollar Rate Loans hereunder. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrowing Agent and including a reasonably detailed calculation of such additional amounts due shall be conclusive absent manifest error.

(g) Notwithstanding any other provision hereof, if any Applicable Law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (g), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Eurodollar Rate Loans) to make or maintain its Eurodollar Rate Loans, the obligation of Lenders to make Eurodollar Rate Loans hereunder shall forthwith be cancelled and Borrowers shall, if any affected Eurodollar Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected Eurodollar Rate Loans or convert such affected Eurodollar Rate Loans into loans of another type. If any such payment or conversion of any Eurodollar Rate Loan is made on a day that is not the last day of the Interest Period applicable to such Eurodollar Rate Loan, Borrowers shall pay Agent, upon Agent's request, such amount or amounts as may be necessary to compensate Lenders for any loss or expense sustained or incurred by Lenders in respect of such Eurodollar Rate Loan as a result of such payment or conversion, including (but not limited to) any interest or other amounts payable by Lenders to lenders of funds obtained by Lenders in order to make or maintain such Eurodollar Rate Loan. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Lenders to Borrowing Agent and including a reasonably detailed calculation of such additional amounts due shall be conclusive absent manifest error.

2.3. <u>Disbursement of Advance Proceeds</u>. All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books. During the Term, Borrowers may use the Revolving Advances by borrowing, prepaying and re-borrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Advance requested by Borrowing Agent on behalf of any Borrower or deemed to have been requested by any Borrower under Section 2.2(a) hereof shall, with respect to requested Revolving Advances to the extent Lenders make such Revolving Advances, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, with respect to Revolving Advances deemed to have been requested by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4. <u>Reserved</u>.

074658.01343/22000590v.9

2.5.    <u>Maximum Advances</u>.  The aggregate balance of Revolving Advances outstanding at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount <u>less</u> the Maximum Undrawn Amount, or (b) the Formula Amount.

2.6.    <u>Repayment of Advances</u>.

(a)    The Advances shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided.

(b)    Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received.  In consideration of Agent's agreement to conditionally credit Borrowers' Account as of the next Business Day following Agent's receipt of those items of payment, each Borrower agrees that, in computing the charges under this Agreement, all items of payment shall be deemed applied by Agent on account of the Obligations one (1) Business Day after (i) the Business Day following Agent's receipt of such payments via wire transfer or electronic depository check or (ii) in the case of payments received by Agent in any other form, the Business Day such payment constitutes good funds in Agent's account.  Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned to Agent unpaid.

(c)    All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 1:00 P.M. (New York time) on the due date therefor in lawful money of the United States of America in federal funds or other funds immediately available to Agent.  Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging Borrowers' Account or by making Advances as provided in Section 2.2 hereof.

(d)    Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

2.7.    <u>Repayment of Excess Advances</u>.  The aggregate balance of Advances outstanding at any time in excess of the maximum amount of Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred.

2.8.    <u>Statement of Account</u>.  Agent shall maintain, in accordance with its customary procedures, a loan account ("Borrowers' Account") in the name of Borrowers in which shall be recorded the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender.  Each month, Agent shall send to Borrowing Agent a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Agent and Borrowers during such month.  The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between

30

Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within thirty (30) days after such statement is received by Borrowing Agent. The records of Agent with respect to the loan account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.9. <u>Letters of Credit</u>. Subject to the terms and conditions hereof, Agent shall issue or cause the issuance of Standby Letters of Credit ("Letters of Credit") for the account of any Borrower; provided, however, that Agent will not be required to issue or cause to be issued any Letters of Credit to the extent that the issuance thereof would then cause the sum of (i) the outstanding Revolving Advances <u>plus</u> (ii) the Maximum Undrawn Amount Letters of Credit to exceed the lesser of (x) the Maximum Revolving Advance Amount or (y) the Formula Amount. The Maximum Undrawn Amount shall not exceed in the aggregate at any time the Letter of Credit Sublimit. All disbursements or payments related to Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the applicable Contract Rate; Letters of Credit that have not been drawn upon shall not bear interest.

2.10. <u>Issuance of Letters of Credit</u>.

(a) Borrowing Agent, on behalf of Borrowers, may request Agent to issue or cause the issuance of a Letter of Credit by delivering to Agent at the Payment Office, prior to 10:00 a.m. (New York time), at least five (5) Business Days' prior to the proposed date of issuance, Agent's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent; and, such other certificates, documents and other papers and information as Agent may reasonably request. Borrowing Agent, on behalf of Borrowers, also has the right to give instructions and make agreements with respect to any application, any applicable letter of credit and security agreement, any applicable letter of credit reimbursement agreement and/or any other applicable agreement, any letter of credit and the disposition of documents, disposition of any unutilized funds, and to agree with Agent upon any amendment, extension or renewal of any Letter of Credit.

(b) Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, other written demands for payment, or acceptances of issuance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the last day of the Term. Each Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time the Letter of Credit is issued ("UCP") or the International Standby Practices (ISP98-International Chamber of Commerce Publication Number 590) ("ISP98 Rules"), as determined by Agent, and each trade Letter of Credit shall be subject to the UCP.

(c) Agent shall use its reasonable efforts to notify Lenders of the request by Borrowing Agent for a Letter of Credit hereunder.

2.11. <u>Requirements For Issuance of Letters of Credit</u>.

(a)     Borrowing Agent shall authorize and direct any Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit. If Agent is not the Issuer of any Letter of Credit, Borrowing Agent shall authorize and direct the Issuer to deliver to Agent all instruments, documents, and other writings and property received by the Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor or any acceptance therefor.

(b)     In connection with all Letters of Credit issued or caused to be issued by Agent under this Agreement, each Borrower hereby appoints Agent, or its designee, as its attorney, with full power and authority if an Event of Default shall have occurred: (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances; (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the United States of America Customs Department ("Customs") in the name of such Borrower or Agent or Agent's designee, and to sign and deliver to Customs officials powers of attorney in the name of Borrower for such purpose; and (iv) to complete in such Borrower's name or Agent's, or in the name of Agent's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Agent nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law, except for Agent's or its attorney's willful misconduct. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

2.12.   <u>Disbursements, Reimbursement</u>.

(a)     Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Agent a participation in such Letter of Credit and each drawing thereunder in an amount equal to such Lender's Commitment Percentage of the Maximum Face Amount of such Letter of Credit and the amount of such drawing, respectively.

(b)     In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, Agent will promptly notify Borrowing Agent. Provided that Borrowing Agent shall have received such notice, the Borrowers shall reimburse (such obligation to reimburse Agent shall sometimes be referred to as a "Reimbursement Obligation") Agent prior to 12:00 Noon, New York time on each date that an amount is paid by Agent under any Letter of Credit (each such date, a "Drawing Date") in an amount equal to the amount so paid by Agent. In the event Borrowers fail to reimburse Agent for the full amount of any drawing under any Letter of Credit by 12:00 Noon, New York time, on the Drawing Date, Agent will promptly notify each Lender thereof, and Borrowers shall be deemed to have requested that a Domestic Rate Loan be made by the Lenders to be disbursed on the Drawing Date under such Letter of Credit, subject to the amount of the unutilized portion of the lesser of the Maximum Revolving Advance Amount or the Formula Amount and subject to Section 9.2 hereof. Any notice given by Agent pursuant to this Section 2.12(b) may be oral if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)     Each Lender shall upon any notice pursuant to Section 2.12(b) make available to Agent an amount in immediately available funds equal to its Commitment Percentage of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.12(d)) each be deemed to have made a Domestic Rate Loan to Borrowers in that amount.  If any Lender so notified fails to make available to Agent the amount of such Lender's Commitment Percentage of such amount by no later than 2:00 p.m., New York time on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Rate during the first three days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Domestic Rate Loans on and after the fourth day following the Drawing Date.  Agent will promptly give notice of the occurrence of the Drawing Date, but failure of Agent to give any such notice on the Drawing Date or in sufficient time to enable any Lender to effect such payment on such date shall not relieve such Lender from its obligation under this Section 2.12(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.12(c) (i) and (ii) until and commencing from the date of receipt of notice from Agent of a drawing.

(d)     With respect to any unreimbursed drawing that is not converted into a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.12(b), because of Borrowers' failure to satisfy the conditions set forth in Section 9.2 (other than any notice requirements) or for any other reason, Borrowers shall be deemed to have incurred from Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Domestic Rate Loan.  Each Lender's payment to Agent pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Lender in satisfaction of its Participation Commitment under this Section 2.12.

(e)     Each Lender's Participation Commitment shall continue until the last to occur of any of the following events: (x) Agent ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled; and (z) all Persons (other than the Borrowers) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.13.   Repayment of Participation Advances.

(a)     Upon (and only upon) receipt by Agent for its account of immediately available funds from Borrowers (i) in reimbursement of any payment made by the Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by Agent under such a Letter of Credit, Agent will pay to each Lender, in the same funds as those received by Agent, the amount of such Lender's Commitment Percentage of such funds, except Agent shall retain the amount of the Commitment Percentage of such funds of any Lender that did not make a Participation Advance in respect of such payment by Agent.

(b)     If Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the

074658.01343/22000590v.9

payments made by Borrowers to Agent pursuant to Section 2.13(a) in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each Lender shall, on demand of Agent, forthwith return to Agent the amount of its Commitment Percentage of any amounts so returned by Agent plus interest at the Federal Funds Effective Rate.

2.14.   Documentation.  Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by Agent's interpretations of any Letter of Credit issued on behalf of such Borrower and by Agent's written regulations and customary practices relating to letters of credit, though Agent's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), Agent shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following the Borrowing Agent's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.15.   Determination to Honor Drawing Request.  In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, Agent shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

2.16.   Nature of Participation and Reimbursement Obligations.   Each Lender's obligation in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrowers to reimburse Agent upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.16 under all circumstances, including the following circumstances:

(i)      any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Agent, any Borrower or any other Person for any reason whatsoever;

(ii)     the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of the Lenders to make Participation Advances under Section 2.12;

(iii)    any lack of validity or enforceability of any Letter of Credit;

(iv)     any claim of breach of warranty that might be made by Borrower or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, crossclaim, defense or other right which any Borrower or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any

34

Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

(v)     the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provisions of services relating to a Letter of Credit, in each case even if Agent or any of Agent's Affiliates has been notified thereof;

(vi)     payment by Agent under any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of such Letter of Credit;

(vii)     the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)     any failure by the Agent or any of Agent's Affiliates to issue any Letter of Credit in the form requested by Borrowing Agent, unless the Agent has received written notice from Borrowing Agent of such failure within three (3) Business Days after the Agent shall have furnished Borrowing Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)     any Material Adverse Effect on any Borrower or any Guarantor;

(x)     any breach of this Agreement or any Other Document by any party thereto;

(xi)     the occurrence or continuance of an insolvency proceeding with respect to any Borrower or any Guarantor;

(xii)     the fact that a Default or Event of Default shall have occurred and be continuing;

(xiii)     the fact that the Term shall have expired or this Agreement or the Obligations hereunder shall have been terminated; and

(xiv)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.17.   <u>Indemnity</u>.   In addition to amounts payable as provided in Section 17.5, each Borrower hereby agrees to protect, indemnify, pay and save harmless Agent and any of Agent's

Affiliates that have issued a Letter of Credit from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Agent or any of Agent's Affiliates may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, other than as a result of (a) the gross negligence or willful misconduct of the Agent as determined by a final and non-appealable judgment of a court of competent jurisdiction or (b) the wrongful dishonor by the Agent or any of Agent's Affiliates of a proper demand for payment made under any Letter of Credit, except if such dishonor resulted from any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body (all such acts or omissions herein called "Governmental Acts").

2.18. <u>Liability for Acts and Omissions</u>. As between Borrowers and Agent and Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the respective foregoing, Agent shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Agent shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Agent, including any governmental acts, and none of the above shall affect or impair, or prevent the vesting of, any of Agent's rights or powers hereunder. Nothing in the preceding sentence shall relieve Agent from liability for Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence. In no event shall Agent or Agent's Affiliates be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

Without limiting the generality of the foregoing, Agent and each of its Affiliates: (i) may rely on any oral or other communication believed in good faith by Agent or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit; (ii) may honor any presentation if the documents presented appear on their face substantially to comply

074658.01343/22000590v.9

with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by Agent or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Agent or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Agent under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put Agent under any resulting liability to any Borrower or any Lender.

2.19.  <u>Additional Payments</u>.  Any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including any Borrower's obligations under Sections 4.2, 4.4, 4.12, 4.13, 4.14 and 7.1 hereof, may be charged to Borrowers' Account as a Revolving Advance and added to the Obligations.

2.20.  <u>Manner of Borrowing and Payment</u>.

(a)  Each borrowing of Revolving Advances shall be advanced according to the applicable Commitment Percentages of Lenders.

(b)  Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Revolving Advances, shall be applied to the Revolving Advances pro rata according to the applicable Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 1:00 P.M., New York time, in Dollars and in immediately available funds.

(c)  (i)  Notwithstanding anything to the contrary contained in Sections 2.20(a) and (b) hereof, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Advances shall be advanced by Agent and each payment by any Borrower on account of Revolving Advances shall be applied first to those Revolving Advances

074658.01343/22000590v.9

advanced by Agent. On or before 1:00 P.M., New York time, on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (I) if the aggregate amount of new Revolving Advances made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Advances during such preceding Week, then each Lender shall provide Agent with funds in an amount equal to its applicable Commitment Percentage of the difference between (w) such Revolving Advances and (x) such repayments and (II) if the aggregate amount of repayments applied to outstanding Revolving Advances during such Week exceeds the aggregate amount of new Revolving Advances made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Commitment Percentage of the difference between (y) such repayments and (z) such Revolving Advances.

