# Exhibit 1

# DEBTOR-IN-POSSESSION FINANCING AGREEMENT

## PNC BANK, NATIONAL ASSOCIATION

## (AS LENDER AND AS AGENT)

## WITH

## UNITED GILSONITE LABORATORIES

### and

## EACH OTHER PERSON THAT MAY BE JOINED AS A BORROWER HERETO

### (as BORROWERS)

## April 11, 2011

# TABLE OF CONTENTS

I.     DEFINITIONS AND ACKNOWLEDGMENT...................................................1
    1.1.   Accounting Terms ...........................................................................1
    1.2.   General Terms ...................................................................................2
    1.3.   Uniform Commercial Code Terms.................................................25
    1.4.   Certain Matters of Construction ....................................................25
II.    ADVANCES, PAYMENTS.........................................................................26
    2.1.   Revolving Advances. ......................................................................26
    2.2.   Procedure for Revolving Advances Borrowing. ............................27
    2.3.   Disbursement of Advance Proceeds ..............................................29
    2.4.   Reserved..........................................................................................29
    2.5.   Maximum Advances .......................................................................30
    2.6.   Repayment of Advances. ................................................................30
    2.7.   Repayment of Excess Advances ....................................................30
    2.8.   Statement of Account .....................................................................30
    2.9.   Letters of Credit .............................................................................31
    2.10.  Issuance of Letters of Credit..........................................................31
    2.11.  Requirements For Issuance of Letters of Credit.............................31
    2.12.  Disbursements, Reimbursement.....................................................32
    2.13.  Repayment of Participation Advances. ..........................................33
    2.14.  Documentation ...............................................................................34
    2.15.  Determination to Honor Drawing Request.....................................34
    2.16.  Nature of Participation and Reimbursement Obligations ..............34
    2.17.  Indemnity .......................................................................................35
    2.18.  Liability for Acts and Omissions ...................................................36
    2.19.  Additional Payments ......................................................................37
    2.20.  Manner of Borrowing and Payment. ..............................................37
    2.21.  Mandatory Prepayments.................................................................39
    2.22.  Use of Proceeds. ............................................................................39
    2.23.  Defaulting Lender. .........................................................................40
III.   INTEREST AND FEES. ............................................................................40
    3.1.   Interest............................................................................................41
    3.2.   Letter of Credit Fees.......................................................................41
    3.3.   Commitment Fee, Facility Fee and Termination Fee......................42
    3.4.   Collateral Evaluation Fee, Collateral Monitoring Fee and Appraisals. .........................42
    3.5.   Computation of Interest and Fees...................................................43
    3.6.   Maximum Charges .........................................................................43
    3.7.   Increased Costs...............................................................................43
    3.8.   Basis For Determining Interest Rate Inadequate or Unfair............44
    3.9.   Capital Adequacy. ..........................................................................44
    3.10.  Gross Up for Taxes ........................................................................45
    3.11.  Withholding Tax Exemption. ..........................................................45
IV.   COLLATERAL:  GENERAL TERMS......................................................46

074658.01343/22000590v.10

| | | |
|---|---|---|
| 4.1. | Security Interest in the Collateral | 46 |
| 4.2. | Perfection of Security Interest | 47 |
| 4.3. | Disposition of Collateral | 47 |
| 4.4. | Preservation of Collateral | 47 |
| 4.5. | Ownership of Collateral. | 48 |
| 4.6. | Defense of Agent's and Lenders' Interests | 48 |
| 4.7. | Books and Records | 49 |
| 4.8. | Financial Disclosure | 49 |
| 4.9. | Compliance with Laws | 49 |
| 4.10. | Inspection of Premises | 49 |
| 4.11. | Insurance | 50 |
| 4.12. | Failure to Pay Insurance | 51 |
| 4.13. | Payment of Taxes | 51 |
| 4.14. | Payment of Leasehold Obligations | 51 |
| 4.15. | Receivables | 52 |
| 4.16. | Inventory | 54 |
| 4.17. | Maintenance of Equipment | 54 |
| 4.18. | Exculpation of Liability | 54 |
| 4.19. | Environmental Matters. | 54 |
| 4.20. | Financing Statements | 56 |
| V. | SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC. | 57 |
| 5.1. | Superpriority Claims and Collateral Security | 57 |
| 5.2. | No Filings Required | 57 |
| 5.3. | Grants, Rights and Remedies | 57 |
| 5.4. | No Discharge; Survival of Claims | 57 |
| 5.5. | Survival | 58 |
| 5.6. | Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances | 58 |
| 5.7. | Exclusive Remedy For Any Alleged Post-Petition Claim | 59 |
| 5.8. | Prohibition on Surcharge; Etc | 59 |
| 5.9. | Marshalling Obligations | 60 |
| 5.10. | Bankruptcy Notices | 60 |
| VI. | REPRESENTATIONS AND WARRANTIES. | 60 |
| 6.1. | Authority | 60 |
| 6.2. | Formation and Qualification. | 60 |
| 6.3. | Survival of Representations and Warranties | 61 |
| 6.4. | Tax Returns | 61 |
| 6.5. | Financial Statements. | 61 |
| 6.6. | Entity Names | 61 |
| 6.7. | O.S.H.A. and Environmental Compliance. | 62 |
| 6.8. | No Litigation, Violation, Indebtedness or Default. | 62 |
| 6.9. | Patents, Trademarks, Copyrights and Licenses | 63 |
| 6.10. | Licenses and Permits | 64 |
| 6.11. | Default of Indebtedness | 64 |
| 6.12. | No Default | 64 |

074658.01343/22000590v.10

6.13. No Burdensome Restrictions.....................................................................64
6.14. No Labor Disputes ...................................................................................64
6.15. Margin Regulations ..................................................................................64
6.16. Investment Company Act..........................................................................65
6.17. Disclosure ...............................................................................................65
6.18. Swaps .....................................................................................................65
6.19. Conflicting Agreements ...........................................................................65
6.20. Application of Certain Laws and Regulations ...........................................65
6.21. Business and Property of Borrowers.........................................................65
6.22. Section 20 Subsidiaries............................................................................65
6.23. Anti-Terrorism Laws.................................................................................65
6.24. Trading with the Enemy ...........................................................................66
6.25. Federal Securities Laws ...........................................................................66
6.26. Equity Interests........................................................................................66
6.27. Bankruptcy Matters..................................................................................67

VII. AFFIRMATIVE COVENANTS. ...........................................................................67
7.1. Payment of Fees .......................................................................................67
7.2. Conduct of Business and Maintenance of Existence and Assets ...............67
7.3. Violations .................................................................................................68
7.4. Government Receivables...........................................................................68
7.5. Fixed Charge Coverage Ratio ...................................................................68
7.6. Execution of Supplemental Instruments ...................................................68
7.7. Payment of Indebtedness..........................................................................68
7.8. Standards of Financial Statements ...........................................................69
7.9. Federal Securities Laws ...........................................................................69
7.10. Bankruptcy Schedules. .............................................................................69