     (ii)  Each Lender shall be entitled to earn interest at the applicable Contract Rate on outstanding Advances which it has funded.

     (iii)  Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances made during the Week immediately preceding such Settlement Date. Such certificate of Agent shall be conclusive in the absence of manifest error.

     (d)  If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

     (e)  Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowing Agent of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Federal Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, times (ii) such amount, times (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately

074658.01343/22000590v.9

available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be conclusive, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to such Revolving Advances hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.21. <u>Mandatory Prepayments</u>. Subject to Section 4.3 hereof, when any Borrower sells or otherwise disposes of any Collateral other than Inventory in the Ordinary Course of Business, Borrowers shall repay the Advances in an amount equal to the net proceeds of such sale (i.e., gross proceeds less the reasonable costs of such sales or other dispositions), such repayments to be made promptly but in no event more than one (1) Business Day following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Agent. The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Such repayments shall be applied to the Advances in such order as Agent may determine, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

2.22. <u>Use of Proceeds</u>.

(a) Borrowers shall apply the proceeds of Advances to (i) pay fees and expenses owed to Agent and Lenders, (ii) provide for its working capital, (iii) to reimburse drawings under Letters of Credit, (iv) to fund the Carve-Out, (v) to pay for Professional Fees, Statutory Fees and Committee Expenses allocated to the Borrowers during the Case in accordance with the Budget and (vi) fund certain Capital Expenditure needs in accordance with the Budget; provided that Borrowers shall not use the proceeds of Advances to fund more than (A) $1,000,000 of Capital Expenditures during the period commencing on the Closing Date through the date prior to the first anniversary of the Closing Date and (B) $2,000,000 of Capital Expenditures during the period commencing of the first anniversary of the Closing Date through the expiration of the Term; provided further that in the event Capital Expenditures during the first year following the Closing Date are less than the amount permitted for such year, then the unused amount may be carried over and used in the immediately succeeding one year period; and provided further that any Capital Expenditures made in connection with a rebuilding or restoration of damaged property from, and only to the extent of, insurance proceeds retained by Agent in Section 4.11 shall be excluded from the Capital Expenditures limitations set forth herein.

(b) Without limiting the generality of Section 2.22(a) above, neither the Borrowers, the Guarantors nor any other Person which may in the future become party to this Agreement or the Other Documents as a Borrower or Guarantor, intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of the Trading with the Enemy Act.

074658.01343/22000590v.9

2.23.  Defaulting Lender.

(a)     Notwithstanding anything to the contrary contained herein, in the event any Lender (x) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance or (y) notifies either Agent or Borrowing Agent that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement) (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.23 while such Lender Default remains in effect.

(b)     Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default.  Amounts received in respect of principal of any type of Advances shall be applied to reduce the applicable Advances of each Lender (other than any Defaulting Lender) pro rata based on the aggregate of the outstanding Advances of that type of all Lenders at the time of such application; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees).  Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent.  Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(c)     A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents.  All amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d)     Other than as expressly set forth in this Section 2.23, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.23 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)     In the event a Defaulting Lender retroactively cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

III.    INTEREST AND FEES.

074658.01343/22000590v.9

3.1.   <u>Interest</u>.  Interest on Advances shall be payable in arrears on the first day of each month with respect to Domestic Rate Loans and, with respect to Eurodollar Rate Loans, at the end of each Interest Period.  Interest charges shall be computed on the actual principal amount of Advances outstanding during the month at a rate per annum equal to the applicable Revolving Interest Rate (as applicable, the "Contract Rate").  Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the applicable Contract Rate shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.  The Eurodollar Rate shall be adjusted with respect to Eurodollar Rate Loans without notice or demand of any kind on the effective date of any change in the Reserve Percentage as of such effective date.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, in the reasonable discretion of Agent or at the direction of Required Lenders, the Obligations shall bear interest at the applicable Contract Rate plus two (2%) percent per annum (as applicable, the "Default Rate").

3.2.   <u>Letter of Credit Fees</u>.

(a)   Borrowers shall pay (x) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by three percent (3.00%) per annum, such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable quarterly in arrears on the first day of each quarter and on the last day of the Term, and (y) to the Issuer together with any and all administrative, issuance, amendment, payment and negotiation charges with respect to Letters of Credit and all fees and expenses as agreed upon by the Issuer and the Borrowing Agent in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder and shall reimburse Agent for any and all fees and expenses, if any, paid by Agent to the Issuer (all of the foregoing fees, the "Letter of Credit Fees").  All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction.  All Letter of Credit Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.

(b)   At any time following the occurrence of an Event of Default or upon the expiration of the Term, Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and seven percent (107%) of the Maximum Undrawn Amount of all outstanding Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time.  Agent will invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and such

41

074658.01343/22000590v.9

Borrower mutually agree and the net return on such investments shall be credited to such account and constitute additional cash collateral. No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following: (x) payment and performance in full of all Obligations; (y) expiration of all Letters of Credit; and (z) termination of this Agreement.

3.3. <u>Commitment Fee, Facility Fee and Termination Fee</u>.

(a) Upon the execution of this Agreement, Borrowers shall pay to Agent a closing fee, which fee is fully earned and payable upon entry of the Interim Order by the Bankruptcy Court, of $35,000.

(b) If, for any calendar month during the Term, the average daily unpaid balance of the Revolving Advances and undrawn amount of any outstanding Letters of Credit for each day of such calendar month does not equal the Maximum Revolving Advance Amount, then Borrowers shall pay to Agent for the ratable benefit of Lenders a fee at a rate equal to three-eighths of one percent (0.375%) per annum on the amount by which the Maximum Revolving Advance Amount exceeds such average daily unpaid balance. Such fee shall be payable to Agent in arrears on the first day of each calendar month with respect to the previous calendar month.

(c) In the event the Borrowers terminate this Agreement prior to the second anniversary of the Closing Date, Borrowers agree to pay to Agent for the benefit of Lenders, an early termination fee in an amount equal to one percent (1.00%) of the Maximum Revolving Advance Amount; provided however, such fee shall be waived by Agent in the event that Agent and Lenders refinance the Obligations hereunder upon such termination.

3.4. <u>Collateral Evaluation Fee, Collateral Monitoring Fee and Appraisals</u>.

(a) Borrowers shall pay Agent a collateral monitoring fee equal to $2,500 per month commencing on the first day of the month following the Closing Date and on the first day of each month thereafter during the Term. The collateral monitoring fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

(b) Borrowers shall pay to Agent on demand, after Agent performs any collateral evaluation - namely any field examination, collateral analysis or other business analysis, the need for which is to be determined by Agent and which evaluation is undertaken by Agent or for Agent's benefit - a collateral evaluation fee in an amount equal to $850 per day for each person employed to perform such evaluation, plus all costs and disbursements incurred by Agent in the performance of such examination or analysis.

(c) Agent may, in its sole discretion, exercised in a commercially reasonable manner, engage the services of an independent appraisal firm or firms of reputable standing, satisfactory to Agent, for the purpose of appraising the then current values of Borrowers' assets. Absent the occurrence and continuance of an Event of Default at such time, Agent shall consult with Borrowers as to the identity of any such firm. All of the fees and out-of-pocket costs and expense of any such firm (collectively, "appraisal amounts") shall be paid for when due, in full

074658.01343/22000590v.9

and without off-set, by Borrowers; provided however, so long as no Default or Event of Default has occurred under this Agreement, Borrowers shall not be liable for more than one such examination in any twelve (12) month period. In the event the value of Borrowers' Inventory, as so determined pursuant to such appraisal, is less than the value reflected for such Inventory on the most recent Borrowing Base Certificate, such that the Revolving Advances against Eligible Inventory, are in fact in excess of such Advances permitted hereunder, then, promptly upon Agent's demand for same, Borrowers shall make mandatory prepayments of the then outstanding Revolving Advances made against such Eligible Inventory so as to eliminate the excess Advances.

3.5. <u>Computation of Interest and Fees</u>. Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate during such extension.

3.6. <u>Maximum Charges</u>. In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.7. <u>Increased Costs</u>. In the event that any Applicable Law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans) with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a) subject Agent or any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to Agent or any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for changes in the rate of tax on the overall net income of Agent or any Lender by the jurisdiction in which it maintains its principal office);

(b) impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c) impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

074658.01343/22000590v.9

and the result of any of the foregoing is to increase the cost to Agent or any Lender of making, renewing or maintaining its Advances hereunder by an amount that Agent or such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that Agent or such Lender deems to be material, then, in any case Borrowers shall promptly pay Agent or such Lender, upon its demand, such additional amount as will compensate Agent or such Lender for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the Eurodollar Rate, as the case may be. Agent or such Lender shall certify the amount of such additional cost or reduced amount to Borrowing Agent including a reasonably detailed calculation of such additional cost or reduced amount, and such certification shall be conclusive absent manifest error.

3.8. <u>Basis For Determining Interest Rate Inadequate or Unfair</u>. In the event that Agent or any Lender shall have determined that:

(a) reasonable means do not exist for ascertaining the Eurodollar Rate applicable pursuant to Section 2.2 hereof for any Interest Period; or

(b) Dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank Eurodollar market, with respect to an outstanding Eurodollar Rate Loan, a proposed Eurodollar Rate Loan, or a proposed conversion of a Domestic Rate Loan into a Eurodollar Rate Loan,

then Agent shall give Borrowing Agent prompt written, telephonic or telegraphic notice of such determination. If such notice is given, (i) any such requested Eurodollar Rate Loan shall be made as a Domestic Rate Loan, unless Borrowing Agent shall notify Agent no later than 10:00 a.m. (New York City time) two (2) Business Days prior to the date of such proposed borrowing, that its request for such borrowing shall be cancelled or made as an unaffected type of Eurodollar Rate Loan, (ii) any Domestic Rate Loan or Eurodollar Rate Loan which was to have been converted to an affected type of Eurodollar Rate Loan shall be continued as or converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 10:00 a.m. (New York City time) two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of Eurodollar Rate Loan, and (iii) any outstanding affected Eurodollar Rate Loans shall be converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 10:00 a.m. (New York City time) two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected Eurodollar Rate Loan, shall be converted into an unaffected type of Eurodollar Rate Loan, on the last Business Day of the then current Interest Period for such affected Eurodollar Rate Loans. Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of Eurodollar Rate Loan or maintain outstanding affected Eurodollar Rate Loans and no Borrower shall have the right to convert a Domestic Rate Loan or an unaffected type of Eurodollar Rate Loan into an affected type of Eurodollar Rate Loan.

3.9. <u>Capital Adequacy</u>.

(a) In the event that Agent or any Lender shall have determined that any Applicable Law, rule, regulation or guideline regarding capital adequacy, or any change therein,

074658.01343/22000590v.9

or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender (for purposes of this Section 3.9, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent or any Lender's capital as a consequence of its obligations hereunder to a level below that which Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent or such Lender such additional amount or amounts as will compensate Agent or such Lender for such reduction. In determining such amount or amounts, Agent or such Lender may use any reasonable averaging or attribution methods. The protection of this Section 3.9 shall be available to Agent and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law, regulation or condition.

(b)     A certificate of Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent or such Lender with respect to Section 3.9(a) hereof and including a reasonably detailed calculation of such additional amounts due when delivered to Borrowing Agent shall be conclusive absent manifest error.

3.10.   Gross Up for Taxes. If any Borrower shall be required by Applicable Law to withhold or deduct any taxes from or in respect of any sum payable under this Agreement or any of the Other Documents to Agent, or any Lender, assignee of any Lender, or Participant (each, individually, a "Payee" and collectively, the "Payees"), (a) the sum payable to such Payee or Payees, as the case may be, shall be increased as may be necessary so that, after making all required withholding or deductions, the applicable Payee or Payees receives an amount equal to the sum it would have received had no such withholding or deductions been made (the "Gross-Up Payment"), (b) such Borrower shall make such withholding or deductions, and (c) such Borrower shall pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with Applicable Law. Notwithstanding the foregoing, no Borrower shall be obligated to make any portion of the Gross-Up Payment that is attributable to any withholding or deductions that would not have been paid or claimed had the applicable Payee or Payees properly claimed a complete exemption with respect thereto pursuant to Section 3.11 hereof.

3.11.   Withholding Tax Exemption.

(a)     Each Payee that is not incorporated under the Laws of the United States of America or a state thereof (and, upon the written request of Agent, each other Payee) agrees that it will deliver to Borrowing Agent and Agent two (2) duly completed appropriate valid Withholding Certificates (as defined under §1.1441-1(c)(16) of the Income Tax Regulations ("Regulations")) certifying its status (i.e., U.S. or foreign person) and making a claim of

45

exemption from U.S. withholding tax on the basis of an income tax treaty or an exemption provided by the Code. The term "Withholding Certificate" means a Form W-9; a Form W-8BEN; a Form W-8ECI; a Form W-8IMY and the related statements and certifications as required under §1.1441-1(e)(2) and/or (3) of the Regulations; a statement described in §1.871-14(c)(2)(v) of the Regulations; or any other certificates under the Code or Regulations that certify or establish the status of a payee or beneficial owner as a U.S. or foreign person.

(b)     Each Payee required to deliver to Borrowing Agent and Agent a valid Withholding Certificate pursuant to Section 3.11(a) hereof shall deliver such valid Withholding Certificate as follows: (i) each Payee which is a party hereto on the Closing Date shall deliver such valid Withholding Certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by any Borrower hereunder for the account of such Payee; (ii) each Payee shall deliver such valid Withholding Certificate at least five (5) Business Days before the effective date of such assignment or participation (unless Agent in its sole discretion shall permit such Payee to deliver such Withholding Certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by Agent). Each Payee which so delivers a valid Withholding Certificate further undertakes to deliver to Borrowing Agent and Agent two (2) additional copies of such Withholding Certificate (or a successor form) on or before the date that such Withholding Certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrowing Agent or Agent.