VIII. NEGATIVE COVENANTS....................................................................................69
8.1. Merger, Consolidation, Acquisition and Sale of Assets.............................69
8.2. Creation of Liens......................................................................................69
8.3. Guaranties................................................................................................69
8.4. Investments..............................................................................................70
8.5. Loans .......................................................................................................70
8.6. Capital Expenditures ................................................................................70
8.7. Dividends / Distributions .........................................................................70
8.8. Indebtedness ............................................................................................70
8.9. Nature of Business ...................................................................................70
8.10. Transactions with Affiliates .....................................................................70
8.11. Leases ......................................................................................................70
8.12. Subsidiaries. ............................................................................................70
8.13. Fiscal Year and Accounting Changes .......................................................71
8.14. Pledge of Credit.......................................................................................71
8.15. Amendment of Articles of Incorporation, By-Laws, Certificate of Formation or Operating Agreement ..............................................................................71
8.16. Compliance with ERISA ...........................................................................71
8.17. Prepayment of Indebtedness.....................................................................71

074658.01343/22000590v.10

| 8.18. | Anti-Terrorism Laws | 71 |
| 8.19. | Trading with the Enemy Act | 72 |
| 8.20. | Bankruptcy Matters. | 72 |
| IX. | CONDITIONS PRECEDENT | 72 |
| 9.1. | Conditions to Initial Advances | 72 |
| 9.2. | Conditions to Each Advance | 76 |
| X. | INFORMATION AS TO BORROWERS. | 77 |
| 10.1. | Disclosure of Material Matters | 77 |
| 10.2. | Schedules | 77 |
| 10.3. | Environmental Reports | 77 |
| 10.4. | Litigation | 77 |
| 10.5. | Material Occurrences | 78 |
| 10.6. | Government Receivables | 78 |
| 10.7. | Annual Financial Statements | 78 |
| 10.8. | Quarterly Financial Statements | 78 |
| 10.9. | Monthly Financial Statements | 79 |
| 10.10. | Other Reports | 79 |
| 10.11. | Additional Information | 79 |
| 10.12. | Budget | 79 |
| 10.13. | Variances From Operating Budget | **Error! Bookmark not defined.** |
| 10.14. | Notice of Suits, Adverse Events | 80 |
| 10.15. | ERISA Notices and Requests | 80 |
| 10.16. | Other Bankruptcy Documents | 80 |
| 10.17. | Additional Documents | 81 |
| XI. | EVENTS OF DEFAULT | 81 |
| 11.1. | Nonpayment | 81 |
| 11.2. | Breach of Representation | 81 |
| 11.3. | Financial Information | 81 |
| 11.4. | Judicial Actions | 81 |
| 11.5. | Noncompliance | 81 |
| 11.6. | Judgments | 81 |
| 11.7. | Purchase Card Agreement Default | 82 |
| 11.8. | Material Adverse Effect. The occurrence of any Material Adverse Effect; | 82 |
| 11.9. | Lien Priority | 82 |
| 11.10. | Cross Default | 82 |
| 11.11. | Change of Ownership | 82 |
| 11.12. | Invalidity | 82 |
| 11.13. | Licenses | 82 |
| 11.14. | Seizures | 82 |
| 11.15. | Pension Plans | 83 |
| 11.16. | Bankruptcy Defaults and Events of Default. | 83 |
| XII. | LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. | 84 |
| 12.1. | Rights and Remedies. | 84 |

iv

| 12.2. | Agent's Discretion | 86 |
| 12.3. | Setoff | 86 |
| 12.4. | Rights and Remedies not Exclusive | 86 |
| 12.5. | Allocation of Payments After Event of Default | 86 |

XIII. WAIVERS AND JUDICIAL PROCEEDINGS............................................................87

| 13.1. | Waiver of Notice | 87 |
| 13.2. | Delay | 87 |
| 13.3. | Jury Waiver | 88 |

XIV. EFFECTIVE DATE AND TERMINATION...................................................................88

| 14.1. | Term | 88 |
| 14.2. | Termination | 88 |

XV. REGARDING AGENT.......................................................................................................88

| 15.1. | Appointment | 88 |
| 15.2. | Nature of Duties | 89 |
| 15.3. | Lack of Reliance on Agent and Resignation | 89 |
| 15.4. | Certain Rights of Agent | 90 |
| 15.5. | Reliance | 90 |
| 15.6. | Notice of Default | 90 |
| 15.7. | Indemnification | 91 |
| 15.8. | Agent in its Individual Capacity | 91 |
| 15.9. | Delivery of Documents | 91 |
| 15.10. | Borrowers' Undertaking to Agent | 91 |
| 15.11. | No Reliance on Agent's Customer Identification Program | 91 |
| 15.12. | Other Agreements | 92 |

XVI. BORROWING AGENCY...............................................................................................92

| 16.1. | Borrowing Agency Provisions. | 92 |
| 16.2. | Waiver of Subrogation | 92 |

XVII. MISCELLANEOUS........................................................................................................93

| 17.1. | Governing Law. | 93 |
| 17.2. | Entire Understanding. | 94 |
| 17.3. | Successors and Assigns; Participations; New Lenders. | 96 |
| 17.4. | Application of Payments | 98 |
| 17.5. | Indemnity | 98 |
| 17.6. | Notice | 99 |
| 17.7. | Survival | 101 |
| 17.8. | Severability | 101 |
| 17.9. | Expenses | 101 |
| 17.10. | Injunctive Relief | 101 |
| 17.11. | Consequential Damages | 101 |
| 17.12. | Captions | 102 |
| 17.13. | Counterparts; Facsimile Signatures | 102 |
| 17.14. | Construction | 102 |

Case 5:11-bk-02032-RNO    Doc 115-1    Filed 05/03/11    Entered 05/04/11 10:20:31
Desc Exhibit #1    Page 7 of 38

17.15. Confidentiality; Sharing Information ........................................................102

17.16. Publicity ..............................................................................................102

17.17. Certifications From Banks and Participants; USA PATRIOT Act .............................103

vi

074658.01343/22000590v.10

## LIST OF EXHIBITS AND SCHEDULES

Exhibits

| | |
|---|---|
| Exhibit 1.2 | Borrowing Base Certificate |
| Exhibit 2.1(a) | Revolving Credit Note |
| Exhibit 6.5(a) | Financial Projections |
| Exhibit 7.1(k) | Financial Condition Certificate |
| Exhibit 17.3 | Commitment Transfer Supplement |

Schedules

| | |
|---|---|
| Schedule 1.2(a) | Permitted Encumbrances |
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.15(h) | Deposit and Investment Accounts |
| Schedule 4.19 | Real Property |
| Schedule 6.1 | Consents |
| Schedule 6.2(a) | States of Qualification and Good Standing |
| Schedule 6.2(b) | Subsidiaries |
| Schedule 6.4 | Federal Tax Identification Number |
| Schedule 6.6 | Prior Names |
| Schedule 6.7(c) | Environmental Releases |
| Schedule 6.8(b) | Litigation |
| Schedule 6.8(d) | Plans |
| Schedule 6.9 | Intellectual Property, Source Code Escrow Agreements |
| Schedule 6.10 | Licenses and Permits |
| Schedule 6.14 | Labor Disputes |
| Schedule 6.26 | Capitalization Chart |
| Schedule 8.3 | Guarantees |

074658.01343/22000590v.10

## DEBTOR-IN POSSESSION FINANCING AGREEMENT

Pursuant to Section 364(c) and (d) of the Bankruptcy Code, this DEBTOR-IN-POSSESSION FINANCING AGREEMENT ("Agreement") is made as of April 11, 2011 among **UNITED GILSONITE LABORATORIES**, a Pennsylvania corporation ("UGL") and **EACH OTHER PERSON THAT MAY BE JOINED AS A BORROWER HERETO** (collectively, the "Borrowers" and each a "Borrower"), the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and each individually a "Lender") and **PNC BANK, NATIONAL ASSOCIATION** ("PNC"), as agent for Lenders (PNC, in such capacity, the "Agent").