(c)     Notwithstanding the submission of a Withholding Certificate claiming a reduced rate of or exemption from U.S. withholding tax required under Section 3.11(b) hereof, Agent shall be entitled to withhold United States federal income taxes at the full 30% withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under §1.1441-7(b) of the Regulations. Further, Agent is indemnified under §1.1461-1(e) of the Regulations against any claims and demands of any Payee for the amount of any tax it deducts and withholds in accordance with regulations under §1441 of the Code.

IV.     COLLATERAL:  GENERAL TERMS

4.1.    <u>Security Interest in the Collateral</u>.     To secure the prompt payment and performance to Agent and each Lender of the Obligations, each Borrower hereby assigns, pledges and grants to Agent for its benefit and for the ratable benefit of each Lender a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter acquired or arising and located wheresoever. Each Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest. Each Borrower shall promptly provide Agent with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s). Upon delivery of each such notice, such Borrower shall be deemed to hereby grant to Agent a security interest and lien in and to such commercial tort claims and all proceeds thereof.

4.2.    Perfection of Security Interest.  Each Borrower shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to: (i) immediately discharging all Liens other than Permitted Encumbrances; (ii) obtaining Lien Waiver Agreements; (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral; (iv) entering into warehousing, lockbox and other custodial arrangements satisfactory to Agent; and (v) executing and delivering financing statements, control agreements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law; provided however, that so long as no Default or Event of Default has occurred or is continuing hereunder, Borrowers shall not be required to execute and deliver mortgages to Agent to evidence the Agent's Liens on the Real Property.  By its signature hereto, each Borrower hereby authorizes Agent to file against such Borrower, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to Agent.  All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

4.3.    Disposition of Collateral.  Each Borrower will safeguard and protect all Collateral for Agent's general account and make no disposition thereof whether by sale, lease or otherwise except (a) the sale of Inventory in the Ordinary Course of Business and (b) the disposition or transfer of obsolete and worn-out Equipment in the Ordinary Course of Business during the Term having an aggregate fair market value of not more than $25,000 and only to the extent that (i) the proceeds of any such disposition are used to acquire replacement Equipment which is subject to Agent's first priority security interest or (ii) the proceeds of which are remitted to Agent to be applied pursuant to Section 2.21.

4.4.    Preservation of Collateral.  Following the occurrence of a Default or Event of Default in addition to the rights and remedies set forth in Section 12.1 hereof, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrowers' owned or leased property.  Each Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may direct.  All of Agent's expenses of preserving the

074658.01343/22000590v.9

Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account as a Revolving Advance and added to the Obligations.

4.5.  Ownership of Collateral.

(a)  With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest:  (i) each Borrower shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a security interest in each and every item of its respective Collateral to Agent; and, except for Permitted Encumbrances the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by each Borrower or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of each Borrower that appear on such documents and agreements shall be genuine and each Borrower shall have full capacity to execute same; and (iv) each Borrower's Equipment and Inventory shall be located as set forth on Schedule 4.5 and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the Ordinary Course of Business and Equipment to the extent permitted in Section 4.3 hereof.

(b)  (i) There is no location at which any Borrower has any Inventory (except for Inventory in transit) other than those locations listed on Schedule 4.5; (ii) Schedule 4.5 hereto contains a correct and complete list, as of the Closing Date, of the legal names and addresses of each warehouse at which Inventory of any Borrower is stored; none of the receipts received by any Borrower from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) Schedule 4.5 hereto sets forth a correct and complete list as of the Closing Date of (A) each place of business of each Borrower and (B) the chief executive officer of each Borrower; and (iv) Schedule 4.5 hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by each Borrower, together with the names and addresses of any landlords.

4.6.  Defense of Agent's and Lenders' Interests.  Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's interests in the Collateral shall continue in full force and effect.  During such period no Borrower shall, without Agent's prior written consent, pledge, sell (except Inventory in the Ordinary Course of Business and Equipment to the extent permitted in Section 4.3 hereof), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the Collateral.  Each Borrower shall defend Agent's interests in the Collateral against any and all Persons whatsoever.  At any time following demand by Agent for payment of all Obligations, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials.  If Agent exercises this right to take possession of the Collateral, Borrowers shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent.  In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law.  Each Borrower shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory,

074658.01343/22000590v.9

documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee, and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7.    Books and Records.  Each Borrower shall: (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business.  All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrowers.

4.8.    Financial Disclosure.  Each Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent and each Lender upon request copies of any of such Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Borrower's financial status and business operations.  Each Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to such Borrower, whether made by such Borrower or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies.

4.9.    Compliance with Laws.  Each Borrower shall comply with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of such Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Each Borrower may, however, contest or dispute any Applicable Laws in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's Lien on or security interest in the Collateral.  The assets of Borrowers at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets of Borrowers so that such insurance shall remain in full force and effect.

4.10.    Inspection of Premises.  So long as no Default or Event of Default is continuing, during business hours after reasonable notice and at any time during the continuance of a Default or Event of Default, Agent shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Borrower's business.  So long as no Default or Event of Default is continuing, during business hours after reasonable notice and at any time during the continuance of a Default or Event of Default, Agent and its agents may enter

074658.01343/22000590v.9

upon any premises of any Borrower at any time during business hours and at any other reasonable time, and from time to time, for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Borrower's business.

4.11. <u>Insurance</u>. The assets and properties of each Borrower at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets and properties of such Borrower so that such insurance shall remain in full force and effect. Each Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At each Borrower's own cost and expense in amounts and with carriers acceptable to Agent, each Borrower shall: (a) keep all its insurable properties and properties in which such Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's including business interruption insurance; (b) maintain a bond or insurance policy in such amounts as is customary in the case of companies engaged in businesses similar to such Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Borrower is engaged in business; (e) furnish Agent with (i) copies of all insurance policies as soon as reasonably available and evidence of the maintenance of such policies within ten (10) Business Days of any expiration date of such policies, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured and loss payee as its interests may appear with respect to all insurance coverage referred to in clauses (a), and (c) above, and providing (A) that all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. In the event of any loss thereunder, the carriers named therein hereby are directed by Agent and the applicable Borrower to make payment for such loss to Agent and not to such Borrower and Agent jointly. If any insurance losses are paid by check, draft or other instrument payable to any Borrower and Agent jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent is hereby authorized to adjust and compromise claims under insurance coverage referred to in clauses (a), and (b) above. All loss recoveries received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine. Any surplus shall be paid by Agent to Borrowers or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Borrowers to Agent, on demand. Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, Agent shall remit to Borrowing Agent insurance proceeds received by Agent during any calendar year under insurance policies procured and maintained by Borrowers which insure Borrowers' insurable properties to the extent such insurance proceeds do not exceed $250,000 in the aggregate during such calendar year or $150,000 per occurrence. In the event the amount of insurance proceeds received by Agent for any occurrence exceeds $150,000, then Agent shall not be obligated to remit the

50

insurance proceeds to Borrowing agent unless Borrowing Agent shall provide Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss. In the event Borrowing Agent has previously received (or, after giving effect to any proposed remittance by Agent to Borrowing Agent would receive) insurance proceeds which equal or exceed $250,000 in the aggregate during any calendar year, then Agent may, in its reasonable discretion, either remit the insurance proceeds to Borrowing Agent upon Borrowing Agent providing Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss, or apply the proceeds to the Obligations, as aforesaid. The agreement of Agent to remit insurance proceeds in the manner above provided shall be subject in each instance to satisfaction of each of the following conditions: (x) No Event of Default or Default shall then have occurred, and (y) Borrowers shall use such insurance proceeds to repair, replace or restore the insurable property which was the subject of the insurable loss and for no other purpose.

4.12.  <u>Failure to Pay Insurance</u>.  If any Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Borrower, and charge Borrowers' Account therefor as a Revolving Advance of a Domestic Rate Loan and such expenses so paid shall be part of the Obligations.

4.13.  <u>Payment of Taxes</u>.  Each Borrower will pay, when due, all undisputed taxes, assessments and other Charges lawfully levied or assessed upon such Borrower or any of the Collateral including real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, Agent may without notice to Borrowers pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof. Agent will not pay any taxes, assessments or Charges to the extent that any applicable Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. The amount of any payment by Agent under this Section 4.13 shall be charged to Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations and, until Borrowers shall furnish Agent with an indemnity therefore (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold without interest any balance standing to Borrowers' credit and Agent shall retain its security interest in and Lien on any and all Collateral held by Agent.

4.14.  <u>Payment of Leasehold Obligations</u>.  Each Borrower shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's request will provide evidence of having done so.

51

4.15. <u>Receivables</u>.

        (a)    <u>Nature of Receivables</u>.  Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower as of the date each Receivable is created.  Same shall be due and owing in accordance with the applicable Borrower's standard terms of sale without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by Borrowers to Agent.

        (b)    <u>Solvency of Customers</u>.  Each Customer, to the best of each Borrower's knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due or with respect to such Customers of any Borrower who are not solvent such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

        (c)    <u>Location of Borrowers</u>.  Each Borrower's chief executive office is located at 1369 Jefferson Avenue, Scranton, Pennsylvania  18501.  Until written notice is given to Agent by Borrowing Agent of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

        (d)    <u>Collection of Receivables</u>.  Until any Borrower's authority to do so is terminated by Agent (which notice Agent may give at any time following the occurrence of an Event of Default or a Default or when Agent in its reasonable discretion believes that Collateral may be diverted), each Borrower will, at such Borrower's sole cost and expense, but on Agent's behalf and for Agent's account, collect as Agent's property and in trust for Agent all amounts received on Receivables, and shall not commingle such collections with any Borrower's funds or use the same except to pay Obligations.  Each Borrower shall deposit in the Blocked Account or, upon request by Agent, deliver to Agent, in original form and on the date of receipt thereof, all checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness.

        (e)    <u>Notification of Assignment of Receivables</u>.  At any time following the occurrence of an Event of Default or a Default or when Agent in its reasonable discretion believes that Collateral may be diverted, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral.  Thereafter, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both.  Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to Borrowers' Account and be added to the Obligations.

        (f)    <u>Power of Agent to Act on Borrowers' Behalf</u>.  Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and

074658.01343/22000590v.9

each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power (i) at any time (A) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (B) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (C) to send verifications of Receivables to any Customer; (D) to sign such Borrower's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; and (ii) at any time following the occurrence of a Default or Event of Default (A) to demand payment of the Receivables; (B) to enforce payment of the Receivables by legal proceedings or otherwise; (C) to exercise all of such Borrower's rights and remedies with respect to the collection of the Receivables and any other Collateral; (D) to settle, adjust, compromise, extend or renew the Receivables; (E) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (F) to prepare, file and sign such Borrower's name on a proof of claim in bankruptcy or similar document against any Customer; (G) to prepare, file and sign such Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; and (H) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time following the occurrence of an Event of Default or Default, to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Borrower.

(g)     No Liability.     Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever other than gross negligence, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom. Following the occurrence of an Event of Default or Default, Agent may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is authorized and empowered to accept following the occurrence of an Event of Default or Default the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

(h)     Establishment of a Lockbox Account, Dominion Account. All proceeds of Collateral shall (i) be deposited by Borrowers into either (a) a lockbox account, dominion account or such other "blocked account" ("Blocked Accounts") established at a bank or banks (each such bank, a "Blocked Account Bank") pursuant to an arrangement with such Blocked Account Bank as may be selected by Borrowing Agent and be acceptable to Agent or (b) depository accounts ("Depository Accounts") established at the Agent for the deposit of such

074658.01343/22000590v.9

proceeds, or (b) be deposited in accordance with a Cash Management Order, in form and substance acceptable to Agent in its sole discretion. Each applicable Borrower, Agent and each Blocked Account Bank shall enter into a deposit account control agreement in form and substance satisfactory to Agent directing such Blocked Account Bank to transfer such funds so deposited to Agent, either to any account maintained by Agent at said Blocked Account Bank or by wire transfer to appropriate account(s) of Agent. All funds deposited in such Blocked Accounts shall immediately become the property of Agent and Borrowing Agent shall obtain the agreement by such Blocked Account Bank to waive any offset rights against the funds so deposited. Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder. All deposit accounts and investment accounts of each Borrower and its Subsidiaries are set forth on Schedule 4.15(h).

(i)     Adjustments.    No Borrower will, without Agent's consent, compromise or adjust any material amount of the Receivables (or extend the time for payment thereof) or accept any material returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the business of such Borrower.

4.16.   Inventory.  To the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.17.   Maintenance of Equipment.    The Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the Equipment shall be maintained and preserved.  No Borrower shall use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation.  Each Borrower shall have the right to sell Equipment to the extent set forth in Section 4.3 hereof.

4.18.   Exculpation of Liability.    Nothing herein contained shall be construed to constitute Agent or any Lender as any Borrower's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any Borrower's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.19.   Environmental Matters.

(a)     Borrowers shall undertake best efforts to ensure that the Real Property and all operations and businesses conducted thereon remain in compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except as permitted by Applicable Law, permits, licenses, or appropriate governmental authorities.

(b)     Borrowers shall undertake best efforts to monitor compliance with all applicable Environmental Laws including periodic reviews of such compliance.

(c)     Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws.  Borrowers shall use their best efforts to obtain certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)     In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Substances at the Real Property (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any such person or entity hereinafter the "Authority"), then Borrowing Agent shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in and Lien on the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)     Borrowing Agent shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances and shall continue to forward copies of correspondence between any Borrower and the Authority regarding such claims to Agent until the claim is settled.  Borrowing Agent shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws.  Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Real Property and the Collateral.