## RECITALS

A.     UGL filed a voluntary petition for relief on March 23, 2011 (the "Petition Date") under Chapter 11 of the Bankruptcy Code (as defined below), which petition was identified as Bankruptcy Case No. 11-02032 (RNO) (the "Case") before the Bankruptcy Court (as defined below).  UGL remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

B.     UGL has requested that during the Case, Agent and Lenders make loans, advances and extensions of credit in an amount up to $8,200,000 on a senior secured, superpriority basis, pursuant to Section 364(c) and (d) of the Bankruptcy Code.

C.     Agent and Lenders are willing to provide loans and advances to UGL on a senior secured, superpriority basis, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, on the terms and subject to the conditions of this Agreement, so long as such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Borrowers, whether now owned or hereafter acquired, which liens are superior to all other liens; and (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code as provided in the Interim Order.

IN CONSIDERATION of the foregoing Recitals, which are incorporated into the operative provisions of this Agreement by this reference, the mutual covenants and undertakings herein contained, Borrowers (acting for themselves and as debtors-in-possession in the Case), Lenders and Agent hereby agree as follows:

I.     DEFINITIONS AND ACKNOWLEDGMENT.

1.1.     <u>Accounting Terms</u>.  As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP; provided, however, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited financial statements of Borrowers for the fiscal year ended December 31, 2009.

1.2.	General Terms.	For purposes of this Agreement the following terms shall have the following meanings:

"Accountants" shall have the meaning set forth in Section 10.7 hereof.

"Advance Rates" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Advances" shall mean and include the Revolving Advances and Letters of Credit.

"Affiliate" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Agreement" shall mean this Debtor-in-Possession Financing Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the higher of (i) the Base Rate in effect on such day, (ii) the sum of the Federal Funds Open Rate in effect on such day plus one half of one-percent (1/2 of 1%), and (iii) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.0%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

"Alternate Source" shall have the meaning set forth in the definition of "Eurodollar Rate".

"Anti-Terrorism Laws" shall mean any Applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA PATRIOT Act, the Applicable Laws comprising or implementing the Bank Secrecy Act, and the Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Applicable Laws may from time to time be amended, renewed, extended, or replaced).

"Applicable Law" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"Authority" shall have the meaning set forth in Section 4.19(d) hereof.

2

"Avoidance Actions" means all actions of Borrowers or their estates under Chapter 5 or Section 724(a) of the Bankruptcy Code and all proceeds thereof.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Pennsylvania, or such other court having jurisdiction over the Case.

"Base Rate" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"Benefited Lender" shall have the meaning set forth in Section 2.20(d) hereof.

"Blocked Accounts" shall have the meaning set forth in Section 4.15(h) hereof.

"Blocked Account Bank" shall have the meaning set forth in Section 4.15(h) hereof.

"Blocked Person" shall have the meaning set forth in Section 6.24(b) hereof.

"Borrower" or "Borrowers" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a Consolidated Basis" shall mean the consolidation in accordance with GAAP of the accounts or other items of the Borrowers and their respective Subsidiaries.

"Borrowers' Account" shall have the meaning set forth in Section 2.8 hereof.

"Borrowing Agent" shall mean UGL.

"Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2 duly executed by the President, Vice President, Chief Financial Officer or Controller of the Borrowing Agent and delivered to the Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"Borrowing Base Reserves" means, as of any date of determination, such amounts (expressed as either a specified amount or as a percentage of a specified category or item) as the Agent may from time to time reasonably establish and adjust upon at least five (5) days prior notice to Borrowers (a) to reflect events, conditions, contingencies or risks arising after the Closing Date which, as reasonably determined by the Agent in good faith, do or may affect (i) the Receivables or Inventory or its respective value, (ii) the assets, business or prospects of the Borrowers, or (iii) the security interests and other rights of the Agent in the Collateral (including

3

the enforceability, perfection and priority thereof), or (b) to reflect the Agent's good faith judgment that any collateral report or financial information furnished by or on behalf of a Borrower to the Agent is or may have been incomplete, inaccurate or misleading in any material respect, or (c) in respect of any state of facts that the Lender determines constitutes an Event of Default.

"Budget" shall mean a budget prepared by Borrowers in good faith based upon assumptions which the Borrowers believe to be reasonable and delivered to Agent on or before the Closing Date and attached hereto as Exhibit A, setting forth Borrowers' cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability for the period commencing March 25, 2011 through and including June 24, 2011 (the "Initial Period"), and at the end of the Initial Period and at the end of each month thereafter, shall mean a budget prepared by Borrowers in good faith based upon assumptions which the Borrowers believe to be reasonable setting forth Borrowers' cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability for the immediately succeeding three (3) month period.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in East Brunswick, New Jersey and, if the applicable Business Day relates to any Eurodollar Rate Loans, such day must also be a day on which dealings are carried on in the London interbank market.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations, which, in accordance with GAAP, would be classified as capital expenditures.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" shall have the meaning given to the term "Carve-Out" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Carve-Out Cap" shall have the meaning given to the term "Carve-Out" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Case" shall have the meaning set forth in the Recitals to this Agreement.

"Cash Management Order" shall have the meaning set forth in Section 9.1(g) hereof

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Control" shall mean (a) the occurrence of any event (whether in one or more transactions) which results in a transfer of control of any Borrower to a Person who is not an

4

Original Owner or (b) any merger or consolidation of or with any Borrower or sale of all or substantially all of the property or assets of any Borrower. For purposes of this definition, "control of Borrower" shall mean the power, direct or indirect (x) to vote 35% or more of the Equity Interests having ordinary voting power for the election of directors (or the individuals performing similar functions) of any Borrower or (y) to direct or cause the direction of the management and policies of any Borrower by contract or otherwise.

"Change of Ownership" shall mean (a) 100% of the Equity Interests of any Borrower is no longer owned or controlled by (including for the purposes of the calculation of percentage ownership, any Equity Interests into which any Equity Interests of any Borrower held by any of the Original Owners are convertible or for which any such Equity Interests of any Borrower or of any other Person may be exchanged and any Equity Interests issuable to such Original Owners upon exercise of any warrants, options or similar rights which may at the time of calculation be held by such Original Owners) a Person who is an Original Owner, or (b) any merger, consolidation or sale of substantially all of the property or assets of any Borrower or Holdings.