(f)     Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral or Real Property to any Lien.  If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or any Borrower shall fail to comply with any of the requirements of any Environmental Laws, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral:  (i) give such notices or (ii) enter onto the Real Property (or

55

authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deem reasonably necessary or advisable, to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint. All reasonable costs and expenses incurred by Agent and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Domestic Rate Loans of Revolving Advances shall be paid upon demand by Borrowers, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between Agent, any Lender and any Borrower.

(g)     At any time following the Closing Date, upon the occurrence of any Hazardous Discharge, or if the Agent has reasonable cause to believe that there has been a Hazardous Discharge or a material violation of Environmental Laws, Borrowers shall promptly upon the written request of Agent from time to time, provide Agent, at Borrowers' expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm acceptable in the reasonable opinion of Agent, to assess with a reasonable degree of certainty the existence of a Hazardous Discharge and the potential costs in connection with abatement, cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property. Any report or investigation of such Hazardous Discharge proposed and acceptable to an appropriate Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent. If such estimates, individually or in the aggregate, exceed $100,000, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)     Borrowers shall defend and indemnify Agent and Lenders and hold Agent, Lenders and their respective employees, agents, directors and officers harmless from and against all loss, liability, damage and expense, claims, costs, fines and penalties, including attorney's fees, suffered or incurred by Agent or Lenders under or on account of any Environmental Laws, including the assertion of any Lien thereunder, with respect to any Hazardous Discharge, the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of Agent or any Lender. Borrowers' obligations under this Section 4.19 shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Substances. Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement.

(i)     For purposes of Section 4.19 and 6.7, all references to Real Property shall be deemed to include all of each Borrower's right, title and interest in and to its owned and leased premises.

4.20.   Financing Statements. Except as respects the financing statements filed by Agent and the financing statements described on Schedule 1.2(a), no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

V.    SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC.

5.1.    Superpriority Claims and Collateral Security.    Borrowers hereby represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable, all of the Obligations:

(a)    shall at all times constitute a Superpriority Claim having priority, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any right of payment and any and all other obligations, liabilities and indebtedness of Borrowers and claims of any Person, whether now existing or hereafter arising, including without limitation any claims under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out; and

(b)    pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code, this Agreement and the Other Documents, shall at all times be secured by a first priority perfected Lien, subject as to priority, only to the Carve-Out, in all assets, whether now owned or hereafter acquired of Borrowers and their estates, such Liens shall be senior to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Bankruptcy Court or otherwise, including without limitation, liens or interests granted in favor of third parties in conjunction with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law. Such security interests and liens shall be senior in all respects to interests of other parties arising out of security interests or liens, if any, in such assets and property existing immediately prior to the Petition Date.  The Liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

The agreement of Agent and Lenders to provide post-petition financing to Borrowers will not prohibit Agent or Lenders from moving in the Bankruptcy Court for any other and further relief which Agent or Lenders believe in good faith to be reasonably and immediately necessary to protect their rights with respect to the Collateral (including a request for Borrowers to abandon any part of the Collateral) or otherwise.

5.2.    No Filings Required.  The Liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Order.  Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document.

5.3.    Grants, Rights and Remedies.  The Lien and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document are independently granted.  The Interim Order, the Final Order, this Agreement and the Other Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

5.4.    No Discharge; Survival of Claims.  Each Borrower agrees that (a) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and each Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such

074658.01343/22000590v.9

discharge), (b) the Superpriority Claim granted to Agent and Lenders pursuant to the Interim Order and the Final Order and the Liens granted to Agent, for the benefit of Agent and the Lenders pursuant to the Interim Order, the Final Order, this Agreement and the Other Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (c) Borrowers shall not propose or support any Reorganization Plan that is not conditioned upon termination of Agent's and Lenders' commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Borrowers and their estate, in each case, on or before the effective date of such Reorganization Plan, and (d) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

5.5.    <u>Survival</u>.  The Liens, lien priority, administrative priorities and other rights and remedies granted to Agent and Lenders pursuant to the Interim Order, the Final Order, this Agreement and the Other Documents (specifically including the existence, perfection and priority of the Liens provided herein and therein, and the superpriority administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code, are or will be prior to or on a parity with any claim of Agent or any Lender against the Borrowers in respect of any Obligation;

(b)    the Liens securing the Obligations shall constitute valid and perfected Liens and subject only to the Carve-Out, shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the Liens securing the Obligations shall continue to be valid and perfected without the necessity that Agent file financing statements, mortgages or otherwise perfecting its Lien under applicable non-bankruptcy law.

5.6.    <u>Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances</u>.  Borrowers, Agent and Lenders know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered orders can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances"). Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and

58

the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case. With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Borrower: (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of the Interim Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with the Final Order and the transactions contemplated by this Agreement and having the Final Order entered that would serve as a basis to allege such Changed Circumstances. Each Borrower understands and agrees that Agent and Lenders are not willing to bear any of the risks involved in Borrowers' business enterprises and Agent and Lenders are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Borrower expressly assumes all risks of any and all such matters, and the consequences that Agent and Lenders will enforce their legal, equitable, and contractual rights if Agent and Lenders are not paid and dealt with strictly in accordance with the terms and conditions of the Interim Order, the Final Order, this Agreement and the Other Documents. Without limiting the foregoing in any way, Borrowers' use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement, the Interim Order and the Final Order, and, until all Obligations are indefeasibly paid and satisfied in full either before or after a termination of this Agreement, no Borrower will seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever.

 5.7. <u>Exclusive Remedy For Any Alleged Post-Petition Claim</u>**.** If any Borrower asserts that it has any adverse claims against Agent or Lenders, with respect to this Agreement and the transactions contemplated hereby, each Borrower agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (the "Damage Lawsuit"). Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Agent and Lenders of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Other Documents, and the Damage Lawsuit (including any and all adverse claims alleged against Agent or Lenders) cannot be asserted by any Borrower as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by Agent or Lenders of their legal, equitable, and contractual rights under the Final Order, the Other Documents, and otherwise.

 5.8. <u>Prohibition on Surcharge; Etc</u>**.** No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out. The prohibition on surcharging or priming of the Liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a Lien or rights (through any means, at law or in equity) which in any case is equal or senior to the Liens of Agent on the Collateral. Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this Article 5.

074658.01343/22000590v.9

5.9.    <u>Marshalling Obligations</u>**.**  The Agent shall not be subject to any equitable remedy of marshalling.

5.10.    <u>Bankruptcy Notices</u>.  The motions to approve the Interim Order and all other first day motions have been served on all secured creditors, all judgment creditors (if any), the twenty (20) largest unsecured creditors, the twenty (20) attorneys handling the largest volume of asbestos cases against Borrowers, and federal and state taxing authorities and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure.

## VI.    REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants as follows:

6.1.    <u>Authority</u>.  Each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents and to perform all its respective Obligations hereunder and thereunder.  This Agreement and the Other Documents have been duly executed and delivered by each Borrower, and, subject to the entry by the Bankruptcy Court of the Interim Order, this Agreement and the Other Documents constitute the legal, valid and binding obligation of such Borrower enforceable in accordance with their terms.  Subject to the entry by the Bankruptcy Court of the Interim Order, the execution, delivery and performance of this Agreement and of the Other Documents (a) are within such Borrower's corporate or limited liability company powers, as applicable, have been duly authorized by all necessary corporate or company action, as applicable, are not in contravention of law or the terms of such Borrower's by-laws, certificate of incorporation, operating agreement, certificate of formation or other applicable documents relating to such Borrower's formation or to the conduct of such Borrower's business or of any material agreement or undertaking to which such Borrower is a party or by which such Borrower is bound, (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body or any other Person, except those Consents set forth on Schedule 6.1 hereto, all of which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of such Borrower under the provisions of any agreement, charter document, instrument, by-law, operating agreement, or other instrument to which such Borrower is a party or by which it or its property is a party or by which it may be bound.

6.2.    <u>Formation and Qualification</u>.

(a)    Each Borrower is duly incorporated or formed, as applicable, and in good standing under the laws of the state listed on Schedule 6.2(a) and is qualified to do business and is in good standing in the states listed on Schedule 6.2(a) which constitute all states in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on such Borrower.  Each Borrower has delivered to Agent true and complete copies of its certificate or articles of incorporation and by-laws or its certificate of formation and

074658.01343/22000590v.9

operating agreement, as applicable, and will promptly notify Agent of any amendment or changes thereto.

(b)     The only Subsidiaries of each Borrower are listed on Schedule 6.2(b).

6.3.   Survival of Representations and Warranties.  All representations and warranties of such Borrower contained in this Agreement and the Other Documents shall be true at the time of such Borrower's execution of this Agreement and the Other Documents, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto, until the end of the Term, except as otherwise provided in Section 17.7.

6.4.   Tax Returns.  Each Borrower's federal tax identification number is set forth on Schedule 6.4.  Each Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable. The provision for taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books.

6.5.   Financial Statements.

(a)     The twelve-month cash flow projections of Borrowers on a Consolidated Basis and their projected balance sheets as of the Closing Date, copies of which are annexed hereto as Exhibit 6.5(a) (the "Projections") were prepared by the Chief Financial Officer of UGL, are based on underlying assumptions which provide a reasonable basis for the projections contained therein and reflect Borrowers' judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

(b)     The consolidated and consolidating balance sheets of Borrowers, their Subsidiaries and such other Persons described therein (including the accounts of all Subsidiaries for the respective periods during which a subsidiary relationship existed) as of September 30, 2008 and the related statements of income, changes in stockholder's equity, and changes in cash flow for the period ended on such date, prepared by management of Borrowing Agent, copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied, and present fairly the financial position of Borrowers and their Subsidiaries at such date and the results of their operations for such period.  Since December 31, 2010, there has been no change in the condition, financial or otherwise, of Borrowers or their Subsidiaries as shown on the consolidated balance sheet as of such date and no change in the aggregate value of machinery, equipment and Real Property owned by Borrowers and their respective Subsidiaries, except changes in the Ordinary Course of Business, none of which individually or in the aggregate has been materially adverse and except the filing of the Case.

6.6.   Entity Names.  No Borrower has been known by any other corporate name in the past five years and does not sell Inventory under any other name except as set forth on Schedule 6.6, nor has any Borrower been the surviving corporation or company, as applicable, of a merger

or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

6.7. **O.S.H.A. and Environmental Compliance**.

(a)     Each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds, Real Property and Equipment are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws and there are no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds or Equipment under any such laws, rules or regulations.

(b)     Each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c)     To the best of Borrowing Agent's knowledge and information, except as set forth on Schedule 6.7(c): (i) there are no visible signs of releases, spills, discharges, leaks or disposal (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property including any premises leased by any Borrower; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property including any premises leased by any Borrower; (iii) the Real Property including any premises leased by any Borrower has never been used as a treatment, storage or disposal facility of Hazardous Waste; and (iv) no Hazardous Substances are present on the Real Property including any premises leased by any Borrower, excepting such quantities as are handled in accordance with all applicable manufacturer's instructions and governmental regulations and in proper storage containers and as are necessary for the operation of the commercial business of any Borrower or of its tenants.

6.8. **No Litigation, Violation, Indebtedness or Default**.

(a)     Intentionally Omitted.

(b)     Except as disclosed in Schedule 6.8(b), no Borrower has (i) any pending or, to the best knowledge of Borrowing Agent after due inquiry, threatened litigation, arbitration, actions or proceedings which involve the possibility of having a Material Adverse Effect, and (ii) any liabilities or indebtedness for borrowed money other than the Obligations.

(c)     No Borrower is in violation of any applicable statute, law, rule, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is any Borrower in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(d)     No Borrower nor any member of the Controlled Group maintains or contributes to any Plan other than those listed on Schedule 6.8(d) hereto.  Except as set forth on Schedule 6.8(d): (i) No Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan; (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been

074658.01343/22000590v.9

determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code; (iii) neither any Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan; (v) except as provided in Schedule 6.8(d) hereto, at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and neither any Borrower nor any member of the Controlled Group knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither any Borrower nor any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vii) neither any Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4972 or 4980B of the Code, and no fact exists which could give rise to any such liability; (viii) neither any Borrower nor any member of the Controlled Group nor any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan; (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period has not been waived; (xi) neither any Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower and any member of the Controlled Group; (xii) neither any Borrower nor any member of the Controlled Group maintains or contributes to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; (xiii) neither any Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; and (xiv) no Plan fiduciary (as defined in Section 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

6.9. <u>Patents, Trademarks, Copyrights and Licenses.</u> All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, tradenames, assumed names, trade secrets and licenses owned by or used in the respective business of any Borrower as currently conducted, which are material to its condition (financial or otherwise), are set forth on Schedule 6.9, are valid and, except for common law rights, have been duly registered or filed with all appropriate Governmental Bodies and constitute all of the intellectual property rights which are necessary for the operation of its business; except as set forth in Schedule 6.9 hereto, there is no objection to or pending challenge to the validity of any such patent, trademark, copyright, design rights, tradenames, trade secret or license and no claims are pending, or to the best of each Borrower's knowledge following diligent inquiry, threatened that any Borrower is infringing or otherwise adversely affecting the rights of any Person with respect to such rights. Except for such claims

074658.01343/22000590v.9

and infringements as do not, in the aggregate, give rise to any liability on the part of any Borrower which will, or is reasonably likely to, result in a Material Adverse Effect, each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, design rights, copyright, copyright application and copyright license owned or held by any Borrower and all trade secrets used by any Borrower consist of original material or property developed by such Borrower or was lawfully acquired by such Borrower from the proper and lawful owner thereof; each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof; with respect to all software used by any Borrower, such Borrower is in possession of all source and object codes related to each piece of software or is the beneficiary of a valid license or source code escrow agreement, and each such source code escrow agreement is listed on Schedule 6.9 hereto.