"Changed Circumstances" shall have the meaning set forth in Section 5.6 hereof.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean April 11, 2011 or such other date as may be agreed to by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean and include:

      (a)      all Receivables;

      (b)      all Equipment;

      (c)      all General Intangibles;

      (d)      all Inventory;

      (e)      all Investment Property;

      (f)      all Avoidance Actions;

5

(g)     all Real Property;

(h)     all of each Borrower's right, title and interest in and to, whether now owned or hereafter acquired and wherever located; (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the Obligations; (v) all of each Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by any Borrower, all real and personal property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(i)     all property and assets described in the Interim Order and the Final Order;

(j)     all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g), (h) or (i) of this paragraph; and

(k)     all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h), (i) and (j) in whatever form, including, but not limited to:  cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"Commitment Percentage" of any Lender shall mean the percentage set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by a Lender pursuant to Section 17.3(c) or (d) hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 17.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances under this Agreement.

6

"Committee Expenses" shall have the meaning given to the term "Committee Expenses" in the Final Order, or, prior to the entry of the Final Order, the Interim Order, less the amount of any retainers, if any, then held by such persons.

"Compliance Certificate" shall mean a compliance certificate to be signed by the Vice President, Chief Financial Officer or Controller of Borrowing Agent, which shall state that, based on an examination sufficient to permit such officer to make an informed statement, no Default or Event of Default exists, or if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such default and, such certificate shall have appended thereto calculations which set forth Borrowers' compliance with the requirements or restrictions imposed by Sections 7.5, 8.4, 8.5, 8.6, 8.7, 8.8 and 8.11 hereof.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement and the Other Documents, including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of any Borrower that is in the possession of another Person on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Contract Rate" shall have the meaning set forth in Section 3.1 hereof.

"Controlled Group" shall mean, at any time, each Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Creditors Committee" means the official unsecured creditors' committee appointed in the Case.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.11(b) hereof.

"Daily LIBOR Rate" shall mean, for any day, the rate per annum determined by the Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the percentage prescribed by the Federal Reserve for determining the maximum reserve requirements with respect to any Eurocurrency funding by banks on such day.

074658.01343/22000590v.10

"Damage Lawsuit" shall have the meaning set forth in Section 5.7 hereof.

"Debt Payments" shall mean and include (a) all cash actually expended by any Borrower to make interest payments on any Advances under this Agreement, plus (b) accrued but unpaid interest on account of Eurodollar Rate Loans under this Agreement, plus (c) scheduled principal payments on any term loans payable to Agent and Lender, plus (d) all cash actually expended by any Borrower to make payments for all fees, commissions and charges set forth herein and with respect to any Advances under this Agreement, plus (e) all cash actually expended by any Borrower to make payments on Capitalized Lease Obligations, plus (f) all cash actually expended by any Borrower to make payments with respect to any other Indebtedness for borrowed money plus the out of pocket costs and expenses to be paid by Borrowers at or prior to the Closing Date to the Agent for the ratable benefit of the Lenders hereunder (excluding the sum of the fees payable under Section 3.3(a) hereof).

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall have the meaning set forth in Section 2.23(a) hereof.

"Depository Accounts" shall have the meaning set forth in Section 4.15(h) hereof.

"Documents" shall have the meaning set forth in Section 9.1(c) hereof.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Drawing Date" shall have the meaning set forth in Section 2.12(b) hereof.

"Earnings Before Interest and Taxes" shall mean for any period the sum of (i) net income (or loss) of Borrowers on a Consolidated Basis for such period (excluding extraordinary gains and losses), plus (ii) all interest expense of Borrowers on a Consolidated Basis for such period, plus (iii) all charges against income of Borrowers on a Consolidated Basis for such period for federal, state and local taxes.

"EBITDA" shall mean for any period the sum of (i) Earnings Before Interest and Taxes for such period, plus (ii) depreciation expenses for such period, plus (iii) amortization expenses for such period.

"Eligible Inventory" shall mean and include finished goods and raw material Inventory, but excluding work-in-process Inventory, with respect to each Borrower, valued at the lower of cost or market value, determined on a first-in-first-out basis, which is not, in Agent's opinion, obsolete, slow moving or unmerchantable and which Agent, in its reasonable discretion, shall not deem ineligible Inventory, based on such considerations as Agent may in its reasonable discretion from time to time deem appropriate including whether the Inventory is subject to a

perfected, first priority security interest in favor of Agent and no other Lien (other than a Permitted Encumbrance). Eligible Inventory shall include all Inventory in-transit between locations owned or leased by the Borrowers and inventory classified as exchanges, which is insured to the full value thereof and for which Agent shall have in its possession (a) all negotiable bills of lading properly endorsed and (b) all non-negotiable bills of lading issued in Agent's name. In addition, Inventory shall not be Eligible Inventory if it: (i) does not conform to all standards imposed by any Governmental Body which has regulatory authority over such goods or the use or sale thereof; (ii) except as set forth above, is in transit; (iii) is located outside the continental United States; (iv) constitutes Consigned Inventory; (v) is the subject of an Intellectual Property Claim; (vi) is subject to a License Agreement or other agreement that limits, conditions or restricts any Borrower's or Agent's right to sell or otherwise dispose of such Inventory, unless Agent is a party to a Licensor/Agent Agreement with the Licensor under such License Agreement; or (vii) or is situated at a location not owned by a Borrower unless the owner or occupier of such location has executed in favor of Agent a Lien Waiver Agreement.

"Eligible Receivables" shall mean and include with respect to each Borrower, each Receivable of such Borrower arising in the Ordinary Course of Business and which Agent, in its sole credit judgment, shall deem to be an Eligible Receivable, based on the criteria set forth below and such other considerations as Agent may from time to time deem appropriate in its reasonable discretion and after providing Borrowers with not less than five (5) days prior notice of any new criteria. A Receivable shall not be deemed eligible unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by an invoice or other documentary evidence satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

      (a)    it arises out of a sale made by any Borrower to an Affiliate of any Borrower or to a Person controlled by an Affiliate of any Borrower;

      (b)    it is due or unpaid more than ninety (90) days after the original invoice date;

      (c)    fifty percent (50%) or more of the Receivables from such Customer are not deemed Eligible Receivables hereunder. Such percentage may, in Agent's reasonable discretion, be increased or decreased from time to time upon at least five (5) days prior written notice to Borrowers;

      (d)    any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

      (e)    the Customer shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed

9

against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)    the sale is to a Customer outside the continental United States of America, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its sole discretion;

(g)    the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(h)    after consultation with Borrowers, Agent in good faith reasonably determines that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay;

(i)    the Customer is the United States of America, any state or any department, agency or instrumentality of any of them, unless the applicable Borrower assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances;

(j)    the goods giving rise to such Receivable have not been delivered to and accepted by the Customer or the services giving rise to such Receivable have not been performed by the applicable Borrower and accepted by the Customer or the Receivable otherwise does not represent a final sale;

(k)    the Receivables of the Customer exceed a credit limit determined by Agent, in its reasonable discretion, after consultation with Borrowing Agent and notice to Borrowing Agent of such credit limit, to the extent such Receivable exceeds such limit;

(l)    the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim (to the extent of such offset, deduction, defense or counterclaim), the Customer is also a creditor or supplier of a Borrower (to the extent of monies owed by Borrowers to such customer) or the Receivable is contingent in any respect or for any reason;

(m)    the applicable Borrower has made any agreement with any Customer for any deduction therefrom, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(n)    any return, rejection or repossession of the merchandise has occurred or the rendition of services has been disputed;

(o)    such Receivable is not payable to a Borrower; or

(p)    such Receivable is not otherwise reasonably satisfactory to Agent.