6.10.   <u>Licenses and Permits</u>.  Except as set forth in Schedule 6.10, each Borrower (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to procure such licenses or permits could have a Material Adverse Effect.

6.11.   <u>Default of Indebtedness</u>.  No Borrower is in default in the payment of the principal of or interest on any Indebtedness for borrowed money or under any instrument or agreement under or subject to which any Indebtedness has been issued (other than any defaults arising as a result of the filing of the Case), and no event has occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

6.12.   <u>No Default</u>.  No Borrower is in default in the payment or performance of any of its contractual obligations and no Default has occurred.

6.13.   <u>No Burdensome Restrictions</u>.  No Borrower is party to any contract or agreement the performance of which could have a Material Adverse Effect.  Each Borrower has heretofore delivered to Agent true and complete copies of all material contracts to which it is a party or to which it or any of its properties is subject.  No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance.

6.14.   <u>No Labor Disputes</u>.  No Borrower is involved in any labor dispute; there are no strikes or walkouts or union organization of any Borrower's employees threatened or in existence and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.14 hereto.

6.15.   <u>Margin Regulations</u>.  No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as

074658.01343/22000590v.9

now and from time to time hereafter in effect. No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

6.16. Investment Company Act. No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

6.17. Disclosure. No representation or warranty made by any Borrower in this Agreement or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading. There is no fact known to any Borrower or which reasonably should be known to such Borrower which such Borrower has not disclosed to Agent in writing with respect to the transactions contemplated or evidenced by this Agreement which could reasonably be expected to have a Material Adverse Effect.

6.18. Swaps. No Borrower is a party to, nor will it be a party to, any swap agreement whereby such Borrower has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

6.19. Conflicting Agreements. No provision of any mortgage, indenture, contract, agreement, judgment, decree or order binding on any Borrower or affecting the Collateral conflicts with, or requires any Consent which has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

6.20. Application of Certain Laws and Regulations. Neither any Borrower nor any Affiliate of any Borrower is subject to any law, statute, rule or regulation which regulates the incurrence of any Indebtedness, including laws, statutes, rules or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

6.21. Business and Property of Borrowers. Upon and after the Closing Date, Borrowers do not propose to engage in any business other than the manufacturing and sale of wood and masonry finishing products and paint sundries and activities necessary to conduct the foregoing. On the Closing Date, each Borrower will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Borrower.

6.22. Section 20 Subsidiaries. Borrowers do not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a Section 20 Subsidiary.

6.23. Anti-Terrorism Laws.

65

(a)    General.  Neither any Borrower nor any Affiliate of any Borrower is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)    Executive Order No. 13224.  Neither any Borrower nor any Affiliate of any Borrower or their respective agents acting or benefiting in any capacity in connection with the Advances or other transactions hereunder, is any of the following (each a "Blocked Person"):

(i)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(iii)    a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

(v)    a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or

(vi)    a Person or entity who is affiliated or associated with a Person or entity listed above.

Neither any Borrower nor to the knowledge of any Borrower, any of its agents acting in any capacity in connection with the Advances or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

6.24.    Trading with the Enemy.  No Borrower has engaged, nor does it intend to engage, in any business or activity prohibited by the Trading with the Enemy Act.

6.25.    Federal Securities Laws.  Neither any Borrower nor any of its Subsidiaries (i) is required to file periodic reports under the Exchange Act, (ii) has any securities registered under the Exchange Act or (iii) has filed a registration statement that has not yet become effective under the Securities Act.

6.26.    Equity Interests.  The authorized and outstanding Equity Interests of each Borrower is as shown on Schedule 6.26 hereto.  All of the Equity Interests of each Borrower has been duly and validly authorized and issued and is fully paid and non-assessable and has been

074658.01343/22000590v.9

sold and delivered to the holders hereof in compliance with, or under valid exemption from, all federal and state laws and the rules and regulations of each Governmental Body governing the sale and delivery of securities. Except for the rights and obligations shown on Schedule 6.26, there are no subscriptions, warrants, options, calls, commitments, rights or agreements by which any Borrower or any of the shareholders of any Borrower is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of Borrowers. Except as shown on Schedule 6.26, Borrowers have not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares.

6.27. <u>Bankruptcy Matters</u>.

(a) Subject to the entry by the Bankruptcy Court of the Final Order (i) the Obligations will constitute a Superpriority Claim, subject as to priority, only to the Carve-Out, and (ii) the Liens of Agent, for the benefit of Agent and Lenders, securing the Obligations are valid and perfected first priority Liens, subject, as to priority only, to the Carve-Out;

(b) The Borrowers are not transferring the Collateral with any intent to hinder, delay or defraud any of its respective creditors; and

(c) The Interim Order and the Final Order, as applicable, has been entered by the Bankruptcy Court and is in full force and effect, and has not been amended, modified or stayed, or reversed.

VII. AFFIRMATIVE COVENANTS.

Each Borrower shall, until payment in full of the Obligations and termination of this Agreement:

7.1. <u>Payment of Fees</u>. Pay to Agent on demand all usual and customary fees and expenses which Agent incurs in connection with (a) the forwarding of Advance proceeds and (b) the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.15(h). Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

7.2. <u>Conduct of Business and Maintenance of Existence and Assets</u>. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any such intellectual property right or other right included in the Collateral; (b) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or

074658.01343/22000590v.9

any political subdivision thereof where the failure to do so could reasonably be expected to have a Material Adverse Effect.

7.3. <u>Violations</u>. Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Borrower which could reasonably be expected to have a Material Adverse Effect.

7.4. <u>Government Receivables</u>. Take all reasonable steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Uniform Commercial Code and all other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them.

7.5. <u>Financial Covenants</u>.

(a) <u>Fixed Charge Coverage Ratio</u>. Cause to be maintained as of the end of each fiscal quarter, commencing with the fiscal quarter ending June 30, 2011 (a) a Fixed Charge Coverage Ratio of not less than 1.20 to 1.0 to be tested on a rolling three (3) month basis and (b) a Fixed Charge Coverage Ratio of not less than 1.20 to 1.0 to be tested on a rolling four (4) quarter basis; provided however that (i) for the fiscal quarter ending June 30, 2011 the Fixed Charge Coverage Ratio shall be measured for the fiscal quarter then ending, (ii) for the fiscal quarter ending September 30, 2011, the Fixed Charge Coverage Ratio shall be measured for the two (2) fiscal quarters then ending and (iii) for the fiscal quarter ending December 31 2011, the Fixed Charge Coverage Ratio shall be measured for the three (3) fiscal quarters then ending.

(b) <u>Minimum EBITDA</u>. Cause to be achieved a minimum EBITDA of not less than seventy percent (70%) of the amounts sets forth on the Budget for the one month period ending each of April 30, 2011 and May 31, 2011, tested monthly.

(c) <u>Minimum Net Income</u>. Commencing with the fiscal quarter ending June 30, 2011 and at the end of each fiscal quarter thereafter, cause to be achieved a net income of not less than one Dollar ($1.00) (before adjustment for costs and expenses related to the Case), tested on a trailing three (3) month basis.

7.6. <u>Execution of Supplemental Instruments</u>. Execute and deliver to Agent from time to time, upon reasonable demand, such material supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may request, in order that the full intent of this Agreement may be carried into effect.

7.7. <u>Payment of Indebtedness</u>. Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature, except when the failure to do so could not reasonably be expected to have a Material Adverse Effect or when the amount or validity thereof is currently being contested in good faith by appropriate proceedings and each Borrower shall have provided for such reserves as Agent may

68

reasonably deem proper and necessary, subject at all times to any applicable subordination arrangement in favor of Lenders.

       7.8.   <u>Standards of Financial Statements</u>.  Cause all financial statements referred to in Sections 10.7, 10.8, 10.9, 10.10, 10.11, 10.12, and 10.13 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein).

       7.9.   <u>Federal Securities Laws</u>.  Promptly notify Agent in writing if any Borrower or any of its Subsidiaries is required to file periodic reports under the Exchange Act; or if any Borrower or any of any Borrower's Subsidiaries (i) registers any securities under the Exchange Act or (ii) files a registration statement under the Securities Act.

       7.10.   <u>Bankruptcy Schedules</u>.

          (a)    File with the Bankruptcy Court and deliver to Agent, within thirty (30) days of the Closing Date, all Schedules of the Borrowers.

Serve each party entitled to notice under the Interim Order with a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure.

## VIII.  NEGATIVE COVENANTS.

       No Borrower shall, until satisfaction in full of the Obligations and termination of this Agreement:

       8.1.   <u>Merger, Consolidation, Acquisition and Sale of Assets</u>.

          (a)    Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Equity Interests of any Person or permit any other Person to consolidate with or merge with it.

          (b)    Sell, lease, transfer or otherwise dispose of any of its properties or assets, except (i) dispositions of Inventory and Equipment to the extent expressly permitted by Section 4.3 and (ii) any other sales or dispositions expressly permitted by this Agreement or the Interim Order or Final Order.

       8.2.   <u>Creation of Liens</u>.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

       8.3.   <u>Guaranties</u>.  Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except (a) as disclosed on Schedule 8.3, and (b) the endorsement of checks in the Ordinary Course of Business.

8.4.     Investments.  Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, except: (a) obligations issued or guaranteed by the United States of America or any agency thereof; (b) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating); (c) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency; and (d) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof.

8.5.     Loans.  Make advances, loans or extensions of credit to any Person, including any Parent, Subsidiary or Affiliate except with respect to the extension of commercial trade credit in connection with the sale of Inventory in the Ordinary Course of Business.

8.6.     Capital Expenditures.  Contract for, purchase or make any expenditure or commitments for Capital Expenditures during the Term in an amount in excess of $3,000,000.

8.7.     Dividends / Distributions.  Declare, pay or make any dividend or distribution on any Equity Interests of any Borrower (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock) or apply any of its funds, property or assets to the purchase, redemption or other retirement of any Equity Interest, or of any options to purchase or acquire any Equity Interest of any Borrower.

8.8.     Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) except in respect of: (i) trade debt, wages, and other accrued expenses incurred in the Ordinary Course of Business, and recourse obligations resulting from endorsement of negotiable instruments for collection in the Ordinary Course of Business; (ii) Indebtedness to Lenders; and (iii) Indebtedness incurred for Capital Expenditures permitted under Section 8.6 hereof.

8.9.     Nature of Business.  Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted.

8.10.    Transactions with Affiliates.  Directly or indirectly, purchase, acquire or lease any property or services from, or sell, transfer or lease any property or services to, or otherwise enter into any transaction or deal with, any Affiliate.

8.11.    Leases.  Enter as lessee into any lease arrangement for real or personal property (unless capitalized and permitted under Section 8.6 hereof) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $100,000 in any one fiscal year in the aggregate for all Borrowers.

8.12.    Subsidiaries.

074658.01343/22000590v.9

(a)    Form any Subsidiary.

(b)    Enter into any partnership, joint venture or similar arrangement.

8.13.    <u>Fiscal Year and Accounting Changes</u>.  Change its fiscal year from December 31 or make any change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law.

8.14.    <u>Pledge of Credit</u>.  Now or hereafter pledge Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of any Advance in or for any business other than such Borrower's business as conducted on the date of this Agreement.

8.15.    <u>Amendment of Articles of Incorporation, By-Laws, Certificate of Formation or Operating Agreement</u>.  Amend, modify or waive any term or material provision of its Articles or Certificate of Incorporation or By-Laws or its Certificate of Formation or Operating Agreement, as applicable, unless required by law.

8.16.    <u>Compliance with ERISA</u>.  (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on Schedule 6.8(d), (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in section 406 of ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan not disclosed on Schedule 6.8(d), (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any Termination Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

8.17.    <u>Prepayment of Indebtedness</u>.  At any time, directly or indirectly, prepay any Indebtedness (other than to Lenders), or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Borrower.

8.18.    <u>Anti-Terrorism Laws</u>.  No Borrower shall, until satisfaction in full of the Obligations and termination of this Agreement, nor shall it permit any Affiliate or agent to:

(a)    Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person.

(b)     Deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

(c)     Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order No. 13224, the USA PATRIOT Act or any other Anti-Terrorism Law. Borrower shall deliver to Lenders any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming Borrower's compliance with this Section.

8.19.   <u>Trading with the Enemy Act</u>.  Engage in any business or activity in violation of the Trading with the Enemy Act.

8.20.   <u>Bankruptcy Matters</u>.

(a)     Directly or indirectly, seek, consent or suffer to exist: (i) any modification, stay, vacation or amendment to the Interim Order or Final Order, unless the Agent has consented to such modification, stay, vacation or amendment in writing; (ii) entry of any order that is not reasonably satisfactory to Agent in form and substance; (iii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code) equal or superior to the Superpriority claim of the Agent and the Lenders in respect of the Obligations, except for the Carve-Out; or (iv) any Lien on any Collateral, having a priority equal or superior to the Lien in favor of the Agent in respect of the Obligations.

(b)     Prior to the date on which the Obligations have been indefeasibly paid in full in cash and Agent and Lenders' commitment to make Advances has been terminated, Borrowers shall not pay any administrative expense claims, including without limitation, Ineligible Professional Expenses; provided however that Borrowers may pay administrative expense claims with respect to (i) the Carve-Out, (ii) Obligations due and payable hereunder and (iii) Professional Fees, Statutory Fees and Committee Expenses as set forth in the Budget allocated to the Borrowers during the Case.

(c)     Make any material expenditure except of the type and for the purposes provided for in the Budget.