"Environmental Complaint" shall have the meaning set forth in Section 4.19(d) hereof.

10

"Environmental Laws" shall mean all federal, state and local environmental laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's tangible personal property (other than Inventory) whether now owned or hereafter acquired and wherever located including: all equipment; machinery; manufacturing; distribution; selling; data processing and office equipment; assembly systems, tools; molds; dies; fixtures; appliances; apparatus; motor vehicles; fittings; furniture; furnishings; fixtures; parts; accessories; and any and all accessions, parts, appurtenances attached to any of the foregoing or used in connection therewith; and any replacements, products, proceeds, and substitutions therefor or accessions thereto.

"Equity Interests" of any Person shall mean any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"Eurodollar Rate" shall mean for any Eurodollar Rate Loan for the then current Interest Period relating thereto, the interest rate per annum determined by Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (i) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which US dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Agent which has been approved by the British Bankers' Association as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (an "Alternate Source"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such Eurodollar Rate Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any Alternate Source, a comparable replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error)), by (ii) a number equal 1.00 minus the Reserve Percentage. The Eurodollar Rate may also be expressed by the following formula:

Eurodollar Rate =  Average of London interbank offered rates quoted by Bloomberg or appropriate Successor as shown on

Bloomberg Page BBAM1

11

074658.01343/22000590v.10

The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date. The Agent shall give prompt notice to the Borrowing Agent of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

"Eurodollar Rate Loan" shall mean an Advance at any time that bears interest based on the Eurodollar Rate.

"Event of Default" shall have the meaning set forth in Article XI hereof.

"Exchange Act" shall have the mean the Securities Exchange Act of 1934, as amended.

"Executive Order No. 13224" shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" shall mean the rate per annum determined by the Agent in accordance with its usual procedures (which determination shall be conclusive absent manifest error) to be the "open" rate for federal funds transactions as of the opening of business for federal funds transactions among members of the Federal Reserve System arranged by federal funds brokers on such day, as quoted by Garvin Guybutler Corporation, any successor entity thereto, or any other broker selected by the Agent, as set forth on the applicable Telerate display page; provided, however; that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day, or if no such rate shall be quoted by a Federal funds broker at such time, such other rate as determined by the Agent in accordance with its usual procedures.

"Final Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to Agent. The Final Order shall, among other things, have:

12

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Loan Amount provided for herein;

(b)     granted the claim and Lien status and Liens described in Section 5.1, and prohibited the granting of additional Liens on the assets of Borrowers except for any Liens specifically provided for in such order;

(c)     provided that such Liens are automatically perfected as of the Petition Date by the entry of the Final Order and also granted to the Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law;

(d)     provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out; and

(e)     provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 12.1.

"Fixed Charge Coverage Ratio" shall mean and include, with respect to any fiscal period, the ratio of (a) EBITDA, plus [bankruptcy related expenses TBD], minus twenty percent (20%) of all Capital Expenditures made during such period, minus distributions (including tax distributions) and dividends made during such period, minus cash taxes paid during such period to (b) all Debt Payments made during such period.

"Foreign Subsidiary" of any Person, shall mean any Subsidiary of such Person that is not organized or incorporated in the United States or any State or territory thereof.

"Formula Amount" shall have the meaning set forth in Section 2.1(a) hereof.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired, including all present and future: (i) general intangibles; (ii) rights, interests, payment intangibles, choses in action, causes of action, claims and other intangible property of every kind and nature (other than Receivables); (iii) corporate and other business records; (iv) loans, royalties, and other obligations receivable; (v) trademarks, registered trademarks, trademark applications, service marks, registered service marks, service mark applications, patents, registered patents, patent applications, trade names, rights of use of any name, labels, fictitious names, inventions, designs, design rights, trade secrets, computer programs, software, printouts, computer information, source codes, codes, records and updates, registrations, and other computer materials, equipment formulations, manufacturing procedures, quality control procedures, goodwill, copyrights, copyright applications, permits, licenses, franchises, customer lists, credit files, correspondence, and

13

advertising materials; (vi) customer and supplier contracts, firm sale orders, rights under license and franchise agreements, rights under tax sharing agreements, rights under non-compete agreements, and other contracts and contract rights; (vii) interests in partnerships and joint ventures; (viii) tax refunds and tax refund claims; (ix) right, title and other agreements relating to property; (x) deposit accounts (general or special with any bank or other financial institution; (xi) credits with and other claims against third parties (including carriers and shippers); (xii) rights to indemnification and with respect to support and keep-well agreements; (xiii) reversionary interests in pension and profit sharing plans and reversionary, beneficial and residual interest in trusts; (xiv) letters of credit, guarantees, Liens, security interests and other security held by or granted to such Person; (xvi) uncertificated securities; (xvii) investment property; (xviii) all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables) all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governmental Acts" shall have the meaning set forth in Section 2.17 hereof.

"Governmental Body" shall mean any nation or government, any federal, state, local or other political subdivision thereof and any entity, authority, agency, division or department exercising the executive, legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean any Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"Guarantor Security Agreement" shall mean any Security Agreement executed by any Guarantor in favor of Agent securing the Guaranty of such Guarantor.

"Guaranty" shall mean any guaranty of the obligations of Borrowers executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders.

"Hazardous Discharge" shall have the meaning set forth in Section 4.19(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedge Liabilities" shall have the meaning provided in the definition of "Lender-Provided Interest Rate Hedge".

14

074658.01343/22000590v.10

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise) and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Ineligible Professional Expenses" shall mean fees or expenses incurred by any Person, including the Creditors' Committee, in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief preventing, hindering or delaying the Agent's or the Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any in accordance with the terms and conditions of the Interim Order or Final Order, (b) a request to use the cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of the Agent, (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the Agent or the Lenders without the prior written consent of the Agent, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the Agent, any Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the Agent or any Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of the Agent or any Lender, or which is contrary, in a manner that is material and adverse to the Agent or any Lender, to any term or condition set forth in or acknowledged by this Agreement, the Other Documents or the Interim Order and which results in the occurrence of an Event of Default under this Agreement, the Interim Order or the Final Order.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Initial Period" shall have the meaning set forth in the definition of "Budget" herein.