IX.     CONDITIONS PRECEDENT.

9.1.    <u>Conditions to Initial Advances</u>.  The agreement of Lenders to make the initial Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:

(a)     <u>Note</u>.  Agent shall have received the Notes duly executed and delivered by an authorized officer of each Borrower;

(b) <u>Filings, Registrations and Recordings</u>. Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received an acknowledgment copy, or other evidence satisfactory to it, of each such filing, registration or recordation and satisfactory evidence of the payment of any necessary fee, tax or expense relating thereto;

(c) <u>Proceedings of Borrowers</u>. Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the Board of Directors, of each Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Notes, and any related agreements (collectively the "Documents") and (ii) the granting by each Borrower of the security interests in and liens upon the Collateral in each case certified by the Secretary of each Borrower, as applicable, as of the Closing Date; and, such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate;

(d) <u>Incumbency Certificates of Borrowers</u>. Agent shall have received a certificate of the Secretary of each Borrower, dated the Closing Date, as to the incumbency and signature of the officers of each Borrower executing this Agreement, the Other Documents, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary;

(e) <u>Bankruptcy Case</u>. The Case shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Case shall be satisfactory in form and substance to Agent and no trustee or examiner shall have been appointed with respect to Borrowers, or any of them, or any property of or any estate of any Borrower;

(f) <u>Interim Order</u>. Agent shall have received satisfactory evidence of the entry of the Interim Order, which Interim Order (i) shall have been entered upon an application or motion of Borrowers reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; and (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Advances, the issuance, extension or renewal of any Letters of Credit, or the performance by the Borrowers of any of the Obligations shall be the subject of a presently effective stay. Borrowers, Agent and Lenders shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration. Agent may, however, in its sole discretion, defer any obligations of Agent and Lenders to make Advances or to issue or to support the issuance of any Letters of Credit until such time as no such objection, appeal or motion for reconsideration is pending and the period for lodging any such objection, appeal or motion for reconsideration has expired;

074658.01343/22000590v.9

(g)     Cash Management Order.  Agent shall have received satisfactory evidence of the entry of a cash management order adopting and implementing cash management arrangements acceptable to Agent (the "Cash Management Order");

(h)     Certificates.     Agent shall have received a copy of the Articles or Certificate of Incorporation of each Borrower, and all amendments thereto, certified by the Secretary of State or other appropriate official of its jurisdiction of incorporation with copies of the By-Laws of each Borrower and all agreements of each Borrower's shareholders or members certified as accurate and complete by the Secretary of each Borrower;

(i)     Good Standing Certificates.     Agent shall have received good standing certificates for each Borrower dated not more than 30 days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each Borrower's and Guarantor's jurisdiction of incorporation or formation and each jurisdiction where the conduct of Holdings, each Borrower's business activities or the ownership of its properties necessitates qualification;

(j)     No Litigation.     Other than in connection with the Case and asbestos litigation, (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing, or to the best knowledge of Borrowing Agent after due inquiry, threatened, against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement the Other Documents and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the reasonable opinion of Agent, have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the Transactions shall have been issued by any Governmental Body;

(k)     Financial Condition Certificates.  Agent shall have received an executed Financial Condition Certificate in the form of Exhibit 9.1(k);

(l)     Collateral Examination.     Agent shall have completed Collateral examinations and received appraisals, the results of which shall be satisfactory in form and substance to Lenders, of the Receivables and Inventory of each Borrower and all books and records in connection therewith and Agent shall have received the Net Orderly Liquidation Appraisal;

(m)     Fees.  Agent shall have received all fees payable to Agent and Lenders on or prior to the Closing Date hereunder, including pursuant to Article III hereof;

(n)     Insurance.  Agent shall have received in form and substance satisfactory to Agent, certified copies of Borrowers' casualty insurance policies, together with loss payable endorsements on Agent's standard form of loss payee endorsement naming Agent as loss payee, and certified copies of Borrowers' liability insurance policies, together with endorsements naming Agent as a co-insured;

(o)     Payment Instructions.  Agent shall have received written instructions from Borrowing Agent directing the application of proceeds of the initial Advances made pursuant to this Agreement;

(p)     Blocked Accounts.  Agent shall have received duly executed agreements establishing the Blocked Accounts or Depository Accounts with financial institutions acceptable to Agent for the collection or servicing of the Receivables and proceeds of the Collateral;

(q)     Budget.  Agent shall have received a copy of the initial Budget which shall be satisfactory in all respects to Lenders;

(r)     Consents.  Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(s)     No Adverse Material Change.  (i) since December 31, 2010, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect, other than the filing of the Case, and (ii) no representations made or information supplied to Agent or Lenders shall have been proven to be inaccurate or misleading in any material respect;

(t)     Leasehold Agreements.  Agent shall have received landlord, mortgagee or warehouseman agreements satisfactory to Agent with respect to all premises leased by Borrowers at which Inventory and books and records are located;

(u)     Other Documents.  The executed Pledge and the executed Other Documents, all in form and substance satisfactory to Agent;

(v)     Contract Review.  Agent shall have reviewed all material contracts of Borrowers including leases, union contracts, labor contracts, vendor supply contracts, license agreements and distributorship agreements and such contracts and agreements shall be satisfactory in all respects to Agent;

(w)     Closing Certificate.  Agent shall have received a closing certificate signed by the Vice President of each Borrower dated as of the date hereof, stating that, in all material respects: (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date; (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents; and (iii) on such date no Default or Event of Default has occurred or is continuing;

(x)     Borrowing Base.  Agent shall have received evidence from Borrowers that the aggregate amount of Eligible Receivables and Eligible Inventory is sufficient in value and amount to support Advances in the amount requested by Borrowers on the Closing Date;

(y)     Compliance with Laws.  Agent shall be reasonably satisfied that each Borrower is in compliance with all materially applicable federal, state, local or territorial regulations, including those with respect to the Federal Occupational Safety and Health Act, the Environmental Protection Act, ERISA and the Trading with the Enemy Act;

(z)     Background Reports. Agent shall have received satisfactory background checks on the Borrowers and their principals in form and substance acceptable to Agent; and

75

(aa)    Other.    All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions shall be satisfactory in form and substance to Agent and its counsel.

9.2.    Conditions to Each Advance.  The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)    Representations and Warranties.    Each of the representations and warranties made by  any Borrower in or pursuant to this Agreement, the Other Documents and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement, the Other Documents or any related agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(b)    No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default;

(c)    Maximum Advances.  In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement;

(d)    Interim Order. The Interim Order shall be in full force and effect and shall not be the subject of any appeal, stay, order of reversal or modification; and

(e)    Final Order.  On or before April 22 2011, the Bankruptcy Court shall have entered the Final Order which Final Order (i) shall have been entered upon an application or motion of Borrowers reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; and (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Final Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Final Order, nor the making of the Advances, the issuance, extension or renewal of any Letters of Credit, or the performance by the Borrowers of any of the Obligations shall be the subject of a presently effective stay. Borrowers, Agent and Lenders shall be entitled to rely in good faith upon the Final Order notwithstanding any such objection, appeal or motion for reconsideration. Agent may, however, in its sole discretion, defer any obligations of Agent and Lenders to make Advances or to issue or to support the issuance of any Letters of Credit until such time as no such objection, appeal or motion for reconsideration is pending and the period for lodging any such objection, appeal or motion for reconsideration has expired.

Each request for an Advance by any Borrower hereunder shall constitute a representation and warranty by each Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

X.    INFORMATION AS TO BORROWERS.

Each Borrower shall, or (except with respect to Section 9.11) shall cause Borrowing Agent on its behalf to, until satisfaction in full of the Obligations and the termination of this Agreement:

10.1.  <u>Disclosure of Material Matters</u>.  Immediately upon learning thereof, report to Agent all matters materially affecting the value, enforceability or collectibility of any portion of the Collateral, including any Borrower's reclamation or repossession of, or the return to any Borrower of, a material amount of goods or claims or disputes asserted by any Customer or other obligor.

10.2.  <u>Schedules</u>.  Deliver to Agent on or before the fifteenth (15th) day of each month as and for the prior month, and if the fifteenth (15th) day of the month falls on a day that is not a Business Day, then it shall be delivered the following Business Day: (a) accounts receivable ageings inclusive of reconciliations to the general ledger; (b) accounts payable schedules inclusive of reconciliations to the general ledger; (c) Inventory reports; (d) a report detailing all Receivables collected by Borrowers, and (e) a Borrowing Base Certificate in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior month and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement).  In addition, each Borrower will deliver to Agent at such reasonable intervals as Agent may require, but not less than monthly: (i) confirmatory assignment schedules; (ii) copies of Customer's invoices; (iii) evidence of shipment or delivery; and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications.  Agent shall have the right to confirm and verify all Receivables by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder.  The items to be provided under this Section are to be in form satisfactory to Agent and executed by each Borrower and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Borrower's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

10.3.  <u>Environmental Reports</u>.  Furnish Agent, concurrently with the delivery of the financial statements referred to in Sections 10.7 and 10.8, with a certificate signed by the President of Borrowing Agent stating, to the best of his knowledge, that each Borrower is in compliance in all material respects with all federal, state and local Environmental Laws.  To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action such Borrower will implement in order to achieve full compliance.

10.4.  <u>Litigation</u>.  Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Borrower or any Guarantor, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect.

074658.01343/22000590v.9

10.5.  **Material Occurrences.**  Promptly notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any event of default under any subordinated loan documentation; (c) any event which with the giving of notice or lapse of time, or both, would constitute an event of default under any subordinated loan documentation; (d) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Borrower as of the date of such statements; (e) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (f) each and every default by any Borrower which might result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (g) any other development in the business or affairs of any Borrower, Holdings or any Guarantor, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Borrowers propose to take with respect thereto.

10.6.  **Government Receivables.**  Notify Agent immediately if any of its Receivables arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them.

10.7.  **Annual Financial Statements.**  Furnish Agent and Lenders within ninety (90) days after the end of each fiscal year of Borrowers, financial statements of Borrowers on a consolidating and consolidated basis including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Agent (the "Accountants").  The report of the Accountants shall be accompanied by a statement of the Accountants certifying that (i) they have caused this Agreement to be reviewed, (ii) in making the examination upon which such report was based either no information came to their attention which to their knowledge constituted an Event of Default or a Default under this Agreement or any related agreement or, if such information came to their attention, specifying any such Default or Event of Default, its nature, when it occurred and whether it is continuing, and such report shall contain or have appended thereto calculations which set forth Borrowers' compliance with the requirements or restrictions imposed by Sections 7.5, 8.4, 8.5, 8.6, 8.7, 8.8 and 8.11 hereof.  In addition, the reports shall be accompanied by a Compliance Certificate.

10.8.  **Quarterly Financial Statements.**  Furnish Agent and Lenders within forty five (45) days after the end of each fiscal quarter, an unaudited balance sheet of Borrowers on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such quarter and for such quarter, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring yearend adjustments that individually and in the

074658.01343/22000590v.9

aggregate are not material to Borrowers' business. The reports shall be accompanied by a Compliance Certificate.

10.9. <u>Monthly Financial Statements</u>. Furnish Agent and Lenders within thirty (30) days after the end of each month (other than for the months of March, June, September and December which shall be delivered in accordance with Sections 10.7 and 10.8 as applicable), an unaudited balance sheet of Borrowers on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring yearend adjustments that individually and in the aggregate are not material to Borrowers' business. The reports shall be accompanied by a Compliance Certificate.

10.10. <u>Other Reports</u>. Furnish Agent as soon as available, but in any event within ten (10) days after the issuance thereof, with copies of such financial statements, reports and returns as each Borrower shall send to its stockholders or members, as applicable.

10.11. <u>Additional Information</u>. Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrowers including, without the necessity of any request by Agent, (a) copies of all existing environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening of any new office or place of business or any Borrower's closing of any existing office or place of business, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Borrower is a party or by which any Borrower is bound.

10.12. <u>Budget</u>. Furnish Agent and Lenders, no later than (a) the Closing Date, a Budget of Borrowers on a consolidated and consolidating basis for the period commencing with March 25, 2011 through and including June 24, 2011, and (b) by no later than the first day of each month commencing May 1, 2011, a Budget of Borrowers on a consolidated and consolidating basis for the next three (3) months such Budgets to be accompanied by a certificate signed by a Vice President of each Borrower to the effect that such Budget has been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared.

10.13. <u>Variances From Operating Budget</u>. Furnish Agent, in connection with the delivery of the budget required in Section 10.12 hereof, a written report setting forth a comparison of the actual cash receipts, cash disbursements, loan balance and availability of Borrowers to the amounts projected in the applicable Budget and a discussion and analysis by management with respect to such variances (it being understood that the comparison shall be on a one month lag, e.g. the Budget due on May 1 will compare actual results vs. budgeted amounts through March 31 and so on.)

074658.01343/22000590v.9

10.14. <u>Notice of Suits, Adverse Events</u>. Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Body or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; and (iii) copies of any periodic or special reports filed by any Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower or any Guarantor, or if copies thereof are requested by Lender, and (iv) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to any Borrower or any Guarantor.

10.15. <u>ERISA Notices and Requests</u>. Furnish Agent with immediate written notice in the event that (i) any Borrower or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Borrower or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter, (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with copies of each such notice, (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment, and (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated; (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan; or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

10.16. <u>Other Bankruptcy Documents</u>. Borrowers will deliver to Agent: (a) contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by Borrowers in the Case, with copies of such papers and documents also provided to or served on Agent's counsel; (b) promptly after the sending thereof, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by Borrowers to the Creditors' Committee or any other official or unofficial creditors' committee in the Case, with copies of

074658.01343/22000590v.9

such reports and term sheets also provided to or served on Agent's counsel; and (c) projections, operating plans and other financial information and information, reports or statements regarding Borrowers, their business and the Collateral as Agent may from time to time reasonably request.