"Intellectual Property" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"Intellectual Property Claim" shall mean the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that any Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other

074658.01343/22000590v.10

property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Interest Period" shall mean the period provided for any Eurodollar Rate Loan pursuant to Section 2.2(b) hereof.

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, interest rate future or option, currency swap, currency future, forward, or option, adjustable strike cap, adjustable strike corridor or similar agreements entered into by any Borrower or its Subsidiaries in order to provide protection to, or minimize the impact upon, such Borrower, any Guarantor and/or their respective Subsidiaries of fluctuation in interests rates or increasing floating rates of interest applicable to Indebtedness, and/or foreign exchange rates or conversion rates for conversion of foreign currencies to Dollars.

"Interim Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents, for an interim period, under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance satisfactory to Agent. The Interim Order shall, among other things, have:

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Loan Amount provided for herein;

(b)     granted the claim and Lien status and Liens described in Section 5.1, and prohibited the granting of additional Liens on the assets of Borrowers except for any Liens specifically provided for in such order;

(c)     provided that such Liens are automatically perfected as of the Petition Date by the entry of the Interim Order and also granted to the Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law; and

(e)     provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 12.1.

"Inventory" shall mean and include as to each Borrower all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

074658.01343/22000590v.10

"Investment Property" shall mean and include as to each Borrower, all of such Borrower's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"Issuer" shall mean any Person who issues a Letter of Credit and/or accepts a draft pursuant to the terms hereof.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.

"Lender-Provided Interest Rate Hedge" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which the Agent confirms meets the following requirements: such Interest Rate Hedge (i) is documented in a standard International Swap Dealer Association Agreement, (ii) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner, and (iii) is entered into for hedging (rather than speculative) purposes. The liabilities of any Borrower to the provider of any Lender-Provided Interest Rate Hedge (the "Hedge Liabilities") shall be "Obligations" hereunder, guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement and otherwise treated as Obligations for purposes of each of the Other Documents. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2 hereof.

"Letter of Credit Borrowing" shall have the meaning set forth in Section 2.12(d) hereof.

"Letter of Credit Sublimit" shall mean $3,000,000.

"Letters of Credit" shall have the meaning set forth in Section 2.9 hereof.

"License Agreement" shall mean any agreement between any Borrower and a Licensor pursuant to which such Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of such Borrower or otherwise in connection with such Borrower's business operations.

"Licensor" shall mean any Person from whom any Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Borrower's manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with such Borrower's business operations.

"Licensor/Agent Agreement" shall mean an agreement between Agent and a Licensor, in form and content satisfactory to Agent, by which Agent is given the unqualified right, vis-a-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of any Borrower's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of such Borrower's default under any License Agreement with such Licensor.

17

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Waiver Agreement" shall mean an agreement which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall authorize Agent from time to time to enter upon the premises to inspect or remove the Collateral from such premises or to use such premises to store or dispose of such Inventory.

"Material Adverse Effect" shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets, business, properties or prospects of the Borrowers and Guarantor on a consolidated basis, (b) any Borrower's ability to duly and punctually pay or perform the Obligations in accordance with the terms thereof, (c) Agent's Liens on the Collateral or the priority of any such Lien, or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents.

"Maximum Face Amount" shall mean, with respect to any outstanding Letter of Credit, the face amount of such Letter of Credit including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Maximum Loan Amount" shall mean $8,200,000.

"Maximum Revolving Advance Amount" shall mean $8,000,000.

"Maximum Undrawn Amount" shall mean with respect to any outstanding Letter of Credit, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Modified Commitment Transfer Supplement" shall have the meaning set forth in Section 17.3(d).

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Note" shall mean the Revolving Credit Note.

074658.01343/22000590v.10

"Notice of Borrowing" shall have the meaning set forth in Section 9.2(d) hereof.

"Obligations" shall mean and include any and all loans (including without limitation, all Advances and all obligations under the Purchase Card Agreement), advances, debts, liabilities, obligations, covenants and duties owing by any Borrower to Lenders or Agent or to any other direct or indirect subsidiary or affiliate of Agent or any Lender of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, (including without limitation this Agreement and the Other Documents or the Interim Order or Final Order, whether or not for the payment of money, whether arising by reason of an extension of credit, opening or amendment of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Agent's or any Lenders non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, any and all of any Borrower's Indebtedness and/or liabilities under this Agreement, the Other Documents or under any other agreement between Agent or Lenders and any Borrower and any amendments, extensions, renewals or increases and all costs and expenses of Agent and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of any Borrower to Agent or Lenders to perform acts or refrain from taking any action.

"Ordinary Course of Business" shall mean with respect to any Borrower, the ordinary course of such Borrower's business as conducted on the Closing Date.

"Original Owners" shall mean Susan Y. Kindelan Trust, Richard P. Yates, Patricia Payne Atkins, Karen MacKinnon Legan, Douglas MacKinnon, Timothy Atkins, Carter Atkins, M C M UGL Share Trust f/b/o Elizabeth H. Legan, M C M UGL Share Trust f/b/o Caroline R. Legan, M C M UGL Share Trust f/b/o Katherine M. Legan, M C M UGL Share Trust f/b/o Grace E. Legan, M C M UGL Share Trust f/b/o Lauren R. MacKinnon, M C M UGL Trust f/b/o Emily B. MacKinnon, M C M UGL Share Trust f/b/o Matthew C. MacKinnon, and M C M UGL Share Trust f/b/o Rebecca C. MacKinnon.

"Other Documents" shall mean the Note, the Interim Order, the Final Order, the Guaranty, any Guarantor Security Agreement, any Lender-Provided Interest Rate Hedge and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by any Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement.

"Out-of-Formula Loans" shall have the meaning set forth in Section 17.2(b).

19

"Parent" of any Person shall mean a corporation or other entity owning, directly or indirectly at least 50% of the shares of stock or other ownership interests having ordinary voting power to elect a majority of the directors of the Person, or other Persons performing similar functions for any such Person.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender as set forth in Section 17.3(b) hereof.

"Participation Advance" shall have the meaning set forth in Section 2.12(d) hereof.

"Participation Commitment" shall mean each Lender's obligation to buy a participation of the Letters of Credit issued hereunder.

"Payment Office" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"Pension Benefit Plan" shall mean at any time any employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained by any member of the Controlled Group for employees of any member of the Controlled Group; or (ii) has at any time within the preceding five years been maintained by any entity which was at such time a member of the Controlled Group for employees of any entity which was at such time a member of the Controlled Group.