10.17. <u>Additional Documents</u>.  Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

## XI.    EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

11.1.    <u>Nonpayment</u>.  Failure by any Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or by notice of intention to prepay, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document;

11.2.    <u>Breach of Representation</u>.  Any representation or warranty made or deemed made by any Borrower or any Guarantor in this Agreement, any Other Document or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

11.3.    <u>Financial Information</u>.  Failure by any Borrower to (i) furnish financial information when due or when requested or (ii) permit the inspection of its books or records as required by this Agreement;

11.4.    <u>Judicial Actions</u>.  Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's Inventory or Receivables or against a material portion of any Borrower's other property which is not stayed or lifted within thirty (30) days;

11.5.    <u>Noncompliance</u>.  Except as otherwise provided for in Sections 11.1, 11.3 and 11.5(ii), (i) failure or neglect of any Borrower or any Guarantor to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document or any other agreement or arrangement, now or hereafter entered into between any Borrower, any Guarantor or any other Person and Agent or any Lender, or (ii) failure or neglect of any Borrower to perform, keep or observe any term, provision, condition or covenant, contained in Sections 4.6, 4.7, 4.9, 7.1, 7.3, 7.4, 10.4 or 10.6 hereof which is not cured within ten (10) days from the occurrence of such failure or neglect;

11.6.    <u>Judgments</u>.  Any judgment or judgments are rendered against any Borrower for an aggregate amount in excess of $250,000 or against all Borrowers for an aggregate amount in excess of $250,000 and (i) enforcement proceedings shall have been commenced by a creditor upon such judgment, (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of the automatic stay, a pending appeal or

otherwise, shall not be in effect, or (iii) any such judgment results in the creation of a Lien upon any of the Collateral (other than a Permitted Encumbrance);

11.7. <u>Purchase Card Agreement Default</u>. An event of default has occurred under the Purchase Card Agreement, which default shall not have been cured or waived within any applicable grace period as provided therein;

11.8. <u>Material Adverse Effect</u>. The occurrence of any Material Adverse Effect;

11.9. <u>Lien Priority</u>. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest;

11.10. <u>Cross Default</u>. A default of the obligations of any Borrower under any other agreement to which it is a party shall occur which causes a Material Adverse Effect which default is not cured within any applicable grace period, or which is outstanding for a period of time sufficient to permit the acceleration of such Indebtedness;

11.11. <u>Change of Ownership</u>. Any Change of Ownership or Change of Control shall occur without the prior written consent of the Agent;

11.12. <u>Invalidity</u>. Any material provision of this Agreement, or any Other Document shall, for any reason, cease to be valid and binding on any Borrower or any Guarantor, or any Borrower or any Guarantor shall so claim in writing to Agent or any Lender;

11.13. <u>Licenses</u>. (i) Any Governmental Body shall (A) revoke, terminate, suspend or adversely modify any license, permit, patent trademark or tradename of any Borrower or any Guarantor, the continuation of which is material to the continuation of any Borrower's or Guarantor's business, or (B) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, tradename or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (c) schedule or conduct a hearing on the renewal of any license, permit, trademark, tradename or patent necessary for the continuation of any Borrower's or any Guarantor's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, tradename or patent; (ii) any agreement which is necessary or material to the operation of any Borrower's or any Guarantor's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within thirty (30) days after the date of such revocation or termination, and such revocation or termination and non-replacement would reasonably be expected to have a Material Adverse Effect;

11.14. <u>Seizures</u>. Any portion of the Collateral shall be seized or taken by a Governmental Body, or any Borrower or any Guarantor or the title and rights of any Borrower, any Guarantor or any Original Owner which is the owner of any material portion of the Collateral shall have become the subject matter of claim, litigation, suit or other proceeding which might, in the opinion of Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents; or

11.15. <u>Pension Plans</u>. An event or condition specified in Sections 7.16 or 9.15 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect.

11.16. <u>Bankruptcy Defaults and Events of Default</u>.

(a)   the Bankruptcy Court shall enter any order (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending the Interim Order, the Final Order, the Cash Management Order, this Agreement, or any Other Document or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Borrower equal or superior to the priority of the Agent and Lenders in respect of the Obligations, except for the Carve-Out, or there shall arise any such Superpriority Claim, or (iii) to grant or permit the grant of a Lien on the Collateral other than Permitted Encumbrances;

(b)   the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Borrower's senior management, (iv) substantively consolidating the estate of Borrowers with the estate of any other Person, (v) dismissing the Case or converting the Case to a Chapter 7 case; or (vi) approving a sale of any Borrower's assets which order does not provide that upon consummation of such sale, all of the Obligations shall be indefeasibly paid and satisfied in full and which shall otherwise be satisfactory to Agent;

(c)   this Agreement or any of the Other Documents for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any of the Borrowers, Guarantors or any third party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Borrower, Guarantor or such third party) any other Person's motion to, disallow in whole or in part Agent's and Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of Agent and Lenders;

(d)   any Borrower files a motion with the Bankruptcy Court or supports a motion filed with the Bankruptcy Court which fails to provide that Agent and/or Lenders have the right to credit bid for any assets of the Borrowers in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(e)   the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of any Borrower;

074658.01343/22000590v.9

(f)     any application for any of the orders described in clauses (a), (b) or (d) above shall be made and, if made by a Person other than a Borrower, such application is not being diligently contested by such Borrower in good faith;

(g)     except as permitted by the Interim Order or Final Order or as otherwise agreed to by Agent, Borrowers shall make any pre-petition payment following the Closing Date;

(h)     any Borrower shall be unable to pay its postpetition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise;

(i)     any Borrower shall file a motion in the Case (i) to use cash Collateral under Section 363(c) of the Bankruptcy Code without Agent's prior written consent, (ii) to sell all or substantially all of the assets of any Borrower, or the sale of any business unit of any Borrower without Agent's prior written consent, (iii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, or (v) to take any other action or actions adverse to Agent or Lenders or their rights and remedies hereunder or under any of the Other Documents or Agent's or Lenders' interest in any of the Collateral;

(j)     a Reorganization Plan is filed in the Case which does not contain provisions for termination of Agent's and Lenders' commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Borrowers and their estate, in each case, on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for termination of Agent's and Lenders commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Borrowers and their estates on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such Reorganization Plan upon entry thereof;

(k)     the termination or rejection of any material contract of any Borrower which could reasonably be expected to result in a Material Adverse Effect;

(l)     the Final Order is not entered immediately following the expiration of the Interim Order, and in any case, not later than April 22, 2011; and

(m)     a default or event of default occurs under the Interim Order or Final Order.

## XII.     LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

### 12.1.     <u>Rights and Remedies</u>.

(a)     Upon the occurrence of an Event of Default and at any time thereafter, at the option of Required Lenders all Obligations shall be immediately due and payable and

074658.01343/22000590v.9

Lenders shall have the right to terminate this Agreement and to terminate the obligation of Lenders to make Advances other than as may be required by an appropriate order of the Bankruptcy Court. Upon the occurrence of any Event of Default, Agent shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral to the extent permitted by law; provided however that prior to exercising any foreclosure on any of the Collateral or otherwise to exercise remedies against the Collateral, the Agent shall provide three (3) Business Days' notice to counsel for the Borrowers, Borrowing Agent, counsel for the Creditors Committee (if appointed) and the U.S. trustee (such notice shall not relieve any borrower of any obligation hereunder). In furtherance of exercising its remedies, Agent may enter any of any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowing Agent at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by each Borrower. In connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual nonrevocable, royalty free, nonexclusive license and Agent is granted permission to use all of each Borrower's (a) trademarks, trade styles, trade names, patents, patent applications, copyrights, service marks, licenses, franchises and other proprietary rights which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of unfinished goods. The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 12.5 hereof. Noncash proceeds will only be applied to the Obligations as they are converted into cash. If any deficiency shall arise, Borrowers shall remain liable to Agent and Lenders therefor.

(b)     To the extent that Applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for the Agent (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies

074658.01343/22000590v.9

against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Borrower, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral. Each Borrower acknowledges that the purpose of this Section 12.1(b) is to provide non-exhaustive indications of what actions or omissions by the Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other actions or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 12.1(b). Without limitation upon the foregoing, nothing contained in this Section 12.1(b) shall be construed to grant any rights to any Borrower or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 12.1(b).

12.2.  <u>Agent's Discretion</u>.  Agent shall have the right in its reasonable discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder.

12.3.  <u>Setoff</u>.  Subject to Section 15.12, in addition to any other rights which Agent or any Lender may have under Applicable Law, upon the occurrence of an Event of Default hereunder, Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Borrower's property held by Agent and such Lender to reduce the Obligations.

12.4.  <u>Rights and Remedies not Exclusive</u>.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

12.5.  <u>Allocation of Payments After Event of Default</u>.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent on account of the Obligations or any other amounts outstanding under any of the Other Documents or in respect of the Collateral may, at Agent's discretion, be paid over or delivered as follows:

86

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of the Agent in connection with enforcing its rights and the rights of the Lenders under this Agreement and the Other Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of this Document;

SECOND, to payment of any fees owed to the Agent;

THIRD, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of the Lenders to the extent owing to such Lender pursuant to the terms of this Agreement;

FOURTH, to the payment of all of the Obligations consisting of accrued fees and interest;

FIFTH, to the payment of the outstanding principal amount of the Obligations (including the payment or cash collateralization of any outstanding Letters of Credit);

SIXTH, to all other Obligations and other obligations which shall have become due and payable under the Other Documents or otherwise and not repaid pursuant to clauses "FIRST" through "FIFTH" above; and

SEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing: (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (ii) each of the Lenders shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding Advances held by such Lender bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FOURTH", "FIFTH" and "SIXTH" above; and (iii) to the extent that any amounts available for distribution pursuant to clause "FIFTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by the Agent in a cash collateral account and applied (A) first, to reimburse the Issuer from time to time for any drawings under such Letters of Credit and (B) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "FIFTH" and "SIXTH" above in the manner provided in this Section 12.5.

XIII.   WAIVERS AND JUDICIAL PROCEEDINGS.

13.1.   <u>Waiver of Notice</u>. Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

13.2.   <u>Delay</u>. No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

13.3.  Jury Waiver.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XIV.  EFFECTIVE DATE AND TERMINATION.

14.1.  Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Borrower, Agent and each Lender, shall become effective on the date hereof and shall continue in full force and effect until the Termination Date (the "Term") unless sooner terminated as herein provided.

14.2.  Termination.  The termination of the Agreement shall not affect any Borrower's, Agent's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully and indefeasibly paid, disposed of, concluded or liquidated.  The security interests, Liens and rights granted to Agent and Lenders hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Borrower have been indefeasibly paid and performed in full after the termination of this Agreement or each Borrower has furnished Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto.  Accordingly, each Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations have been indefeasibly paid in full in immediately available funds.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are indefeasibly paid and performed in full.

XV.  REGARDING AGENT.

15.1.  Appointment.  Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement and the Other Documents.  Each Lender hereby irrevocably

074658.01343/22000590v.9

authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in Sections 3.3 and 3.4), charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including collection of the Note) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

15.2. <u>Nature of Duties</u>. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower. The duties of Agent as respects the Advances to Borrowers shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

15.3. <u>Lack of Reliance on Agent and Resignation</u>. Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower and each Guarantor in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower and each Guarantor. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals,

statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Other Document, or of the financial condition of any Borrower or any Guarantor, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default.

Agent may resign on sixty (60) days' written notice to each of Lenders and Borrowing Agent and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers.

Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After any Agent's resignation as Agent, the provisions of this Article XV shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

15.4.  Certain Rights of Agent.  If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

15.5.  Reliance.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

15.6.  Notice of Default.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

074658.01343/22000590v.9

15.7.  Indemnification.  To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Advances (or, if no Advances are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

15.8.  Agent in its Individual Capacity.  With respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender.  Agent may engage in business with any Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

15.9.  Delivery of Documents.  To the extent Agent receives financial statements required under Sections 10.7, 10.8, 10.9, 10.12 and 10.13 or Borrowing Base Certificates from any Borrower pursuant to the terms of this Agreement which any Borrower is not obligated to deliver to each Lender, Agent will promptly furnish such documents and information to Lenders.

15.10.  Borrowers' Undertaking to Agent.  Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

15.11.  No Reliance on Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any Borrower, its Affiliates or its agents, this Agreement, the Other Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures; (2) any record-keeping; (3) comparisons with government lists; (4) customer notices; or (5) other procedures required under the CIP Regulations or such other laws.

074658.01343/22000590v.9

15.12. <u>Other Agreements</u>.  Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Borrower or any deposit accounts of any Borrower now or hereafter maintained with such Lender.  Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

## XVI.  BORROWING AGENCY.

16.1. <u>Borrowing Agency Provisions</u>.

(a)     Each Borrower hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.

(b)     The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Borrowers and at their request.  Neither Agent nor any Lender shall incur liability to Borrowers as a result thereof.  To induce Agent and Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent and each Lender and holds Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent or any Lender on any request or instruction from Borrowing Agent or any other action taken by Agent or any Lender with respect to this Section 16.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)     All Obligations shall be joint and several, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extensions, renewals and forbearance granted to Agent or any Lender to any Borrower, failure of Agent or any Lender to give any Borrower notice of borrowing or any other notice, any failure of Agent or any Lender to pursue or preserve its rights against any Borrower, the release by Agent or any Lender of any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by Agent or any Lender to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.  Each Borrower waives all suretyship defenses.