"Permitted Encumbrances" shall mean: (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrowers; provided, that, the Lien shall have no effect on the priority of the Liens in favor of Agent or the value of the assets in which Agent has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) Liens disclosed in the financial statements referred to in Section 5.5, the existence of which Agent has consented to in writing; (d) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (e) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (f) Liens placed upon fixed assets hereafter acquired to secure a portion of the purchase price thereof, provided that (x) any such lien shall not encumber any other property of any Borrower and (y) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; and (g) carriers', warehousemen's, mechanics', materialmen's, suppliers' repairmen's, landlord's or other similar Liens arising in the Ordinary Course of Business for amounts which are not overdue or that are being contested in good faith by appropriate

20

proceedings (in any event, so long as no foreclosure proceedings have been commenced with respect thereto or if commenced, such proceedings are stayed during the pendency of such contest); provided, that adequate reserves with respect to such obligations contested in good faith are maintained on the books of the applicable Borrower, to the extent required by GAAP; (h) easements, covenants, rights-of-way, restrictions, subdivisions, parcelizations, encroachments and other similar encumbrances and other minor defects and irregularities in title affecting any Real Property that, in the aggregate, are not substantial in amount and do not materially detract from the value of any such Real Property; (i) Liens of sellers of goods to any Borrower arising under Article 2 of the Uniform Commercial Code or similar provisions of applicable law in the Ordinary Course of Business, which shall be junior to the liens of the Agent on such goods and which shall cover only the goods sold and securing only the unpaid purchase price for such goods and related expenses; and (j) Liens disclosed on Schedule 1.2(a).

"Person" shall mean any natural person, individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" has the meaning set forth in the Recitals.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan), maintained for employees of any Borrower or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Professional Fees" shall have the meaning given to the term "Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order, less the amount of any retainers, if any, then held by such persons.

"Properly Contested" shall mean, in the case of any Indebtedness or Lien, as applicable, of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness or Lien, as applicable, is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment,

074658.01343/22000590v.10

writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Projections" shall have the meaning set forth in Section 6.5(a) hereof.

"Published Rate" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the Eurodollar rate for a one month period as published in another publication selected by the Agent).

"Purchase Card Agreement" shall mean that certain Visa Purchasing Card Agreement entered into effective as of June 12, 2007 by and between PNC and UGL or any similar agreement entered into by and among Borrowers and PNC as the same may be amended, supplemented or restated from time to time.

"Purchasing CLO" shall have the meaning set forth in Section 17.3(d) hereof.

"Purchasing Lender" shall have the meaning set forth in Section 17.3(c) hereof.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to the owned and leased premises identified on Schedule 4.19 hereto.

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's present and future: (i) accounts; (ii) contract rights, chattel paper (including electronic chattel paper), instruments (including those evidencing indebtedness owed to such Borrower by its Affiliates), documents, general intangibles relating to accounts, drafts and acceptances, credit card receivables, deposit accounts, and other rights to payment of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, and whether or not earned by performance; (iii) any of the foregoing which are not evidenced by instruments or chattel paper; (iv) inter-company receivables, and any security documents executed in connection therewith; (v) proceeds of any letters of credit or insurance policies on which such Borrower is named as beneficiary; (vi) claims against third parties for advances and other financial accommodations and any other obligations whatsoever owing to such Borrower; (vii) rights in and to all security agreements, leases, guarantees, instruments, securities, documents of title and other contracts securing, evidencing, supporting or otherwise relating to any of the foregoing, together with all rights in any goods, merchandise or Inventory which any of the foregoing may represent: (viii) rights in returned and repossessed goods, merchandise and Inventory which any of the same may represent, including, without limitation, any right of stoppage in transit; and (ix) and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured,

22

now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(i) hereof.

"Register" shall have the meaning set forth in Section 17.3(e) hereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.12(b)hereof.

"Release" shall have the meaning set forth in Section 6.7(c)(i) hereof.

"Reorganization Plan" means a plan or plans of reorganization in the Case.

"Reportable Event" shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder.

"Required Lenders" shall mean Lenders holding at least sixty-six and two thirds percent (66.6667%) of the Advances and, if no Advances are outstanding, shall mean Lenders holding sixty-six and two thirds percent (66.6667%) of the Commitment Percentages; provided, however, if there are fewer than three (3) Lenders, Required Lenders shall mean all Lenders.

"Reserve Percentage" shall mean as of any day the maximum percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities".

"Revolving Advances" shall mean Advances made other than Letters of Credit.

"Revolving Credit Note" shall mean, collectively, the promissory notes referred to in Section 2.1(a) hereof.

"Revolving Interest Rate" shall mean an interest rate per annum equal to (a) the sum of the Alternate Base Rate plus one and one-half of one percent (1.50%) with respect to Domestic Rate Loans and (b) the sum of the Eurodollar Rate plus three percent (3.00%) with respect to Eurodollar Rate Loans.

"Schedules" shall mean all schedules and statement of financial affairs required to be filed with the Bankruptcy Court under the Federal Rules of Bankruptcy Procedure with respect to the Borrowers and the other debtors in the Case.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Section 20 Subsidiary" shall mean the Subsidiary of the bank holding company controlling PNC, which Subsidiary has been granted authority by the Federal Reserve Board to underwrite and deal in certain Ineligible Securities.

23

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Settlement Date" shall mean the Closing Date and thereafter Wednesday or Thursday of each week or more frequently if Agent deems appropriate unless such day is not a Business Day in which case it shall be the next succeeding Business Day.

"Standby Letters of Credit" shall mean letters of credit constituted with all the documents complying with the Uniform Customs and Practice for International Standby Practices as most recently published by the International Chamber of Commerce at the time the letter of credit is issued.

"Statutory Fees" shall have the meaning given to the term "Statutory Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Subsidiary" of any Person shall mean a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person, one or more of the other Subsidiaries of such Person or any combination thereof.

"Superpriority Claim" means an allowed claim against any Borrower or such Borrower's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"Term" shall have the meaning set forth in Section 14.1 hereof.

"Termination Date" means the earliest to occur of: (a) the date that is two (2) years after the Petition Date; (b) the effective date or substantial consummation of a Reorganization Plan that has been confirmed by an order of the Bankruptcy Court; (c) the closing of a sale of all or substantially all of the Borrowers' or any Borrower's assets or business pursuant to Section 363 of the Bankruptcy Code; (d) the date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (e) the date of the dismissal of the Case; (f) such earlier date on which all Obligations shall become due and payable, in whole, in accordance with the terms of this Agreement (including by acceleration by Agent); and (g) the date that is twenty nine (29) days after the entry of the Interim Order (May 3, 2011) if the Final Order has not been entered.

"Termination Event" shall mean: (i) a Reportable Event with respect to any Plan or Multiemployer Plan; (ii) the withdrawal of any Borrower or any member of the Controlled Group from a Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (v) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA;

24

or (vi) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of any Borrower or any member of the Controlled Group from a Multiemployer Plan.

"Toxic Substance" shall mean and include any material present on the Real Property or the Leasehold Interests which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Trading with the Enemy Act" shall mean the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"Transactions" shall mean the transactions contemplated by this Agreement.

"Transferee" shall have the meaning set forth in Section 17.3(d) hereof.

"Uniform Commercial Code" shall have the meaning set forth in Section 1.3 hereof.

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Week" shall mean the time period commencing with the opening of business on a Wednesday and ending on the end of business the following Tuesday.