16.2. <u>Waiver of Subrogation</u>.  Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such

074658.01343/22000590v.9

Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

## XVII. MISCELLANEOUS.

### 17.1.   Governing Law.

(a)   This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania applied to contracts to be performed wholly within the Commonwealth of Pennsylvania except to the extent that the application of the Bankruptcy Code is mandatory.

(b)   IF (I) THE CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA.   EACH OF THE BORROWERS HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE BORROWERS HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY BORROWER BY THE AGENT OR LENDERS IN ACCORDANCE WITH THIS SECTION.

(c)   Each Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in Section 17.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at the Agent's option, by service upon Borrowing Agent which each Borrower irrevocably appoints as such Borrower's Agent for the purpose of accepting service within the Commonwealth of Pennsylvania.   Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent or any Lender to bring proceedings against any Borrower in the courts of any other jurisdiction.   Each

93

Borrower waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.

17.2.    <u>Entire Understanding</u>.

(a)    This Agreement and the documents executed concurrently herewith contain the entire understanding between each Borrower, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.   Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Borrower's, Agent's and each Lender's respective officers.   Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the Agent, Lenders and Borrowers and such parties shall be permitted to amend this Agreement and the Other Documents without further approval or order of the Court so long as such Amendment is not material (for purposes hereof, a "material" Amendment shall mean, any Amendment that operates to increase the interest rate other than as currently provided in this Agreement, increase the Maximum Revolving Advance Amount, add specific new events of default or enlarge the nature and extent of default remedies available to the Agent and the Lenders following an Event of Default) and is undertaken in good faith by the Borrowers, the Agent and the Lenders.   Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)    The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrowers may, subject to the provisions of this Section 17.2 (b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Borrowers, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent or Borrowers thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, that no such supplemental agreement shall, without the consent of all Lenders:

(i)    increase the Commitment Percentage, the maximum dollar commitment of any Lender or the Maximum Revolving Advance Amount;

(ii)    extend the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Borrowers to Lenders pursuant to this Agreement;

(iii)    alter the definition of the term Required Lenders or alter, amend or modify this Section 17.2(b);

(iv)    release any Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of $1,000,000;

074658.01343/22000590v.9

(v)     change the rights and duties of Agent;

(vi)    permit any Revolving Advance to be made if after giving effect thereto the total of Revolving Advances outstanding hereunder would exceed the Formula Amount for more than sixty (30) consecutive Business Days or exceed one hundred and ten percent (110%) of the Formula Amount;

(vii)   increase the Advance Rates above the Advance Rates in effect on the Closing Date; or

(viii)  release any Guarantor.

Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Borrowers, Lenders and Agent and all future holders of the Obligations. In the case of any waiver, Borrowers, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

In the event that Agent requests the consent of a Lender pursuant to this Section 17.2 and such Lender shall not respond or reply to Agent in writing within five (5) days of delivery of such request, such Lender shall be deemed to have consented to the matter that was the subject of the request. In the event that Agent requests the consent of a Lender pursuant to this Section 17.2 and such consent is denied, then PNC may, at its option, require such Lender to assign its interest in the Advances to PNC or to another Lender or to any other Person designated by the Agent (the "Designated Lender"), for a price equal to (i) the then outstanding principal amount thereof plus (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from Borrowers. In the event PNC elects to require any Lender to assign its interest to PNC or to the Designated Lender, PNC will so notify such Lender in writing within forty-five (45) days following such Lender's denial, and such Lender will assign its interest to PNC or the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, PNC or the Designated Lender, as appropriate, and Agent.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 9.2 hereof have not been satisfied or (c) any other provision of this Agreement, Agent may at its discretion and without the consent of the Required Lenders, voluntarily permit the outstanding Revolving Advances at any time to exceed the Formula Amount by up to ten percent (10%) of the Formula Amount for up to thirty (30) consecutive Business Days (the "Out-of-Formula Loans"). If Agent is willing in its sole and absolute discretion to make such Out-of-Formula Loans, such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate for Revolving Advances consisting of Domestic Rate Loans; provided that, if Lenders do make Out-of-Formula Loans, neither Agent nor Lenders shall be deemed thereby to have changed the limits of Section 2.1(a). For purposes of this paragraph, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Formula

95

Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be either "Eligible Receivables" or "Eligible Inventory", as applicable, becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral.  In the event Agent involuntarily permits the outstanding Revolving Advances to exceed the Formula Amount by more than ten percent (10%), Agent shall use its efforts to have Borrowers decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess.  Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

In addition to (and not in substitution of) the discretionary Revolving Advances permitted above in this Section 17.2, the Agent is hereby authorized by Borrowers and the Lenders, from time to time in the Agent's sole discretion, (A) after the occurrence and during the continuation of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 9.2 hereof have not been satisfied, to make Revolving Advances to Borrowers on behalf of the Lenders which the Agent, in its reasonable business judgment, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (c) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement; provided, that at any time after giving effect to any such Revolving Advances the outstanding Revolving Advances do not exceed one hundred and ten percent (110%) of the Formula Amount.

17.3.  <u>Successors and Assigns; Participations; New Lenders</u>.

(a)    This Agreement shall be binding upon and inure to the benefit of Borrowers, Agent, each Lender, all future holders of the Obligations and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)    Each Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to other financial institutions (each such transferee or purchaser of a participating interest, a "Participant").  Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that Borrowers shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder and in no event shall Borrowers be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant. Each Borrower hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.

074658.01343/22000590v.9

(c)     Any Lender, with the consent of Agent which shall not be unreasonably withheld or delayed, may sell, assign or transfer all or any part of its rights and obligations under or relating to Revolving Advances under this Agreement and the Other Documents to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make Advances hereunder (each a "Purchasing Lender"), in minimum amounts of not less than $2,000,000, pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording; provided, however, that so long as (i) no Default or Event of Default has occurred, and (ii) the Maximum Revolving Advance Amount is less than $15,000,000, no Lender shall sell, assign or transfer any part of its rights and obligations under or relating to Advances under this Agreement and the Other Documents to one or more additional banks or financial institutions without Borrowers' consent, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Agent or any Lender may, at any time or from time to time, assign its rights and obligations under this Agreement as part of an assignment and transfer of such Agent's or Lender's rights in and to a material portion or all of such Agent's or Lender's portfolio of asset-based credit facilities.   Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose.  Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents.  Each Borrower hereby consents to the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents.  Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(d)     Any Lender, with the consent of Agent which shall not be unreasonably withheld or delayed, may directly or indirectly sell, assign or transfer all or any portion of its rights and obligations under or relating to Revolving Advances under this Agreement and the Other Documents to an entity, whether a corporation, partnership, trust, limited liability company or other entity that (i) is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and (ii) is administered, serviced or managed by the assigning Lender or an Affiliate of such Lender (a "Purchasing CLO" and together with each Participant and Purchasing Lender, each a "Transferee" and collectively the "Transferees"), pursuant to a Commitment Transfer Supplement modified as appropriate to reflect the interest being assigned ("Modified Commitment Transfer Supplement"), executed by any intermediate purchaser, the Purchasing CLO, the transferor Lender, and Agent as appropriate and delivered to Agent for recording. Upon such execution and delivery, from and after the transfer effective date determined pursuant to such Modified Commitment Transfer Supplement, (i) Purchasing CLO thereunder shall be a

074658.01343/22000590v.9

party hereto and, to the extent provided in such Modified Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder and (ii) the transferor Lender thereunder shall, to the extent provided in such Modified Commitment Transfer Supplement, be released from its obligations under this Agreement, the Modified Commitment Transfer Supplement creating a novation for that purpose. Such Modified Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing CLO. Each Borrower hereby consents to the addition of such Purchasing CLO. Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(e)     Agent shall maintain at its address a copy of each Commitment Transfer Supplement and Modified Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder. The entries in the Register shall be conclusive, in the absence of manifest error, and each Borrower, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Advance recorded therein for the purposes of this Agreement. The Register shall be available for inspection by any Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of $3,500 payable by the applicable Purchasing Lender and/or Purchasing CLO upon the effective date of each transfer or assignment (other than to an intermediate purchaser) to such Purchasing Lender and/or Purchasing CLO.

(f)     Each Borrower authorizes each Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning such Borrower which has been delivered to such Lender by or on behalf of such Borrower pursuant to this Agreement or in connection with such Lender's credit evaluation of such Borrower.

17.4.   <u>Application of Payments</u>. Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations. To the extent that any Borrower makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent or such Lender.

17.5.   <u>Indemnity</u>. Each Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, except to the extent that any

074658.01343/22000590v.9

of the foregoing arises out of the willful misconduct of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment). Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the indemnitees described above in this Section 16.5 by any Person under any Environmental Laws or similar laws by reason of any Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Substances and Hazardous Waste, or other Toxic Substances. Additionally, if any taxes (excluding taxes imposed upon or measured solely by the net income of Agent and Lenders, but including any intangibles taxes, stamp tax, recording tax or franchise tax) shall be payable by Agent, Lenders or Borrowers on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrowers will pay (or will promptly reimburse Agent and Lenders for payment of) all such taxes, including interest and penalties thereon, and will indemnify and hold the indemnitees described above in this Section 17.5 harmless from and against all liability in connection therewith.

17.6. <u>Notice</u>. Any notice or request hereunder may be given to Borrowing Agent or any Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section. Any notice, request, demand, direction or other communication (for purposes of this Section 17.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Loan Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a site on the World Wide Web (a "Website Posting") if Notice of such Website Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 17.6) in accordance with this Section 17.6. Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 17.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 17.6. Any Notice shall be effective:

(a) In the case of hand-delivery, when delivered;

(b) If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c) In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, a Website Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d) In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

074658.01343/22000590v.9

(e)     In the case of electronic transmission, when actually received;

(f)     In the case of a Website Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(g)     If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to Borrowing Agent or any Borrower shall concurrently send a copy thereof to the Agent, and the Agent shall promptly notify the other Lenders of its receipt of such Notice.

(A)     If to Agent or PNC at:

PNC Bank, National Association
1600 Market Street
Philadelphia, Pennsylvania  19103
Attention: O. Theodore Kuber, Jr.
Telephone: (215) 585-8546
Facsimile:  (215) 585-4771

with an additional copy to:

Blank Rome LLP
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania  19103
Attention: Lawrence F. Flick, II, Esq.
Telephone: (215) 569-5556
Facsimile: (215) 832-5556

(B)     If to a Lender other than Agent, as specified on the signature pages hereof

(C)     If to Borrowing Agent or any Borrower:


United Gilsonite Laboratories, Inc.
1369 Jefferson Avenue
Scranton, Pennsylvania  18501
Attention: Thomas White, President
Telephone: _____
Facsimile: _____

with additional copies to:

Gibbons P.C.
One Gateway Center

074658.01343/22000590v.9

Newark, New Jersey 07102
Attention: Michael J. Lubben, Esquire
Telephone: (973) 596-4649
Facsimile: (973) 639-6236

17.7. <u>Survival</u>. The obligations of Borrowers under Sections 2.2(f), 3.7, 3.8, 3.9, 4.19(h), and 17.5 and the obligations of Lenders under Section 15.7, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.

17.8. <u>Severability</u>. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

17.9. <u>Expenses</u>. All costs and expenses including reasonable attorneys' fees (including the allocated costs of in house counsel) and disbursements incurred by Agent on its behalf or on behalf of Lenders (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement, or any consents or waivers hereunder and all related agreements, documents and instruments, or (c) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, or maintaining, preserving or enforcing any of Agent's or any Lender's rights hereunder, and under all related agreements, documents and instruments, whether through judicial proceedings or otherwise, or (d) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's or any Lender's transactions with any Borrowers, any Guarantor or (e) in connection with any advice given to Agent or any Lender with respect to its rights and obligations under this Agreement, and all related agreements, documents and instruments, may be charged to Borrowers' Account and shall be part of the Obligations, or (f) in connection with the Case, including without limitation, (i) costs and expenses incurred in connection with review of pleadings and other filings made with the Bankruptcy Court, (ii) attendance at all hearings in respect of the Case, and (iii) the monitoring of the Case.

17.10. <u>Injunctive Relief</u>. Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

17.11. <u>Consequential Damages</u>. No party hereto shall be liable to any other party hereto (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong as a result of any transaction contemplated under this Agreement or any Other Document.

17.12. <u>Captions</u>. The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

17.13. <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile or electronic transmission shall be deemed to be an original signature hereto.

17.14. <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

17.15. <u>Confidentiality; Sharing Information</u>. Agent, each Lender and each Transferee shall hold all non-public information obtained by Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender and each Transferee may disclose such confidential information (a) to its examiners, Affiliates, outside auditors, counsel and other professional advisors, (b) to Agent, any Lender or to any prospective Transferees, and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law or court order, Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Borrower of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender or any Transferee be obligated to return any materials furnished by any Borrower other than those documents and instruments in possession of Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated. Each Borrower acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Borrower or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Borrower hereby authorizes each Lender to share any information delivered to such Lender by such Borrower and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 17.15 as if it were a Lender hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

17.16. <u>Publicity</u>. Each Borrower and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Borrowers, Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall in its sole and absolute discretion deem appropriate.

17.17. <u>Certifications From Banks and Participants; USA PATRIOT Act</u>. Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States

074658.01343/22000590v.9

of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within 10 days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

074658.01343/22000590v.9

Each of the parties has signed this Agreement as of the day and year first above written.

UNITED GILSONITE LABORATORIES

By: _____

Name: _____

Title: _____


PNC BANK, NATIONAL ASSOCIATION,
As Lender and as Agent

By: _____

Name: _____

Title: _____


Commitment Percentage:    100%

[SIGNATURE PAGE TO DIP FINANCING AGREEMENT]

S-1

074658.01343/22000590v.9