1.3.　Uniform Commercial Code Terms. All terms used herein and defined in the Uniform Commercial Code as adopted in the State of Pennsylvania from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the terms "accounts", "chattel paper", "instruments", "general intangibles", "payment intangibles", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code. To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4.　Certain Matters of Construction. The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents,

074658.01343/22000590v.10

shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof. All references herein to the time of day shall mean the time in Philadelphia, Pennsylvania. Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first-in, first-out basis. Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation". A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders. Wherever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

## II.    ADVANCES, PAYMENTS.

### 2.1.    Revolving Advances.

(a)    <u>Amount of Revolving Advances</u>. Subject to the terms and conditions set forth in this Agreement including Section 2.1(b), each Lender, severally and not jointly, will make Revolving Advances to Borrowers in aggregate amounts outstanding at any time equal to such Lender's Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount <u>less</u> the aggregate Maximum Undrawn Amount or (y) an amount equal to the sum of:

(i)    up to 85%, subject to the provisions of Section 2.1(b) hereof ("Receivables Advance Rate"), of Eligible Receivables, <u>plus</u>

(ii)    subject to the provision of Section 2.1(b) hereof, up to the lesser of (A) 50% of the value of Eligible Inventory (but not to exceed 85% of the appraised net recovery

074658.01343/22000590v.10

value of such Inventory based on appraisal prepared by an appraiser acceptable to Agent and in form and substance acceptable to Agent) ("Inventory Advance Rate") or (B) $4,500,000, minus

      (iii)     the aggregate Maximum Undrawn Amount, minus

      (iv)     the Carve-Out Cap; minus

      (v)     any applicable Borrowing Base Reserves.

The amount derived from the sum of (x) Sections 2.1(a)(y)(i) and (ii) minus (y) Sections 2.1(a)(y)(iii), (iv) and (v) at any time and from time to time shall be referred to as the "Formula Amount". The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a).

      (b)     Discretionary Rights. Based on a material change in the composition, or performance, of the collateral base as determined by Agent from the results of field examinations and/or other collateral evaluations performed after the Closing Date, the Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its reasonable discretion after reasonable prior notice to Borrowers. Each Borrower consents to any such increases or decreases and acknowledges that decreasing the Advance Rates or increasing or imposing reserves may limit or restrict Advances requested by Borrowing Agent. The rights of Agent under this subsection are subject to the provisions of Section 17.2(b).

    2.2.    Procedure for Revolving Advances Borrowing.

      (a)     Borrowing Agent on behalf of any Borrower may notify Agent prior to 12:00 p.m. on a Business Day of a Borrower's request to incur, on that day, a Revolving Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation, become due, same shall be deemed a request for a Revolving Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent or Lenders, and such request shall be irrevocable.

      (b)     Notwithstanding the provisions of subsection (a) above, in the event any Borrower desires to obtain a Eurodollar Rate Loan, Borrowing Agent shall, give Agent written notice by no later than 1:00 p.m. on the day which is three (3) Business Days prior to the date such Eurodollar Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount on the date of such Advance to be borrowed, which amount shall be in a minimum amount of $500,000 and in integral multiples of $100,000 thereafter, and (iii) the duration of the first Interest Period therefor. Interest Periods for Eurodollar Rate Loans shall be for one, two or three months; provided, if an Interest Period would end on a day that is not a Business Day, it shall end on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day. No Eurodollar Rate Loan shall be made available to any Borrower during the continuance of a Default or an Event of Default. After giving effect to each requested Eurodollar Rate Loan, including those

27

which are converted from a Domestic Rate Loan under Section 2.2(d), there shall not be outstanding more than three (3) Eurodollar Rate Loans, in the aggregate.

(c)     Each Interest Period of a Eurodollar Rate Loan shall commence on the date such Eurodollar Rate Loan is made and shall end on such date as Borrowing Agent may elect as set forth in subsection (b)(iii) above provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore Dollar deposits and no Interest Period shall end after the last day of the Term.

Borrowing Agent shall elect the initial Interest Period applicable to a Eurodollar Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.2(b) or by its notice of conversion given to Agent pursuant to Section 2.2(d), as the case may be. Borrowing Agent shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 11:00 a.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Agent does not receive timely notice of the Interest Period elected by Borrowing Agent, Borrowing Agent shall be deemed to have elected to convert to a Domestic Rate Loan subject to Section 2.2(d) herein below.

(d)     Provided that no Event of Default shall have occurred and be continuing, Borrowing Agent may, on the last Business Day of the then current Interest Period applicable to any outstanding Eurodollar Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such loan into a loan of another type in the same aggregate principal amount provided that any conversion of a Eurodollar Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Borrowing Agent desires to convert a loan, Borrowing Agent shall give Agent written notice by no later than 11:00 a.m. (i) on the day which is three (3) Business Days' prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a Eurodollar Rate Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur with respect to a conversion from a Eurodollar Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the loans to be converted and if the conversion is from a Domestic Rate Loan to any other type of loan, the duration of the first Interest Period therefor.

(e)     At its option and upon written notice given prior to 11:00 a.m. (New York time) at least three (3) Business Days' prior to the date of such prepayment, any Borrower may prepay the Eurodollar Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being prepaid to the date of such repayment. Such Borrower shall specify the date of prepayment of Advances which are Eurodollar Rate Loans and the amount of such prepayment. In the event that any prepayment of a Eurodollar Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto, such Borrower shall indemnify Agent and Lenders therefor in accordance with Section 2.2(f) hereof.

(f)     Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any

28

Borrower in the payment of the principal of or interest on any Eurodollar Rate Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Eurodollar Rate Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Eurodollar Rate Loans hereunder. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrowing Agent and including a reasonably detailed calculation of such additional amounts due shall be conclusive absent manifest error.

(g) Notwithstanding any other provision hereof, if any Applicable Law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (g), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Eurodollar Rate Loans) to make or maintain its Eurodollar Rate Loans, the obligation of Lenders to make Eurodollar Rate Loans hereunder shall forthwith be cancelled and Borrowers shall, if any affected Eurodollar Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected Eurodollar Rate Loans or convert such affected Eurodollar Rate Loans into loans of another type. If any such payment or conversion of any Eurodollar Rate Loan is made on a day that is not the last day of the Interest Period applicable to such Eurodollar Rate Loan, Borrowers shall pay Agent, upon Agent's request, such amount or amounts as may be necessary to compensate Lenders for any loss or expense sustained or incurred by Lenders in respect of such Eurodollar Rate Loan as a result of such payment or conversion, including (but not limited to) any interest or other amounts payable by Lenders to lenders of funds obtained by Lenders in order to make or maintain such Eurodollar Rate Loan. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Lenders to Borrowing Agent and including a reasonably detailed calculation of such additional amounts due shall be conclusive absent manifest error.

2.3. <u>Disbursement of Advance Proceeds</u>. All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books. During the Term, Borrowers may use the Revolving Advances by borrowing, prepaying and re-borrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Advance requested by Borrowing Agent on behalf of any Borrower or deemed to have been requested by any Borrower under Section 2.2(a) hereof shall, with respect to requested Revolving Advances to the extent Lenders make such Revolving Advances, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, with respect to Revolving Advances deemed to have been requested by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4. <u>Reserved</u>.

074658.01343/22000590v.10