# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
|  | : |  |
| IN RE: | : | Chapter 11 |
|  | : |  |
| UNITED GILSONITE LABORATORIES, | : | Case No. 5:11-bk-02032 (RNO) |
| A PENNSYLVANIA CORPORATION,[1] | : |  |
|  | : |  |
| DEBTOR. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER APPROVING EXIT FACILITY AND CONFIRMING THE MODIFIED FIRST AMENDED PLAN OF REORGANIZATION OF UNITED GILSONITE LABORATORIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**GIBBONS P.C.**

Mark B. Conlan (PA No. 86559)
Karen A. Giannelli (admitted *pro hac vice*)
Frank J. Vecchione (admitted *pro hac vice*)
One Gateway Center
Newark, NJ 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail: mconlan@gibbonslaw.com
          kgiannelli@gibbonslaw.com
          fvecchione@gibbonslaw.com

Natasha M. Songonuga (admitted *pro hac vice*)
1000 N. West Street, Suite 1200
Wilmington, DE 19801-1058
Telephone: (302) 295-4875
Facsimile: (302) 295-4876
E-mail: nsongonuga@gibbonslaw.com

*Counsel for the Debtor and Debtor-in-Possession*

---

[1] The last four digits of the Debtor's federal tax identification number are 7530.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

I.  FINDINGS OF FACTS AND CONCLUSIONS OF LAW ...............................2

    A.    Jurisdiction and Venue ........................................................3

    B.    Judicial Notice ........................................................................3

    C.    History and Number of Asbestos Personal Injury Claims Asserted Against the Debtor ...........................................................3

        i.    Description and History of UGL's Business .................3

        ii.    UGL's Pre-Bankruptcy Asbestos Liability.....................4

    D.    Events Leading Up to the Bankruptcy Filing ..........................5

        i.    Background on UGL's Insurance Coverage .................5

        ii.    UGL's Insurance Coverage Action ..............................6

    E.    Commencement of Chapter 11 Case .....................................6

    F.    Development and Negotiation of the Plan..............................7

    G.    Filing of Chapter 11 Plan and Adequacy of Disclosure Statement ........................8

    H.    Solicitation and Notice; Voting .............................................9

        i.    Solicitation.....................................................................9

        ii.    Notice of Confirmation Hearing ..................................11

        iii.    GCG Voting Certification...........................................11

    I.    Plan Documents ...................................................................12

    J.    Agreements Resolving Informal Objections to the Plan ......12

        i.    Informal Objection of the U.S. Trustee ......................12

        ii.    Informal Objection of the EPA....................................13

    K.    Bankruptcy Rule 3016 .........................................................14

    L.    Exit Financing......................................................................14

    M.    Compliance with the Requirements of Section 1129 of the Bankruptcy Code..............................................................15

i.      Section 1129(a)(1) - The Plan Complies with Applicable
        Provisions of the Bankruptcy Code ..................................................15

        (a)     Section 1122:  Classification and Treatment of Claims and
                Interests ........................................................................15
        (b)     Section 1123(a):  Mandatory Contents of a Plan..........................16
        (c)     Section 1123(a)(2): Specification of Impairment .........................16
        (d)     Section 1123(a)(3): Specification of Treatment of Impaired
                Classes ...........................................................................16
        (e)     Section 1123(a)(4): Equal Treatment of Each Claim or
                Interest Within a Particular Class .......................................17
        (f)     Section 1123(a)(5): Adequate Means for the Plan's
                Implementation................................................................17
        (g)     Section 1123(a)(6): Prohibition of the Issuance of Non-
                voting Equity Securities....................................................18
        (h)     Section 1123(a)(7): Selection of Officers and Directors ..............18
        (i)     Section 1123(a)(8): Payments from Post-petition Earning of
                Individual Debtors .........................................................18
        (j)     Section 1123(b): Discretionary Plan Provisions ..........................18

                (i)     Section 1123(b)(1): Impairment/Unimpairment of
                        Claims and Interests..........................................18

                (ii)    Section 1123(b)(2): Assumption/Rejection of
                        Executory Contracts and Leases .......................................19

                (iii)   Section 1123(b)(3): Preservation of Claims and
                        Causes of Action; Settlement, Releases,
                        Exculpation and Injunction..............................................20

                (iv)    Section 1123(b)(4): Sale of Property of the Estate ...........22

                (v)     Section 1123(b)(5): Modification of Creditor Rights .......23

        (k)     Section 1123(d): Cure of Defaults ................................23

ii.     Section 1129(a)(2) - The Debtor Is in Compliance with Applicable
        Provisions of the Bankruptcy Code ..........................................23

iii.    Section 1129(a)(3) — The Plan Proposed in Good Faith.......................24

iv.     Section 1129(a)(4) — Approval of Certain Payments for Services,
        Costs and Expenses................................................................25

v.      Section 1129(a)(5) — Disclosure of Identity of Directors, Officers,
        and Insiders ..........................................................................25

- ii -

vi.      Section 1129(a)(6) — No Rate Changes ...................................25

vii.     Section 1129(a)(7) — Best Interests of Creditors ....................26

viii.    Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class; Presumption of Acceptance by Unimpaired Classes ...................26

ix.      Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code ...............26

x.       Section 1129(a)(10) — Acceptance by at Least One Impaired Class; Non-Insider Class ...................................................................27

xi.      Section 1129(a)(11) — Feasibility of the Plan ........................27

xii.     Section 1129(a)(12) — Payment of Statutory Fees ................27

xiii.    Section 1129(a)(13) — Continuance of Retiree Benefits ........27

xiv.   Section 1129(b) — The "Cramdown" Requirements Are Inapplicable ................................................................................28

xv.    Section 1129(c) — Only One Plan ............................................28

xvi.   Section 1129(d) — Principal Purpose of the Plan ...................28

N.      The Trust and the Channeling Injunction Comply with Section 524(g) of the Bankruptcy Code ...........................................................29

(a)    The Plan Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code ...................29

(i)     Section 524(g)(2)(B)(i)(I): Assumption of Liabilities ........................................................................29

(ii)    Section 524(g)(2)(B)(i)(II): Funding of the Trust ...........30

(iii)   Section 524(g)(2)(B)(i)(III): Ownership of Voting Shares ...................................................................31

(iv)   Section 524(g)(2)(B)(i)(IV): Use of Trust Assets ...........31

(b)    The Trust Satisfies the Requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code ...................................32

(i)     Section 524(g)(2)(B)(ii)(I): Likelihood of Future Demands ...........................................................................32

(ii)     Section 524(g)(2)(B)(ii)(II): Indeterminate Nature of Future Demands ............................................................32

(iii)    Section 524(g)(2)(B)(ii)(III): Impact of Future Demands Pursued Outside of the Plan.............................33

(iv)    Section 524(g)(2)(B)(ii)(IV)(aa): Terms of Injunction......................................................................33

(v)     Section 524(g)(2)(B)(ii)(IV)(bb): Classification and Acceptance of Plan by Class 4..........................................34

(vi)    Section 524(g)(2)(B)(ii)(V): Operation of the Trust ........34

(c)     The Trust Satisfies the Requirements of Section 524(g)(4)(A)(ii) of the Bankruptcy Code ....................................35

(d)     The Interests of Future Asbestos Claimants were Properly Represented by the Appointment of The FCR, Thus Satisfying the Requirements of Section 524(g)(4)(B)(i) of the Bankruptcy Code ....................................................35

(e)     Entry of the Channeling Injunction Is Fair and Equitable with Respect to Future Demand Holders......................................36

O.     The Trust Satisfies the Requirements of a Qualified Settlement Fund ................37

P.     The Non-Settling Insurers Injunction Satisfies the Requirements of Section 105(a) of the Bankruptcy Code...............................................37

Q.     Approval of the Discharge Injunction, Exculpation, and Release Provisions Provided Under the Plan.................................................38

R.     Comprehensive Settlements of all Claims and Controversies ..............................39

S.     Satisfaction of Conditions to Confirmation and Consummation of the Plan.......40

II.     ORDER OF CONFIRMATION ..........................................................................43

A.     Effects Of Confirmation ...................................................................................43

B.     Conditions To Confirmation And Consummation Of The Plan..........................44

C.     Objections .......................................................................................................44

D.     Approval Of Exit Facility .................................................................................44

E.     Claims Bar Dates and Other Claims Matter .......................................................48

i.      Bar Date for Administrative Expense Claims ...........................48

ii.     Bar Date for Professional Fee Claims ......................................48

iii.    Bar Date for Rejection Damages Claims ...................................49

iv.     Enforcement of Bar Dates ........................................................50

F.      Approval of the Record Date ...............................................................50

G.      Approval of the Treatment of Executory Contract and Unexpired Lease
        Provisions ...........................................................................................51

i.      Assumption And Rejection Of Executory Contracts ...............51

ii.     Compensation and Benefit Plans; Treatment of Retiree and
        Pension Benefits .....................................................................52

H.      Matters Relating to Implementation of the Plan......................................53

i.      General Authorization in Furtherance of the Plan....................53

ii.     Directors and Officers of Reorganized UGL............................55

iii.    Vesting of Reorganized UGL Assets........................................55

iv.     Indemnification and Reimbursement Obligations of Reorganized
        UGL .........................................................................................55

v.      Section 524(g) Trust ................................................................56

        (a)   Creation of the Trust..............................................56
        (b)   Funding and Receipt of Trust Assets; Assumption of
              Liabilities ..............................................................57
        (c)   Vesting of Causes of Action in the Trust.................58
        (d)   Appointment of the Trustee and the Trust Advisory
              Committee...............................................................58
        (e)   Appointment of Futures Representative ...................58
        (f)   Qualified Settlement Fund......................................59
        (g)   Approval of the Trust Distributions Procedures .........59
        (h)   Indemnity Obligations of the Trust..........................59
        (i)   Institution and Maintenance of Legal and Other
              Proceedings ...........................................................59

I.      Exemptions From Taxation ................................................................59

J.      Exemptions From Securities Laws .....................................................60

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 6 of 302

K.     Injunction, Release, Exculpation, and Discharge Provisions ..............................60

     i.     Third-Party Releases.................................................................60

     ii.     Terms of the Channeling Injunction...........................................62

     iii.     Non-Settling Insurers Injunction ...............................................64

L.     Reduction of Insurance Judgments ......................................................66

M.     Payment of Statutory Fees ..................................................................66

N.     Governmental Approvals Not Required .............................................67

O.     Filing and Recording ..........................................................................67

P.     Dissolution of the Creditors' Committee ............................................68

Q.     Retention of Jurisdiction by the Bankruptcy Court ............................68

R.     Conflicts Between Confirmation Order and Plan................................68

S.     Notice of Confirmation Order, Effective Date, and Related Matters ..................69

T.     No Just Cause For Delay .....................................................................69

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 7 of 302

# INTRODUCTION

United Gilsonite Laboratories, as debtor and debtor in possession ("UGL" or the "Debtor"), having filed with the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Court") under chapter 11, title 11 United States Code (the "Bankruptcy Code") the *Modified First Amended Plan of Reorganization of United Gilsonite Laboratories Under Chapter 11 of The Bankruptcy Code* dated September 30, 2014 (the "Plan"); and the Court having entered, pursuant to Sections to 502, 1125, 1126, and 1128 of the Bankruptcy Code, Rules 2002, 3016, 3017, 3018, and 3020 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Rules 3016-2, 3017-1, and 3018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Middle District of Pennsylvania (the "Local Rules"), an *Order (A) Approving Disclosure Statement with respect to Debtor's Modified First Amended Plan of Reorganization ("the Plan"); (B) Establishing the Procedures for Solicitation and Tabulation of Voting on the Plan and Approving Forms of Ballots; (C) Scheduling a Hearing on Confirmation of the Plan; and (D) Approving the Form and Manner of Notice of Said Confirmation Hearing*, dated September 30, 2014 (the "Order Approving Disclosure Statement and Solicitation Procedures"); and upon the (i) testimony, affidavits, declarations, and exhibits admitted into evidence at the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), (ii) the arguments of counsel presented at the Confirmation Hearing, (iii) the objection filed with respect to confirmation of the Plan (the "Objection"), (iv) the pleadings filed in support of confirmation of the Plan and in response to the Objection, including the *Debtor's Memorandum of Law in Support of Confirmation of the Modified First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated December 2, 2014 [Docket No.2143] (the "Confirmation Brief"), (v) the *Declaration of Craig E. Johnson of GCG, Inc., Certifying the Methodology for the*

*Tabulation of Votes on and Results of Voting with Respect to the Debtor's Modified First Amended Plan of Reorganization*, dated December 1, 2014, [Docket No. 2134] (the "Voting Certification"), (vi) the *Declaration of Thomas White in Support of Chapter 11 Petition and First Day Motions* [Docket No. 3] (the "White Decl."), and (vii) the *Declaration of Donald R. Mancuso in Support of Confirmation of the Modified First Amended Plan of Reorganization of United Gilsonite Laboratories*, dated December 2, 2014, [Docket No. 2152] (the "Mancuso Declaration") filed in support of confirmation of the Plan; and the Objection having been withdrawn, resolved, or otherwise overruled as set forth herein; and upon the Court having found that due and proper notice has been given with respect to the Confirmation Hearing and the deadlines and procedures for filing objections to the Plan and votes to accept or reject the Plan; and such notice being sufficient under the circumstances and no further or other notice being required; and upon the entire record properly before the Court, including the record made at the Confirmation Hearing, the Court makes the following findings of fact and conclusions of law in support of this Order confirming the Plan and approving the Trust and the releases and injunctions as set forth in the Plan, as described in more detail below.

## I.    FINDINGS OF FACTS AND CONCLUSIONS OF LAW[2]

These Findings and Conclusions constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014. To the extent that any provision designated herein as a finding of fact is more properly characterized as a conclusion of law, it is adopted as such. To the extent that any provision designated herein as a conclusion of law is more properly characterized as a finding of fact, it is adopted as such.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Plan.

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**

**A.     JURISDICTION AND VENUE**

1.      The Court has jurisdiction over the Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  Confirmation of the Plan constitutes a core proceeding pursuant to 28 U.S.C. § 157(b), over which this Court has jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  The Debtor was and is qualified to be a debtor under Section 109(a) of the Bankruptcy Code.

2.      Venue of the Chapter 11 Case is proper in this District pursuant to 28 U.S.C. § 1408.

3.      Each of the conditions precedent to confirmation of the Plan has been satisfied in accordance with Section 13.1 of Article XIII of the Plan.

**B.     JUDICIAL NOTICE**

4.      The Court takes judicial notice of the docket of the Chapter 11 Case, and all pleadings and other documents filed, all orders entered, and evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Case.  All unresolved objections, statements, and reservations of rights to the extent not sustained are hereby overruled on the merits.

**C.     HISTORY AND NUMBER OF ASBESTOS PERSONAL INJURY CLAIMS ASSERTED AGAINST THE DEBTOR**

        **i.     DESCRIPTION AND HISTORY OF UGL'S BUSINESS**

5.      UGL is a small, family-owned corporation that was founded in 1932 and is headquartered in Scranton, Pennsylvania.  White Decl., at ¶¶ 5-6.  UGL has approximately 150 employees.  *Id.* at 5.  Over the years, UGL's products have included: the first asphalt aluminum

paint "Gilsalume"; drain openers; furniture polish; wall sizing; glazing; caulking compounds; patching and repair products. *Id.* at 6. In 1953, UGL introduced the "DRYLOK®" line for waterproofing basements and stopping masonry leaks, which continues to be the primary product line today. *Id.* Around the same time, the "ZAR®" line was introduced in the form of a polyurethane clear finish for wood. ZAR® is UGL's second largest source of revenue. *Id.*

6.      Overall, UGL manufactures over 80 paint specialty and home maintenance products sold at hardware stores, home centers, paint stores, and lumberyards. Mancuso Decl., at ¶ 13. UGL had sales of approximately $49,000,000, $45,000,000, and $48,000,000 in calendar years 2011, 2012 and 2013, respectively. *Id.*

### ii.      UGL's PRE-BANKRUPTCY ASBESTOS LIABILITY

7.      UGL began manufacturing joint compound (a/k/a joint cement) with asbestos in 1954 and discontinued manufacturing the product with asbestos in 1975. *Id.* at 14. During that time, UGL did not compete in the larger "joint compound" business arena. *Id.* Instead, it sold small quantities of that product to lumber, hardware, and paint stores. *Id.* Total revenue of joint compound during the period in question was $965,000. *Id.*

8.      The first asbestos-related suit asserting personal injury and wrongful death claims against UGL was filed in 1983. *Id.* at 15. Between 1992 and 2000, UGL was sued in approximately 124 asbestos related lawsuits. *Id.* With the exception of a single lung cancer claim, each of the 124 lawsuits involved non-malignant diseases. *Id.* The first mesothelioma claims were brought against UGL in 2001, when two lawsuits were filed. *Id.* That year, an additional sixteen lawsuits involving non-malignant diseases were filed against UGL. *Id.* During the four-year period between 2002 and 2005, UGL saw a slight increase in the number of mesothelioma filings, with annual filings ranging between six and ten claims a year and averaging just over seven mesothelioma lawsuit filings a year. *Id.* By 2006, however, the

-4-

Debtor's litigation burden became a quickly moving target with the number of lawsuits increasing dramatically in the years immediately preceding the filing of the petition. *Id.* As of the Petition Date, there were approximately 900 (not including duplicates) asbestos-related lawsuits pending against the UGL across the country. *Id.*

9. UGL's cost of defending and resolving the asbestos-related lawsuits was substantial. *Id.* at 16. As of the Petition Date, it was estimated that UGL's insurance carriers had paid out approximately $25 million in settlements and indemnity. *Id.*

**D.    EVENTS LEADING UP TO THE BANKRUPTCY FILING**

**i.    BACKGROUND ON UGL'S INSURANCE COVERAGE**

10. Beginning at least as early as 1972, UGL maintained primary comprehensive general liability insurance coverage ("CGL") applicable to Asbestos Personal Injury Claims. *Id.* at 18. Beginning in approximately 1988, UGL's CGL policies appeared to contain policy exclusions generally barring coverage for liabilities resulting from asbestos-related injuries or damage. *Id.* UGL's primary insurers have taken the position that coverage for Asbestos Personal Injury Claims has been exhausted by the payment of claims prior to the Petition Date. *Id.*

11. UGL also maintained excess liability coverage applicable to Asbestos Personal Injury Claims from at least 1976 through 1985. *Id.* at 19. After 1988, UGL's umbrella and excess insurance policies also appeared to contain policy exclusions generally barring coverage for liabilities resulting from asbestos-related injuries or damage. *Id.* At least two excess insurers have taken the position that their policies contain similar "asbestos exclusions." *Id.* In addition, certain UGL umbrella policies arguably contain policy exclusions generally barring coverage for claims arising out of the products hazard. *Id.*

12.     In total, from 1972 to 1988, UGL purchased primary CGL, umbrella, and/or excess liability policies with undisputed combined per-occurrence limits of more than $42 million.  *Id.* at 20.  Some of that coverage was allegedly exhausted by the resolution of UGL's Asbestos Personal Injury Claims prior to the Petition Date.  *Id.*  Insurers who issued some of the indisputably unexhausted policies have contested coverage for UGL's asbestos-related liabilities.  *Id.*

### ii.     UGL'S INSURANCE COVERAGE ACTION

13.     Prior to the Petition Date, as defined below, UGL was engaged in litigation with its liability insurers in the Superior Court of Connecticut regarding coverage for UGL's asbestos-related liabilities.  *Id.* at 21.  Through two of its umbrella insurance carriers, UGL's insurers settled approximately seven Asbestos Personal Injury Claims and paid settlements totaling $2,012,500 during the 90 days preceding the Petition Date.  *Id.* at 22.  The Plan includes a waiver of all potential avoidance claims, including those against the Settling Insurers.  *Id.*  In addition, UGL's insurers settled certain claims prior to the Petition Date but did not actually pay such claims prior to the Petition Date.  *Id.*  The Plan provides that such claims will be paid in full.  *Id.*

### E.     COMMENCEMENT OF CHAPTER 11 CASE

14.     On March 23, 2011 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has operated its business and managed its properties as debtor-in-possession since the Petition Date pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Case.

15.     On April 14, 2011, the United States Trustee for Region Three (the "US Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Chapter 11 Case.  The Creditors' Committee consists of two Asbestos Claimants, two holders of

-6-

Settled Asbestos Claims, and one trade creditor as follows: Joseph Bayer; John J. Juliano; Allen Rabinowitz, Personal Representative for the Estate of Stanley Rabinowitz; Estate of Grady Peeler; and E.W. Kaufmann Company.

16.     By Order dated April 13, 2011, The Garden City Group Inc., ("GCG" or the "Claims and Balloting Agent") was retained as notice, claims, and balloting agent to the Debtor [Docket No. 89] ("GCG Retention Order"). Pursuant to the GCG Retention Order, GCG established a website that provides information to the Debtor's creditors. The Plan and Disclosure Statement are accessible on that website.

17.     By Order dated June 30, 2011, the Court approved the appointment of James L. Patton, Jr., as Legal Representative for Future Asbestos Personal Injury Claimants ("FCR").

F.     DEVELOPMENT AND NEGOTIATION OF THE PLAN

18.     Subsequent to the Petition Date, the Debtor, the Creditors' Committee, the FCR, and the UGL Shareholders began negotiations on a plan of reorganization, which culminated in a global deal that is reflected in the Plan. The Plan is supported by the Creditor's Committee and the FCR appointed to represent the Debtor's various creditor constituencies and holders of Demands. Among other things, the Plan will establish and adequately fund the Trust, which will resolve all Asbestos Personal Injury Claims, Indirect Asbestos Personal Injury Claims, and Demands channeled to the Trust (the "Trust Claims") pursuant to standard trust distribution procedures. The Plan also permits UGL to reorganize with sustainable debt levels for the benefit of all parties-in-interest. The key terms of the Plan are summarized below:

(i)     Trust Funding. On the Effective Date of the Plan, the Trust shall receive payments, some over time, totaling approximately $35.5 million from contributions to be made by the Debtor, Reorganized UGL, the UGL Shareholders, and the proceeds of Court-approved Asbestos Insurance Settlement Agreements. In addition, the Trust shall receive the Debtor's Asbestos Insurance Rights.

-7-

(ii) <u>Treatment of Trust Claims</u>. All Trust Claims shall be channeled to and assumed by the Trust, and all holders of Trust Claims, including Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims that are classified in Class 4 under the Plan, shall have their Claims resolved by the Trust in the same manner pursuant to the Trust Distribution Procedures.

(iii) <u>Treatment of Unsecured Claims</u>. All General Unsecured Claims are classified in Class 3A under the Plan and holders of such Claims shall receive payment in full satisfaction of such Claims on the later of the Effective Date or the date that such Claims become an Allowed General Unsecured Claim. Unsecured Claims constituting Settled Asbestos Claims are classified in Class 3B under the Plan and holders of such Claims shall receive Cash on the Effective Date in the amounts set forth on Exhibit J to the Plan, which shall be paid from the UGL Shareholder Cash Contribution.

## G.  FILING OF CHAPTER 11 PLAN AND ADEQUACY OF DISCLOSURE STATEMENT

19.     On September 21, 2012, the Debtor filed an initial Chapter 11 plan of reorganization, which was later amended on August 14, 2014 by a First Amended Chapter 11 Plan of Reorganization, and then modified on September 30, 2014 by the Plan [Docket No. 2013]. On August 14, 2014, the Debtor filed an initial disclosure statement, which was later modified on September 30, 2014 by the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with respect to the Modified First Amended Plan of Reorganization of United Gilsonite Laboratories under Chapter 11 of the Bankruptcy Code* [Docket No. 2012] (the "Disclosure Statement").

20.     On September 4, 2014, the Debtor filed the *Debtor's Motion for an Order (A) Approving Disclosure Statement with respect to Debtor's Modified First Amended Plan of Reorganization ("the Plan"); (B) Establishing Procedures for Solicitation and Tabulation of Voting on the Plan; (C) Approving Ballot Forms and Establishing Voting Deadline to Accept or Reject the Plan; (D) Scheduling a Hearing on Confirmation of the Plan; (E) Approving the Form and Manner of Notice of Said Confirmation Hearing; and (F) Granting Related Relief* [Docket No. 1951] ("Motion for Order Approving Disclosure Statement and Solicitation Procedures").

21.     After a hearing on the adequacy of the Disclosure Statement, on September 30, 2014, the Court entered the Order Approving Debtor's Disclosure Statement and Solicitation Procedures [Docket No. 2014], which, among other things: (i) approved the Disclosure Statement as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; (ii) fixed September 30, 2014 as the date to be used to determine which holders of Claims are entitled to vote to accept or reject the Plan (the "Voting Record Date"); (iii) fixed November 21, 2014, at 5:00 p.m. as the deadline for holders of Claims to vote to accept or reject the Plan (the "Voting Deadline"); (iv) fixed November 21, 2014 at 4:00 p.m. as the deadline to file objections and/or responses to confirmation of the Plan (the "Confirmation Objection Deadline"); (v) fixed December 2, 2014 at 5:00 p.m. as the date by which replies, if any, to objections and/or responses to confirmation of the Plan had to be filed (the "Confirmation Reply Deadline"); (vi) fixed December 8, 2014 at 10:00 a.m. as the date of the Confirmation Hearing; (vii) approved the solicitation procedures, solicitation package, and voting procedures for voting on the Plan; and (viii) approved the form and method of notice of the Confirmation Hearing set forth therein.

H.      **SOLICITATION AND NOTICE; VOTING**

        i.      **SOLICITATION.**

22.     The Plan, the Disclosure Statement, the appropriate Ballot for voting on the Plan, and the notice of the Confirmation Hearing were transmitted and served in compliance with the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, and with the procedures set forth in the Order Approving Disclosure Statement and Solicitation Procedures. The forms of the Ballots adequately addressed the particular needs of the Chapter 11 Case and were appropriate for the holders of Class 4 Claims, Asbestos Personal Injury Claims, and Indirect Asbestos Personal Injury Claims (the "Voting Class"), the only Class of Claims entitled

-9-

to vote to accept or reject the Plan. The period during which the Debtor solicited acceptances to the Plan was a reasonable period of time for holders of Claims in the Voting Class to make an informed decision to accept or reject the Plan.

23. Other than Plan Class 4, the Debtor was not required to solicit acceptances or rejection of the Plan with respect to the remaining Plan Classes as each such other Class is unimpaired under the Plan and, thus, deemed to accept the Plan.

24. The Court finds that the transmittal and service of the Plan, the Disclosure Statement, the Ballots, and the notice of the Confirmation Hearing (all of the foregoing, the "Solicitation"), as evidenced by the affidavit of service with respect to the mailing of the Solicitation filed on December 1, 2014, by Craig E. Johnson of GCG [Docket No. 2134], complied with the solicitation procedures set forth in the Order Approving the Disclosure Statement and Solicitation Procedures, constituted sufficient notice of the Confirmation Hearing, the Voting Deadline, the Confirmation Objection Deadline, and all other matters to be noticed pursuant to said Order, was proper, timely, appropriate, and satisfactory based upon the circumstances of the Chapter 11 Case, was conducted in good faith, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and any other applicable rules, laws, and regulations. In addition, the Debtor published the Confirmation Hearing Notice and the Asbestos Publication Notice (as such term is defined in the Order Approving Disclosure Statement and Solicitation Procedures) in substantial compliance with said Order and as set forth in the affidavit of publication filed by Craig E. Johnson of GCG [Docket No. 2134].

25. The Court finds that in accordance with Section 1125(e) of the Bankruptcy Code, the Debtor, and its designees, shareholders (including the UGL Shareholders), officers, directors,

employees, and agents, and the attorneys, advisors, accountants, and other professionals retained by such persons acted in good faith in soliciting acceptances or rejections of the Plan and in compliance with all applicable provisions of the Bankruptcy Code.

### ii.    NOTICE OF CONFIRMATION HEARING.

26.    All parties required to receive notice of the Confirmation Hearing have received due, proper, timely, and adequate notice as required under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Order Approving Disclosure Statement and Solicitation Procedures and have had an opportunity to appear and be heard with respect thereto.  No other or further notice or opportunity for hearing need be given.

### iii.    GCG VOTING CERTIFICATION

27.    As evidenced by the Voting Certification, which summarizes the votes received to accept or reject the Plan, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

28.    As set forth in the Plan and Disclosure Statement, holders of Claims in Class 4 were eligible to vote on the Plan pursuant to the Plan and the Solicitation Procedures.  In addition, holders of Claims in Class 1 (Non-Tax Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), Class 5 (Workers' Compensation Claims), and Class 6 (Interests) (collectively, the "Deemed Accepting Classes") are deemed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

29.    As evidenced by the Voting Certification, holders of Claims in the Voting Class other than any entity designated under Section 1126(e) of the Bankruptcy Code, that hold 100% in amount and 100% in number of the Claims in the Voting Class that have voted, have voted to accept the Plan.  Based on the foregoing, and as evidenced by the Voting Certification, at least

-11-

one Impaired Class of Claims (excluding the acceptance by any insiders of UGL) has voted to accept the Plan in accordance with the requirements of Sections 524(g), 1124, 1126 and 1129(a)(10) of the Bankruptcy Code.

30. The Court finds that by executing the certification to a Ballot, a claimant is not asserting that it will be successful in prosecuting its claim, but that he or she has the right to bring the claim under applicable non-bankruptcy law.

## I. PLAN DOCUMENTS

31. On September 30, 2014, as supplemented on November 14, 2014, and by the record of the Confirmation Hearing, the Debtor filed all of the Plan Documents with the Court and served notice of such filing on the Bankruptcy Rule 2002 list and those other parties affected by documents contained therein. The Plan Documents are integral to, part of, and incorporated by reference into the Plan. The Plan Documents comply with the terms of the Plan, and the filing and notice of such documents constitutes good and proper notice in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Order Approving Disclosure Statement and Solicitation Procedures, and no other or further notice shall be required. Pursuant to the Plan, the Debtor reserves its right to modify and/or supplement the Plan Documents prior to the Effective Date in a manner consistent with and contemplated by the Plan.

## J. AGREEMENTS RESOLVING INFORMAL OBJECTIONS TO THE PLAN

### i. INFORMAL OBJECTION OF THE U.S. TRUSTEE

32. In resolution of the concerns of the U.S. Trustee:

   a. Section 12.3 of the Plan shall be deemed amended to read as follows:

   Except as otherwise provided in this Plan or the Confirmation Order, neither the Debtor, Reorganized UGL, the UGL Shareholders, the Creditors' Committee, the Future Claimants' Representative and each of their professionals, advisors, agents and attorneys, in their capacity as such (together, the "Exculpated

-12-

Parties"), shall have or incur any liability to any Entity (including any holder of a Claim or Interest) for any act or omission in connection with, related to, or arising out of: (a) the formulation, negotiation, preparation, dissemination, prosecution, confirmation, consummation, discussion, implementation or administration of the Plan, the Disclosure Statement, the Plan Documents, and/or any settlement, contract, release, or other agreement or document created or entered into in connection with the Chapter 11 Case or the Plan; (b) the property to be distributed under the Plan; or (c) any other action or omission in connection with, related to, or arising out of the administration of the Chapter 11 Case or this Plan, except for fraud, gross negligence or willful misconduct as determined by a Final Order, and, in all respects, the Exculpated Parties shall be entitled to rely upon the good faith and informed advice of counsel with respect to their duties and responsibilities under the Plan and the Plan Documents. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct.

b. Sections 12.4(a), (b) and (c) are deemed amended to exclude from the releases provided therein any potential Causes of Action based upon fraud and gross negligence.

33. These modifications to Sections 12.3 and 12.4 of the Plan do not effect a materially adverse change in the treatment of any holder of a Claim or Interest under the Plan. In accordance with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan are hereby deemed to have accepted the Plan as modified, and no holder of a Claim shall be permitted to change its vote on account of any such modification to the Plan.

## ii. INFORMAL OBJECTION OF THE EPA

34. The following language resolves the informal objection of the United States Environmental Protection Agency:

Nothing in this Confirmation Order or the Plan discharges, releases, resolves, exculpates, precludes, or enjoins: (i) any environmental liability to any governmental unit that did not constitute a claim as defined in Section 101(5) of the Bankruptcy Code as of the Effective Date; (ii) any environmental claim of any governmental unit arising after the Effective

-13-

Date; (iii) any environmental liability to any governmental unit on the part of the Debtor or Reorganized UGL or any other Entity as the owner or operator of property after the Effective Date, except for any dischargeable liabilities to reimburse response costs expended or paid by a governmental unit before the Petition Date or to pay penalties owing to a governmental unit for days of violation of environmental law before the Effective Date; or (iv) any liability to the United States on the part of any Person or Entity other than the Debtor or Reorganized UGL.

## K.   BANKRUPTCY RULE 3016

35.     The Plan is dated and specifically identifies UGL as the proponent of the Plan, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b).

## L.   EXIT FINANCING

36.     On August 7, 2014, the Court entered an order [Docket No. 1894] (the "Exit Facility Terms Approval Order") approving the *Stipulation Authorizing the Debtor to (A) Enter Into Proposal Letter Relating to an Exit Financing Term Sheet and (B) Incur and/or Pay Certain Fees, Indemnities, Costs and Expenses in Connection Therewith* [Docket No. 1890].

37.     Drafts of certain of the forms of the Loan Documents to be entered into in connection with the Exit Facility have been filed with the Plan Documents and may be amended from time to time without notice or court approval.  On the Effective Date (or as soon as practicable thereafter with respect to any post-closing documents) and as a means to implement the Plan, Reorganized UGL shall execute and deliver the Exit Facility Agreement (which defined term used herein includes all documents contemplated to be entered into in connection therewith and as may be amended from time to time before and/or after the Effective Date without notice or court approval) and shall become obligated under the Exit Facility.

38.     The proposed terms and conditions of the Exit Facility, as set forth in the Exit Facility Agreement, as may be amended from time to time before and/or after the Effective Date without notice or court approval, are fair and reasonable and approved.  The Exit Facility is

-14-

necessary to implement the Plan, and entry into and consummation of the transactions

contemplated by the Exit Facility Agreement is in the best interest of the Debtor, the Estate,

Reorganized UGL and the Holders of Claims and Interests.

39.     The Debtor and Reorganized UGL have exercised reasonable business judgment

in connection with the Exit Facility and the Exit Facility Agreement and have provided sufficient

and adequate notice thereof, including notice of all of Reorganized UGL's obligations under the

Exit Facility Agreement.

40.     The proposed terms of the Exit Facility Agreement have been negotiated in good

faith and at arm's length, are supported by reasonably equivalent value and fair consideration,

and are fair and reasonable.  The Debtor and Reorganized UGL are authorized, without further

notice to, or action, order, or approval of the Court or any other person, to execute and deliver all

agreements necessary to effectuate the transactions contemplated therein.

**M.     COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE**

**i.     SECTION 1129(A)(1) - THE PLAN COMPLIES WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE**

41.     The Plan complies with all applicable provisions of the Bankruptcy Code, as

required by Section 1129(a)(1) of the Bankruptcy Code, including Sections 1122, 1123, and

524(g).

**(a)     SECTION 1122: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.**

42.     In accordance with Section 1122(a) of the Bankruptcy Code, Article IV of the

Plan provides for the separate classification of Claims and Interests based upon differences in the

legal nature, priority, or factual nature of such Claims and Interests.  The Claims and Interests

placed in each Class are substantially similar to other Claims and Interests, as the case may be, in

each such Class.  Valid business, factual, and legal reasons exist for separately classifying the

-15-

various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Interests. Thus, the Plan satisfies the requirements of Section 1122(a) of the Bankruptcy Code. Additionally, because the Plan does not designate a separate class of unsecured claims for administrative convenience purposes, Section 1122(b) is inapplicable here.

### (b) SECTION 1123(A): MANDATORY CONTENTS OF A PLAN

43. As required by Section 1123(a)(1), in addition to Administrative Expense Claims, Priority Tax Claims, and the DIP Claims, which need not be classified, Article IV of the Plan designates six (6) Classes of Claims and Interests. Thus, the Plan satisfies Section 1123(a)(1) of the Bankruptcy Code.

### (c) SECTION 1123(A)(2): SPECIFICATION OF IMPAIRMENT

44. Articles IV and V of the Plan specify that Class 1 (Non-Tax Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), Class 5 (Workers' Compensation Claims), and Class 6 (Interests) are unimpaired under the Plan, in that the legal, equitable, or contractual rights of holders of Claims and Interests in these Classes are not altered under the Plan. Additionally, Article IV of the Plan properly identifies and describes the treatment of each Class of Claims or Interests that is unimpaired under the Plan, thereby satisfying Section 1123(a)(2) of the Bankruptcy Code.

### (d) SECTION 1123(A)(3): SPECIFICATION OF TREATMENT OF IMPAIRED CLASSES

45. Article IV of the Plan sets forth the treatment of Class 4 (Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims), the only impaired Class of Claims under the Plan, thereby satisfying Section 1123(a)(3) of the Bankruptcy Code.

-16-

(e)     SECTION 1123(A)(4): EQUAL TREATMENT OF EACH CLAIM OR
INTEREST WITHIN A PARTICULAR CLASS

46.     The Plan provides for the same treatment for each Claim or Interest in each

respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable

treatment of such Claim or Interest, thereby satisfying Section 1123(a)(4) of the Bankruptcy

Code.

(f)     SECTION 1123(A)(5): ADEQUATE MEANS FOR THE PLAN'S
IMPLEMENTATION

47.     Article XI, and various other provisions of the Plan, set forth the means for

implementation of the Plan as required by Section 1123(a)(5) of the Bankruptcy Code.  All

documents necessary to implement the Plan and all other relevant and necessary documents

shall, as of the Effective Date, upon completion of documentation and execution, be valid,

binding, and enforceable agreements and shall not be in conflict with any federal or state law.

Among other things, the Plan provides for:

- the continued existence of UGL as Reorganized UGL;

- the effectuation of all corporate documents, including the Amended
  Articles of Incorporation and the Amended By-Laws of Reorganized
  UGL;

- the continuance of the UGL board of directors as directors of Reorganized
  UGL;

- the automatic conversion of all of the issued and outstanding shares of
  Class A Voting and Class B Non-Voting stock of UGL into shares of
  Reorganized UGL Stock;

- entry into the Exit Facility; and

- the sources of Cash for (i) Plan Distributions to holders of Allowed Claims
  and (ii) distributions to holders of Allowed Trust Claims pursuant to the
  Trust Distribution Procedures.

-17-

(g)    **SECTION 1123(A)(6): PROHIBITION OF THE ISSUANCE OF NON-VOTING EQUITY SECURITIES**

48.    Pursuant to Section 11.5 of the Plan, the Amended Certificate of Incorporation and Amended Bylaws of UGL shall include a provision prohibiting the issuance of non-voting equity securities, thereby satisfying Section 1123(a)(6) of the Bankruptcy Code.

(h)    **SECTION 1123(A)(7): SELECTION OF OFFICERS AND DIRECTORS**

49.    The provisions of Section 11.5 of the Plan and Reorganized UGL's corporate documents regarding the manner of selection of officers and directors of Reorganized UGL are consistent with the interests of creditors and equity security holders and with public policy, and the Debtor has identified the individuals proposed to serve as the directors and officers of Reorganized UGL, thereby satisfying Section 1123(a)(7) of the Bankruptcy Code.

(i)    **SECTION 1123(A)(8): PAYMENTS FROM POST-PETITION EARNING OF INDIVIDUAL DEBTORS**

50.    Section 1123(a)(8) of the Bankruptcy Code is not applicable to the Chapter 11 Case because the Debtor is not an individual.

(j)    **SECTION 1123(B): DISCRETIONARY PLAN PROVISIONS**

51.    The Plan contains various provisions that may be construed as discretionary. As set forth below, such discretionary provisions comply with Section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code. Thus, Section 1123(b) of the Bankruptcy Code is satisfied.

(i)    **SECTION 1123(B)(1): IMPAIRMENT/UNIMPAIRMENT OF CLAIMS AND INTERESTS**

52.    Article IV of the Plan provides for the impairment of certain Classes of Claims and Interests, while leaving others Unimpaired, as permitted by Section 1123(b)(1). Specifically, pursuant to Article IV of the Plan, Classes 1 (Non-Tax Priority Claims), 2 (Secured Claims), 3

-18-

(General Unsecured Claims), 5 (Workers' Compensation Claims), and 6 (Interests) are

Unimpaired under the Plan. Only Plan Class 4 (Asbestos Personal Injury Claims and Indirect

Asbestos Personal Injury Claims) is Impaired under the Plan. As such, the Plan is consistent

with Section 1123(b)(1) of the Bankruptcy Code.

(ii)     **SECTION 1123(B)(2): ASSUMPTION/REJECTION OF EXECUTORY CONTRACTS AND LEASES**

53.     Article VII of the Plan provides for the assumption of all executory contracts and

unexpired leases, including all of the Debtor's insurance policies and any agreements,

documents, or instruments relating thereto, that exist between the Debtor and any other person or

entity prior to the Confirmation Date that have not expired by their own terms before the

Confirmation Date or have not been expressly rejected by the Debtor by Order of the Court on or

prior to the Confirmation Date, unless (i) there is pending before the Court on the Confirmation

Date a motion to reject such executory contract or unexpired lease or (ii) such executory contract

or unexpired lease is listed on Exhibit I to the Plan. In addition, Section 12.8 of Article XII of

the Plan provides further that the obligations of the Debtor to indemnify and reimburse persons

who are or were current or former shareholders, directors, officers, or employees of the Debtor

against and for any obligations as provided in the Debtor's certificate of incorporation, bylaws,

shareholders' agreement, applicable state law, or any other agreement, or any combination of the

foregoing, including, without limitation, the UGL Shareholders' Agreement executed on March

4, 1987, as amended, requiring the disbursement of dividends to shareholders to pay their federal

and state tax obligations on an annual basis, shall survive confirmation of the Plan, remain

unaffected thereby, and not be discharged in accordance with Section 1141 of the Bankruptcy

Code, irrespective of whether indemnification or reimbursement is owed in connection with an

-19-

event occurring before, on, or after the Petition Date.  Accordingly, the Plan is consistent with Section 1123(b)(2) of the Bankruptcy Code.

(iii)     SECTION 1123(B)(3): PRESERVATION OF CLAIMS AND CAUSES OF ACTION; SETTLEMENT, RELEASES, EXCULPATION AND INJUNCTION

54.     **Preservation of Claims and Causes of Action**.  Section 9.7 of the Plan appropriately provides for the preservation and retention by the Debtor and Reorganized UGL of the right to enforce, sue on, settle, or compromise (or decline to do any of the foregoing) certain Claims (other than Trust Claims), rights, certain Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Entity, in accordance with Section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions in the Plan regarding the retained right to enforce, sue on, settle, or compromise Claims (other than Trust Claims), Causes of Action, causes of action held by the Debtor or its Estate against any Entity are appropriate and are in the best interests of the Debtor, its Estates, and all holders of Claims and Interests.

55.     **Settlements**.  The Plan settles numerous litigable issues in the Chapter 11 Case, including potential claims against the UGL Shareholders, pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code.  These settlements are in consideration for the distributions and other benefits provided under the Plan; any other compromise and settlement provisions of the Plan, and the Plan itself, constitute a compromise of all Claims or Causes of Action relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such an Allowed Claim.  The compromise and settlement of such Claims embodied in the Plan is in the best interests of the Debtor, its Estate, and all holders of Claims, and is fair, equitable, and reasonable.

-20-

56.    **Releases by the Debtor**.  The releases and discharges of claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and Causes of Action in favor of the Released Parties that the Debtor, Reorganized UGL, the Trust, or any other Entity seeking to exercise the rights of the Estate, as described in Section 12.4(a) of the Plan (the "Debtor Release"), pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, represents a valid exercise of the Debtor's business judgment.  Pursuing any such claims against the Released Parties could create unnecessary delay and uncertainty, and the direct and indirect costs associated with such litigation could jeopardize any potential benefits from pursuing such claims.

57.    **Third Party Releases**.  For the reasons reflected on the record of the Confirmation Hearing and/or in the pleadings filed in support of confirmation, the releases by holders of Claims described in Section 12.4(b) of the Plan ("Third Party Releases") are appropriate and warranted under the unique circumstances of the Chapter 11 Case.

58.    The Plan reflects the settlement and resolution of complex issues, and the Third Party Releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan.  Specifically, the release provisions in the Plan, including the release provisions in Section 12.4 of the Plan, are a critical component of the Plan, which Plan maximizes recoveries to all creditors and affords the Debtor the opportunity to restructure its businesses to compete effectively post-emergence.

59.    The Third Party Releases are (a) in exchange for the good, valuable, and significant consideration provided by the Released Debtor Parties; (b) a good faith settlement and compromise of the claims released by holders of Claims; (c) in the best interests of the Debtor and all holders of Claims; (d) fair, equitable, and reasonable; (e) necessary to the Plan because the enjoined claims would directly impact the Debtor's reorganization as certain of the

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 28 of 302

Released Parties would not provide the substantial consideration they have agreed to contribute under the Plan without such releases.

60. **Exculpation**. The exculpation provisions set forth in Section 12.3 of the Plan (as modified by this Confirmation Order) are essential to the Plan and are appropriately tailored to protect the Exculpated Parties (as defined below) from inappropriate litigation related to acts or omissions up to and including the Effective Date of the Plan and are hereby approved; provided that nothing in the Plan shall (a) exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, gross negligence, or willful misconduct as determined by a Final Order and, in all respects, the Debtor, Reorganized UGL, and each of the other Exculpated Parties shall be entitled to rely upon the good faith and informed advice of counsel with respect to their duties and responsibilities under the Plan and the Plan Documents.

61. Notwithstanding anything to the contrary in the Plan or his Confirmation Order, the release provisions in the Plan do not discharge, release, or relieve any Person from any liability with respect to the Debtor's programs, plans, agreements, and arrangements relating to the Debtor's employee compensation and benefits, including programs, plans, agreements, and arrangements subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code and including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, life, accidental death and dismemberment insurance plans, workers' compensation plans, severance, salary continuation, and retention agreements entered into before the Petition Date and not since terminated as a result of the Chapter 11 Case or the Plan.

(iv)    SECTION 1123(B)(4): SALE OF PROPERTY OF THE ESTATE

62. The Plan does not provide for the sale of any of the Debtor's property and therefore, Section 1123(b)(4) of the Bankruptcy Code is not applicable.

-22-

63.    Article IV of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims and Interests.

### *(k)    SECTION 1123(D): CURE OF DEFAULTS*

64.    Section 7.2 of the Plan provides for the satisfaction of any monetary defaults under each Executory Contract to be assumed pursuant to the Plan, in accordance with Sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of Section 365 of the Bankruptcy Code, by payment of any cure amount pursuant to entry of a Final Order determining the amount, if any, of the Debtor's or Reorganized UGL's liability with respect thereto and approving the assumption or assumption and assignment, as the case may be, or as may otherwise be agreed to by the parties to such Executory Contracts. Notwithstanding the foregoing, the Debtor or Reorganized UGL, as applicable, is hereby authorized, upon written notice to the affected party, to reject any Executory Contract to be deemed effective as of the day before the Effective Date, to the extent the Debtor or Reorganized UGL shall, in the exercise of its sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order, renders the assumption of such Executory Contract unfavorable to the Debtor or Reorganized UGL. Accordingly, the requirements of Section 1123(d) of the Bankruptcy Code are satisfied.

### ii.    SECTION 1129(A)(2) - THE DEBTOR IS IN COMPLIANCE WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE

65.    The Debtor has complied with all applicable provisions of the Bankruptcy Code, as required by Section 1129(a)(2) of the Bankruptcy Code, including Sections 1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019. As set forth above, votes to accept or reject the Plan were solicited by the Debtor after the Court

-23-

approved the adequacy of the Disclosure Statement pursuant to Section 1125(a) of the Bankruptcy Code. The Debtor has also complied with the Bankruptcy Rules and the Local Bankruptcy Rules, and the solicitation and voting procedures set forth in the Order Approving Disclosure Statement and Solicitation Procedures in transmitting the Plan, the Disclosure Statement, the ballots, and related documents and notices and in soliciting and tabulating votes on the Plan.

66. The Debtor and its officers, directors, employees, advisors, attorneys, and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan. Accordingly, the requirements of Section 1129(a)(2) of the Bankruptcy Code are satisfied.

### iii. SECTION 1129(A)(3) — THE PLAN PROPOSED IN GOOD FAITH

67. The Debtor has proposed the Plan (along with all documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying Section 1129(a)(3) of the Bankruptcy Code. The Debtor's good faith is evident from the facts and records of this Chapter 11 Case, the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in this Chapter 11 Case. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtor's estate, of effectuating a successful reorganization of the Debtor and of fairly and equitably addressing the Asbestos Personal Injury Claims, Indirect Asbestos Personal Injury Claims and Demands.

-24-

68.     The Plan is the product of extensive, good faith, arm's-length negotiations among the Debtor, the UGL Shareholders, and representatives of the Debtor's principal constituencies, including the Creditors' Committee and the FCR.  The Plan itself and the process leading to its formulation provide independent evidence of the Debtor's good faith, serve the public interest, and assure fair treatment of holders of Claims and Interests.  Accordingly, the requirements of Section 1129(a)(3) of the Bankruptcy Code are satisfied.

### iv.     SECTION 1129(A)(4) — APPROVAL OF CERTAIN PAYMENTS FOR SERVICES, COSTS AND EXPENSES

69.     Any payment made or to be made by the Debtor under the Plan for services or for costs and expenses in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying Section 1129(a)(4) of the Bankruptcy Code.

### v.     SECTION 1129(A)(5) — DISCLOSURE OF IDENTITY OF DIRECTORS, OFFICERS, AND INSIDERS

70.     The Plan complies with the requirements of Section 1129(a)(5) of the Bankruptcy Code.  Specifically, the Debtor has fully disclosed that its current officers and directors shall continue to serve in their respective positions with Reorganized UGL after confirmation of the Plan, consistent with the interest of holders of Claims against the Debtor and with public policy.  Accordingly, the requirements of Section 1129(a)(5) of the Bankruptcy Code are satisfied.

### vi.     SECTION 1129(A)(6) — NO RATE CHANGES

71.     After confirmation of the Plan, the Debtor's business will not involve rates established or approved by, or otherwise subject to, any governmental regulatory commission.  Thus, Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Case.

### vii.  SECTION 1129(A)(7) — BEST INTERESTS OF CREDITORS

72.     The liquidation analysis attached as Exhibit F to the Disclosure Statement (the "Liquidation Analysis"), and other evidence related thereto in support of the Plan that was proffered or adduced at or prior to, or in declarations in connection with, the Confirmation Hearing: (i) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (ii) utilize reasonable and appropriate methodologies and assumptions; (iii) have not been controverted by other evidence; and (iv) establish that holders of Allowed Claims in every Class will recover property of a value at least as much or more under the Plan on account of such Claim, as of the Effective Date, than the amount such holder would receive if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Accordingly, the requirements of Section 1129(a)(7) of the Bankruptcy Code are satisfied.

### viii.  SECTION 1129(A)(8) — ACCEPTANCE OF THE PLAN BY EACH IMPAIRED CLASS; PRESUMPTION OF ACCEPTANCE BY UNIMPAIRED CLASSES

73.     Plan Class 4 is the only Impaired Class of Claims under the Plan.  As set forth in the Voting Certification, holders of Claims in Plan Class 4 have voted unanimously to accept the Plan.  Plan Classes 1, 2, 3, 5, and 6 are Classes of Unimpaired Claims and Interests under the Plan that are conclusively presumed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.  Accordingly, the requirements of Section 1129(a)(8) of the Bankruptcy Code have been satisfied.

### ix.  SECTION 1129(A)(9) — TREATMENT OF CLAIMS ENTITLED TO PRIORITY PURSUANT TO SECTION 507(A) OF THE BANKRUPTCY CODE

74.     The treatment of Administrative Expense Claims, Priority Tax Claims, and Allowed DIP Facility Claim under Article II of the Plan satisfies the requirements of, and complies in all respects with, the requirements of Section 1129(a)(9) of the Bankruptcy Code.

-26-

x.    **SECTION 1129(A)(10) — ACCEPTANCE BY AT LEAST ONE IMPAIRED CLASS; NON-INSIDER CLASS**

75.    As set forth in the Voting Certifications, Impaired Class 4 has voted to accept the Plan.  As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code), thus satisfying the requirements of Section 1129(a)(10) of the Bankruptcy Code.

xi.    **SECTION 1129(A)(11) — FEASIBILITY OF THE PLAN**

76.    The evidence in support of confirmation of the Plan proffered or adduced at, or prior to, or in declarations filed in connection with, the Confirmation Hearing (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other evidence; (c) utilizes reasonable and appropriate methodologies and assumptions; and (d) establishes that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, thus satisfying the requirements of Section 1129(a)(11) of the Bankruptcy Code.

xii.    **SECTION 1129(A)(12) — PAYMENT OF STATUTORY FEES**

77.    Section 16.15 of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing, have been or will be paid for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.  Accordingly, the Debtor has satisfied the requirements of Section 1129(a)(12) of the Bankruptcy Code.

xiii.    **SECTION 1129(A)(13) — CONTINUANCE OF RETIREE BENEFITS**

78.    Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for "retiree benefits" (as defined in Section 1114 of the Bankruptcy Code) at levels established pursuant to

Section 1114 of the Bankruptcy Code. Section 7.4 of the Plan provides that, on and after the Effective Date, all of the Debtor's programs, plans, agreements, and arrangements relating to the Debtor's employee compensation and benefits, including programs, plans, agreements, and arrangements subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code and including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, life, accidental death and dismemberment insurance plans, workers' compensation plans, severance, salary continuation, and retention agreements entered into before the Petition Date and not since terminated, shall continue to be honored and paid by Reorganized UGL in accordance with applicable law. Accordingly, the requirements of Section 1129(a)(13) of the Bankruptcy Code are satisfied.

### xiv. SECTION 1129(B) — THE "CRAMDOWN" REQUIREMENTS ARE INAPPLICABLE

79. Based upon the Voting Certification and the evidence presented by the Debtor at or in connection with the Confirmation Hearing, the provisions of Section 1129(b)(1) of the Bankruptcy Code are inapplicable.

### xv. SECTION 1129(C) — ONLY ONE PLAN

80. Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Case that was not previously withdrawn. Accordingly, the requirements of Section 1129(c) of the Bankruptcy Code have been satisfied.

### xvi. SECTION 1129(D) — PRINCIPAL PURPOSE OF THE PLAN

81. No governmental unit has requested that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933. Accordingly, the requirements of Section 1129(d) of the Bankruptcy Code are satisfied.

-28-

**N.     THE TRUST AND THE CHANNELING INJUNCTION COMPLY WITH SECTION 524(G) OF THE BANKRUPTCY CODE**

82.     As of the Petition Date, the Debtor had been named as a defendant in approximately 1,400 asbestos-related personal injury suits, seeking recovery for damages allegedly caused by exposure to asbestos-containing products.  *See* Disclosure Statement, at 17. The provisions of the Plan, including the Channeling Injunction and the Non-Settling Insurers Injunction, set forth in Sections 12.5 and 12.6 of the Plan, respectively, comply with the requirements of Section 524(g) of the Bankruptcy Code as follows:

> *(a)     THE PLAN SATISFIES THE STRUCTURE AND FUNDING REQUIREMENTS OF SECTION 524(G)(2)(B)(I) OF THE BANKRUPTCY CODE*
>
> (i)     SECTION 524(G)(2)(B)(I)(I): ASSUMPTION OF LIABILITIES

83.     The Discharge Injunction and the Channeling Injunction are to be implemented in connection with the Plan and the Trust. Plan §§ 12.1, 12.2, and 12.5.

84.     As noted above, as of the Petition Date, the Debtor had been named as a defendant in over 1,400 asbestos-related lawsuits seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.  *See* Disclosure Statement, at 17.  In compliance with Section 524(g)(2)(B)(i)(I) of the Bankruptcy Code, Section 10.3 of the Plan provides that immediately upon the Effective Date, all liabilities, obligations, and responsibilities for all Trust Claims, including Asbestos Personal Injury Claims and Demands, shall automatically be transferred and channeled to, and assumed by, the Trust without any further action of the Court or further act or agreement of any entity in accordance with, and to the extent set forth in, the Plan and the Trust Agreement.  The Trust shall be solely responsible for the determination, allowance, and payment of all Trust Claims in accordance with the terms, provisions, and procedures of the Trust Agreement and the Trust Distribution Procedures.

-29-

85.     The Trust shall be funded by the Trust Assets, which include, among other things, the UGL Contribution, which includes the UGL Promissory Note and the Asbestos Insurance Rights (which include the proceeds of the Asbestos Insurance Settlement Agreements), and the UGL Shareholder Contribution in accordance with the provisions of Section 10.2 of the Plan. The UGL Promissory Note constitutes an obligation of Reorganized UGL to make future payments to the Trust. Therefore, the Plan satisfies the provisions of Section 542(g)(2)(B)(i)(II) of the Bankruptcy Code.

86.     The Settling Insurers have agreed to make contributions to the Trust pursuant to the Asbestos Insurance Settlement Agreements. Specifically, Hartford Accident and Indemnity Company and Twin City Fire Insurance Company have agreed to contribute $4,350,000, Hudson Insurance Company has agreed to contribute $4,750,000, Travelers Indemnity Company has agreed to contribute $760,834.78, Pennsylvania Manufacturers' Association Insurance Company has agreed to contribute $375,000, OneBeacon America Insurance Company has agreed to contribute $75,000, and Fireman's Fund Insurance Company has agreed to contribute $45,000. Mancuso Decl., at ¶ 41.

87.     The proposed terms of these Asbestos Insurance Settlement Agreements have been negotiated in good faith and at arm's length. The contributions by the Settling Insurers constitute reasonable settlements and fair resolutions of the alleged liability of the Settling Insurers for claims arising out of the Asbestos Insurance Rights assigned to the Trust.

88.     Granting the Settling Insurers the protections of the Channeling Injunction is essential and necessary to the Debtor's reorganization because, among other reasons, the Settling Insurers would not be willing to make their respective contributions to the Trust without the protection provided by the Channeling Injunction.

-30-

(iii)    **SECTION 524(G)(2)(B)(I)(III): OWNERSHIP OF VOTING SHARES**

89.    Pursuant to Section 10.2 of the Plan, (a) Reorganized UGL shall execute and deliver to the Trust as part of the UGL Contribution, the UGL Promissory Note; and (b) the UGL Shareholders shall execute and deliver to the Trust as part of the UGL Shareholder Contribution, the UGL Shareholder Promissory Note.  As security for the UGL Promissory Note and the UGL Shareholder Promissory Note, on the Effective Date, the UGL Shareholders shall execute and deliver to the Trust the Pledge Agreement pursuant to which the UGL Shareholders shall grant a security interest in 100% of the equity interests in Reorganized UGL to the Trust as collateral for the repayment of the UGL Promissory Note and the UGL Shareholder Promissory Note.  The Trust will be entitled to foreclose its security interest in the shares of Reorganized UGL and own such interests in the event of a default by Reorganized UGL and/or the UGL Shareholders under the terms of the UGL Promissory Note and/or the UGL Shareholder Promissory Note; and therefore, the Plan satisfies Section 524(g)(2)(B)(i)(III) of the Bankruptcy Code.

(iv)    **SECTION 524(G)(2)(B)(I)(IV): USE OF TRUST ASSETS**

90.    In accordance with Article X of the Plan, the Trust shall preserve, hold, and manage the Trust's assets and income for use in resolving and paying Trust Claims in accordance with the terms and provisions of the Trust Agreement, the Trust Distribution Procedures, and the Plan.  Thus, the Plan satisfies the requirements of Section 524(g)(2)(B)(i)(IV) of the Bankruptcy Code.

-31-

(b) **THE TRUST SATISFIES THE REQUIREMENTS OF SECTION 524(G)(2)(B)(II) OF THE BANKRUPTCY CODE**

(i) **SECTION 524(G)(2)(B)(II)(I): LIKELIHOOD OF FUTURE DEMANDS**

91.     Based on the long latency period of asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted against the Debtor in the past and that remained unresolved on the Petition Date, the Debtor, either directly or indirectly, likely would be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims that were pending against the Debtor on the Petition Date and that are addressed by the Channeling Injunction. *See* Declaration of James L. Patton, Jr. in Support of Section 542(g) Requirements, dated December 2, 2014, filed in support of confirmation [Docket No. 2140] ("Patton Decl."). Accordingly, the Plan satisfies the requirements of Section 524(g)(2)(B)(ii)(I) of the Bankruptcy Code.

(ii) **SECTION 524(G)(2)(B)(II)(II): INDETERMINATE NATURE OF FUTURE DEMANDS**

92.     In accordance with the representations made in the Patton Decl., and in light of the long latency period of asbestos-related diseases, the inherent uncertainties regarding asbestos-related claims and demands, and the substantial number and amounts of asbestos-related personal injury claims asserted against the Debtor prior to the Petition Date, the actual amounts, numbers, and timing of Demands cannot be determined at this time. Patton Decl., at ¶¶ 27-28. Therefore, the Plan satisfies the requirements of Section 524(g)(2)(B)(ii)(II) of the Bankruptcy Code.

(iii)    SECTION 524(G)(2)(B)(II)(III): IMPACT OF FUTURE
         DEMANDS PURSUED OUTSIDE OF THE PLAN

93.     Due to the Debtor's limited resources, including the limited nature of remaining coverage under the Debtor's available Asbestos Insurance Policies, the pursuit of Demands outside the procedures prescribed by the Plan is extremely likely to threaten the Plan's purpose to deal equitably with Trust Claims. Patton Decl., at ¶¶ 14, 29. Specifically, if the holders of Trust Claims are able to pursue such Claims outside of the procedures set forth in the Plan, the Debtor would be forced back into the tort system as a prominent defendant. Large numbers of lawsuits would likely be asserted against the Debtor in short order, given that the automatic stay has prevented the assertion of such claims against the Debtor for approximately three years, which would likely result in inconsistent rulings. Any such lawsuits would present the Debtor with an enormous burden immediately upon its departure from chapter 11. Mancuso Decl., ¶ 89. Thus, the Plan satisfies the requirements of Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code.

(iv)    SECTION 524(G)(2)(B)(II)(IV)(AA): TERMS OF
        INJUNCTION

94.     The terms of the Channeling Injunction, including any provisions barring actions against the Asbestos Protected Parties and Settling Insurers pursuant to Section 524(g)(4)(A) of the Bankruptcy Code, are set out in conspicuous language in Article XII of the Plan and described in the Disclosure Statement. *See* Plan § 12.5; Disclosure Statement, at 54-56. The description of the Channeling Injunction is set out in bold letters and/or is underlined to bring attention to the Injunction. Accordingly, the requirements of Section 524(g)(2)(B)(ii)(IV)(aa) of the Bankruptcy Code are satisfied.

-33-

(v)      SECTION 524(G)(2)(B)(II)(IV)(BB): CLASSIFICATION AND ACCEPTANCE OF PLAN BY CLASS 4

95.      Pursuant to Section IV of the Plan, the Plan separately classifies Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims in Class 4. As evidenced by the Voting Certification, 100% of Holders of Class 4 Claims actually voting on the Plan have voted to accept the Plan. *See* Voting Certification ¶ 23. Thus, the Plan satisfies the requirements of Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

(vi)      SECTION 524(G)(2)(B)(II)(V): OPERATION OF THE TRUST

96.      On the Effective Date, the Trust will be established, and all Trust Claims will be paid in accordance with the Plan, the Trust Agreement, and the Trust Distribution Procedures. Plan § 10.1. All Trust Claims, including Demands that are presently unknown, will be resolved pursuant to the Plan, the Trust Agreement and the Trust Distribution Procedures. *Id.* Following the Effective Date, the Trustee will implement the Trust Agreement and the Trust Distribution Procedures, which describes in greater detail the mechanisms governing the valuation, payment, and administration of Trust Claims. *See* Trust Distribution Procedures (Exhibit F to the Plan); Trust Agreement (Exhibit E to the Plan). Pursuant to the Plan, the Trust Distribution Procedures, this Order, and the Trust Documents, the Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Trust Claims or other comparable mechanisms, that provide reasonable assurance that the Trust shall value, and be in a financial position to pay all Trust Claims, including Demands, in substantially the same manner. Thus, the Plan satisfies the requirements of Section 524(g)(2)(B)(ii)(V) of the Bankruptcy Code.

-34-

*(c)* ***THE TRUST SATISFIES THE REQUIREMENTS OF SECTION 524(G)(4)(A)(II) OF THE BANKRUPTCY CODE***

97.     The Channeling Injunction set forth in Sections 12.5 of the Plan bars actions against the Asbestos Protected Parties and Settling Insurers, which third parties are clearly identified in the Plan by name or as part of an identifiable group. Plan § 12.5; 1.11 (definition of Asbestos Protected Parties); 1.88 (definition of Settling Insurer); Exhibit B (List of Settling Insurers). All of the Asbestos Protected Parties and Settling Insurers are, or may be alleged to be, directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtor by reason of such third party's (1) ownership of a financial interest in the Debtor, an affiliate or predecessor in interest; (2) involvement in management of the Debtor or predecessor in interest, including service as an office, director or employee; (3) provision of insurance to the Debtor or a related party; or (4) involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition of the Debtor or a related party. Identifying or describing each Asbestos Protected Party and Settling Insurer in the Channeling Injunction is fair and equitable in light of the benefits provided, or to be provided, to the Trust by and on behalf of each such Asbestos Protected Party and Settling Insurer. Accordingly, the Plan complies with Section 524(g)(4)(A)(ii) of the Bankruptcy Code.

*(d)* ***THE INTERESTS OF FUTURE ASBESTOS CLAIMANTS WERE PROPERLY REPRESENTED BY THE APPOINTMENT OF THE FCR, THUS SATISFYING THE REQUIREMENTS OF SECTION 524(G)(4)(B)(I) OF THE BANKRUPTCY CODE***

98.     The FCR was appointed by the Court for the purpose of, among other things, protecting the rights of Persons that might subsequently assert Demands of the kind that are addressed by the Channeling Injunction and channeled to the Trust.

-35-

99. The FCR has in all respects fulfilled his duties as the legal representative for purposes of protecting the rights of Persons that might subsequently assert Demands in accordance with Section 524(g) of the Bankruptcy Code.

### (e) *ENTRY OF THE CHANNELING INJUNCTION IS FAIR AND EQUITABLE WITH RESPECT TO FUTURE DEMAND HOLDERS*

100. Reorganized UGL and the UGL Shareholders on behalf of all of the Asbestos Protected Parties, are contributing substantial assets to the Trust. Plan § 10.2 (Funding and Receipt of Trust Assets). Specifically, on the Effective Date, Reorganized UGL and the UGL Shareholders, as applicable, will irrevocably transfer and assign to the Trust (i) the Asbestos Insurance Rights, including all rights of the Debtor under, and all proceeds of, the Asbestos Insurance Settlement Agreements, which total approximately $10 million; (ii) the UGL Shareholder Contribution, which includes $8.0 million in Cash payable on the Effective Date (less the portion of such Cash to be paid to the Holders of Settled Asbestos Claims, and the UGL Shareholder Promissory Note in the principal amount of $375,000); (iii) the UGL Cash Contribution; and (iv) the UGL Promissory Note. In light of the benefits provided, or to be provided, to the Trust by and/or on behalf of each Asbestos Protected Party and Settling Insurer, the Channeling Injunction is fair and equitable with respect to Asbestos Claimants and Future Demand Holders against the Debtor, Reorganized UGL or any other Asbestos Protected Party or Settling Insurer.

101. Moreover, the FCR supports the Plan or issuance of the Channeling Injunction, as evidenced by the Patton Decl.

-36-

102.    The Creditors' Committee and the FCR with the approval of the Debtor have designated Alan Rich[3] as the initial Trustee of the Trust, and Mr. Rich has agreed to serve as the initial Trustee.

103.    The Creditors' Committee has nominated J. Barry Julian, Ethan Early, Brian Fitzpatrick, Jonathan Ruckdeschel and John M. Comerford., Jr. to serve as members of the Trust Advisory Committee and those individuals have agreed to serve on the Trust Advisory Committee.  Accordingly, the Plan complies with Section 524(g) of the Bankruptcy Code.

O.    THE TRUST SATISFIES THE REQUIREMENTS OF A QUALIFIED SETTLEMENT FUND

104.    The Trust satisfies the requirements of a "qualified settlement fund" pursuant to Section 468B of the Internal Revenue Code and the regulations applicable thereto.  The Trust will be established pursuant to this Order confirming the Plan and the Court will have continuing jurisdiction over the Plan Trust.  *See* Treas. Reg. § 1.468B-1(c)(1).  The Trust will be established to resolve or satisfy in excess of 900 contested asbestos tort claims that have resulted (or may result) from a series of related events that have occurred and that have given rise to at least one claim asserting tort liability.  Treas. Reg. § 1.468B-1(c)(2).  In addition, the Trust will be formed and administered in a trust in accordance with Delaware law.  Treas. Reg. § 1.468B-1(c)(3).

P.    THE NON-SETTLING INSURERS INJUNCTION SATISFIES THE REQUIREMENTS OF SECTION 105(A) OF THE BANKRUPTCY CODE

105.    In order to preserve and promote settlements with all of the Debtor's Asbestos Insurance Companies, and to supplement, where necessary, the Discharge Injunction, Section 12.6 of the Plan provides for the Non-Settling Insurers Injunction.  As described in Section 12.6 of the Plan, except with respect to the Trust, the Non-Settling Insurers Injunction shall operate as an injunction, pursuant to Section 105(a) of the Bankruptcy Code, prohibiting and enjoining the

---

[3] On December 5, 2014, the FCR filed its *Notice of Selection of Proposed Trustee of the United Gilsonite Laboratories Asbestos Personal Injury Trust* [D.I. 2167].

commencement, conduct, or continuation of any action or Cause of Action, whether known or unknown, the employment of process or any act to collect, recover from, or offset any Trust Claim against any of the Debtor's Asbestos Insurance Companies that did not settle with the Debtor prior to the Effective Date.

106.    The Debtor fully disclosed the terms of the Non-Settling Insurers Injunction in the Plan and Disclosure Statement, and the Plan Class 4 Asbestos Claimants have voted in favor of the Plan.  No party has objected to the issuance or entry of the Non-Settling Insurers Injunction.

107.    The Non-Settling Insurers Injunction merely continues the automatic stay over property of the Estate, specifically the Debtor's insurance policies, by giving the Trust, which is liable for payment of all valid Trust Claims, breathing room to negotiate with the Asbestos Insurance Companies that did not settle with the Debtor prior to the Effective Date of the Plan. The Non-Settling Insurers Injunction is issued solely for the benefit of the Trust and is not issued for the benefit of any Asbestos Insurance Company that is not a Settling Insurer, and no Asbestos Insurance Company that is not a Settling Insurer is a third-party beneficiary of the Non-Settling Insurers Injunction.  The Trust shall have the sole and exclusive authority at any time to terminate, reduce, or limit the scope of, the Non-Settling Insurers Injunction.  Based upon the foregoing, the issuance of the Non-Settling Insurers Injunction is fair, necessary to preserve and promote the reorganization, has been supported by fair consideration, and is appropriate under Section 105(a) of the Bankruptcy Code.

**Q.    APPROVAL OF THE DISCHARGE INJUNCTION, EXCULPATION, AND RELEASE PROVISIONS PROVIDED UNDER THE PLAN**

108.    Each of the discharge, release, injunction, and exculpation provisions provided under the Plan, including those set forth in Section 12.1, 12.2, 12.3 (as amended by this Order), 12.4, 12.5, and 12.6 of the Plan, is: (1) integral to the terms, conditions, and settlements

-38-

contained in the Plan, (2) appropriate in connection with the reorganization of the Debtor, and

(3) supported by reasonable consideration. In light of all of circumstances of the Chapter 11

Case, these discharges, releases, injunctions, indemnifications, and exculpations are fair and

reasonable to all parties in interest.

109.    Each of the discharge, release, injunction, and exculpation provisions set forth in

the Plan and this Confirmation Order is: (i) within the jurisdiction of the Court under 28 U.S.C.

§§ 1334(a), 1334(b), and 1334(d); (ii) an essential means of implementing the Plan pursuant to

Section 1123(a)(6) of the Bankruptcy Code; (iii) an integral element of the transactions

incorporated into the Plan; (iv) beneficial to, and in the best interests of, the Debtor, its Estate,

and its creditors[4]; (v) critical to the overall objectives of the Plan to finally resolve all Claims

among or against the parties-in-interest in the Chapter 11 Case; and (vi) consistent with Sections

105, 363, 1123, 1129, and other applicable provisions of the Bankruptcy Code.

**R.    COMPREHENSIVE SETTLEMENTS OF ALL CLAIMS AND CONTROVERSIES**

110.    Based upon the representations and arguments of counsel for the Debtor, the

Creditors' Committee, the FCR, and all other testimony either actually given or proffered at the

Confirmation Hearing or prior hearings and the full record of this Chapter 11 Case, the Court

finds that, pursuant to Section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, and

in consideration of the distributions and other benefits provided under the Plan, including the

UGL Shareholder Contribution, the provisions of the Plan, including the Channeling Injunction,

Discharge Injunction, the Exculpations, and releases set forth in Article XII of the Plan,

constitute a good faith compromise and settlement of all claims or controversies relating to the

rights that a holder of a Claim may have with respect to any Claim, including Trust Claims, or

---

[4] See *Declaration of Brian T. Fitzpatrick in Support of Confirmation of the Modified First Amended Plan of Reorganization of the United Gilsonite Laboratories Under Chapter 11 of the Bankruptcy Code* [D.I. 2166]. Mr. Fitzpatrick represents John J. Juliano, the principal asbestos claimant for the Committee.

any distribution to be made pursuant to the Plan on account of any Allowed Claim. As such, each of the Channeling Injunction, the Discharge Injunction, Exculpation, and releases set forth in Article XII of the Plan is implemented in accordance with applicable law, is consensual, and/or is supported by substantial consideration.

111.    Moreover, based upon the Plan Documents and the representations of counsel for the Debtor, the Creditors' Committee, the FCR, and all other testimony given or proffered at the Confirmation Hearing or prior hearings relating to the negotiations leading to the Plan, the Plan constitutes a fair and reasonable, good faith settlement and compromise of all claims or controversies relating to the rights of holders of Claims against and Interests in the Debtor.

**S.    SATISFACTION OF CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

112.    Section 13.1 of the Plan contains conditions precedent to confirmation and consummation of the Plan that must be satisfied or duly waived in writing by the Debtor, the Creditors' Committee, and the FCR acting jointly. Pursuant to these Findings of Fact and Conclusions of Law and Confirmation Order, each of the conditions precedent to confirmation set forth in Section 13.1(a)-(g) of the Plan has been satisfied or duly waived. With respect to the establishment and funding of the Trust, and the issuance of the Channeling Injunction, among other things, the Court specifically finds:

(i)    the Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that the Plan be proposed in good faith;

(ii)    the Discharge Injunction, the Channeling Injunction, and the Non-Settling Insurers Injunction are to be implemented in connection with the Plan and the Trust;

(iii)    as of the Petition Date, UGL was named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

-40-

(iv)     UGL is likely to be subject to substantial future Demands for payment arising out of similar conduct or events that gave rise to Trust Claims that are addressed by the Channeling Injunction;

(v)      the actual amounts, numbers, and timing of future demands cannot be determined;

(vi)     the Trust, upon the Effective Date, shall assume the liabilities of the Debtor with respect to Trust Claims (subject to the limitations of Sections 10.3 and 12.5 of the Plan);

(vii)    the Trust is to be funded by the Trust Contributions, including the Asbestos Insurance Rights;

(viii)   the Trust, on the Effective Date, by the exercise of contingent rights granted under the Plan, and pursuant to the UGL Promissory Note, the UGL Shareholder Promissory Note, and the Pledge Agreement, would be entitled to own the majority of Reorganized UGL Stock in accordance with the terms of the Pledge Agreement;

(ix)     the Trust is to use its assets and income to pay valid Trust Claims and otherwise as set forth in the Trust Agreement;

(x)      the pursuit of Demands outside the procedures prescribed by the Plan and the Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Trust Claims;

(xi)     the Plan separately classifies Class 4 Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims, and at least two-thirds (2/3) in amount and at least seventy-five percent (75%) of the members in such Class that voted on the Plan have voted to accept/vote in favor of the Plan;

(xii)    pursuant to the Trust Distribution Procedures, court order, or otherwise, the Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Trust Claims or other comparable mechanisms, that provide reasonable assurance that the Trust will value, and be in a financial position to pay, similar Trust Claims in substantially the same manner;

(xiii)   the FCR was appointed by the Court to protect the rights of persons who may, subsequent to the date of confirmation of the Plan, assert "demands," as defined by Section 524(g) of the Bankruptcy Code, on account of personal injury or wrongful death claims from alleged exposure to asbestos and asbestos-containing products against the Debtor, which Demands are subject to the Channeling Injunction;

-41-

(xiv)     in light of the benefits provided, or to be provided, to the Trust by or on behalf of each Asbestos Protected Party and each Settling Insurer, the Channeling Injunction and the Non-Settling Insurers Injunction are fair and equitable with respect to all Creditors and all Future Demand Holders that might subsequently assert Demands against any Asbestos Protected Party or Settling Insurer;

(xv)      the Plan and its acceptance otherwise comply with Sections 524(g) and 1126 of the Bankruptcy Code, and confirmation of the Plan is in the best interests of all Creditors;

(xvi)     the Trust will have the sole and exclusive authority as of the Effective Date to satisfy or defend against all Trust Claims;

(xvii)    the Channeling Injunction and the Non-Settling Insurers Injunction are essential to the Plan and the Debtor's reorganization efforts;

(xviii)   the UGL Shareholder Contribution constitutes a contribution of substantial assets to the Debtor, the Plan, and the Debtor's reorganization, is essential to the feasibility of the Plan and the successful reorganization of the Debtor; constitutes actual and necessary new value to Reorganized UGL; and constitutes a sufficient basis upon which to provide the UGL Shareholders with the protections afforded to them under the Plan, Plan Documents, and Confirmation Order;

(xix)     the terms and conditions of the UGL Promissory Note, the UGL Shareholder Promissory Note, the Pledge Agreement, and any related documents are essential to the success and feasibility of the Plan. All such documents shall constitute legal, valid, binding, and authorized obligations of the parties obligated thereunder, enforceable in accordance with their terms;

(xx)      the Plan does not provide for the liquidation of all or substantially all of the property of the Debtor, Reorganized UGL will continue in business, and confirmation of the Plan is not likely to be followed by the liquidation of Reorganized UGL or the need for further financial reorganization;

(xxi)     on the Effective Date, all of the Liens and security interests granted in accordance with UGL Promissory Note (subject to terms, conditions, and restrictions of the intercreditor agreement entered into in connection with the Exit Facility), the UGL Shareholder Promissory Note, the Pledge Agreement, and any related documents shall be deemed approved and shall be legal, valid, binding, and enforceable Liens on the collateral in accordance with the terms of each agreement;

(xxii)    Reorganized UGL and the Trust are valid legal Entities separate and distinct from one another, and each of Reorganized UGL and the Trust are not and may not in the future be held liable for any liability of the other

-42-

Entity based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, including but not limited to fraudulent transfer or fraudulent conveyance claims under applicable state or federal law; and

(xxiii)  the Trust is a "qualified settlement fund" as defined in Treasury Regulation Section 1.468B-1 and shall be interpreted and administered in accordance with the rules governing such a fund and the regulations issued pursuant thereto.

## II.  ORDER OF CONFIRMATION

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, THE PLAN SATISFIES THE REQUIREMENTS FOR CONFIRMATION; ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

113.    The Plan, a copy of which is attached hereto as <u>Exhibit A</u>, and each of its provisions (whether or not specifically approved herein), as may have been modified in accordance with Section 1127(a) of the Bankruptcy Code, and all exhibits and schedules thereto, and separate findings of fact and conclusions of law, shall be, and hereby are, CONFIRMED pursuant to Sections 524(g) and 1129 of the Bankruptcy Code.  The terms of the Plan, all of its exhibits and schedules and the Plan Documents are incorporated by reference into, and are an integral part of, the Plan and this Confirmation Order and are authorized and approved.

114.    If there is any direct conflict between the terms of the Plan or any exhibit thereto and the terms of this Confirmation Order, the terms of the Confirmation Order shall control; provided, however, nothing in this Confirmation Order shall supersede the provisions of Section 12.4 and 12.5 of the Plan.  This Confirmation Order shall supersede any prior orders of the Court that may be inconsistent herewith.

## A.    EFFECTS OF CONFIRMATION.

115.    In accordance with Section 1141(a) of the Bankruptcy Code, immediately upon the entry of this Confirmation Order, the terms of the Plan and this Confirmation Order shall be binding upon all Persons and parties in interest, including the Debtor, Reorganized UGL, and

any and all holders of Claims and Interests (irrespective of whether such Claims and Interests are impaired under the Plan or whether the holders of such Claims and Interests accepted, rejected or are deemed to have accepted or rejected the Plan).

**B.    CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN.**

116.    Nothing in this Confirmation Order shall in any way affect the provisions of Sections 13.1, 13.2, 13.3, and 13.4 of the Plan, which include provisions regarding (1) the conditions precedent to the confirmation and consummation of the Plan, (2) the conditions precedent to the Effective Date of the Plan, (3) the waiver of any such conditions, and (4) the effect of failure of the Effective Date of the Plan.

**C.    OBJECTIONS.**

117.    All Objections, responses, reservations, statements, and comments in opposition to the Plan, other than those resolved by this Order or withdrawn with prejudice prior to, or on the record at, the Confirmation Hearing are overruled for the reasons stated on the record.

**D.    APPROVAL OF EXIT FACILITY.**

118.    The Exit Facility and the Exit Facility Agreement, as may be hereafter amended from time to time without notice or court approval, and all transactions contemplated therein, are approved and, upon execution and delivery of the agreements and documents relating thereto by the applicable parties, and the satisfaction or waiver of all conditions precedent to the effectiveness thereof the Exit Facility and the Exit Facility Agreement shall be in full force and effect and valid, binding, and enforceable immediately in accordance with its terms without further notice to or action, order, or approval of the Court or any other Person or other act or action under Applicable Laws.

119.    The Debtor or Reorganized UGL, as applicable, is authorized, without further notice to or action, order, or approval of the Court or any other Person, to: (a) enter into, execute

and perform under the Exit Facility Agreement; (b) execute and deliver all agreements, documents, instruments, notices, and certificates relating to the Exit Facility and the Exit Facility Agreement (including, without limitation, all security agreements, mortgages, and financing statements) (collectively, the "Loan Documents"); (c) to incur and pay all fees and expenses and all other obligations required to be paid in connection with the Exit Facility and the Exit Facility Agreement as and when they become due under the terms of the Exit Facility Agreement; and (d) perform all obligations under the Exit Facility and the Exit Facility Agreement, including any and all indemnity obligations and/or releases set forth therein.

120. The loans and other extensions of credit contemplated by the terms of the Exit Facility and the Exit Facility Agreement, and the granting of Liens to secure such Exit Facility are approved and authorized. The Debtor or Reorganized UGL, as applicable, shall execute and deliver to the Exit Facility Lenders all such agreements, financing statements, instruments, notices, and other documents the Exit Facility Lenders may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the Exit Facility and the security interests arising thereunder or related thereto. All such documents (other than any such documents required or permitted by the terms of the Exit Facility Agreement to be delivered, recorded, or filed after the Effective Date) will be deemed to have been recorded and filed as of the Effective Date. Such Liens shall be valid, binding, perfected, and enforceable first priority Liens and security interests in the property described in the Exit Facility Agreement, and the granting of such Liens, the making of such loans and other extensions of credit, and the execution and consummation of the Exit Facility and the Exit Facility Agreement shall not be subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as such term is defined in the Bankruptcy Code) of any kind under the

Bankruptcy Code or any Applicable Laws as of the Effective Date and shall not subject the Exit Facility Lenders to any liability by reason of incurrence of such obligation or grant of such Liens, guarantees, or security interests under applicable federal or state law including, but not limited to, successor or transferee liability. Reorganized UGL, the Exit Facility Lenders, or collateral agent for, or anyone else acting on behalf of the Exit Facility Lenders pursuant to the terms of the Loan Documents, and any other parties granting Liens and security interests related to the Exit Facility and the Exit Facility Agreement are hereby authorized to file or record financing statements, trademark filings, copyright filings, mortgages, notices of Lien, or similar instruments in any jurisdiction, or take possession of or control over, or take any action in order to validate and perfect the Liens, security interests, and mortgages granted hereunder or under the Exit Facility Agreement contemplated therein.

121. The guarantees, mortgages, pledges, Liens, and other security interests, and all other consideration granted pursuant to or in connection with the Exit Facility are or will be (as the case may be) hereby deemed to be granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to the Exit Facility Lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer under the Bankruptcy Code or any Applicable Laws and shall not otherwise be subject to avoidance, subordination, or recharacterization and shall not subject the Exit Facility Lenders or any agents, arrangers, or bookrunners in connection with the Exit Facility to any liability by reason of the incurrence of such obligation or grant of such Liens, guarantees, or security interests under applicable federal or state law, including, but not limited to, successor or transferee liability.

122.     Any one or more of the Chief Executive Officer, President, Chief Financial Officer, Vice President, Treasurer, and Secretary of the Debtor or Reorganized UGL, as applicable, (collectively, the "Authorized Officers") be, and each of them hereby is, authorized to execute and deliver, in the name of and on behalf of the Debtor or Reorganized UGL, as applicable, the Exit Facility Agreement and all other Loan Documents, with such modifications, amendments or additions thereto as they or any of them may determine to be necessary or advisable without any necessity for further notice or court approval (the execution and delivery of such documents to be conclusive evidence of such determination by the Authorized Officer or Officers executing the same.

123.     Any and all indemnification, cost reimbursement, and fee obligations accruing or payable prior to the Effective Date in accordance with the terms of the Exit Facility Agreement or any engagement or commitment letters executed and approved by the Court in connection therewith are hereby approved as allowed administrative expense claims under Sections 503 and 507(a)(2) of the Bankruptcy Code, and shall not be subject to disgorgement.

124.     If, after the Effective Date, this Confirmation Order or the District Court order affirming this Confirmation Order and the Injunction (the "District Court Order") is modified, vacated, or reversed, in whole or in part, and the Exit Facility is in effect at the time this Confirmation Order or District Court Order is modified, vacated, or reversed, then, as applicable: (a) the modification, vacatur, or reversal of this Confirmation Order or the District Court Order shall not adversely affect the validity or priority of any obligations incurred by Reorganized UGL arising in connection with the Exit Facility or any Liens, guarantees, or claims granted by any party pursuant to the Exit Facility or the Exit Facility Agreement; (b) the terms and conditions of the Exit Facility Agreement, as in effect at the time of the modification, vacatur, or

-47-

reversal of this Confirmation Order or the District Court Order, shall be binding on Reorganized UGL, and the parties to the Exit Facility Agreement shall enjoy the same priority of Liens and rights granted to them under the Exit Facility and the Exit Facility Agreement; and (c) any Liens, guarantees, or claims granted to any party pursuant to the Exit Facility and the Exit Facility Agreement shall be deemed to have been granted by, and shall become the obligations of, the predecessors in interest of Reorganized UGL.

## E. CLAIMS BAR DATES AND OTHER CLAIMS MATTER.

### i. BAR DATE FOR ADMINISTRATIVE EXPENSE CLAIMS.

125. Pursuant to Section 2.2(a) of the Plan, all requests for payment of an Administrative Expense Claim shall be filed with the Court and served on the Debtor's counsel so that such requests are actually received by counsel no later than thirty (30) days after notice of the Effective Date is filed with the Court (the "Administrative Expense Claim Bar Date"). The Debtor or Reorganized UGL may object to an Administrative Expense Claim within 180 days after the Administrative Expense Claim Bar Date, which objection deadline may be further extended by an additional 90 days at the sole discretion of the Debtor or Reorganized UGL upon filing notice of such extension with the Court. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be filed with respect to an Administrative Expense Claim which is paid or payable by the Debtor or Reorganized UGL in the ordinary course of business.

### ii. BAR DATE FOR PROFESSIONAL FEE CLAIMS.

126. Pursuant to Section 2.2(b) of the Plan, all holders of a Professional Fee Claim for compensation for services rendered or reimbursement of expenses incurred pursuant to Sections 330 and/or 503(b) of the Code shall file an application for final allowance of compensation and reimbursement of expenses with the Court, and serve on counsel for the Debtor or Reorganized

-48-

UGL, the Creditors' Committee, the FCR, and the United States Trustee no later than thirty (30) days after the Effective Date, or such later date as the Court may order upon application made prior to the end of such 30-day period (the "Professional Fee Claims Bar Date"). Objections to Professional Fee Claims must be filed and served on counsel for the Debtor or Reorganized UGL, the Creditors' Committee, the FCR, the United States Trustee, and the Professional to whose application the objections are addressed within the time frame set forth in the notice served with the application seeking payment, unless an extension is granted by the applicant or the Court.

### iii.     BAR DATE FOR REJECTION DAMAGES CLAIMS.

127. Pursuant to Section 7.3 of the Plan, in the event that the rejection of an Executory Contract by the Debtor results in damages to the non-debtor party or parties to such Executory Contract, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor, Reorganized UGL, or their respective properties or interests in property, unless a Proof of Claim with respect to such damages is filed with the Claims and Balloting Agent and served upon counsel for the Debtor or Reorganized UGL, as applicable, on or before: (a) if such Executory Contract is rejected pursuant to Sections 7.1(b) of the Plan, the later of (i) thirty (30) days after entry of this Confirmation Order, and (ii) thirty (30) days after the non-debtor party receives notice of the rejection of such Executory Contract pursuant to Section 7.1(b) of the Plan; and (b) if such Executory Contract is rejected pursuant to a Final Order of the Court, thirty (30) days after entry of such Final Order (the "Rejection Damages Bar Date"). To the extent any such Claim is Allowed by the Court by Final Order, such Claim shall become, and shall be treated for all purposes under this Plan as, a Class 3A Claim (General Unsecured Claim), and the holder thereof shall receive Distributions as a holder of an Allowed Claim in such Class pursuant to this Plan.

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 56 of 302

### iv.     ENFORCEMENT OF BAR DATES.

128.    In accordance with Section 502(b)(9) of the Bankruptcy Code, any Person or Entity that fails to file a Proof of Claim by the Administrative Expense Claims Bar Date, Professional Fee Claims Bar Date, or Rejection Damages Bar Date, or any other bar dates established in this Chapter 11 Case (collectively, the "Bar Dates"), or was not otherwise permitted to file a Proof of Claim after the applicable Bar Date by a Final Order of the Court, is and shall be barred, estopped, and enjoined from asserting any Claim against the Debtor (i) in an amount that exceeds the amount, if any, that is identified in the Debtor's Schedules on behalf of such Person or Entity as undisputed, noncontingent and liquidated, or (ii) of a different nature or a different classification than any Claim identified in the Debtor's Schedules on behalf of such Person or Entity.

### F.     APPROVAL OF THE RECORD DATE.

129.    The date for determining an entitlement to receive Distributions under the Plan on account of Allowed Claims shall be the date upon which this Confirmation Order is entered on the docket of the Court (the "Record Date"), and affirmed by the District Court. As of the close of business on the Record Date, the Claims register maintained by the Claims and Balloting Agent shall be closed, and there shall be no further changes in the record Holder of any Claim. Neither the Debtor nor Reorganized UGL shall have any obligation to recognize any transfer of any Claim occurring after the Record Date. The Debtor is hereby entitled to recognize and deal for all purposes hereunder only with Holders of Claims on the Record Date. If there is any dispute regarding the identity of the Entity entitled to receive a Distribution in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

-50-

**G.**      **APPROVAL OF THE TREATMENT OF EXECUTORY CONTRACT AND UNEXPIRED LEASE PROVISIONS.**

**i.**      **ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS**

130.    The provisions regarding Executory Contracts contained in Article VII of the Plan are hereby approved.  Except as otherwise provided in the Plan, any Executory Contract that (a) has not been expressly rejected by the Debtor pursuant to Exhibit I of the Plan or by Order of the Court on or prior to the Confirmation Date, or (b) is not the subject of a pending motion before the Court on the Confirmation Date to reject such Executory Contract pursuant to Section 365 of the Bankruptcy Code, shall as of the Confirmation Date (subject to the occurrence of the Effective Date), be deemed to have been assumed by the Debtor.  Each of the Asbestos Insurance Settlement Agreements is assumed by the Debtor and assigned to the Trust, and  Reorganized UGL and  the Trust  both shall  be  bound  by  the  terms  of  the  Asbestos  Insurance  Settlement Agreements.   This Confirmation Order shall constitute an order of the  Court approving the rejections, assumptions, or assumptions and assignments, as the case may be, described in Article VII of the Plan pursuant to Section 365 of the Bankruptcy Code as of the Confirmation Date.  For the avoidance of doubt, the Non-Asbestos Insurance Policies identified on Exhibit C to the Plan and any related agreements are assumed.

131.    Each such rejection or assumption is a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor, the Estate, its creditors, and all other parties in interest in the Chapter 11 Case.  To the extent there are any defaults by the Debtor with respect to a particular assumed Executory Contract, Reorganized UGL shall, pursuant to the provisions of Sections  1123(a)(5)(G)  and  1123(b)(2) of  the  Bankruptcy Code  and  consistent  with  the requirements of Section 365 of the Bankruptcy Code, satisfy any monetary defaults under such Executory Contracts by Cure.  In the event of a dispute regarding (a) the existence or amount of

-51-

any Cure, (b) the ability of Reorganized UGL to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract to be assumed, or (c) any other matter pertaining to assumption, Cure shall be made by Reorganized UGL either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's or Reorganized UGL's liability with respect thereto and approving the assumption or assumption and assignment, as the case may be, or as may otherwise be agreed to by the parties to such Executory Contract; *provided, however*, that the Debtor or Reorganized UGL, as applicable, shall be authorized to reject any Executory Contract to be deemed effective as of the day before the Effective Date, to the extent the Debtor or Reorganized UGL shall, in the exercise of its sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order, renders the assumption of such Executory Contract unfavorable to the Debtor or Reorganized UGL.

132.    All Executory Contracts assumed or assumed and assigned by the Debtor or Reorganized UGL during the Chapter 11 Case or under the Plan shall remain in full force and effect for the benefit of Reorganized UGL or the assignee thereof notwithstanding any provision in such contract or lease (including those provisions described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such Executory Contract.

ii.    COMPENSATION AND BENEFIT PLANS; TREATMENT OF RETIREE AND PENSION BENEFITS

133.    Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all of the Debtor's programs, plans, agreements, and arrangements relating to the Debtor's employee compensation and benefits, including programs, plans, agreements, and arrangements

-52-

subject to Sections 1114 and 1129(a)(l3) of the Bankruptcy Code and including, without

limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans,

incentive plans, life, accidental death and dismemberment insurance plans, workers'

compensation plans, severance, salary continuation, and retention agreements entered into before

the Petition Date and not since terminated, will be deemed to be, and will be treated as though

they are, Executory Contracts that are assumed under Section 7.1 of the Plan, and the Debtor's

obligations under such programs, plans, agreements, and arrangements will survive confirmation

of the Plan, except for Executory Contracts or plans that previously have been rejected, are the

subject of a motion to reject pending on the Confirmation Date, or have been specifically waived

by the beneficiaries of any such plans or contracts.

134.    Pursuant to the requirements of Section 1129(a)(13) of the Bankruptcy Code and

Section 7.3 of the Plan, the Debtor shall continue to pay all "retiree benefits," as defined in

Section 1114(a) of the Bankruptcy Code, if any, at previously established levels.

135.    For the avoidance of doubt, no provision contained in the Disclosure Statement,

the Plan, this Confirmation Order, or in any other documents filed in the Chapter 11 Case shall

release or discharge any Entity, in any capacity, from liability arising under the Employee

Retirement Income Security Act of 1974 or the Internal Revenue Code of 1986.

## H.    MATTERS RELATING TO IMPLEMENTATION OF THE PLAN.

### i.    GENERAL AUTHORIZATION IN FURTHERANCE OF THE PLAN.

136.    The transactions described in the Plan and the Plan Documents are hereby

approved. Pursuant to Sections 1123 and 1142 of the Bankruptcy Code and the appropriate

provisions of the Pennsylvania Business Corporation Law of 1988, without further action by the

Court or the officers, or board of directors of the Debtor, Reorganized UGL, or the UGL

Shareholders, as applicable, as well as each appropriate officer or director of the Debtor, are

-53-

hereby authorized to: (a) take any and all actions necessary or appropriate to implement, effectuate, and consummate the Plan, the Plan Documents, this Confirmation Order, and the transactions contemplated thereby or hereby; and (b) enter into, execute and deliver, assign, or adopt, as the case may be, the Plan Documents in accordance with their terms.

137. To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the stockholders, officers, or directors of the Debtor or Reorganized UGL, this Confirmation Order shall, pursuant to Sections 1123(a)(5) and 1142 of the Bankruptcy Code and the applicable non-bankruptcy laws, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the stockholders, officers, or directors, as the case may be, of the Debtor or Reorganized UGL.

138. The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of the Debtor or Reorganized UGL, or any officer or director thereof, to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order pursuant to Section 1142(b) of the Bankruptcy Code.

139. Pursuant to Section 1142 of the Bankruptcy Code, to the extent that, under applicable nonbankruptcy law, any of the foregoing actions that would otherwise require approval of the UGL Shareholders or the directors (or any equivalent body) of the Debtor, such approval shall be deemed to have occurred and shall be in effect from and after the Confirmation Date pursuant to applicable state law without any requirement of further action by the equity holders or directors (or any equivalent body) of the Debtor. On the Effective Date, or as soon thereafter as is practicable, the Debtor shall, if required by applicable law, file any documents needed to effectuate the provisions of the Plan. Any or all documents contemplated herein shall

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document    Page 61 of 302

be accepted by each state filing office and recorded, if required, in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law. All counterparties to any documents described in this paragraph are hereby directed to execute such documents as may be required or provided by such documents, without any further order of this Court.

### ii. DIRECTORS AND OFFICERS OF REORGANIZED UGL.

140. On or after the Effective Date, the Debtor's current officers and directors will continue to serve in their respective capacities.

### iii. VESTING OF REORGANIZED UGL ASSETS.

141. As set forth in Section 11.8 of the Plan, except as otherwise provided in the Plan, the Plan Documents, or this Confirmation Order, as of the Effective Date, all property of the Estate, except for the UGL Contribution, shall vest in Reorganized UGL free and clear of any and all Liens, Claims, Encumbrances, or other Interests, except for all Liens, Claims, Encumbrances, and Interests granted under the Exit Facility Agreement and Exit Facility. From and after the Effective Date, Reorganized UGL may operate its business and use, acquire, or dispose of property and settle and compromise Claims or Interests without supervision by the Court and free of any restrictions in the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and this Confirmation Order.

### iv. INDEMNIFICATION AND REIMBURSEMENT OBLIGATIONS OF REORGANIZED UGL.

142. For purposes of the Plan, the obligations of the Debtor to indemnify and reimburse persons who are or were current or former shareholders, directors, officers, or employees of the Debtor against and for any obligations as provided in the Debtor's articles of incorporation, bylaws, shareholders' agreement, applicable state law, or any other agreement, or

-55-

any combination of the foregoing, including, without limitation, the UGL Shareholders' Agreement executed on March 4, 1987, as same may be amended, requiring the disbursement of dividends to shareholders to pay their federal and state tax obligations on an annual basis, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with Section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date. Such obligations shall be assumed by Reorganized UGL on the Effective Date. In furtherance of the foregoing, Reorganized UGL shall use its commercially reasonable efforts to maintain or procure insurance for the benefit of such shareholders, directors, officers, or employees at levels satisfactory to Reorganized UGL.

### v. SECTION 524(G) TRUST

#### (a) CREATION OF THE TRUST.

143. On the Effective Date, the Trust shall be created in accordance with the Plan and the Trust Agreement. The Trust and the Trustee thereof are authorized and empowered to receive the property to be transferred to the Trust pursuant to Section 10.2 of the Plan.

144. Pursuant to Sections 1123 and 1142 of the Bankruptcy Code and the appropriate provisions of the Pennsylvania Business Corporation Law of 1988, as applicable, and other appropriate provisions of applicable state laws governing corporations or other legal entities and Section 1142(b) of the Bankruptcy Code, without further action of the Court or the directors, officers, or stockholders of Reorganized UGL or further notice to any Entities, Reorganized UGL is authorized to execute, deliver, and perform its obligations under the Trust Agreement and to execute, deliver, file, and record all such other contracts, instruments, agreements, or documents and take all such other actions as any of the responsible shareholders, officers, or directors of Reorganized UGL may determine are necessary, appropriate, or desirable in

-56-

connection therewith. The Trust Agreement, as in effect on the Effective Date, shall be substantially in the form of Exhibit E to the Plan. The Trust Distribution Procedures shall be substantially in the form of Exhibit F to the Plan.

### (b) *FUNDING AND RECEIPT OF TRUST ASSETS; ASSUMPTION OF LIABILITIES*.

145. On the Effective Date, all right, title, and interest in and to the Trust Assets, including, but not limited to, the Asbestos Insurance Rights, and any proceeds or causes of action thereunder shall be transferred automatically and assigned to, and indefeasibly vested in, the Trust free and clear of all Claims, Interests, Encumbrances, Liens, and other interests of any Entity.

146. Among other things, on the Effective Date:

- as part of the UGL Contribution, the Debtor or Reorganized UGL shall assign (or cause to be assigned) the Asbestos Insurance Rights pursuant to Section 8.1 of the Plan;

- as part of the UGL Contribution, the Debtor shall (a) deliver to the Trust the UGL Cash Contribution and the UGL Shareholder Cash Contribution (less the sum necessary to satisfy the Allowed Settled Asbestos Claims), (b) execute and deliver the UGL Promissory Note, and (c) execute and deliver any and all documents necessary to grant a Lien on the Debtor's assets, subordinate only to the Exit Facility Lenders' Lien, to secure repayment of the UGL Promissory Note; and

- as part of the UGL Shareholder Contribution, the UGL Shareholders shall (a) contribute Cash in the amount of $8.0 million to the Debtor and the Debtor is obligated to contribute such amount to the Trust (a) after deducting the amount to be used to satisfy the Allowed Settled Asbestos Claims), (b) execute and deliver the UGL Shareholder Promissory Note, and (c) execute and deliver the Pledge Agreement.

147. Immediately upon the Effective Date, and without any further action of the Court or further act or agreement of any Entity: (a) all liabilities, obligations, and responsibilities for all Asbestos Insurance Rights and Trust Claims shall automatically be transferred and channeled to, and assumed by, the Trust, and (b) the Trust shall be solely responsible for the resolution of

-57-

Trust Claims under the terms of the Trust Agreement and the Trust Distribution Procedures; provided, however, that any Claim not subject to the Channeling Injunction because of the terms, conditions, reservations, or termination provisions set forth in Section 12.5 (or otherwise) of the Plan is not and shall not be transferred and/or channeled to or assumed by the Trust.

(c)     <b>VESTING OF CAUSES OF ACTION IN THE TRUST.</b>

148. Any and all claims, demands, rights, and causes of action arising from or related to the Asbestos Insurance Rights shall vest with and in the Trust on the Effective Date as described in Sections 8.1 and 11.10 of the Plan.

(d)     <b>APPOINTMENT OF THE TRUSTEE AND THE TRUST ADVISORY COMMITTEE.</b>

149. The appointment of Alan Rich as the initial Trustee of the Trust is approved, and such appointment shall be effective as of the Effective Date. The Trustee shall serve in accordance with the terms of the Trust Agreement. The appointment of J. Barry Julian, Ethan Early, Brian Fitzpatrick, Jonathan Ruckdeschel and John M. Comerford., Jr. as the initial members of the Trust Advisory Committee ("TAC") of the Trust is approved, and such appointment shall be effective as of the Effective Date. The members of the TAC shall serve in accordance with the terms of the Trust Agreement.

(e)     <b>APPOINTMENT OF FUTURES REPRESENTATIVE.</b>

150. The appointment of James L. Patton, Jr., as the Futures Representative from and after the Effective Date under the Trust Agreement is hereby approved. Effective on the Effective Date, James L. Patton, Jr. shall serve as the Futures Representative in accordance with the terms of the Trust Agreement.

-58-

### (f) QUALIFIED SETTLEMENT FUND.

151.     The Trust is a "qualified settlement fund" pursuant to Section 468(B) of the Internal Revenue Code and the regulations issued pursuant thereto.

### (g) APPROVAL OF THE TRUST DISTRIBUTIONS PROCEDURES.

152.     The Trust Distribution Procedures (Exhibit F to the Plan) are hereby approved. From and after the Effective Date, the Trust shall resolve each Trust Claim in accordance with the Trust Agreement and the Trust Distribution Procedures.

### (h) INDEMNITY OBLIGATIONS OF THE TRUST.

153.     The Trust shall be bound by the indemnity obligations set forth in the Plan and the Trust Documents, including, without limitation, those indemnity obligations set forth in Sections 8.3 and 10.13 of the Plan.

### (i) INSTITUTION AND MAINTENANCE OF LEGAL AND OTHER PROCEEDINGS.

154.     As of the Effective Date, the Trust shall be empowered and entitled, in its sole and absolute discretion, to pursue, compromise, or settle the Debtor's or Reorganized UGL's interests in any and all Asbestos Insurance Rights.

### I. EXEMPTIONS FROM TAXATION.

155.     In accordance with Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities, or the execution, delivery, or recording of an instrument of transfer on or after the Effective Date, including the transfer of all Trust Assets to the Trust shall be deemed to be made pursuant to and under the Plan, and shall not be taxed under any law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument under the Plan is to be recorded shall, pursuant to this Order and the Plan,

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 66 of 302

be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

## J. EXEMPTIONS FROM SECURITIES LAWS.

156. Any and all stock, notes or other related rights, contractual, equitable or otherwise, issued, authorized, or reserved under or in connection with the Plan, shall be, and shall be deemed to be, exempt from registration under any applicable state or federal securities law to the fullest extent possible under applicable non-bankruptcy law and under bankruptcy law, including, without limitation, Section 1145 of the Bankruptcy Code.

## K. INJUNCTION, RELEASE, EXCULPATION, AND DISCHARGE PROVISIONS.

157. Each of the injunctions, including the Channeling Injunction, release, and exculpation provisions set forth in the Plan (including, without limitation, Sections 12.1, 12.2, 12.3, 12.4 and 12.5 of the Plan as amended by this Confirmation Order), is hereby approved in all respects, is incorporated herein in its entirety, is so ordered and shall be effective immediately on the Effective Date of the Plan without further action or notice by the Court, any of the parties to such provisions or any other party. Specifically the following releases and injunctions contained in Sections 12.4(c), 12.5 and 12.6 of the Plan (as amended by this Confirmation Order) are hereby approved, authorized, and incorporated herein.

### i. THIRD-PARTY RELEASES.

158. **In exchange for the Trust Assets to be provided to the Trust, as of the Effective Date, any Entity that has accepted the Plan and/or that is entitled to receive any distribution pursuant to the Plan or the Trust Distribution Procedures shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action whatsoever against the Released Parties and the Settling Insurers based in whole or in part upon any act or**

-60-

omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the conduct of the Debtor's business, the Chapter 11 Case, the Plan, or Reorganized UGL (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases, and other agreements or documents delivered or to be delivered hereunder), including, for the avoidance of doubt, any and all causes of action that an Asbestos Claimant, the Trust, or the FCR did commence or could have commenced against any officer or director of the Debtor (serving in such capacity) that is based upon or arising from any acts or omissions of such officer or director occurring prior to the Effective Date on account of a Trust Claim, to the fullest extent permitted under Section 524(e) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended); provided, however, that nothing contained herein is intended to operate as a release of (a) any potential claims based upon fraud, gross negligence or willful misconduct or (b) any claim by any federal, state, or local authority under the Internal Revenue Code or other tax regulation or any applicable environmental or criminal laws. The foregoing release will be enforceable as a matter of contract law against any Entity who has accepted the Plan and/or who is entitled to receive any property or interest in property pursuant to the Plan or any distribution under the Trust Distribution Procedures.

159. Notwithstanding anything contained in Section 12.4(c) of the Plan to the contrary, nothing contained in the Plan shall discharge or release any claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action held by any of the Released Parties, the Trust, or any holder of a Trust Claim against any Asbestos Insurance Company.

## ii.   TERMS OF THE CHANNELING INJUNCTION.

160.   The sole recourse of the Holder of a Trust Claim on account of such Claim shall be to the Trust pursuant to the provisions of the Channeling Injunction, the Plan, the Trust Agreement, and the Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Trust Claim against the Debtor, Reorganized UGL, the UGL Shareholders, or any other Asbestos Protected Party or Settling Insurer, or any property or interest in property of the Debtor, Reorganized UGL, the UGL Shareholders, or any other Asbestos Protected Party or Settling Insurer. Without limiting the foregoing, from and after the Effective Date, the Channeling Injunction shall apply to all Entities that have held or asserted, that hold or assert, or that may in the future hold or assert any Trust Claim against the Asbestos Protected Parties or the Settling Insurers, including, but not limited to, all Asbestos Claimants and all Future Demand Holders, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any such Trust Claims other than from the Trust in accordance with the Plan and the Channeling Injunction and pursuant to the Trust Agreement, including but not limited to:

    (a)   commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) with respect to any such Trust Claim in any forum against or affecting any Asbestos Protected Party or Settling Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer;

    (b)   enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner with respect to any such Trust Claim, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party or Settling

-62-

Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer;

(c)      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party or Settling Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer with respect to any such Trust Claim;

(d)      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Asbestos Protected Party or Settling Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer with respect to any such Trust Claim, except as otherwise specifically provided in the Plan; and

(e)      proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Trust Agreement with respect to any such Trust Claim, except in conformity and compliance with the Trust Distribution Procedures and, if applicable, any other Plan Documents.

161.    Except as otherwise expressly provided in the Plan, nothing contained in Section 12.5 of the Plan shall (a) constitute or be deemed a waiver of any claim, right, or cause of action that the Debtor, Reorganized UGL, or the Trust may have against any Entity in connection with or arising out of or related to any Trust Claim, or (b) enjoin the Trust from enforcing the Asbestos Insurance Rights, including but not limited to, the assertion of any claim, debt, obligation, or liability for payment against an Asbestos Insurance Company to the extent that the coverage obligations of that insurer are not resolved in an Asbestos Insurance Settlement Agreement.

162.    For purposes of the Channeling Injunction, the Asbestos Protected Parties shall consist of any and all of the following parties: (a) the Debtor and Reorganized UGL; (b) any Entity alleged to be directly or indirectly liable for Trust Claims by reason of such Entity's (i) involvement in the management of the Debtor or a predecessor of the Debtor, (ii) service as an

-63-

officer, director, or employee of the Debtor or Reorganized UGL, or (iii) involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting, the financial condition, of the Debtor; (c) any Entity that owned or owns a financial interest in the Debtor, Reorganized UGL, or the predecessors in interest of each, including, but not limited to, the UGL Shareholders; and (d) any Debtor-indemnified party, who is a party to an Executory Contract assumed by the Debtor under Section 7.1 of the Plan (but only to the extent of the Debtor's indemnification obligations under such Executory Contract (if any) to such Debtor-indemnified party arising out of, resulting from, or attributable to, directly or indirectly, a Trust Claim).

### iii. NON-SETTLING INSURERS INJUNCTION.

163. **All Entities, except the Trust, that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, obligation, suit, judgment, remedy, damage, demand, debt, right, liability, or cause of action, against any Asbestos Insurance Company that is not a Settling Insurer, based on, relating to, arising out of, or in any way connected with any Trust Claim under any Asbestos Insurance Policy, including all claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action, including:**

> (a) **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Insurance Company that is not a Settling Insurer;**

(b)      enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Company that is not a Settling Insurer;

(c)      creating, perfecting, or otherwise enforcing, in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Company that is not a Settling Insurer; and

(d)      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Asbestos Insurance Company that is not a Settling Insurer, or against the property of any such Asbestos Insurance Company.

164.     The Trust shall have the sole and exclusive authority at any time to terminate, reduce, or limit the scope of, the Non-Settling Insurers Injunction. The Non-Settling Insurers Injunction is issued solely for the benefit of the Trust and is not issued for the benefit of any Asbestos Insurance Company that is not a Settling Insurer, and no Asbestos Insurance Company that is not a Settling Insurer is a third-party beneficiary of the Non-Settling Insurers Injunction.

165.     The Non-Settling Insurers Injunction shall not (a) constitute or be deemed a waiver of any claim, right, or cause of action that the Debtor, Reorganized UGL, or the Trust may have against any Entity in connection with or arising out of or related to any Trust Claim, (b) enjoin the rights of Entities to the treatment accorded them under the Plan, including the rights of Asbestos Claimants to assert their Trust Claims against the Trust in accordance with the Trust Distribution Procedures, or (c) enjoin the Trust from enforcing any Asbestos Insurance Rights, including, but not limited, to the right to assert any claim, debt, obligation, or liability for payment against an Asbestos Insurance Company to the extent that the coverage obligations of that insurer are not resolved in an Asbestos Insurance Settlement Agreement.

-65-

## L. REDUCTION OF INSURANCE JUDGMENTS.

166. As set forth in Section 12.9 of the Plan, any right, claim, or cause of action that an Asbestos Insurance Company may have under applicable non-bankruptcy law against any Settling Insurer, including, but not limited to, any contribution claim, shall be channeled to and become a right, claim, or cause of action solely as an offset claim against the Trust and not against the Settling Insurer in question. Any such right, claim, or cause of action to which an Asbestos Insurance Company may be entitled, if any, shall be solely a setoff against any recovery of the Trust from that non-settling Asbestos Insurance Company and under no circumstances shall that Asbestos Insurance Company receive an affirmative recovery of funds from the Trust or any other Asbestos Insurance Company for such right or cause of action. Any setoff in favor of an Asbestos Insurance Company shall not constitute a classified or unclassified Claim under the Plan and shall not be subject to or impaired by the Plan, except as provided therein. Instead, any such setoff shall be determined, calculated, and applied solely as a matter of applicable non-bankruptcy law without regard to the Plan (except as provided therein) or any bankruptcy law or decision. Notwithstanding anything in Section 12.9 of the Plan to the contrary, Section 12.9 of the Plan does not affect or limit any rights granted to a Settling Asbestos Insurance Company under the terms of any Asbestos Insurance Settlement Agreement or the obligations of any party to an Asbestos Insurance Settlement Agreement.

## M. PAYMENT OF STATUTORY FEES.

167. All fees due and owing under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, and as pro-rated to the Effective Date, shall be paid on or before the Effective Date. Reorganized UGL shall pay all such fees that arise after the Effective Date but before the closing of the Chapter 11 Case, as pro-rated to the closing of the Chapter 11 Case. Reorganized UGL shall be responsible for timely payment of fees incurred pursuant to 28

-66-

U.S.C. §1930(a)(6). After confirmation and within thirty (30) days after the end of each calendar quarter, Reorganized UGL shall file with the Bankruptcy Court and serve on the United States Trustee a quarterly financial report for each calendar quarter (or portion thereof) during which the case remains open, in a format prescribed by the Office of the United States Trustee and provided to the Debtor and/or Reorganized UGL by the United States Trustee.

**N.      GOVERNMENTAL APPROVALS NOT REQUIRED.**

168.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan, and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto.

**O.      FILING AND RECORDING.**

169.    This Confirmation Order is and shall be binding upon and shall govern the acts of all Persons or Entities including, without limitation, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons and Entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 74 of 302

**P.** **DISSOLUTION OF THE CREDITORS' COMMITTEE**

170.    Except as otherwise provided under Section 11.13 of the Plan, on the Effective Date, the Creditors' Committee shall be dissolved automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code.

**Q.** **RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT.**

171.    Pursuant to Section 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of this Confirmation Order and occurrence of the Effective Date, except as otherwise provided in Article XV of the Plan, the Court shall retain exclusive jurisdiction, to the fullest extent permissible, over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Case or the Plan, or that relates to any of the matters listed in Article XV of the Plan.  To the extent the Court is not permitted under applicable law to determine a matter within the District Court's subject matter jurisdiction after the Effective Date, the reference to the "Bankruptcy Court" in Article XV of the Plan shall be deemed a reference to the "District Court."  Notwithstanding anything in the Plan to the contrary, the Trust Agreement and the Trust Distribution Procedures shall govern the satisfaction of Trust Claims and the forum in which Trust Claims shall be determined.

**R.** **CONFLICTS BETWEEN CONFIRMATION ORDER AND PLAN.**

172.    The failure to specifically include any particular provision of the Plan in this Confirmation Order will not diminish the effectiveness of such provision, it being the intent of this Court that the Plan is confirmed in its entirety and the Plan Documents are incorporated herein by this reference.  The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; provided, however, that if there is determined to be any inconsistency between any Plan provision and any

-68-

provision of this Confirmation Order that cannot be so reconciled, then solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any provision of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.  Except as set forth directly above, the provisions of the Plan and this Confirmation Order are integrated with each other and are non-severable and mutually dependent.

**S.     NOTICE OF CONFIRMATION ORDER, EFFECTIVE DATE, AND RELATED MATTERS.**

173.     Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Debtor or Reorganized UGL is directed to serve, within ten (10) days after the occurrence of the Effective Date, a notice of this Confirmation Order, which shall include notice of the Bar Dates, notice of the Channeling Injunction, notice of the Non-Settling Insurers Injunction, and notice of the Effective Date on all parties that received notice of the Confirmation Hearing.  As soon as practicable after the entry of this Confirmation Order, the Debtor shall make a copy available on the Debtor's website and through the Debtor's reorganization website hosted by GCG (http://cases.gcginc.com/ugl).

**T.     NO JUST CAUSE FOR DELAY.**

174.     The Court determines that there is no just cause for delay, and this Confirmation Order shall not be stayed and shall take effect immediately upon entry, notwithstanding anything to the contrary in Bankruptcy Rule 3020(e).

**THIS ORDER IS HEREBY DECLARED TO BE IN RECORDABLE FORM AND SHALL BE ACCEPTED BY ANY RECORDING OFFICER FOR FILING AND RECORDING PURPOSES WITHOUT FURTHER OR ADDITIONAL ORDERS, CERTIFICATIONS OR OTHER SUPPORTING DOCUMENTS.**

**By the Court,**

_Robert N. Opel, II_

Robert N. Opel, II, Bankruptcy Judge
(BI)

Dated: December 8, 2014

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In Re: | Chapter 11 |
| United Gilsonite Laboratories, A Pennsylvania Corporation,[1] | Case No. 5:11-bk-02032 (RNO) |
| Debtor. |  |

## MODIFIED FIRST AMENDED PLAN OF REORGANIZATION OF UNITED GILSONITE LABORATORIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**GIBBONS P.C.**

Mark B. Conlan (PA No. 86559)
Karen A. Giannelli (admitted *pro hac vice*)
Frank J. Vecchione (admitted *pro hac vice*)
One Gateway Center
Newark, NJ 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail: mconlan@gibbonslaw.com
　　　　kgiannelli@gibbonslaw.com
　　　　fvecchione@gibbonslaw.com

- and -

Natasha M. Songonuga (admitted *pro hac vice*)
1000 N. West Street, Suite 1200
Wilmington, DE 19801-1058
Telephone: (302) 295-4875
Facsimile: (302) 295-4876
E-mail: nsongonuga@gibbonslaw.com

*Counsel for the Debtor and Debtor-in-Possession*

---

[1] The last four digits of the Debtor's federal tax identification number are 7530.

*This Plan of Reorganization provides for a "Channeling Injunction" pursuant to Section 524(g) of the Bankruptcy Code. For a description of the causes of action to be enjoined and the identities of the entities that would be subject to the injunction, see Article XI of this Plan.*

# TABLE OF CONTENTS

Page

PLAN EXHIBITS ....................................................................................................................IX

INTRODUCTION ....................................................................................................................1

ARTICLE I      DEFINITIONS AND INTERPRETATIONS....................................................1
1.1        Administrative Expense Claim ....................................................1
1.2        Allowed....................................................................................2
1.3        Allowed Amount ......................................................................2
1.4        Asbestos Claimant ....................................................................2
1.5        Allowed DIP Claim ..................................................................2
1.6        Asbestos Insurance Company....................................................2
1.7        Asbestos Insurance Policy.........................................................2
1.8        Asbestos Insurance Rights ........................................................3
1.9        Asbestos Insurance Settlement Agreement ................................3
1.10      Asbestos Personal Injury Claim.................................................3
1.11      Asbestos Protected Parties ........................................................4
1.12      Asbestos Record ......................................................................4
1.13      [Intentionally Omitted]. ...........................................................4
1.14      Avoidance Action ....................................................................4
1.15      Ballot......................................................................................4
1.16      Bankruptcy Code .....................................................................5
1.17      Bankruptcy Court.....................................................................5
1.18      Bankruptcy Rules.....................................................................5
1.19      Bar Date(s)..............................................................................5
1.20      Business Day ...........................................................................5
1.21      Cash .......................................................................................5
1.22      Cause of Action ......................................................................5
1.23      Channeling Injunction .............................................................5
1.24      Chapter 11 Case ......................................................................5
1.25      Claim......................................................................................5
1.26      Claims and Balloting Agent .....................................................5
1.27      Class.......................................................................................5
1.28      Confirmation...........................................................................5
1.29      Confirmation Date ...................................................................6
1.30      Confirmation Hearing ..............................................................6
1.31      Confirmation Order..................................................................6
1.32      Creditor ..................................................................................6
1.33      Creditors' Committee ..............................................................6
1.34      Cure........................................................................................6
1.35      Cure Notice ............................................................................6
1.36      Debtor ....................................................................................6
1.37      Debtor-in-Possession...............................................................6

1.38     Demand ..................................................................................................6
1.39     DIP Agreement .......................................................................................6
1.40     DIP Lender..............................................................................................6
1.41     Disallowed .............................................................................................7
1.42     Disclosure Statement .............................................................................7
1.43     Disputed .................................................................................................7
1.44     Distribution ............................................................................................7
1.45     Distribution Date ...................................................................................7
1.46     District Court ..........................................................................................7
1.47     Effective Date ........................................................................................7
1.48     Encumbrance ..........................................................................................8
1.49     Entity......................................................................................................8
1.50     Estate......................................................................................................8
1.51     Executory Contract ................................................................................8
1.52     Exit Facility ...........................................................................................8
1.53     Exit Facility Agreement.........................................................................8
1.54     Exit Facility Lenders .............................................................................8
1.55     File, Filed or Filing ...............................................................................8
1.56     Final Judgment or Final Order...............................................................8
1.57     Future Claimants' Representative ..........................................................8
1.58     Future Demand Holder ..........................................................................9
1.59     General Unsecured Claim ......................................................................9
1.60     Impaired .................................................................................................9
1.61     Indirect Asbestos Personal Injury Claim ..............................................9
1.62     Injunction...............................................................................................9
1.63     Interest ...................................................................................................9
1.64     Lien ........................................................................................................9
1.65     Litigation Reserve .................................................................................9
1.66     Non-Settling Insurers Injunction ..........................................................9
1.67     Non-Tax Priority Claim .......................................................................10
1.68     Payment Percentage .............................................................................10
1.69     Person ...................................................................................................10
1.70     Petition Date .........................................................................................10
1.71     Plan .......................................................................................................10
1.72     Plan Documents ....................................................................................10
1.73     Pledge Agreement ................................................................................10
1.74     Priority Tax Claim ...............................................................................10
1.75     Professional...........................................................................................10
1.76     Proof of Claim ......................................................................................10
1.77     Record Date ..........................................................................................10
1.78     Rejection Claim ....................................................................................10
1.79     Released Claims....................................................................................11
1.80     Released Debtor Parties........................................................................11
1.81     Released Non-Debtor Parties................................................................11

| | | |
|---|---|---|
| 1.82 | Released Parties | 11 |
| 1.83 | Reorganized UGL | 11 |
| 1.84 | Reorganized UGL Stock | 11 |
| 1.85 | Schedules | 11 |
| 1.86 | Secured Claim | 11 |
| 1.87 | Settled Asbestos Claim | 12 |
| 1.88 | Settling Insurer | 12 |
| 1.89 | Solicitation Procedures Order | 12 |
| 1.90 | Standing Motion | 12 |
| 1.91 | Trust | 12 |
| 1.92 | Trust Advisory Committee | 12 |
| 1.93 | Trust Agreement | 12 |
| 1.94 | Trust Assets | 12 |
| 1.95 | Trust Bylaws | 12 |
| 1.96 | Trust Claim | 12 |
| 1.97 | Trust Contributions | 12 |
| 1.98 | Trust Distribution Procedures | 13 |
| 1.99 | Trust Documents | 13 |
| 1.100 | Trust Expense | 13 |
| 1.101 | Trustee | 13 |
| 1.102 | UGL | 13 |
| 1.103 | UGL Cash Contribution | 13 |
| 1.104 | UGL Contribution | 13 |
| 1.105 | UGL Promissory Note | 13 |
| 1.106 | UGL Shareholder | 13 |
| 1.107 | UGL Shareholders' Agreement | 14 |
| 1.108 | UGL Shareholder Cash Contribution | 14 |
| 1.109 | UGL Shareholder Contribution | 14 |
| 1.110 | UGL Shareholder Pledge | 14 |
| 1.111 | UGL Shareholder Promissory Note | 14 |
| 1.112 | Unimpaired | 14 |
| 1.113 | United States Trustee | 14 |
| 1.114 | Unsecured Claims | 14 |
| 1.115 | Workers' Compensation Claim | 14 |
| 1.116 | Workers' Compensation Insurance | 15 |
| | | |
| ARTICLE II | ADMINISTRATIVE EXPENSE, PRIORITY TAX AND DIP CLAIMS | 15 |
| 2.1 | Allowed Administrative Expense Claims | 15 |
| 2.2 | Administrative Expense Claims Bar Dates | 15 |
| 2.3 | Priority Tax Claims | 16 |
| 2.4 | Allowed DIP Claim | 17 |

- iii -

ARTICLE III    PROVISIONS FOR TREATMENT OF DEMANDS .......................................17

    3.1         Demands. ...........................................................................................................17

ARTICLE IV    CLASSIFICATION AND TREATMENT OF CLAIMS AND
              INTERESTS .................................................................................17

    4.1         Classification. ...................................................................................................17
    4.2         Treatment of Claims and Interests. ...................................................................19

ARTICLE V     ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION
              BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS ...................22

    5.1         Classes Entitled to Vote – Generally. ...............................................................22
    5.2         Class Acceptance Requirement For Impaired Classes. ......................................22
    5.3         Acceptance By Plan Class 4 Pursuant to Section 524(g) of the
              Bankruptcy Code. ..............................................................................................22
    5.4         Acceptance by Unimpaired Classes. ..................................................................22
    5.5         General Reservation of Rights. ..........................................................................22

ARTICLE VI    DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF CLAIMS
              OTHER THAN TRUST CLAIMS ..............................................................23

    6.1         Distributions. .....................................................................................................23
    6.2         Post-petition Interest on Claims. .......................................................................23
    6.3         Means of Cash Payment. ....................................................................................23
    6.4         Delivery of Distributions. ..................................................................................23
    6.5         Time Bar to Cash Payments. ..............................................................................24
    6.6         Holders of Claims on Record Date. ...................................................................24
    6.7         Distributions after Distribution Date. ................................................................24
    6.8         Setoff. .................................................................................................................24

ARTICLE VII   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
              LEASES .......................................................................................25

    7.1         Assumption And Rejection Of Executory Contracts. ........................................25
    7.2         Cure Payments. ..................................................................................................25
    7.3         Rejection Damages Bar Date. ............................................................................26
    7.4         Compensation and Benefit Plans; Treatment of Retiree and Pension
              Benefits. ..............................................................................................................26

ARTICLE VIII  ASBESTOS INSURANCE RIGHTS ................................................................27

    8.1         Transfer of Insurance Proceeds to the Trust. .....................................................27
    8.2         Debtor's Obligation to Pursue Asbestos Insurance Rights. ...............................27
    8.3         Cooperation. .......................................................................................................27

| | | |
|---|---|---|
| 8.4 | Unidentified Asbestos Insurance Policies. | 27 |
| 8.5 | Representations and Warranties. | 28 |

| | | |
|---|---|---|
| ARTICLE IX | RESOLUTION OF DISPUTED CLAIMS OTHER THAN ASBESTOS CLAIMS | 28 |
| 9.1 | Disputed Claims Other than Trust Claims. | 28 |
| 9.2 | Objection to Claims. | 28 |
| 9.3 | Disallowance of Improperly Filed Claims. | 28 |
| 9.4 | No Distributions Pending Allowance. | 29 |
| 9.5 | Estimation of Claims. | 29 |
| 9.6 | Allowance of Claims Subject to Section 502 of the Bankruptcy Code. | 29 |
| 9.7 | Preservation of Rights to Settle Claims. | 29 |

| | | |
|---|---|---|
| ARTICLE X | THE TRUST | 29 |
| 10.1 | Creation and Purpose of the Trust. | 29 |
| 10.2 | Funding and Receipt of Trust Assets. | 30 |
| 10.3 | Assumption of Liabilities. | 30 |
| 10.4 | Institution and Maintenance of Legal and Other Proceedings. | 31 |
| 10.5 | Payment of Trust Claims. | 31 |
| 10.6 | Excess Trust Assets. | 31 |
| 10.7 | Appointment of Trustee. | 31 |
| 10.8 | Appointment of Future Claimants' Representative. | 31 |
| 10.9 | Appointment of Trust Advisory Committee Members. | 31 |
| 10.10 | Trust Claims Review. | 31 |
| 10.11 | Discharge of Liabilities to Holders of Trust Claims. | 31 |
| 10.12 | Payment of Trust Expenses. | 32 |
| 10.13 | Indemnification by the Trust. | 32 |
| 10.14 | Medicare Obligations. | 32 |
| 10.15 | Vesting of Causes of Action in the Trust. | 32 |
| 10.16 | Investment Policy. | 32 |

| | | |
|---|---|---|
| ARTICLE XI | IMPLEMENTATION OF THE PLAN AND EFFECT OF CONFIRMATION | 32 |
| 11.1 | Generally. | 32 |
| 11.2 | Transactions on the Effective Date. | 33 |
| 11.3 | Funding for Plan Distributions. | 33 |
| 11.4 | Exit Facility. | 34 |
| 11.5 | Amended Certificate of Incorporation and Bylaws. | 34 |
| 11.6 | Reorganized UGL Stock. | 34 |
| 11.7 | Effectuating Documents; Further Transactions. | 34 |
| 11.8 | Vesting of Reorganized UGL's Assets. | 35 |
| 11.9 | Title to Trust Assets. | 35 |
| 11.10 | Preservation of Certain Causes of Action; Defenses. | 35 |

| 11.11 | Terms of Injunction and Automatic Stay. | 36 |
| 11.12 | No Successor Liability. | 37 |
| 11.13 | Dissolution of Creditors' Committee; Continuation of Future Claimants' Representative; Creation of the Trust Advisory Committee. | 37 |

ARTICLE XII   INJUNCTIONS, RELEASES AND DISCHARGE .......................................38

| 12.1 | Discharge. | 38 |
| 12.2 | Discharge Injunction. | 38 |
| 12.3 | Exculpation. | 39 |
| 12.4 | Releases. | 39 |
| 12.5 | Section 524(g) Channeling Injunction. | 41 |
| 12.6 | Non-Settling Insurers Injunction. | 42 |
| 12.7 | Limitations of Injunctions/Release Provisions. | 43 |
| 12.8 | Indemnification and Reimbursement Obligations. | 44 |
| 12.9 | Reduction of Insurance Judgments. | 44 |

ARTICLE XIII   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................................................44

| 13.1 | Conditions Precedent to Confirmation of the Plan. | 44 |
| 13.2 | Conditions Precedent to the Effective Date of the Plan. | 51 |
| 13.3 | Waiver of Conditions Precedent. | 51 |
| 13.4 | Effect of Failure of the Effective Date of the Plan. | 51 |

ARTICLE XIV   MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ...........................................................53

| 14.1 | Modification and Amendments. | 53 |
| 14.2 | Effect of Confirmation on Modification. | 53 |
| 14.3 | Revocation or Withdrawal of the Plan. | 53 |

ARTICLE XV   JURISDICTION OF BANKRUPTCY COURT ...............................54

| 15.1 | Retention of Jurisdiction. | 54 |

ARTICLE XVI   MISCELLANEOUS PROVISIONS .............................................56

| 16.1 | Governing Law. | 56 |
| 16.2 | Notices. | 56 |
| 16.3 | Filing of Additional Documents. | 58 |
| 16.4 | Controlling Documents. | 58 |
| 16.5 | Compromises of Controversies. | 58 |
| 16.6 | Reservation of Rights. | 58 |
| 16.7 | Withholding and Reporting Requirements. | 58 |
| 16.8 | Expedited Tax Determination. | 59 |

16.9       No Waiver...........................................................................................................59
16.10     Tax Exemptions. ..............................................................................................59
16.11     Section 346 Injunction. ...................................................................................59
16.12     Binding Effect of the Plan. .............................................................................60
16.13     Severability. ....................................................................................................60
16.14     Further Authorizations. ..................................................................................60
16.15     Payment of Statutory Fees. ............................................................................60
16.16     Effective Date Actions Simultaneous. ...........................................................61
16.17     Effective Date Notice. ....................................................................................61

## PLAN EXHIBITS

| | |
|---|---|
| **Plan Exhibit A** | **List of [Identified] Asbestos Insurance Policies** |
| **Plan Exhibit B** | **List of Settling Insurer and Asbestos Insurance Settlement Agreements**<br>**[To Be Supplied]** |
| **Plan Exhibit C** | **List of Non-Asbestos Insurance Policies** |
| **Plan Exhibit D** | **Form of Pledge Agreement**<br>**[To Be Supplied]** |
| **Plan Exhibit E** | **Form of UGL Asbestos Trust Agreement and Bylaws** |
| **Plan Exhibit F** | **Form of UGL Asbestos Trust Distribution Procedures**<br>**[To Be Supplied]** |
| **Plan Exhibit G** | **Form of UGL Twenty-Year Trust Promissory Note**<br>**[To Be Supplied]** |
| **Plan Exhibit H** | **Form of UGL Shareholder Promissory Note**<br>**[To Be Supplied]** |
| **Plan Exhibit I** | **List of Executory Contracts To Be Rejected**<br>**[To Be Supplied]** |
| **Plan Exhibit J** | **List of Settled Asbestos Claims** |

# INTRODUCTION

United Gilsonite Laboratories, a Pennsylvania corporation, and the Debtor in this reorganization case ("UGL" or "Debtor"), proposes this Modified First Amended Plan of Reorganization pursuant to Section 1121(a) of title 11 of the United States Code (the "Plan"). Reference is made to the Disclosure Statement distributed contemporaneously herewith for, among other things, a discussion of the history, business, properties, results of operations, projections for future operations of the Debtor, and risks associated with the Plan. All references to the Plan herein shall be construed, where applicable, to include references to the Plan and all its exhibits, appendices and schedules and any amendments thereto made in accordance with the Bankruptcy Code.

# ARTICLE I

## DEFINITIONS AND INTERPRETATIONS

All capitalized terms not defined herein, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and such definitions are incorporated herein by reference. The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

Unless the context requires otherwise, the terms used herein shall have meanings set forth below when used with the initial letter capitalized. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Unless otherwise specified, any Article, schedule or exhibit references in the Plan is to the respective Article of, schedule or exhibit to the Plan, as the same may be amended or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Article, subsection or clause. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

Any reference in the Plan to any of the Plan Documents shall mean the document as it may have been or may be amended, modified or supplemented. Any reference to an Entity as the holder of a Claim shall include that Entity's successors, assigns and affiliates. The word "including" (and, with correlative meaning, the forms of the word "include") shall mean including, without limiting the generality of any description preceding that word; and the words "shall" and "will" are used interchangeably and have the same meaning.

**1.1 Administrative Expense Claim** means any claim for costs and expenses of administration that is allowable and entitled to priority under Sections 503(b), 507(a)(1), 507(b), and/or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any post-petition tax claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of business, compensation or reimbursement of expenses of Professionals, any indebtedness or obligations incurred or assumed by the Debtor as Debtor-in-Possession during the Chapter 11 Case, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

-1-

**1.2     Allowed** means with respect to any Claim (other than a Disputed Claim or a Trust Claim), (a) any Claim, proof of which was timely filed with the Bankruptcy Court or its duly appointed claims agent or, by order of the Bankruptcy Court, was not required to be filed, or (b) any Claim that has been, or hereafter is, listed in the Schedules as liquidated in amount and not disputed or contingent, and, in (a) and (b) above, as to which either (1) no objection to the allowance thereof has been filed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or (2) the Claim has been allowed by a Final Order (but only to the extent so allowed).   The term "Allowed" shall not apply to Trust Claims.   "Allowed" means, with respect to any Trust Claim, any Trust Claim that is liquidated and allowed pursuant to the Trust Distribution Procedures.

**1.3     Allowed Amount** means: (a) with respect to any Claim (other than a Disputed Claim or a Trust Claim), (i) if the holder of such Claim has not filed a Proof of Claim as prescribed by the Court within the applicable period of limitation fixed by such Court pursuant to Bankruptcy Rule 3003, the amount, if any, of such Claim that is listed in the Schedules as being not disputed, contingent or unliquidated, (ii) if the holder of such Claim has duly and timely filed a Proof of Claim, (A) the amount stated in such Proof of Claim if no objection to such Proof of Claim is interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (B) such amount as shall be fixed as the Allowed Amount thereof by a Final Order if an objection is interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court; (b) with respect to a Settled Asbestos Claim, the amount of such Claim as set forth on Exhibit J to the Plan; (c) with respect to an Administrative Expense Claim (other than an Administrative Expense Claim by a Professional), the amount of such Claim or such amount as shall be fixed as the Allowed Amount thereof by a Final Order; or (d) with respect to an Administrative Expense Claim by a Professional, such amount as shall be fixed and allowed by a Final Order.   Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court or the District Court, the Allowed Amount of an Allowed Claim, except for the Allowed Amount of the Allowed DIP Claim, an Administrative Expense Claim (other than Administrative Expense Claims by a Professional), and the Allowed Amount of Plan Class 3A and 3B Claims, shall not include interest or penalties accruing on such Allowed Claim from and after the Petition Date.

**1.4     Asbestos Claimant** means the holder of an Asbestos Personal Injury Claim or an Indirect Asbestos Personal Injury Claim.

**1.5     Allowed DIP Claim** means the claim of the DIP Lender arising out of the DIP Agreement and approved by the Bankruptcy Court.

**1.6     Asbestos Insurance Company** means any insurance company, other Entity, or any such company's or Entity's successor or assign, that has issued, or that has any actual, potential, demonstrated or alleged liabilities, duties, or obligations under or with respect to, any Asbestos Insurance Policy.

**1.7     Asbestos Insurance Policy** means any insurance policy that was issued or allegedly issued that may afford the Debtor indemnity or insurance coverage with respect to any Trust Claims including, without limitation, those insurance policies listed on Exhibit A to this

Plan. For the avoidance of doubt, the insurance policies listed on <u>Exhibit C</u> to the Plan are not Asbestos Insurance Policies.

**1.8     Asbestos Insurance Rights** means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtor to any proceeds, payments, initial or supplemental dividends, initial or supplemental scheme payments, causes of action, and choses in action arising under or attributable to any and all Asbestos Insurance Policies and Asbestos Insurance Settlement Agreements, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including without limitation:

> (a)     Any and all rights of the Debtor to pursue or receive payments under any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement, whether for liability, defense, or otherwise;
>
> (b)     Any and all rights of the Debtor to pursue or receive payments under any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement from any domestic or foreign insolvent Asbestos Insurance Company or liquidator, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement, or any other form of proceeding; and
>
> (c)     Any and all rights of the Debtor to pursue or receive payments under or with regard to any Asbestos Insurance Policy or Asbestos Insurance Settlement Agreement from any state insurance guaranty association or fund.

**1.9     Asbestos Insurance Settlement Agreement** means any settlement agreement listed on <u>Exhibit B</u> to this Plan.

**1.10     Asbestos Personal Injury Claim** means any Claim, demand, allegation, suit, remedy, damage, right or cause of action of any kind asserted against the Debtor or any other Asbestos Protected Party or Settling Insurer, or any debt, liability, or obligation of the Debtor or any other Asbestos Protected Party or Settling Insurer, whether in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty, for, arising out of, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or any other actual or alleged personal injury, physical, emotional or otherwise, to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos, including, without limitation, asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used by the Debtor or any Entity for whose products or operations the Debtor has liability or is alleged to have liability, to the extent arising, directly or indirectly, from acts, omissions, business or operations of the Debtor (including the acts, omissions, business or operations of any other Entity for whose products or operations the Debtor has liability, to the extent of the Debtor's liability for such acts, omissions,

business or operations), including any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of the Debtor or any Entity for whose products or operations the Debtor has liability or is alleged to have liability, or any conduct for which the Debtor, or any Entity for whose products or operations the Debtor has liability or is alleged to have liability, may be deemed to have strict liability under any applicable law) including all related claims, debts, obligations, or liabilities for compensatory damages (such as, but not limited to, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages).

Notwithstanding the foregoing, a claim, demand, allegation, debt, liability or obligation shall only be an Asbestos Personal Injury Claim to the extent of the Debtor's liability for that claim, demand, allegation, debt, liability or obligation. Under this Plan, Asbestos Personal Injury Claims do not include Workers' Compensation Claims, Settled Asbestos Claims or Indirect Asbestos Personal Injury Claims but do include Delayed Manifestation Claims (as such term is defined in 1.115 of this Section).

**1.11   Asbestos Protected Parties** means (a) the Debtor and Reorganized UGL; (b) any Entity alleged to be directly or indirectly liable for Trust Claims by reason of such Entity's (i) involvement in the management of the Debtor or a predecessor of the Debtor, (ii) service as an officer, director, or employee of the Debtor or Reorganized UGL, or (iii) involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting, the financial condition, of the Debtor; (c) any Entity that owned or owns a financial interest in the Debtor, Reorganized UGL, or the predecessors in interest of each, including, but not limited to, the UGL Shareholders; and (d) any Debtor-indemnified party, who is a party to an Executory Contract assumed by the Debtor under Section 7.1 of the Plan (but only to the extent of the Debtor's indemnification obligations under such Executory Contract (if any) to such Debtor-indemnified party arising out of, resulting from, or attributable to, directly or indirectly, a Trust Claim).

**1.12   Asbestos Record** means any document created or maintained by the Debtor or its representatives, wherever located, that is relevant to the Claims of the Asbestos Claimants, provided, however, that the Trust will maintain as confidential any proprietary or confidential information.

**1.13   [Intentionally Omitted].**

**1.14   Avoidance Action** means a Cause of Action arising or brought pursuant to Sections 329, 510, 522, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including without limitation, the avoidance and recovery of preferential and fraudulent transfer claims held by the Debtor, whether or not litigation is commenced to prosecute such action.

**1.15   Ballot** means each of the ballots and/or master ballots distributed with the Disclosure Statement to holders of Impaired Claims on which ballot such holder may, among other things, vote to accept or reject the Plan.

**1.16** **Bankruptcy Code** means title 11 of the United States Code, Sections 101-1532, as now in effect or as hereafter amended, and applicable to the Chapter 11 Case.

**1.17** **Bankruptcy Court** means the United States Bankruptcy Court for the Middle District of Pennsylvania or such other court as may have jurisdiction over the Chapter 11 Case.

**1.18** **Bankruptcy Rules** means, collectively: (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Case or any proceedings therein; and (c) the local rules of the Bankruptcy Court, all as amended from time to time and applicable to the Chapter 11 Case.

**1.19** **Bar Date(s)** means the date(s) fixed by order(s) of the Bankruptcy Court by which Persons are required by such order to file a Proof of Claim or be forever barred from asserting such Claim against the Debtor or its property and from voting on this Plan and/or sharing in distributions hereunder.

**1.20** **Business Day** means any day other than a Saturday, Sunday or a legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

**1.21** **Cash** means lawful currency of the United States of America and its equivalents.

**1.22** **Cause of Action** means any claim, right of action, proceeding, chose in action, cause of action, liability, obligation, account, controversy, right to legal remedy, right to equitable remedy, right to payment, suit, debt, sum of money, damage, judgment, claim or demand whatsoever, whether in law or in equity, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured or otherwise and whether asserted or assertable directly or derivatively, by or on behalf of the Debtor and/or the Estate, arising under any provision of the Bankruptcy Code or other applicable law or regulation or similar governmental pronouncement.

**1.23** **Channeling Injunction** means the injunction pursuant to Section 524(g) of the Bankruptcy Code and described more fully in Section 12.5 of the Plan.

**1.24** **Chapter 11 Case** means the case filed by the Debtor under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court captioned *In re United Gilsonite Laboratories, a Pennsylvania Corporation*, Case No. 11-02032 (RNO).

**1.25** **Claim** means any "claim" against the Debtor, as such term is defined in Section 101(5) of the Bankruptcy Code.

**1.26** **Claims and Balloting Agent** means Garden City Group, Inc. ("GCG").

**1.27** **Class** means a category of Claims or Interests designated pursuant to Section 1122 of the Bankruptcy Code and set forth in Article IV of the Plan.

**1.28** **Confirmation** means entry by the Bankruptcy Court of the Confirmation Order.

-5-

**1.29    Confirmation Date** means the later of, as applicable, with respect to the Chapter 11 Case: (a) the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court and affirmed by the District Court or (b) the date on which the Confirmation Order is entered on the docket of the District Court.

**1.30    Confirmation Hearing** means the hearing to be held by the Bankruptcy Court and/or District Court pursuant to Section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.31    Confirmation Order** means, as the context requires, the order or orders of the District Court confirming the Plan under Section 1129 of the Bankruptcy Code or affirming an order of the Bankruptcy Court confirming the Plan under Section 1129 of the Bankruptcy Code, which shall contain, among other things, the Channeling Injunction.

**1.32    Creditor** means "creditor" as defined in Section 101(10) of the Bankruptcy Code.

**1.33    Creditors' Committee** means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the United States Trustee and approved by order of the Bankruptcy Court, dated April 15, 2011, pursuant to Section 1102 of the Bankruptcy Code and consisting of two Asbestos Claimants, two holders of Settled Asbestos Claims, and one trade creditor as follows: Joseph Bayer; John J. Juliano; Allen Rabinowitz, Personal Representative for the Estate of Stanley Rabinowitz; Estate of Grady Peeler; and E.W. Kaufmann Company.

**1.34    Cure** means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to: (a) cure a default by the Debtor under an Executory Contract; and (b) permit the Debtor to assume such Executory Contract under Section 365 of the Bankruptcy Code.

**1.35    Cure Notice** means the pleading that Reorganized UGL shall file and serve within thirty (30) days after the Effective Date listing the amount of the proposed Cure for each assumed, or assumed and assigned, Executory Contract.

**1.36    Debtor** means United Gilsonite Laboratories, a Pennsylvania Corporation.

**1.37    Debtor-in-Possession** means United Gilsonite Laboratories, as debtor in possession in the Chapter 11 Case pursuant to Section 1101(1) of the Bankruptcy Code.

**1.38    Demand** means a future demand for payment within the meaning of Section 524(g) of the Bankruptcy Code, that: (a) was not a Claim prior to the Effective Date; (b) arises out of same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims; and (c) pursuant to the Plan, is to be resolved by the Trust.

**1.39    DIP Agreement** means the post-petition loan facility entered into by and between the Debtor and PNC Bank, National Association, as may be modified or amended by the parties or order of the Bankruptcy Court.

**1.40    DIP Lender** means the lender under the DIP Agreement.

-6-

**1.41** **Disallowed** when used with respect to a Claim, other than a Trust Claim, means a Claim or any portion thereof that (a) has been disallowed by Final Order, (b) is scheduled as zero or as contingent, disputed, or unliquidated and, in either instance, as to which no Proof of Claim or request for payment of an Administrative Expense Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, or otherwise deemed timely Filed under applicable law or the Plan, (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Expense Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or this Plan, (d) has been withdrawn by agreement of the Debtor and the holder thereof, (e) has been withdrawn by the holder thereof; (f) is disallowed under the Plan; or (g) is the subject of a Proof of Claim or request for payment of an Administrative Expense Claim, or is scheduled, and such Claim is a Disputed Claim, but only during such time as it remains a Disputed Claim.

**1.42** **Disclosure Statement** means the disclosure statement with respect to the Plan, including the exhibits and schedules thereto, as approved by the Bankruptcy Court as containing adequate information pursuant to Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified, or supplemented from time to time.

**1.43** **Disputed** when used with respect to a Claim against the Debtor or property of the Debtor, means a Claim to the extent that: (a) the allowance of such Claim is the subject of an objection, adversary proceeding, appeal or motion to estimate that has been timely Filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order, or (b) during the period prior to the deadline fixed by the Plan or the Bankruptcy Court for objecting to such Claim, such Claim is in excess of the amount scheduled as other than disputed, unliquidated or contingent. In the event that any part of a Claim is Disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of voting and distribution under the Plan unless the Debtor and the holder thereof agree otherwise.

**1.44** **Distribution** means any: (a) Cash; (b) property; or (c) interest in property to be paid or distributed hereunder to the holders of Allowed Claims or Interests, not including Trust Claims.

**1.45** **Distribution Date** means, when used with respect to an Allowed Claim (other than a Trust Claim), the date which is as soon as practicable after the latest of: (i) the Effective Date; or (ii) the first Business Day of the next calendar month after the Claim becomes an Allowed Claim; or (iii) the first Business Day of the next calendar month after the Claim matures and becomes due and payable according to its own terms.

**1.46** **District Court** means the United States District Court for the Middle District of Pennsylvania.

**1.47** **Effective Date** means, and shall occur on, the first Business Day immediately following the first day upon which all of the conditions to occurrence of the Effective Date contained in Section of 13.2 the Plan have been satisfied or waived.

**1.48    Encumbrance** means, with respect to any property (whether real or personal, or tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

**1.49    Entity** means an "entity" as defined in Section 101(15) of the Bankruptcy Code.

**1.50    Estate** means the estate created for the Debtor under Section 541 of the Bankruptcy Code upon commencement of the Chapter 11 Case.

**1.51    Executory Contract** means any unexpired lease or executory contract that is subject to treatment under Section 365 of the Bankruptcy Code. For the avoidance of doubt, an Asbestos Settlement Agreement does not constitute an Executory Contract.

**1.52    Exit Facility** means the secured credit facilities to be made available under the Exit Facility Agreement, as more fully described in Section 11.4 hereof.

**1.53    Exit Facility Agreement** means the agreement, and all related documents, that will memorialize the Exit Facility borrowings by the Debtor and Reorganized UGL.

**1.54    Exit Facility Lenders** means PNC Bank, National Association, and such other lender or group of lenders that PNC Bank, National Association, in its sole discretion, may choose to use to syndicate the Exit Facility from time to time.

**1.55    File, Filed or Filing** refers to a document in the Chapter 11 Case that a Person properly and timely files, has filed or causes to be a filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case, as reflected on the official docket of the Bankruptcy Court for the Chapter 11 Case, and served on Persons, as such Filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or order of the Bankruptcy Court.

**1.56    Final Judgment or Final Order** means a judgment or an order, as the case may be, as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; provided, however, that if an appeal, petition for certiorari, or request for reargument or rehearing thereof has been Filed or sought; (a)(i) such judgment or order shall have been affirmed by the highest court to which such judgment or order was appealed; or (ii) certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; or (b) such appeal, petition for certiorari, or request for reargument or rehearing shall have been dismissed with prejudice by the filing or seeking party.

**1.57    Future Claimants' Representative** means James L. Patton, Jr. (or any court-appointed alternative or successor), solely in and limited to his capacity set forth in the June 30, 2011 *Order Appointing James L. Patton, Jr. as Legal Representative For Future Asbestos Claimants* (Doc. No. 214).

-8-

**1.58    Future Demand Holder** means a holder of a Demand, whether now known or hereafter discovered.

**1.59    General Unsecured Claim** means a Claim, that is not an Administrative Expense Claim, an Asbestos Personal Injury Claim, an Indirect Asbestos Personal Injury Claim, a Non-Tax Priority Claim, a DIP Claim, a Priority Tax Claim, a Secured Claim, a Settled Asbestos Claim or a Workers' Compensation Claim.

**1.60    Impaired** means, when used with respect to a Claim or an Interest, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.61    Indirect Asbestos Personal Injury Claim** means any cross-claim, contribution claim, subrogation claim, reimbursement claim, indemnity claim, and any other similar derivative or indirect claim, demand, allegation, suit, remedy, damage, right or cause of action of any kind asserted against the Debtor or any other Asbestos Protected Party or Settling Insurer, or any debt, liability, or obligation of the Debtor or any other Asbestos Protected Party or Settling Insurer whether or not any such claim, demand, allegation, suit, remedy, damage, right, cause of action, debt, liability or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, whatsoever, arising out of, resulting from, or attributable to, directly or indirectly, an Asbestos Personal Injury Claim.

**1.62    Injunction** means the Channeling Injunction, the Non-Settling Insurers Injunction, and/or any other injunction entered or to be entered by Order of the Bankruptcy Court or the District Court in the Chapter 11 Case.

**1.63    Interest** means an "equity security" as defined in Section 101(16) of the Bankruptcy Code and includes any legal, equitable, or contractual rights arising from any share or other instrument evidencing an ownership in the Debtor, whether or not transferable or denominated "stock" or any similar security, and any partnership, membership interest, beneficial interest, warrants, options, or other rights to purchase or acquire any equity interest, or the right to payment or compensation based on such interest existing as of the Petition Date.

**1.64    Lien** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.65    Litigation Reserve** means a segregated fund in the amount of $300,000 to be deducted from the UGL Cash Contribution on the Effective Date and held by the Debtor for a period of five (5) years to be used exclusively for the Debtor's defense of post-confirmation litigation relating to asbestos-related property damage claims against the Debtor. Upon expiration of five (5) years from the Effective Date, the Debtor shall turn over to the Trust the balance of the Litigation Reserve, if any, along with a reasonably detailed accounting of all payments made from the Litigation Reserve.

**1.66    Non-Settling Insurers Injunction** means the injunction described in Section 12.6 of the Plan.

**1.67     Non-Tax Priority Claim** means any Claim entitled to priority pursuant to Section 507 of the Bankruptcy Code other than an Administrative Expense Claim, a DIP Claim, or a Priority Tax Claim.

**1.68     Payment Percentage** means the then applicable percent of the liquidated value of Trust Claims payable to the Asbestos Claimants, as determined by the Trustee in accordance with the Trust Distribution Procedures.

**1.69     Person** means any individual, partnership, corporation, limited liability company, joint venture company, association, trust or other entity or being of whatever kind, whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

**1.70     Petition Date** means March 23, 2011.

**1.71     Plan** means this first amended plan of reorganization under Chapter 11 of the Bankruptcy Code, including any supplements, schedules and exhibits hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

**1.72     Plan Documents** means, collectively, and as the same may be amended or modified in accordance with the Plan: (a) the Disclosure Statement (including all documents, attachments and exhibits thereto); (b) the Plan (including all documents, attachments, schedules, and exhibits thereto); (c) the Trust Documents; and (d) any other documents necessary to implement the Plan, including, but not limited to, the Exit Facility Agreement.

**1.73     Pledge Agreement** means that certain pledge agreement that will be executed on the Effective Date by and among Reorganized UGL, the UGL Shareholders, and the Trust, substantially in the form annexed hereto as Exhibit D, to secure the payment obligations under the UGL Promissory Note and the UGL Shareholder Promissory Note.

**1.74     Priority Tax Claim** means any Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

**1.75     Professional** means any person retained or to be compensated pursuant to Sections 327, 328, 330, 503(b), 506(b), 524(g) or 1103 of the Bankruptcy Code.

**1.76     Proof of Claim** means any proof of claim filed with the Bankruptcy Court or the Claims and Balloting Agent pursuant to Section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim.

**1.77     Record Date** means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Claims, which shall be the Confirmation Date.

**1.78     Rejection Claim** means any Claim for damages under Section 502(g) of the Bankruptcy Code resulting from the rejection of an Executory Contract or unexpired lease by the Debtor.

-10-

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 96 of 302

**1.79**  **Released Claims** means any and all claims and causes of action of any nature that the Debtor, Reorganized UGL, creditors of the Debtor (in their capacity as such), anyone acting or purporting to act on the Debtor's or Reorganized UGL's behalf, the Creditors' Committee, the Trust, the Trustee or the Future Claimants' Representative have or may have in the future against any of the Released Debtor Parties, including claims, liabilities or causes of action that may now or hereafter arise directly or as derivative claims, including, claims in the nature of fraudulent transfer, preferential transfer, diversion of corporate opportunity, breach of fiduciary duties, veil piercing or alter ego-type claims, which shall include but not be limited to creditor claims against any of the Released Debtor Parties which are or become property of the Estate, such as fraudulent transfer or fraudulent conveyance claims under applicable state and federal law.

**1.80**  **Released Debtor Parties** means the Debtor, Reorganized UGL, the UGL Shareholders and any of their pre- and post-Confirmation Date officers, directors, shareholders, trustees, employees, principals, financial advisors, agents, attorneys, investment bankers, accountants, consultants, members, and other professionals, in their capacity as such, the Exit Facility Lenders, and any successors and assigns of the foregoing; provided, however, that the Trust does not constitute a Released Debtor Party.

**1.81**  **Released Non-Debtor Parties** means: (a) the Creditors' Committee, its members, representatives, professionals and experts; (b) the Future Claimants' Representative, his professionals and experts; (c) the DIP Lender; (d) any Entity that, pursuant to the Plan or otherwise, on or after the Effective Date, makes a loan to any of Reorganized UGL, the Trust, or to a successor to, or transferee of any of the respective assets of, the Debtor, Reorganized UGL, or the Trust (but only to the extent that any liability is asserted to exist as a result of its becoming such a lender or to the extent any Encumbrance made in connection with such a loan is sought to be invalidated, upset or impaired in whole or in part as a result of its being such a lender); and (e) any current or former representative of any of the above.

**1.82**  **Released Parties** means each of (a) the Released Non-Debtor Parties, and (b) the Released Debtor Parties.

**1.83**  **Reorganized UGL** means UGL, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

**1.84**  **Reorganized UGL Stock** means all of the issued and outstanding shares of Class A Voting and Class B Non-Voting stock of Reorganized UGL to be deemed authorized and issued under Article XI of the Plan.

**1.85**  **Schedules** means the schedules of assets and liabilities and the statements of financial affairs and executory contracts Filed by the Debtor with the Bankruptcy Court in accordance with Section 521 of the Bankruptcy Code and the Bankruptcy Rules, as such schedules and statements may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1007.

**1.86**  **Secured Claim** means a Claim that is: (a) secured in whole or in part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject

to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value, net of any senior Lien, of the Estate's interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

**1.87  Settled Asbestos Claim** means a Claim listed on <u>Exhibit J</u> to the Plan.

**1.88  Settling Insurer** means the Asbestos Insurance Companies identified on <u>Exhibit B</u> to the Plan.

**1.89  Solicitation Procedures Order** means the Order entered by Bankruptcy Court dated September 30, 2014, approving, among other things, the adequacy of the Disclosure Statement and the solicitation procedures related to the Plan.

**1.90  Standing Motion** means the Joint Motion of the Official Committee of Unsecured Creditors and the Future Claimants' Representative for Entry of an Order Granting Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtor's Estate filed with the Bankruptcy Court on June 24, 2013 [Doc. No. 1303].

**1.91  Trust** means the Trust that is to be established pursuant to Section 524(g) of the Bankruptcy Code and in accordance with the Plan, the Confirmation Order and the Trust Agreement, which trust shall be treated as a "qualified settlement fund" under Section 468B of the Internal Revenue Code.

**1.92  Trust Advisory Committee** means the advisory committee appointed and serving in accordance with the Trust Agreement and having the powers, duties, and obligations set forth in the Trust Agreement.

**1.93  Trust Agreement** means the agreement, to be dated as of the Effective Date, by and among Reorganized UGL, the Trustee, the Future Claimants' Representative and the Trust Advisory Committee, governing the creation and terms of the Trust, in substantially the form annexed hereto as <u>Exhibit E, as may be amended, modified or supplemented from time to time in accordance with the terms thereof</u>.

**1.94  Trust Assets** means all assets, rights, and benefits to be assigned, delivered, transferred or conveyed to the Trust pursuant to the Plan, the Plan Documents, or otherwise, and include, without limitation, the following assets and any income, profits and proceeds derived therefrom: (a) the UGL Contribution; (b) the UGL Shareholder Contribution; (c) the Asbestos Insurance Rights; and (d) the Asbestos Records.

**1.95  Trust Bylaws** means the bylaws, effective as of the Effective Date, substantially in the form annexed hereto as <u>Exhibit E</u>, as such bylaws may be amended or modified from time to time in accordance with the terms of the Trust Agreement.

**1.96  Trust Claim** means any Asbestos Personal Injury Claim, Indirect Asbestos Personal Injury Claim or Demand.

**1.97  Trust Contributions** means the UGL Contribution and the UGL Shareholder Contribution.

**1.98    Trust Distribution Procedures** means the trust distribution procedures for the Trust, in substantially the form annexed hereto as <u>Exhibit F</u> and such additional procedures as subsequently may be adopted by the Trust, which provide for the resolution of Trust Claims, as may be amended, modified or supplemented from time to time in accordance with the terms thereof.

**1.99    Trust Documents** means, collectively:  (a) the Trust Agreement; (b) the Trust Distribution Procedures; (c) the Trust Bylaws; and (d) the other agreements, instruments and documents governing the establishment and administration of the Trust, as the same may be amended or modified from time to time, in accordance with the terms thereof.

**1.100    Trust Expense** means any of the liabilities, costs, taxes, or expenses incurred by, or imposed upon, the Trust (except for payments to Asbestos Claimants or to Future Demand Holders) in carrying out the terms of the Trust Agreement.

**1.101    Trustee** means the individual, or any successor thereto, appointed pursuant to Article IX of the Plan for the purpose of acting as trustee of the Trust in accordance with the terms and conditions contained in the Trust Documents, the Plan, and the Confirmation Order.

**1.102    UGL** means United Gilsonite Laboratories, a Pennsylvania Corporation, the Debtor.

**1.103    UGL Cash Contribution** means the aggregate of (a) Cash in an amount not to exceed $11 million payable from the proceeds of the Exit Facility; and (b) the difference between $3.5 million and the aggregate of (i) the Allowed Amount of General Unsecured Claims, and (ii) the portion of Administrative Expense Claims entitled to priority under Sections 503(b)(1)(B) and 503(b)(9) of the Bankruptcy Code, all of which monies will be transferred to the Trust by the Debtor and/or Reorganized UGL on the Effective Date after deduction for the Litigation Reserve.

**1.104    UGL Contribution** means, collectively, contributions by the Debtor or Reorganized UGL to the Trust, on account of Trust Claims, comprised of the following: (a) the UGL Cash Contribution; (b) the UGL Shareholder Cash Contribution; (c) the UGL Promissory Note; and (d) the Asbestos Insurance Rights.

**1.105    UGL Promissory Note** means Reorganized UGL's Promissory Note, in substantially the form annexed hereto as <u>Exhibit G</u>, in the principal amount of the difference between $18.25 million and the portion of the UGL Cash Contribution which is paid from the proceeds of the Exit Facility (which difference is estimated at $7.25 million), bearing interest at 7% per annum and payable over 20 years from the Effective Date as follows: quarterly interest only for year 1 through year 11, with quarterly principal payments commencing in year 12, amortized over the remaining 9 years of the UGL Promissory Note.

**1.106    UGL Shareholder** means any Person holding any of the issued and outstanding shares of Class A Voting and/or Class B Non-Voting stock in UGL, including the beneficiaries of any trust that is a UGL Shareholder.

**1.107 UGL Shareholders' Agreement** means that certain Shareholders' Agreement dated March 4, 1987 by and among UGL and the UGL Shareholders as amended from time to time.

**1.108 UGL Shareholder Cash Contribution** means Cash in the amount of $8.0 million to be contributed to the Debtor and/or Reorganized UGL by the UGL Shareholders, of which up to $2.2 million shall be used to fund Distributions by the Debtor and/or Reorganized UGL to be made to the holders of Allowed Settled Asbestos Claims and the remainder shall be paid to the Trust by the Debtor and/or Reorganized UGL on the Effective Date.

**1.109 UGL Shareholder Contribution** means, in the aggregate, the following contributions by the UGL Shareholders: (a) the UGL Shareholder Promissory Note; (b) the UGL Shareholder Cash Contribution; and (c) the UGL Shareholder Pledge.

**1.110 UGL Shareholder Pledge** means the granting of a security interest by the UGL Shareholders in 100% of the equity interests in UGL pursuant to the Pledge Agreement, in substantially the form annexed hereto as <u>Exhibit D</u>, as security for repayment of the UGL Promissory Note and the UGL Shareholder Promissory Note.

**1.111 UGL Shareholder Promissory Note** means that certain Promissory Note in the principal amount of $375,000, payable in two years, executed and delivered by the UGL Shareholders to the Trust on the Effective Date, in substantially the form annexed hereto as <u>Exhibit H</u>.

**1.112 Unimpaired** means a Claim or Interest, or a Class of Claims or Interests, as appropriate, that is not Impaired under the Plan.

**1.113 United States Trustee** means the United States Trustee appointed under Section 581 of title 28 of the United States Code to serve in the Middle District of Pennsylvania.

**1.114 Unsecured Claims** means collectively, General Unsecured Claims and Settled Asbestos Claims.

**1.115 Workers' Compensation Claim** means any claim or demand made by any past or present UGL employee who is currently receiving, currently has the right to receive, or may in the future have a right to receive, benefits under any state or federal mandated workers' compensation statute, system or other statute providing compensation to an employee from an employer, and fees and expenses incurred under any insurance policies or laws or regulations covering such employee claims, including, but not limited to, a claim for reimbursement brought by any insurance company as a result of payments made to or for the benefit of such employees and all asbestos-related claims by any present or former employee of the Debtor that is subject to treatment under a government-mandated workers' compensation system.

For the avoidance of doubt, under this Plan, Workers' Compensation Claims do not include Asbestos Personal Injury Claims of past or present employees of UGL where the manifestation of such employees' Asbestos Personal Injury Claim arose outside the limitations period set under any applicable state or federal mandated workers' compensation statute, system or other statute providing compensation to an employee from an employer, <u>provided</u>, <u>however</u>,

-14-

that applicable state law and/or a final order of a state or federal court provides for recovery by such employees against UGL outside of the applicable state or federal workers' compensation system ("Delayed Manifestation Claims").

**1.116 Workers' Compensation Insurance** means any insurance policy or portion of any insurance policy to the extent that it provides insurance coverage or benefits for Workers' Compensation Claims.

## ARTICLE II

## ADMINISTRATIVE EXPENSE, PRIORITY TAX AND DIP CLAIMS

### 2.1 Allowed Administrative Expense Claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim (including a holder of a Professional Fee Claim, as defined below) agrees to a different treatment, in full satisfaction, settlement and discharge of and in exchange for such claims, the Debtor or Reorganized UGL shall pay each Allowed Administrative Expense Claim in Cash on the later of (a) the Effective Date, (b) the date that such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (c) the date such Allowed Administrative Expense Claim becomes due and payable according to its terms; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtor-in-Possession in the ordinary course of business or liabilities under loans or advances to or other obligations incurred by the Debtor-in-Possession may be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

### 2.2 Administrative Expense Claims Bar Dates.

(a) General Administrative Expense Claim Bar Date

Except for Professional Fee Claims, all requests for payment of Administrative Expense Claims (including Administrative Expense Claim requests by governmental units) must be Filed with the Bankruptcy Court and served so that such requests are actually received by counsel for the Debtor no later than thirty (30) days after notice of the Effective Date is Filed with the Bankruptcy Court (the "Administrative Expense Claim Bar Date"). Holders of Administrative Expense Claims (including, without limitation, the holders of any Claims for federal, state or local taxes), that are required to File an Administrative Expense Claim request and that do not File such requests by the Administrative Expense Claim Bar Date shall be forever barred from asserting such claims against the Debtor, the Estate and/or any of its property. Notwithstanding the foregoing, any bar dates established during the course of the Chapter 11 Case shall remain in full force and effect.

All objections to allowance of Administrative Expense Claims must be Filed by the Debtor or Reorganized UGL no later than 180 days after the Administrative Expense Claim Bar Date (the "Administrative Expense Claim Objection Deadline"). The Administrative Expense Claim Objection Deadline may be initially extended for an additional ninety (90) days at the sole

-15-

discretion of the Debtor upon the filing of a notice of the extended Administrative Expense Claim Objection Deadline with the Bankruptcy Court. Thereafter, the Administrative Expense Claim Objection Deadline may be extended only by an Order of the Bankruptcy Court upon application by the Debtor, which Order may be granted without notice to any Creditors. Unless the Debtor or Reorganized UGL timely objects to an Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Debtor or Reorganized UGL timely objects to an Administrative Expense Claim, and the parties are unable to reach a settlement, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

(b)     Professional Fee Claim Bar Date

All Professionals requesting compensation for services rendered or reimbursement of expenses pursuant to Sections 330 and/or 503(b) of the Bankruptcy Code ("Professional Fee Claims") shall File and serve on counsel for the Debtor, counsel for the Creditors' Committee, counsel for the Future Claimants' Representative, and the United States Trustee, an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than (a) thirty (30) days after the Effective Date, or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 30-day period.

Objections to Professional Fee Claims must be Filed and served on counsel for the Debtor, counsel for the Creditors' Committee, counsel for the Future Claimants' Representative, the United States Trustee, and the Professional to whose application the objections are addressed within the time frame set forth in the notice served with the application seeking payment of such Professional Fee Claim, unless an extension is granted by the applicant or the Bankruptcy Court.

Reorganized UGL is authorized to pay compensation for Professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without the need for Bankruptcy Court approval.

2.3     **Priority Tax Claims.**

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim, if any, shall, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, in the sole and absolute discretion of Reorganized UGL: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the later of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable; and (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law, or (b) regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; (ii) over a period ending not later than five (5) years after the Effective Date; and (iii) in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors under Section 1122(b) of the Bankruptcy Code).

-16-

**2.4    Allowed DIP Claim.**

Except to the extent that the holder of the Allowed DIP Claim agrees to a different treatment, the Allowed DIP Claim shall be satisfied on the Effective Date through the Exit Facility.

# ARTICLE III

## PROVISIONS FOR TREATMENT OF DEMANDS

**3.1    Demands.**

On the Effective Date, in consideration of the Trust Contributions to the Trust, each holder of a Demand shall have its Demand permanently channeled to and assumed by the Trust pursuant to the Channeling Injunction and such Demand may thereafter be asserted exclusively against the Trust in accordance with the provisions set forth in the Plan and the Trust Distribution Procedures. None of the Asbestos Protected Parties shall have any further liability for such Demands. Each Demand shall be resolved as provided in the Trust Agreement, as well as the Trust Distribution Procedures. Each Demand shall be subject to the provisions of Article XII set forth below.

# ARTICLE IV

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtor. Consistent with Section 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims and the DIP Claims are not classified.

**4.1    Classification.**

Claims and Interests are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Plan, pursuant to Sections 1122 and 1123 of the Bankruptcy Code, as follows:

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | | | |
|---|---|---|---|---|---|
| **CLASS** | **DESIGNATION** | **ESTIMATED NUMBER** | **ESTIMATED AMOUNT** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS** | **ESTIMATED RECOVERY** |
| Class 1 | Non-Tax Priority Claims | None | None | Paid in Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim on, or soon as practicable after, the later of: (a) the Distribution Date; or (b) such other date as may be agreed to between the holder of such Claim and the Debtor or Reorganized UGL | 100% |
| Class 2 | Secured Claims | None | None | Each holder of an Allowed Secured Claim shall have such Claim reinstated pursuant to Section 1124(2) of the Bankruptcy Code such that the Claim is rendered Unimpaired. | 100% |
| Class 3 | Unsecured Claims | | | | |
| Class 3A | General Unsecured Claims | 264 | $3,000,000 | Paid in Cash equal to the Allowed Amount of such General Unsecured Claim on, or soon as practicable after, the later of: (a) the Distribution Date; or (b) such other date as may be agreed to between the holder of such Claim and the Debtor or Reorganized UGL. | 100% |
| Class 3B | Settled Asbestos Claims | 10 | $2,175,000[2] | Paid in Cash, from the UGL Shareholder Cash Contribution, on the Effective Date equal to the Allowed Amount of such Claim as set forth on Exhibit J to the Plan. | 100% |

---

[2] This amount is not estimated but instead is the aggregate amount of all Allowed Class 3B Claims as set forth on Exhibit J attached hereto.

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | | | | |
|---|---|---|---|---|---|
| **CLASS** | **DESIGNATION** | **ESTIMATED NUMBER** | **ESTIMATED AMOUNT** | **TREATMENT OF ALLOWED CLAIMS WITHIN CLASS** | **ESTIMATED RECOVERY** |
| Class 4 | Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims | Unknown | Unknown | Channeled to and assumed by the Trust. | Unknown |
| Class 5 | Workers' Compensation Claims | Unknown | Unknown | Determined and paid pursuant to the Workers' Compensation Insurance in accordance with the applicable statutory, regulatory and other procedures governing Workers' Compensation Claims. | 100% |
| Class 6 | Interests | | | Retain their Interests, subject to the UGL Shareholder Pledge. | Unknown |

### 4.2 Treatment of Claims and Interests.

Allowed Claims and Allowed Interests shall be treated in the manner set forth in this Article IV. The treatment in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Entity holding an Allowed Claim or an Allowed Interest may have in or against the Debtor.

**(a)** Class 1 – Non-Tax Priority Claims

Except to the extent a holder of an Allowed Non-Tax Priority Claim has been paid prior to the Effective Date, or agrees to a different treatment, each holder of an Allowed Non-Tax Priority Claim shall receive in full satisfaction, settlement and discharge and in exchange for such Non-Tax Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Non-Tax Priority Claim on, or as soon as practicable after, the later of: (a) the Distribution Date; or (b) such other date as mutually may be agreed to by and between the holder of such Non-Tax Priority Claim and the Debtor or Reorganized UGL.

Class 1 is Unimpaired under the Plan. Each holder of a Non-Tax Priority Claim is conclusively presumed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan. The Debtor is not aware of any Claims in this Class.

**(b)** Class 2 – Secured Claims

Except to the extent a holder of a Secured Claim agrees to a different treatment, each holder of an Allowed Secured Claim shall have such Claim reinstated pursuant to Section 1124(2) of the Bankruptcy Code such that the Claim is rendered Unimpaired. The failure of the Debtor or any other party in interest to file an objection, prior to the Effective Date, with respect to any Secured Claim that is reinstated hereunder shall be without prejudice to the rights of Reorganized UGL or any other party in interest to contest or otherwise defend against such Secured Claim in an appropriate forum when and if such Secured Claim is sought to be enforced. Any amount that the Debtor may be required to pay pursuant to Section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed Secured Claim shall be paid in full, in Cash, on, or as soon as practicable after, the later of: (a) the Distribution Date; or (b) such other date as mutually may be agreed to by and between the holder of such Secured Claim and the Debtor or Reorganized UGL.

Class 2 is Unimpaired under the Plan. Each holder of a Secured Claim is conclusively presumed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan. The Debtor is not aware of any Claims in this Class.

**(c)** Class 3 – Unsecured Claims

(i) Class 3A - General Unsecured Claims

Except to the extent a holder of an Allowed Class 3A General Unsecured Claim agrees to a different treatment of such General Unsecured Claim, each holder of an Allowed Class 3A Claim shall receive, in full and final satisfaction of such Claim, a Distribution from Reorganized UGL, in Cash, equal to the Allowed Amount of such Claim on, or as soon as practicable after, the later of: (a) the Distribution Date; or (b) such other date as mutually may be agreed to by and between the holder of such General Unsecured Claim and the Debtor or Reorganized UGL.

(ii) Class 3B - Settled Asbestos Claims

On the Effective Date, each holder of an Allowed Class 3B Claim shall receive, in full and final satisfaction of such Allowed Class 3B Claim, a Distribution payable to the attorney trust account of such claimant's attorney of record as set forth on Exhibit J to the Plan, which Distribution shall be payable from the UGL Shareholder Cash Contribution, in Cash, equal to the Allowed Amount of such Claim as set forth on Exhibit J to the Plan. For the avoidance of doubt, the sole recourse of a holder of a Settled Asbestos Claim is the Effective Date Distribution being made to such holder under the Plan.

Class 3 is Unimpaired under the Plan. Each holder of a General Unsecured Claim and/or a Settled Asbestos Claim is conclusively presumed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(d)    Class 4 – Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims

On the Effective Date, all Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims shall be discharged as against the Debtor, Reorganized UGL, the Settling Insurers and the Released Debtor Parties pursuant to the terms and conditions of this Plan and the Trust Documents. Pursuant to the Channeling Injunction, as of the Effective Date, without further act or deed, each holder of an Asbestos Personal Injury Claim or an Indirect Asbestos Personal Injury Claim shall have its Claim permanently channeled to and assumed by the Trust, which shall be funded with the Trust Assets, and neither the Debtor, Reorganized UGL, the Released Debtor Parties, nor any Settling Insurer shall have any further liability for such Claims. Each Asbestos Personal Injury Claim and Indirect Asbestos Personal Injury Claim shall be resolved, after the Effective Date, in accordance with the terms, provisions and procedures of the Trust Agreement and the Trust Distribution Procedures. The sole recourse of the holders of Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims on account of such Claims shall be to the Trust and each such holder shall have no right whatsoever at any time to assert any Asbestos Personal Injury Claim or Indirect Asbestos Personal Injury Claim against any Asbestos Protected Party or Settling Insurer.

Class 4 is Impaired under the Plan. Each holder of an Asbestos Personal Injury Claim or an Indirect Asbestos Personal Injury Claim shall be entitled to vote to accept/vote in favor of or vote to reject/vote against the Plan to the extent and in the manner provided in Article V below and in the Solicitation Procedures Order.

(e)    Class 5 – Workers' Compensation Claims

Each holder of a Workers' Compensation Claim shall be entitled to have such Claim determined and paid in the ordinary course pursuant to the Workers' Compensation Insurance in accordance with the applicable statutory, regulatory and other procedures governing Workers' Compensation Claims.

Class 5 is Unimpaired under the Plan. Each holder of a Workers' Compensation Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(f)    Class 6 – Interests

On the Effective Date, the holders of Interests in the Debtor shall retain their Interests, which shall be deemed Reorganized UGL Stock as of the Effective Date. On or before the Effective Date, the UGL Shareholders shall (a) make the UGL Shareholder Cash Contribution, and (b) execute and deliver the UGL Shareholder Promissory Note and the Pledge Agreement, pursuant to which 100% of their stock in Reorganized UGL will be pledged to the Trust and held by the Trust until such time as the UGL Promissory Note and the UGL Shareholder Promissory Note are paid in full.

Class 6 is Unimpaired under the Plan. Each holder of an Interest is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

# ARTICLE V

## ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

### 5.1    Classes Entitled to Vote – Generally.

Except as set forth below, each holder of an Allowed Claim, and each holder of a Claim that has been temporarily allowed for voting purposes in each Impaired Class of Claims shall be entitled to vote to accept/vote in favor of or vote to reject/vote against the Plan unless such Impaired Class shall receive no distribution under the Plan, in which case, such Impaired Class shall be deemed to reject the Plan and shall not be entitled to vote to accept or reject the Plan.

### 5.2    Class Acceptance Requirement For Impaired Classes.

Acceptance of the Plan by any Impaired Class of Claims shall be determined in accordance with Section 1126 of the Bankruptcy Code and the terms of the Solicitation Procedures Order.  With respect to Class 4, acceptance of the Plan shall also be determined in accordance with Section 524(g) of the Bankruptcy Code.

### 5.3    Acceptance By Plan Class 4 Pursuant to Section 524(g) of the Bankruptcy Code.

The Bankruptcy Court shall be asked to issue the Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those holders of Class 4 Claims actually voting on the Plan, determined in accordance with Section 1126(c) of the Bankruptcy Code and the Solicitation Procedures Order, and at least seventy-five percent (75%) in number of those holders of Class 4 Claims actually voting on the Plan, in accordance with Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

### 5.4    Acceptance by Unimpaired Classes.

Class 1 (Non-Tax Priority Claims), Class 2 (Secured Claims), Class 3A (General Unsecured Claims), Class 3B (Settled Asbestos Claims), Class 5 (Workers' Compensation Claims) and Class 6 (Interests) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, solicitation of votes of holders of Claims in Class 1, Class 2, Class 3A, Class 3B, Class 5 and Class 6 is not required.

### 5.5    General Reservation of Rights.

Should this Plan fail to be accepted by the requisite number and amount of the holders of Claims and Interests required to satisfy Sections 524(g) and 1129 of the Bankruptcy Code, then, notwithstanding any other provision of this Plan to the contrary, the Debtor reserves the right to amend this Plan.

-22-

## ARTICLE VI

## DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT
## OF CLAIMS OTHER THAN TRUST CLAIMS

**6.1    Distributions.**

Except as expressly provided herein, the Debtor and/or Reorganized UGL shall make all Distributions on account of Allowed Claims required under the Plan to holders of each such Allowed Claim, other than distributions to be made to holders of Class 4 and Class 5 Claims, as of the Distribution Date or as soon thereafter as is practicable. For the avoidance of doubt, while UGL shall make Distributions to holders of Allowed Class 3B Settled Asbestos Claims, such Distributions are limited to the Settled Asbestos Claims set forth on Exhibit J to the Plan and shall be made from the UGL Shareholder Cash Contribution on the Effective Date in an amount not to exceed $2.2 million in the aggregate. All distributions to be made to holders of Trust Claims shall be made by the Trust in accordance with the terms of the Trust Agreement and the Trust Distribution Procedures, subject to the conditions for the Effective Date as set forth in Section 13.2 of the Plan having been previously satisfied.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**6.2    Post-petition Interest on Claims.**

Unless expressly provided for in the Plan, the Plan Documents, the Confirmation Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, interest shall not accrue on or after the Petition Date on account of any Claim, except with respect to the following Claims, which shall accrue interest from and after the Petition Date until paid at the federal judgment rate in effect on the Confirmation Date: (i) the Allowed portion of Administrative Expense Claims entitled to priority under Section 503(b)(9) of the Bankruptcy Code; (ii) the Allowed Class 3A General Unsecured Claims; and (iii) the Allowed Class 3B Settled Asbestos Claims.

**6.3    Means of Cash Payment.**

At the option of the Debtor, any Cash payment to be made hereunder may be made by a check, or wire transfer or as otherwise required or provided in any applicable agreement.

**6.4    Delivery of Distributions.**

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules or on the books and records of the Debtor or in any Proof of Claim filed by such holder, unless the Debtor has been notified in a writing of a change of address.

-23-

If any holder's Distribution is returned as undeliverable, then no further Distributions to such holder shall be made unless and until Reorganized UGL is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest. Nothing contained in the Plan shall require the Debtor or Reorganized UGL to attempt to locate any holder of an Allowed Claim.

### 6.5    Time Bar to Cash Payments.

Checks issued by Reorganized UGL in respect of Distributions on Allowed Claims shall be null and void if not presented for payment within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to Reorganized UGL by the holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check. After expiration of the thirty (30) day period, all funds held on account of such void check shall become the property of Reorganized UGL or the Trust (if such void check relates to a Settled Asbestos Claim), and the Claim of any holder otherwise entitled to such Distributions shall be discharged and forever barred.

### 6.6    Holders of Claims on Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Record Date. The Debtor and/or Reorganized UGL shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. If there is any dispute regarding the identity of the Entity entitled to receive a Distribution in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

### 6.7    Distributions after Distribution Date.

Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter. Except as otherwise provided in the Plan, no interest shall accrue or be payable on such Distributions.

### 6.8    Setoff.

Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Debtor, Reorganized UGL or the Trust, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, any claims of any nature whatsoever the Debtor or Reorganized UGL may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized UGL of any claim that the Debtor may have against such holder.

# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 7.1    Assumption And Rejection Of Executory Contracts.

**(a)**    *Assumption*.    Except as otherwise provided in the Plan and in Section 7.1(b) below, any Executory Contract that has not been expressly rejected by the Debtor by Order of the Bankruptcy Court on or prior to the Confirmation Date shall, as of the Confirmation Date (subject to the occurrence of the Effective Date), be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to reject such Executory Contract.

**(b)**    *Rejection*.    Notwithstanding subpart (a) of this Section 7.1, the Debtor shall reject those Executory Contracts listed on Exhibit I hereto (as such list may be amended or supplemented up to and including the Confirmation Date).  The Debtor shall provide notice of any such amendment to the parties to the Executory Contract(s) affected thereby and to parties on any master service list established by the Bankruptcy Court in the Chapter 11 Case.  The fact that any contract or lease is listed on Exhibit I shall not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code or that the Debtor or any successor in interest to the Debtor (including Reorganized UGL) has any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such:  (a) rejections; (b) assumptions; or (c) assumptions and assignments, as the case may be, effectuated by the Debtor on or before the Confirmation Date pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### 7.2    Cure Payments.

Except to the extent that a different treatment has been agreed to by the non-debtor party or parties to any Executory Contract to be assumed (including any Executory Contract to be assumed and assigned) pursuant to Section 7.1(a) of the Plan, Reorganized UGL shall, pursuant to the provisions of Sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of Section 365 of the Bankruptcy Code, satisfy any monetary defaults under such Executory Contracts by Cure.  In the event of a dispute regarding (a) the existence or amount of any Cure, (b) the ability of Reorganized UGL to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract to be assumed, or (c) any other matter pertaining to assumption, Cure shall be made by Reorganized UGL either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's or Reorganized UGL's liability with respect thereto and approving the assumption or assumption and assignment, as the case may be, or as may otherwise be agreed to by the parties to such Executory Contract; provided, however, that the Debtor or Reorganized UGL, as applicable, shall be authorized to reject any Executory Contract to be deemed effective as of the day before the Effective Date, to the extent the Debtor or Reorganized UGL shall, in the exercise of its sound business judgment, conclude that the

-25-

amount of the Cure obligation as determined by such Final Order, renders the assumption of such Executory Contract unfavorable to the Debtor or Reorganized UGL.

**7.3     Rejection Damages Bar Date.**

In the event that the rejection of an Executory Contract by the Debtor results in damages to the non-debtor party or parties to such Executory Contract, a claim for such damages shall be forever barred and shall not be enforceable against the Debtor, Reorganized UGL, or their respective properties or interests in property, unless a Proof of Claim with respect to such damages is filed with the Claims and Balloting Agent and served upon counsel for the Debtor on or before: (a) if such Executory Contract is rejected pursuant to Sections 7.1(b) above, the later of (i) thirty (30) days after entry of the Confirmation Order, and (ii) thirty (30) days after the non-debtor party receives notice of the rejection of such Executory Contract pursuant to Section 7.1(b) above; and (b) if such Executory Contract is rejected pursuant to a Final Order of the Bankruptcy Court, thirty (30) days after entry of such Final Order. To the extent any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under this Plan as, a Class 3A Claim (General Unsecured Claim), and the holder thereof shall receive Distributions as a holder of an Allowed Claim in such Class pursuant to this Plan.

**7.4     Compensation and Benefit Plans; Treatment of Retiree and Pension Benefits.**

Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, all of the Debtor's programs, plans, agreements and arrangements relating to the Debtor's employee compensation and benefits, including programs, plans, agreements and arrangements subject to Sections 1114 and 1129(a)(l3) of the Bankruptcy Code and including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, life, accidental death and dismemberment insurance plans, workers' compensation plans, severance, salary continuation and retention agreements entered into before the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, Executory Contracts that are assumed under Section 7.1 of the Plan, and the Debtor's obligations under such programs, plans, agreements and arrangements will survive confirmation of the Plan, except for Executory Contracts or plans that previously have been rejected, are the subject of a motion to reject pending on the Confirmation Date or have been specifically waived by the beneficiaries of any plans or contracts. In addition, pursuant to the requirements of Section 1129(a)(13) of the Bankruptcy Code, the Plan provides for the continuation of payment by the Debtor of all "retiree benefits," as defined in Section 1114(a) of the Bankruptcy Code, if any, at previously established levels.

For the avoidance of doubt, no provision contained in the Disclosure Statement, the Plan, the Confirmation Order or in any other documents filed in this Chapter 11 Case shall release or discharge any Entity, in any capacity, from liability arising under the Employee Retirement Income Security Act of 1974 or the Internal Revenue Code of 1986.

-26-

# ARTICLE VIII

## ASBESTOS INSURANCE RIGHTS

**8.1    Transfer of Insurance Proceeds to the Trust.**

On the Effective Date, the Debtor hereby irrevocably transfers, grants and assigns to the Trust any and all of the Asbestos Insurance Rights. This transfer, grant and assignment is made to the maximum extent permitted under applicable law. This transfer, grant and assignment is not an assignment of any insurance policy. From and after the Effective Date, the Trust shall be empowered and entitled, in its sole and absolute discretion, to pursue, compromise or settle the Asbestos Insurance Rights.

Notwithstanding anything in this Plan to the contrary, the Trust shall be responsible for any applicable deductibles and/or self-insured retentions that may be required by the terms of any Asbestos Insurance Policy. The Trust shall have no recourse against the Debtor or Reorganized UGL in the event any deductibles and/or self-insured retentions reduce the amounts otherwise payable to the Trust under any Asbestos Insurance Policy.

**8.2    Debtor's Obligation to Pursue Asbestos Insurance Rights.**

In the event that the transfer, grant and assignment set forth in Section 8.1 of this Plan is determined to be invalid by a court of competent jurisdiction, upon request by the Trust, the Debtor and/or Reorganized UGL shall: (i) pursue any of the Asbestos Insurance Rights for the benefit of and to the fullest extent required by the Trust; and (ii) immediately transfer any amounts recovered under or on account of any of the Asbestos Insurance Rights to the Trust. While any such amounts are held by or under the control of the Debtor or Reorganized UGL, such amounts shall be held in an interest-bearing account for the benefit of the Trust. For purposes of implementing this Section 8.2 only, the Debtor and Reorganized UGL appoint the Trust as their agent solely for the purpose of pursuing recovery of the Asbestos Insurance Rights, and the Trust shall accept such appointment.

**8.3    Cooperation.**

To the extent permitted by applicable law and not inconsistent with any of the provisions of the Plan, the Debtor and Reorganized UGL shall provide the Trust with such cooperation as the Trust may request in connection with the pursuit by the Trust of the Asbestos Insurance Rights, including, but not limited to, any request by the Trust under Section 8.2 above. Upon request by the Debtor and/or Reorganized UGL, the Trust shall promptly reimburse the Debtor or Reorganized UGL for its reasonable out-of-pocket costs and expenses (including attorneys' and consultants' fees) incurred at any time in connection with providing such cooperation.

**8.4    Unidentified Asbestos Insurance Policies.**

If after the Effective Date, the Debtor or Reorganized UGL discovers the existence of an insurance policy that falls within the definition of "Asbestos Insurance Policy" that is not identified on Plan <u>Exhibit A</u>, the Debtor or Reorganized UGL shall promptly notify the Trust of

such discovery and shall cooperate with the Trust to effectuate an assignment of rights under said policy to the Trust in a manner consistent with Section 8.1 of the Plan.

**8.5      Representations and Warranties.**

The Debtor represents to the Trust that, to the Debtor's knowledge, (i) there is no currently operative assignment to any third party of any Asbestos Insurance Rights under any Asbestos Insurance Policy; and (ii) any written information pertaining to the Asbestos Insurance Policies provided by the Debtor or its authorized representatives to the Committee, the Future Claimants' Representative, or the Trust was true and correct in all material respects as of the respective dates specified therein or, in the absence of any such specification, at the time it was so provided.

## ARTICLE IX

## RESOLUTION OF DISPUTED CLAIMS OTHER THAN ASBESTOS CLAIMS

**9.1      Disputed Claims Other than Trust Claims.**

All Disputed Claims against the Debtor (other than Trust Claims) shall be subject to the provisions of this Article IX. Only Claims that are Allowed shall be entitled to Distribution under the Plan. All Trust Claims shall be resolved by the Trust in accordance with the terms of the Trust Agreement and the Trust Distribution Procedures. Only the Trust will have the right to object to and/or resolve Trust Claims; and all Trust Claims must be submitted solely to the Trust for allowance and payment, which shall be in accordance with the Trust Distribution Procedures.

**9.2      Objection to Claims.**

As soon as practicable, but in no event later than the first anniversary of the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), unless otherwise ordered by the Bankruptcy Court or as set forth herein, objections to Claims (other than Trust Claims) shall be filed with the Bankruptcy Court; provided, however, that Reorganized UGL may seek to extend such period (or any extended period) for cause. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtor or Reorganized UGL, as the case may be, shall have the exclusive right to make and file objections to Proofs of Claim (other than Proofs of Claim in respect of Trust Claims).

**9.3      Disallowance of Improperly Filed Claims.**

Subject to Section 502 of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Claim for which the filing of a Proof of Claim or motion with the Bankruptcy Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court (including one providing a Bar Date) or this Plan, shall be Disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

**9.4     No Distributions Pending Allowance.**

No payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Debtor or Reorganized UGL, as the case may be, may, in its discretion, make a Distribution pursuant to the Plan on account of the portion of such Claim that is an Allowed Claim.

**9.5     Estimation of Claims.**

Except Trust Claims, the Debtor or Reorganized UGL, as the case may be, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim for any reason pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Claim or of any appeal relating thereto. Claims (except Trust Claims) may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

**9.6     Allowance of Claims Subject to Section 502 of the Bankruptcy Code.**

Allowance of Claims (except Trust Claims) shall be in all respects subject to the provisions of Section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h), and (i) thereof.

**9.7     Preservation of Rights to Settle Claims.**

In accordance with Section 1123(b) of the Bankruptcy Code, the Debtor and Reorganized UGL shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims (other than Trust Claims), rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Entity, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019.

# ARTICLE X

# THE TRUST

**10.1     Creation and Purpose of the Trust.**

On the Effective Date, the Trust shall be created in accordance with the Plan Documents, the Trust Documents and Section 524(g) of the Bankruptcy Code. The Trust shall be a "qualified settlement fund" within the meaning of Treasury Regulation Section 1.468B-1. The purpose of the Trust shall be to, among other things: (a) assume and direct the processing, liquidation and payment of Trust Claims in accordance with the Plan, the Trust Agreement, the

Trust Distribution Procedures and the Confirmation Order; (b) preserve, hold, manage, maximize (on a risk-adjusted basis), and liquidate the assets of the Trust for use in resolving Trust Claims; (c) qualify at all times as one or more qualified settlement funds; and (d) otherwise comply in all respects with the requirements of Section 524(g)(2)(B) of the Bankruptcy Code.

The Trust shall have no liability for any Claim other than a Trust Claim, which shall be resolved in accordance with the terms, provisions and procedures of the Trust Agreement and the Trust Distribution Procedures. On the Effective Date, all right, title and interest in and to the Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Trust, free and clear of all Claims (except as to Trust Claims), Liens, demands, Interests, Encumbrances and other interests of any Entity without any further action of the Bankruptcy Court or any Entity, but subject to the remaining provisions of this Article 9.

**10.2    Funding and Receipt of Trust Assets.**

(a)    *Cash Contributions to the Trust*. On the Effective Date, the Debtor and/or Reorganized UGL shall make the UGL Cash Contribution and the UGL Shareholder Cash Contribution to the Trust less an amount not to exceed $2.2 million to fund Distributions to the holders of Allowed Class 3B Settled Asbestos Claims.

(b)    *Promissory Notes*. On the Effective Date, (i) as part of the UGL Contribution, Reorganized UGL shall execute and deliver to the Trust the UGL Promissory Note and the security agreement conveying a Lien on all assets of Reorganized UGL in favor of the Trust, subordinate to the Exit Facility Lenders' Liens; and (ii) as part of the UGL Shareholder Contribution, the UGL Shareholders shall execute and deliver the UGL Shareholder Promissory Note. As security for the UGL Promissory Note and the UGL Shareholder Promissory Note, on the Effective Date, the UGL Shareholders shall execute and deliver to the Trust the Pledge Agreement.

(c)    *Insurance Proceeds*. The transfer, grant and assignment of the Asbestos Insurance Rights on the Effective Date to the Trust pursuant to Article VIII of the Plan.

(d)    *Asbestos Records*. On the Effective Date, the Debtor and the Trust shall execute an agreement that provides for the Debtor to make the Asbestos Records available to the Trust.

**10.3    Assumption of Liabilities.**

Immediately upon the Effective Date, and without any further action of the Bankruptcy Court or further act or agreement of any Entity, (a) all liabilities, obligations and responsibilities for all Trust Claims shall automatically be transferred and channeled to, and assumed by, the Trust and (b) the Trust shall be solely responsible for the resolution of Trust Claims under the terms of the Trust Agreement and the Trust Distribution Procedures; provided, however, that any Claim not subject to the Channeling Injunction because of the terms, conditions, reservations or termination provisions set forth in Section 12.5 (or otherwise) is not and shall not be transferred and/or channeled to or assumed by the Trust.

-30-

**10.4    Institution and Maintenance of Legal and Other Proceedings.**

From and after the Effective Date, the Trust shall be empowered and entitled, in its sole and absolute discretion, to pursue, compromise or settle the Debtor's or Reorganized UGL's interests in any and all Asbestos Insurance Rights.

**10.5    Payment of Trust Claims.**

Prior to the Effective Date, the Trust shall <u>not</u> pay any Trust Claims.  On or after the Effective Date, the Trust shall pay Trust Claims that have been determined to be payable pursuant to the Trust Agreement and Trust Distribution Procedures.

**10.6    Excess Trust Assets.**

To the extent there are any Trust Assets remaining after the payment, in full, of all valid Trust Claims, and the payment, in full, of all Trust Expenses, such excess Trust Assets shall be transferred in accordance with the Trust Agreement.

**10.7    Appointment of Trustee.**

Prior to or on the Confirmation Date, the Future Claimants' Representative and the Creditors' Committee, acting jointly, shall designate the initial Trustee of the Trust.  On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall appoint the initial Trustee of the Trust, who shall serve in accordance with the Trust Agreement.

**10.8    Appointment of Future Claimants' Representative.**

James L. Patton, Jr. shall serve as the Future Claimants' Representative from and after the Effective Date.

**10.9    Appointment of Trust Advisory Committee Members.**

The initial members of the Trust Advisory Committee shall be those persons designated in the Confirmation Order, upon the advice and nomination of the Future Claimants' Representative and the Creditors' Committee.

**10.10    Trust Claims Review.**

From and after the Effective Date, the Trust may retain such third-party claims reviewers as the Trustee, the Trust Advisory Committee, and the Future Claimants' Representative deem appropriate to resolve all Trust Claims submitted to the Trust in accordance with the Trust Agreement and the Trust Distribution Procedures.

**10.11    Discharge of Liabilities to Holders of Trust Claims.**

The transfer to, vesting in, and assumption by the Trust of the Trust Assets, on or after the Effective Date, as contemplated by the Plan, and the occurrence of the Effective Date shall,

-31-

among other things, discharge all obligations and liabilities of all Asbestos Protected Parties for and in respect of all Trust Claims as of the Effective Date.

### 10.12  Payment of Trust Expenses.

As of the Effective Date, all liabilities for all Trust Expenses shall automatically, and without further act, deed or court order, be assumed by the Trust and resolved in accordance with the terms, provisions and procedures of the Trust Agreement and the Trust Distribution Procedures.  Neither the Debtor, Reorganized UGL, nor any other Asbestos Protected Party shall have any obligation to pay any Trust Expenses.

### 10.13  Indemnification by the Trust.

As and to the extent provided in the Trust Agreement, the Trust will indemnify and hold harmless each of (a) the Debtor and Reorganized UGL and their successors and assigns, in their capacities as such; and (b) the Released Parties.  In addition, the Trust will provide the Trustee and the Future Claimants' Representative with insurance that is usual and customary for those acting in a fiduciary capacity.

### 10.14  Medicare Obligations.

If and when necessary, the Trust shall implement procedures to comply with any and all obligations it may have to satisfy the requirements of the Medicare Secondary Payer Act (42 U.S.C. 1395y(b)) and Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 (42 U.S.C. 1395y(b)(8)).

### 10.15  Vesting of Causes of Action in the Trust.

Any and all claims, demands, rights and causes of action arising from or related to the Asbestos Insurance Rights shall vest with and in the Trust on the Effective Date as described in Sections 8.1 and 11.10 hereof.

### 10.16  Investment Policy.

Investment of monies held in the Trust shall be administered in the manner which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to any applicable limitations and provisions as set forth in the Trust Agreement.

## ARTICLE XI

## IMPLEMENTATION OF THE PLAN AND EFFECT OF CONFIRMATION

### 11.1  Generally.

On the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable it to implement the provisions of the Plan, including, without limitation, the creation of the Trust.  From and after the

-32-

Effective Date, Reorganized UGL shall be governed pursuant to the Amended Certificate of Incorporation and Amended Bylaws described below.

### 11.2 Transactions on the Effective Date.

(a)     On the Effective Date, the UGL Shareholders shall retain their Interests in the Debtor and Reorganized UGL, subject to the Pledge Agreement, and the following shall be deemed for all purposes to have occurred simultaneously:

> (i)     the making of the UGL Contribution and the UGL Shareholder Contribution to the Trust;
>
> (ii)     The security to be conveyed pursuant to the Pledge Agreement shall be effective;
>
> (iii)     The security to be conveyed pursuant to the security agreement granting a subordinated Lien on all assets of Reorganized UGL in favor of the Trust shall be effective;
>
> (iv)     the UGL Shareholders' Agreement dated March 4, 1987, shall be deemed to be amended solely to the extent necessary to permit the execution and delivery of the UGL Shareholder Promissory Note and the Pledge Agreement as set forth herein;
>
> (v)     the establishment of the Trust; and
>
> (vi)     the vesting in the Trust of the Trust Assets, as more fully described in, and subject to the conditions set forth in Article X of the Plan.

(b)     Distributions required to be made on the Effective Date shall be deemed actually made on the Effective Date if made either (a) on the Effective Date or (b) as soon thereafter as is reasonably practicable.

(c)     The UGL Shareholder Contribution shall be made in consideration for the releases and injunctions, including the Channeling Injunction, afforded the UGL Shareholders under the Plan and on account of the retention by the UGL Shareholders of their Interests in UGL and Reorganized UGL.

### 11.3 Funding for Plan Distributions.

The Debtor or Reorganized UGL shall fund its obligations under the Plan, including the payment of Administrative Expense Claims and Distributions on account of Allowed Claims (except for satisfaction of Class 4 and Class 5 Claims) with Cash on hand, including Cash from operations, the proceeds of the Exit Facility and up to $2.2 million from the UGL Shareholder Cash Contribution (which shall be used to fund Distributions to the holders of Allowed Class 3B Settled Asbestos Claims).

-33-

**11.4    Exit Facility.**

On the Effective Date, the Debtor shall be authorized without the need for any further corporate action or without any further action by the Debtor or Reorganized UGL, as applicable, to enter into the Exit Facility Agreement with the Exit Facility Lenders.  The Exit Facility Agreement shall provide for senior secured financing in the aggregate amount of $14 million consisting of a revolving loan and a term loan.  Reorganized UGL may use the Exit Facility to (a) fund its obligations under the Plan, (b) repay any existing senior debt; (c) pay fees and expenses associated with the Exit Facility, and (d) such other uses as permitted under the Exit Facility Agreement.

Confirmation of the Plan shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtor and/or Reorganized UGL in connection therewith) and authorization and direction for Reorganized UGL to enter into and execute the Exit Facility Agreement and such other documents as may be required to consummate the Exit Facility, subject to such modifications as the Debtor may deem to be reasonably necessary to consummate its entry into the Exit Facility.

**11.5    Amended Certificate of Incorporation and Bylaws.**

The Certificate of Incorporation and the Bylaws of UGL shall, as of the Effective Date, be deemed amended as necessary to effectuate the provisions of Section 1123(a)(6) of the Bankruptcy Code to prohibit the issuance of non-voting equity securities and to allow for the execution and delivery to the Trust of the Pledge Agreement.  Except as otherwise provided herein, such Amended Certificate of Incorporation and Amended Bylaws shall contain indemnification provisions applicable to the officers, directors and employees of Reorganized UGL and such other Entities as may be deemed appropriate in the discretion of Reorganized UGL.

**11.6    Reorganized UGL Stock.**

On the Effective Date, all of the issued and outstanding shares of Class A Voting and Class B Non-Voting stock of the Debtor shall be deemed to be Reorganized UGL Stock, specifically Class A Voting and Class B Non-Voting stock, respectively, as those classes existed prior to the Petition Date.

Except for payment of state and federal income and other applicable taxes as required under the UGL Shareholders' Agreement, no distribution shall be made to any UGL Shareholder on account of any stock in Reorganized UGL unless and until the UGL Promissory Note and the UGL Shareholder Promissory Note are paid in full.

**11.7    Effectuating Documents; Further Transactions.**

Any officer or director of the Debtor or Reorganized UGL, as the case may be, shall be, and hereby is, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of

the Plan. The Debtor's Secretary is hereby authorized to certify or attest to any of the foregoing, if necessary.

The Debtor and Reorganized UGL, and all other parties, including all holders of Claims entitled to receive Distributions under the Plan, shall execute any and all documents and instruments that must be executed under or in connection with the Plan in order to implement the terms of the Plan or to effectuate the Distributions under the Plan; *provided*, *however*, that such documents and instruments are reasonably acceptable to such party or parties.

### 11.8    Vesting of Reorganized UGL's Assets.

Pursuant to Section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Documents or the Confirmation Order, the property of the Estate (except for the UGL Contribution) shall vest in Reorganized UGL on the Effective Date free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity, except for Liens securing repayment of the Exit Facility and/or otherwise permitted under the Exit Facility Agreement, including the Liens securing the UGL Promissory Note. From and after the Effective Date, Reorganized UGL may operate its business and may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. Without limiting the generality of the foregoing, Reorganized UGL may, without application to, or approval by, the Bankruptcy Court, pay Professional fees and expenses that Reorganized UGL incurs after the Effective Date.

### 11.9    Title to Trust Assets.

On the Effective Date, title to all of the Trust Assets shall vest in the Trust free and clear of all Claims, Liens, Interests, Encumbrances and other interests of any Entity, subject to the provisions of Articles VIII and X above. The Trust shall be empowered and entitled to resolve Trust Claims in accordance with the Trust Distribution Procedures and the Trust Agreement.

### 11.10    Preservation of Certain Causes of Action; Defenses.

In accordance with Section 1123(b) of the Bankruptcy Code, Reorganized UGL, as successor in interest to the Debtor and its Estate, shall retain and may enforce any and all rights, claims, and Causes of Action accruing to or that are property of the Debtor or its Estate pursuant to the Bankruptcy Code or any statute or legal theory, including any Avoidance Action, any rights to, claims or Causes of Action for recovery under any policies of insurance issued to or on behalf of the Debtor, but not including any Asbestos Insurance Rights (except to the extent provided in Section 8.2 of the Plan), and any rights, claims, and Causes of Action against third parties related to or arising out of Allowed Claims, and Reorganized UGL shall retain and may enforce all defenses and counterclaims to all Claims asserted against the Debtor or its Estate, including, but not limited to, setoff, recoupment and any rights under Section 502(d) of the Bankruptcy Code. Reorganized UGL may pursue such claims, rights, or Causes of Action, as appropriate, in its sole and absolute discretion. **Notwithstanding anything in this Section 11.10 of the Plan to the contrary, neither the Debtor, Reorganized UGL, the Trust, the Creditors' Committee nor the Future Claimants' Representative shall have any rights to pursue any Avoidance Actions or Causes of Action against any of the UGL Shareholders. Nor shall the**

**Debtor, Reorganized UGL, the Creditors' Committee or the Future Claimants' Representative, as applicable, pursue any Avoidance Actions, any Causes of Action, or any other claim relating to any transfer made by or on behalf of the Debtor prior to the Petition Date in connection with, on account of, or attributable to a claim for personal injuries or wrongful death based on exposure to asbestos or an asbestos-containing product.**

Notwithstanding anything in this Section 11.10 to the contrary, but subject to Section 11.2 above, on the Effective Date all claims, demands, defenses, rights and Causes of Action of the Debtor and Reorganized UGL relating to Trust Claims and all Asbestos Insurance Rights shall be transferred and assigned to the Trust. Except as otherwise provided in this Section 11.10 of the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, the Trust shall retain and may enforce such claims, demands, defenses, rights and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Trust with respect to such Trust Claims, including, but not limited to, setoff, recoupment and any rights under Section 502(d) of the Bankruptcy Code; provided, however, that no such claims, demands, defenses, rights, Causes of Action, or counterclaims may be asserted against any Asbestos Protected Party, Settling Insurer, or any Released Party. The Trust shall be deemed to be the appointed representative to, and may, pursue, litigate, compromise and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

Except as expressly provided in the Plan, nothing in this Section 11.10, however, shall be deemed to be a transfer by the Debtor or Reorganized UGL to the Trust of any claims, demands, rights, Causes of Action, or defenses relating to assumed Executory Contracts (other than Asbestos Insurance Policies and Asbestos Insurance Settlement Agreements) or which otherwise are required by Reorganized UGL to conduct its business in the ordinary course subsequent to the Effective Date.

### 11.11 Terms of Injunction and Automatic Stay.

All of the injunctions and/or stays in existence immediately prior to the Confirmation Date, whether pursuant to Sections 105, 362 or any other provisions of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, shall remain in full force and effect until the Injunctions set forth in the Plan become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. In addition, from and after the Confirmation Date, the Debtor may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order. All actions of the type or nature of those to be enjoined by such Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

**11.12  No Successor Liability.**

Except as otherwise expressly provided in this Plan, neither the Debtor, Reorganized UGL, any Released Debtor Party, nor the Trust (except as it relates to Trust Claims) does, or shall be deemed to, assume, agree to perform, pay, or indemnify Creditors or have any responsibility whatsoever for any liabilities or obligations of the Debtor relating to or arising out of the operations of, or assets of, the Debtor, or resulting from actions, events, or circumstances occurring or existing prior to, on, or after the Effective Date.

**11.13  Dissolution of Creditors' Committee; Continuation of Future Claimants' Representative; Creation of the Trust Advisory Committee.**

On the Effective Date, the Creditors' Committee shall be dissolved automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that the Creditors' Committee shall have standing and capacity to:  (a) object to any proposed modification of the Plan; (b) object to or defend Administrative Expenses Claims of Professionals employed by or on behalf of the Estate; (c) participate in any appeals of the Confirmation Order; and (d) participate as a party in interest in any proceeding involving Section 524(g) of the Bankruptcy Code.  Reorganized UGL shall pay the reasonable fees and expenses incurred by the Creditors' Committee and the Future Claimants' Representative relating to any post-Effective Date activities authorized in this Section 11.13 (but only to the extent such fees and expenses are not Trust Expenses, provided, further that any portions of such fees and expenses that are Trust Expenses shall be paid as Trust Expenses in accordance with the Trust Agreement, with the remainder to be paid by the Debtor and/or Reorganized UGL).

As provided in Section 10.9 above, the Confirmation Order shall provide for the appointment of the Trust Advisory Committee, effective as of the Effective Date.  The Confirmation Order shall also provide that, from and after the Effective Date, the Future Claimants' Representative shall continue to serve as provided in the Plan and the Trust Agreement, to perform the functions specified and required therein.

Upon termination of the Trust:  (a) the members of the Trust Advisory Committee and the Future Claimants' Representative and their respective professionals shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with Trust Claims; and (b) the Trust Advisory Committee shall be deemed dissolved and the Future Claimants' Representative's employment shall be deemed terminated.

Except as expressly provided in this Section 11.13, all reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Trust Advisory Committee and the Future Claimants' Representative shall be paid exclusively by the Trust in accordance with the terms of the Trust Agreement, and Reorganized UGL shall not be liable for any such fees and expenses.  The parties shall attempt to resolve any dispute regarding the payment of such fees and expenses in good faith, and if they shall fail to resolve such dispute, they shall submit the dispute to the Bankruptcy Court for resolution.

# ARTICLE XII

## INJUNCTIONS, RELEASES AND DISCHARGE

### 12.1    Discharge.

Except as specifically provided in this Plan, the Confirmation Order or the Trust Documents, confirmation of the Plan shall discharge the Debtor and Reorganized UGL from any and all Claims (including Trust Claims and any Claim of a kind specified in Sections 502(g) 502(h) or 502(i) of the Bankruptcy Code), all Demands, and all Liens on, or interests in the assets and property of the Debtor or Reorganized UGL, based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature, that occurred, arose, or existed prior to the Effective Date, whether known or unknown, regardless of whether a Proof of Claim was filed, the Claim was Allowed, or the holder of such Claim or Demand voted on this Plan; provided, however, that nothing contained in this Section 12.1 shall be deemed to release and/or discharge (a) the Trust from making any distribution it is required to make to any holder of a Trust Claim pursuant to other provisions of this Plan or the Trust Documents; (b) UGL and/or Reorganized UGL from any indemnification and/or contribution obligations owed to the UGL Shareholders and/or any of the Debtor's former or current officers and/or directors as set forth in Section 12.8 below; (c) UGL, Reorganized UGL and/or the UGL Shareholders from making any and all payments due and owing under the UGL Promissory Note and the UGL Shareholder Promissory Note; and (d) UGL and/or Reorganized UGL from any indemnification obligations owed in connection with, arising under or related to the DIP Agreement and the Exit Facility.

Except as specifically provided for in the Plan to the contrary, as of the Effective Date the rights provided in the Plan shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including Trust Claims), Demands, Liens on, and interests in the assets and property of the Debtor, Reorganized UGL and/or the Trust. For the avoidance of doubt, with respect to a Settled Asbestos Claim, other than the Cash Distributions to the holders of such Claims in the amounts listed on Exhibit J to the Plan, to be made from the UGL Shareholder Cash Contribution on the Effective Date, neither the Debtor nor Reorganized UGL shall have any liability on account of such Claims. With respect to Trust Claims, the entry of the Channeling Injunction shall permanently and forever, stay, enjoin and restrain any Entity from taking any of the actions prohibited by the Channeling Injunction.

### 12.2    Discharge Injunction.

Except as specifically provided in the Plan, the Confirmation Order or the Plan Documents to the contrary, the release and discharge of debts by operation of law under Section 1141 of the Bankruptcy Code, set forth in Section 12.1 above, shall also act as a permanent injunction, prohibiting and enjoining: (a) the commencement or continuation in any manner of any action or other proceeding of any kind; (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order; (c) the creation, perfection, or enforcement of any Encumbrance of any kind; (d) the assertion of any right of setoff, subrogation, or recoupment of any kind; and (e) the pursuit of any Claim or Demand released pursuant to this Article XI of the Plan with respect to any Claim or Demand

-38-

against, or interest in, or obligation due from, the Debtor, Reorganized UGL, or the Trust by any Entity, and with respect to any cause of action, whether known or unknown, against any of the Asbestos Protected Parties based on the same subject matter as any Claim or Demand.

### 12.3 Exculpation.

Except as otherwise provided in this Plan or the Confirmation Order, none of the Released Parties shall have or incur any liability to any Entity (including any holder of a Claim or Interest) for any act or omission in connection with, related to, or arising out of: (a) the formulation, negotiation, preparation, dissemination, prosecution, confirmation, consummation, discussion, implementation or administration of the Plan, the Disclosure Statement, the Plan Documents, and/or any settlement, contract, release, or other agreement or document created or entered into in connection with the Chapter 11 Case or the Plan; (b) the property to be distributed under the Plan; or (c) any other action or omission in connection with, related to, or arising out of the administration of the Chapter 11 Case or this Plan, except for fraud or willful misconduct as determined by a Final Order, and, in all respects, the Released Parties shall be entitled to rely upon the good faith and informed advice of counsel with respect to their duties and responsibilities under the Plan and the Plan Documents. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct.

### 12.4 Releases.

(a) *By the Debtor, Reorganized UGL, and the Trust vis à vis the Released Parties.* As of the Effective Date, for good and valuable consideration, the Debtor, Reorganized UGL, the Trust and any Entity seeking to exercise the rights of the Estate, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall be deemed to forever release, waive and discharge the Released Parties of all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities and Causes of Action that the Debtor, Reorganized UGL, the Trust, or any other Entity seeking to exercise the rights of the Estate, are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the conduct of the Debtor's business, the Chapter 11 Case, this Plan or Reorganized UGL (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder); provided, however, that: (i) nothing contained herein (1) is intended to operate as a release of any potential Causes of Action based upon willful misconduct, (2) shall apply to obligations arising under the Exit Facility, including any indemnification obligations owed in connection with, arising under or related to the Exit Facility, or (3) shall apply to obligations in connection with, arising under or related to the DIP Agreement; and (ii) the foregoing release applies to the Released Parties solely in their respective capacities described herein.

Case 5:11-bk-02032-RNO   Doc 2190   Filed 12/08/14   Entered 12/08/14 13:45:12   Desc
Main Document      Page 125 of 302

**(b)** *By the Released Non-Debtor Parties vis à vis the Released Debtor Parties and the Trust.* As of the Effective Date, for good and valuable consideration, the Released Non-Debtor Parties and the Settling Insurer shall be deemed to forever release, waive and discharge the Released Debtor Parties and the Trust of and from all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities and causes of action that the Settling Insurer and/or Released Non-Debtor Parties are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the conduct of the Debtor's business, the Chapter 11 Case, this Plan or Reorganized UGL (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including any claims asserted, or which could have been asserted, by the Debtor, the Creditors' Committee, the Future Claimants' Representative, and any other party in the action against the UGL Shareholders and others contemplated by the Standing Motion, including the claims asserted in the draft complaint (as amended) filed in connection therewith; provided, however, that: (i) nothing contained herein (1) is intended to operate as a release of any potential Causes of Action based upon willful misconduct, or (2) shall apply to obligations arising under the Exit Facility; and (ii) the foregoing release applies to the Released Parties solely in their respective capacities described herein.

**(c)** *By Holders of Claims.* As of the Effective Date, for good and valuable consideration, any Entity who has accepted the Plan and/or who is entitled to receive any distribution pursuant to the Plan or the Trust Distribution Procedures shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities and causes of action whatsoever against the Released Parties and the Settling Insurers based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the conduct of the Debtor's business, the Chapter 11 Case, this Plan or Reorganized UGL (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, for the avoidance of doubt, any and all causes of action that an Asbestos Claimant, the Trust or the Future Claimants' Representative did commence or could have commenced against any officer or director of the Debtor (serving in such capacity) that is based upon or arising from any acts or omissions of such officer or director occurring prior to the Effective Date on account of a Trust Claim, to the fullest extent permitted under Section 524(e) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended); provided, however, that nothing contained herein is intended to operate as a release of (a) any potential claims based upon willful misconduct or (b) any claim by any federal, state or local authority under the Internal Revenue Code or other tax regulation or any applicable environmental or criminal laws. The foregoing release will be enforceable as a matter of contract law against any Entity who has accepted the Plan and/or who is entitled to receive any property or interest in property pursuant to the Plan or any distribution under the Trust Distribution Procedures.

Notwithstanding anything contained in this Section 12.4(c) to the contrary, nothing contained in this Plan shall discharge or release any claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities and causes of action held by

any of the Released Parties, the Trust or any holder of a Trust Claim against any Asbestos Insurance Company.

**12.5    Section 524(g) Channeling Injunction.**

In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge provided by Sections 1141(a) and 524(g) of the Bankruptcy Code and as described in this Article XII, and pursuant to the exercise of the legal and equitable jurisdiction as set forth in Sections 524(g) of the Bankruptcy Code and the Confirmation Order, all Asbestos Personal Injury Claims, Indirect Asbestos Personal Injury Claims and Demands shall be channeled to and resolved solely by the Trust.

Except as expressly provided for in the Plan and Plan Documents, the sole recourse of any Asbestos Claimant or Future Demand Holder with respect to any Trust Claim shall be against the Trust. Each such holder shall be and is hereby enjoined from taking legal action directed against the Debtor, Reorganized UGL, any Settling Insurers, or any other Asbestos Protected Party, or their respective property, for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to a Trust Claim.

Without limiting the foregoing, from and after the Effective Date, the Channeling Injunction shall apply to all Entities which have held or asserted, which hold or assert, or which may in the future hold or assert any Trust Claim against the Asbestos Protected Parties or the Settling Insurers, including, but not limited to, all Asbestos Claimants and all Future Demand Holders, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any such Trust Claims other than from the Trust in accordance with the Plan and the Channeling Injunction and pursuant to the Trust Agreement, including but not limited to:

> (i)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) with respect to any such Trust Claim in any forum against or affecting any Asbestos Protected Party or Settling Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer;

> (ii)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner with respect to any such Trust Claim, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party or Settling Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer;

-41-

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party or Settling Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer with respect to any such Trust Claim;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Asbestos Protected Party or Settling Insurer, or any property or interest in property of any Asbestos Protected Party or Settling Insurer with respect to any such Trust Claim, except as otherwise specifically provided in this Plan; and

(v) proceeding in any other manner with regard to any matter that is subject to resolution pursuant to the Trust Agreement with respect to any such Trust Claim, except in conformity and compliance with the Trust Distribution Procedures and, if applicable, any other Plan Documents.

Except as otherwise expressly provided in this Plan, nothing contained in this Section 12.5 of the Plan shall (i) constitute or be deemed a waiver of any claim, right, or cause of action that the Debtor, Reorganized UGL, or the Trust may have against any Entity in connection with or arising out of or related to any Trust Claim, or (ii) enjoin the Trust from enforcing the Asbestos Insurance Rights, including but not limited to, the assertion of any claim, debt, obligation, or liability for payment against an Asbestos Insurance Company to the extent that the coverage obligations of that insurer are not resolved in an Asbestos Insurance Settlement Agreement.

### 12.6    Non-Settling Insurers Injunction.

Notwithstanding anything to the contrary elsewhere in the Plan, all Entities, except the Trust, that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, obligation, suit, judgment, remedy, damage, demand, debt, right, liability or cause of action, against any Asbestos Insurance Company that is not a Settling Insurer, based on, relating to, arising out of, or in any way connected with any Trust Claim under any Asbestos Insurance Policy, including all claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action, including:

(a) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Insurance Company that is not a Settling Insurer;

-42-

(b)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Insurance Company that is not a Settling Insurer;

(c)     creating, perfecting, or otherwise enforcing, in any manner, directly or indirectly, any Encumbrance against any Asbestos Insurance Company that is not a Settling Insurer; and

(d)     asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Asbestos Insurance Company that is not a Settling Insurer, or against the property of any such Asbestos Insurance Company.

The Trust shall have the sole and exclusive authority at any time to terminate, reduce, or limit the scope of, the Non-Settling Insurers Injunction.  The Non-Settling Insurers Injunction is issued solely for the benefit of the Trust and is not issued for the benefit of any Asbestos Insurance Company that is not a Settling Insurer, and no Asbestos Insurance Company that is not a Settling Insurer is a third-party beneficiary of the Non-Settling Insurers Injunction.

For the avoidance of doubt, the Non-Settling Insurers Injunction shall not (a) constitute or be deemed a waiver of any claim, right, or cause of action that the Debtor, Reorganized UGL, or the Trust may have against any Entity in connection with or arising out of or related to any Trust Claim, (b) enjoin the rights of Entities to the treatment accorded them under this Plan, including the rights of Asbestos Claimants to assert their Trust Claims against the Trust in accordance with the Trust Distribution Procedures, or (c) enjoin the Trust from enforcing any Asbestos Insurance Rights, including, but not limited, to the right to assert any claim, debt, obligation, or liability for payment against an Asbestos Insurance Company to the extent that the coverage obligations of that insurer are not resolved in an Asbestos Insurance Settlement Agreement.

## 12.7    Limitations of Injunctions/Release Provisions.

The discharges, releases, injunctions and other provisions contained in this Plan, including those set forth in Sections 12.1, 12.2, 12.3, 12.4, 12.5 and 12.6, shall not serve to satisfy, discharge, release, or enjoin:

(a)     the rights of Entities to the treatment accorded to them under Articles III and IV of this Plan, as applicable, including the rights of Entities with Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims to assert such Claims or Demands against the Trust in accordance with the Trust Distribution Procedures;

(b)     the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Trust; and

(c)     claims by the Debtor, the Trust, and/or Reorganized UGL, pursuant to the terms of any Asbestos Insurance Settlement Agreement, including, without limitation, claims against a Settling Insurer concerning any obligation of such company not released in an Asbestos Insurance Settlement Agreement.

-43-

**12.8    Indemnification and Reimbursement Obligations.**

For purposes of this Plan, the obligations of the Debtor to indemnify and reimburse persons who are or were current or former shareholders, directors, officers, or employees of the Debtor against and for any obligations as provided in the Debtor's certificate of incorporation, bylaws, shareholders' agreement, applicable state law, or any other agreement, or any combination of the foregoing, including, without limitation, the UGL Shareholders' Agreement executed on March 4, 1987, as same may be amended, requiring the disbursement of dividends to shareholders to pay their federal and state tax obligations on an annual basis, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with Section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date. Such obligations shall be assumed by Reorganized UGL on the Effective Date. In furtherance of the foregoing, Reorganized UGL shall use its commercially reasonable efforts to maintain or procure insurance for the benefit of such shareholders, directors, officers, or employees at levels satisfactory to Reorganized UGL.

**12.9    Reduction of Insurance Judgments.**

Any right, claim or cause of action that an Asbestos Insurance Company may have under applicable non-bankruptcy law against any Settling Insurer, including, but not limited to, any contribution claim, shall be channeled to and become a right, claim or cause of action solely as an offset claim against the Trust and not against the Settling Insurer in question. Any such right, claim or cause of action to which an Asbestos Insurance Company may be entitled, if any, shall be solely a setoff against any recovery of the Trust from that non-settling Asbestos Insurance Company and under no circumstances shall that Asbestos Insurance Company receive an affirmative recovery of funds from the Trust or any other Asbestos Insurance Company for such right or cause of action. Any setoff in favor of an Asbestos Insurance Company shall not constitute a classified or unclassified Claim under the Plan and shall not be subject to or impaired by the Plan, except as provided in this Section. Instead, any such setoff shall be determined, calculated, and applied solely as a matter of applicable non-bankruptcy law without regard to the Plan (except as provided in this Section) or any bankruptcy law or decision. Notwithstanding anything in this Section 12.9 to the contrary, this Section 12.9 does not affect or limit any rights granted to a Settling Asbestos Insurance Company under the terms of any Asbestos Insurance Settlement Agreement or the obligations of any party to an Asbestos Insurance Settlement Agreement.

## ARTICLE XIII

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**13.1    Conditions Precedent to Confirmation of the Plan.**

Confirmation of the Plan shall not occur unless each of the following conditions, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article XII shall be effective, binding and enforceable, has been satisfied or waived, in

-44-

writing, by the Debtor, the Creditors' Committee and the Future Claimants' Representative acting jointly:

(a)     The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information in accordance with Section 1125 of the Bankruptcy Code;

(b)     The Confirmation Order, in form and substance reasonably acceptable to the Debtor, the Creditors' Committee, the Future Claimants' Representative, and the Exit Facility Lenders, shall have been entered by the Bankruptcy Court and accepted and affirmed by the District Court or issued by the District Court;

(c)     The Debtor shall have received binding commitments with respect to the Exit Facility on terms and conditions satisfactory to the Debtor;

(d)     At least two-thirds (2/3) in amount and at least seventy-five percent (75%) of those holders of Class 4 Claims actually voting on the Plan shall have voted to accept/vote in favor of the Plan as contemplated by Sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code;

(e)     The Trust is approved by the Bankruptcy Court and is subject to its continuing jurisdiction; and

(f)     The Confirmation Order shall, among other things:

(i)     decree that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(ii)    provide that, except with respect to obligations specifically preserved in the Plan, including, without limitation, Section 12.8 above, the Debtor is discharged effective on the Effective Date (in accordance with the Plan) from any Claims and Demands, and the Debtor's liability in respect thereof, whether reduced to judgment or contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, that arose from any agreement of the Debtor entered into or obligation of the Debtor incurred before the Effective Date, or from any conduct of the Debtor prior to the Effective Date, or whether such interest accrued before or after the Petition Date, is extinguished completely;

(iii)   provide for the Injunction, including the Channeling Injunction;

(iv)    provide that, as part of the UGL Contribution, the Debtor or Reorganized UGL is obligated to assign (or cause to be

-45-

assigned) the Asbestos Insurance Rights pursuant to Section 8.1 of the Plan;

(v) provide that, as part of the UGL Contribution, the Debtor is obligated to (a) deliver to the Trust the UGL Cash Contribution and the UGL Shareholder Cash Contribution (less the sum necessary to satisfy the Allowed Settled Asbestos Claims), (b) execute and deliver the UGL Promissory Note, and (c) execute and deliver any and all documents necessary to grant a Lien on the Debtor's assets, subordinate only to the Exit Facility Lenders' Lien, to secure repayment of the UGL Promissory Note;

(vi) provide that, as part of the UGL Shareholder Contribution, the UGL Shareholders are obligated, on or before the Effective Date, to (A) contribute Cash in the amount of $8.0 million to the Debtor and the Debtor is obligated to contribute such amount to the Trust (a portion of which shall be used to satisfy the Allowed Settled Asbestos Claims), (B) execute and deliver the UGL Shareholder Promissory Note, and (C) execute and deliver the Pledge Agreement;

(vii) provide that the UGL Shareholders shall retain their Interests;

(viii) provide that, subject to the limitations expressly set forth in Articles VIII and X of the Plan, all transfers of assets of the Debtor contemplated under the Plan shall be free and clear of all Claims, Liens and Encumbrances against or on such assets;

(ix) authorize the implementation of the Plan in accordance with its terms;

(x) decree that any transfers effected or entered into, or to be effected or entered into, under this Plan, including under the Exit Facility, shall be and are exempt under Section 1146(a) of the Bankruptcy Code from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(xi) approve in all respects the other settlements, transactions and agreements to be effected pursuant to the Plan, including, without limitation, the Trust Agreement, the Trust Distribution Procedures, the UGL Promissory Note, the UGL Shareholder Promissory Note, the Pledge Agreement and the other Trust Documents;

(xii) provide that all Executory Contracts assumed or assumed and assigned by the Debtor during the Chapter 11 Case or under

-46-

the Plan shall remain in full force and effect for the benefit of Reorganized UGL or the assignee thereof notwithstanding any provision in such contract or lease (including those provisions described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(xiii)  provide that the transfers of property by the Debtor to Reorganized UGL (A) are or will be legal, valid, and effective transfers of property, (B) vest or will vest Reorganized UGL with good title to such property, except as expressly provided in Section 11.8 of the Plan, (C) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (D) do not and will not subject Reorganized UGL to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws affecting or effecting successor or transferee liability;

(xiv)  approve the Exit Facility Agreement and authorize the Debtor and/or Reorganized UGL, as applicable, to execute, deliver and perform their obligations under the Exit Facility Agreement; and

(xv)  provide that Reorganized UGL shall continue to provide monthly and annual financial reporting to the Trust until such time as the UGL Promissory Note and the UGL Shareholder Promissory Note are paid in full.

(g)  The Bankruptcy Court shall have made findings of fact and conclusions of law, among others, in substantially the following form:

(i)  as of the Petition Date, the Debtor had been named as a defendant in personal injury, wrongful death actions, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(ii)  the Debtor is likely to be subject to substantial future demands for payment arising out of similar conduct or events that gave rise to Trust Claims which are addressed by the Channeling Injunction;

(iii)  the actual amounts, numbers and timing of future demands cannot be determined;

-47-

(iv) the Channeling Injunction and the Non-Settling Insurers Injunction shall be issued and implemented in accordance with the Plan and the Trust;

(v) the Plan does not provide for the liquidation of all or substantially all of the property of the Debtor, Reorganized UGL will continue in business, and confirmation of the Plan is not likely to be followed by the liquidation of Reorganized UGL or the need for further financial reorganization;

(vi) the Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(vii) the Trust, upon the Effective Date, shall assume the liabilities of the Debtor with respect to Trust Claims (subject to the limitations of Sections 10.3 and 12.5 of this Plan);

(viii) the Trust is to be funded by the Trust Contributions, including the Asbestos Insurance Rights;

(ix) the Trust, on the Effective Date, by the exercise of contingent rights granted under the Plan, and pursuant to the UGL Promissory Note, the UGL Shareholder Promissory Note, and the Pledge Agreement, would be entitled to own the majority of Reorganized UGL Stock in accordance with the terms of the Pledge Agreement;

(x) the Trust is to use its assets and income to pay valid Trust Claims;

(xi) pursuit of demands outside the procedures prescribed by the Plan and the Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Trust Claims;

(xii) the terms of the Channeling Injunction, including any provisions barring actions against third parties, are set forth in the Plan and the Disclosure Statement;

(xiii) the Plan separately classifies Class 4 Asbestos Personal Injury Claims, and Indirect Asbestos Personal Injury Claims, and at least two-thirds (2/3) in amount and at least seventy-five percent (75%) of the members in such Class that voted on the Plan have voted to accept/vote in favor of the Plan;

-48-

(xiv)    pursuant to the Trust Distribution Procedures, court order or otherwise, the Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Trust Claims or other comparable mechanisms, that provide reasonable assurance that the Trust will value, and be in a financial position to pay, similar Trust Claims in substantially the same manner;

(xv)     the Future Claimants' Representative was appointed by the Bankruptcy Court to protect the rights of persons who may, subsequent to the date of confirmation of the Debtor's Plan, assert "demands," as defined by Section 524(g) of the Bankruptcy Code, for personal injury or wrongful death from alleged exposure to asbestos and asbestos-containing products against the Debtor, which demands are subject to the Channeling Injunction;

(xvi)    in light of the benefits provided, or to be provided, to the Trust by or on behalf of each Asbestos Protected Party and each Settling Insurer, the Channeling Injunction and the Non-Settling Insurers Injunction are fair and equitable with respect to all Creditors and all Future Demand Holders that might subsequently assert Demands and shall be approved as part of this Plan;

(xvii)   the Plan and its acceptance otherwise comply with Sections 524(g) and 1126 of the Bankruptcy Code, and confirmation of the Plan is in the best interests of all Creditors;

(xviii)  the Trust will have the sole and exclusive authority as of the Effective Date to satisfy or defend against all Trust Claims;

(xix)    the Channeling Injunction and the Non-Settling Insurers Injunction are essential to the Plan and the Debtor's reorganization efforts;

(xx)     the UGL Shareholder Contribution constitutes a contribution of substantial assets to the Debtor, the Plan and the Debtor's reorganization, is essential to the feasibility of the Plan and the successful reorganization of the Debtor; constitutes actual and necessary new value to Reorganized UGL; and constitutes a sufficient basis upon which to provide the UGL Shareholders with the protections afforded to them under the Plan, Plan Documents and Confirmation Order;

(xxi) the terms and conditions of the UGL Promissory Note, the UGL Shareholder Promissory Note, the Pledge Agreement and any related documents are essential to the success and feasibility of the Plan. All such documents shall constitute legal, valid, binding and authorized obligations of the parties obligated thereunder, enforceable in accordance with their terms. On the Effective Date, all of the Liens and security interests granted in accordance with such documents shall be deemed approved and shall be legal, valid, binding and enforceable Liens on the collateral in accordance with the terms of each agreement;

(xxii) Reorganized UGL and the Trust to be established pursuant to the Plan are valid legal Entities separate and distinct from one another and each of Reorganized UGL and the Trust are not and may not in the future be held liable for any liability of the other Entity based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, including but not limited to fraudulent transfer or fraudulent conveyance claims under applicable state or federal law;

(xxiii) the Trust is a "qualified settlement fund" as defined in Treasury Regulation Section 1.468B-1 and shall be interpreted and administered in accordance with the rules governing such a fund and the regulations issued pursuant thereto;

(xxiv) the Exit Facility is approved, and the Debtor or Reorganized UGL, as applicable, are authorized to execute, deliver and perform their obligations under the Exit Facility Agreement with the Exit Facility Lender, upon terms and conditions substantially consistent with those contained in the Exit Facility Term Sheet, with such changes as may be agreed between the Debtor or Reorganized UGL, as applicable, and the Exit Facility Lenders, as necessary or appropriate to facilitate the funding of the Exit Facility in accordance with the Plan; and

(xxv) the Exit Facility Agreement and all documents relating thereto are approved and shall constitute legal, valid, binding and authorized obligations of the Debtor or Reorganized UGL, as applicable, enforceable in accordance with their terms, and the Exit Facility Lenders are authorized to file at any time and from time to time such financing statements indicating as the collateral all now existing or hereafter arising or acquired property and assets of Reorganized UGL as the Exit Facility

Lenders may require, together with any amendments or continuations with respect thereto.

**13.2    Conditions Precedent to the Effective Date of the Plan.**

Notwithstanding any other provision of this Plan or the Confirmation Order, the Effective Date of this Plan shall not occur unless and until each of the following conditions has been satisfied or, if applicable, waived:

      **(a)**    The Channeling Injunction and the Non-Settling Insurers Injunction shall be in full force and effect;

      **(b)**    The UGL Shareholders shall have made the UGL Shareholder Cash Contribution to the Debtor and/or Reorganized UGL;

      **(c)**    The Exit Facility Agreement shall be in form and substance reasonably acceptable to the Debtor, and to the extent that any of such documents contemplate execution by one or more Persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document and to the funding and credit of the Exit Facility thereunder shall have been satisfied or waived;

      **(d)**    All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

      **(e)**    All actions, documents, certificates and agreements necessary to implement the Plan, including the Plan Documents, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental agencies in accordance with applicable laws; and

      **(f)**    The Confirmation Order, as entered by the Bankruptcy Court and accepted and confirmed by the District Court or issued by the District Court, has become a Final Order without modification.

**13.3    Waiver of Conditions Precedent.**

To the fullest extent permitted by law, the conditions to Confirmation and the Effective Date set forth in this Article XIII may be waived or modified, in whole or in part, by the Debtor with the consent of the Creditors' Committee and the Future Claimants' Representative. Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

**13.4    Effect of Failure of the Effective Date of the Plan.**

      **(a)**    If the Effective Date of the Plan does not occur, and the Debtor, in consultation with the Creditors' Committee and the Future Claimants' Representative, determine it is appropriate, then upon notification submitted by the Debtor to the Bankruptcy Court:

(i) the Confirmation Order shall be vacated, reversed, or modified;

(ii) no Distributions under the Plan shall be made; and

(iii) the Debtor and all holders of Claims against and Interests in the Debtor shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred.

**(b)** If the Confirmation Order is vacated, modified or reversed pursuant to this Section 13.4 or otherwise, the Debtor, the Creditors' Committee and the Future Claimants' Representative shall negotiate in good faith to determine if they can agree upon a modified Plan acceptable to all such parties. If the parties are unable to do so within ninety (90) days from the date of such vacating, modification, or reversal of the Confirmation Order (which period may be extended by the agreement of the Debtor, the Creditors' Committee, and Future Claimants' Representative, filed with the Bankruptcy Court), then the following shall thereupon occur:

(i) the Trust shall immediately return the UGL Cash Contribution and the portion of the UGL Shareholder Cash Contribution transferred to the Trust to the Debtor and the UGL Promissory Note issued as part of the UGL Contribution shall immediately become null and void and unenforceable against the Debtor and/or Reorganized UGL;

(ii) the Debtor and/or Reorganized UGL shall return the UGL Shareholder Cash Contribution to the UGL Shareholders;

(iii) the UGL Shareholder Promissory Note and Pledge Agreement issued as part of the UGL Shareholder Contribution shall immediately become null and void and unenforceable against any UGL Shareholder;

(iv) the Trust shall immediately transfer all of its assets to the Debtor;

(v) all rights and interests relating to insurance previously transferred by the Debtor to the Trust shall immediately and automatically revert to the Debtor;

(vi) the Trust shall immediately thereafter be dissolved and its determinations with respect to any Trust Claim shall be deemed void;

(vii) the Asbestos Records shall be returned to the Debtor;

(viii) each of the injunctions and releases contained in the Plan or the Confirmation Order shall be deemed terminated; and

-52-

(ix)     nothing contained in the Plan and the Disclosure Statement shall:

(A) constitute a waiver or release of any Claims or Interests by, against, or in the Debtor or any other Entity;

(B) prejudice in any manner the rights of the Debtor, any holders of Claims against or Interests in the Debtor, or any other Entity in any other or further proceedings involving the Debtor; or

(C) constitute an admission, acknowledgement, offer or undertaking by the Debtor, any holders of Claims or any other Entity.

## ARTICLE XIV

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### 14.1     Modification and Amendments.

The Debtor with the consent of the Creditors' Committee and the Future Claimants' Representative may alter, amend, or modify the Plan or any schedules or exhibits thereto under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, provided, however, that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with Section 1125 of the Bankruptcy Code, to the extent necessary.   After the Confirmation Date and prior to "substantial consummation" (as such term is defined in Section 1101(2) of the Bankruptcy Code) of the Plan, Reorganized UGL may alter, amend or modify the Plan or any schedules or exhibits thereto in accordance with Section 1127(b) of the Bankruptcy Code by filing a motion on notice to the Bankruptcy Rule 2002 service list only, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by Bankruptcy Court, provided, however, that: (a) the Plan, as modified, altered, or amended, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code; and (b) the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under Section 1129 of the Bankruptcy Code, and finds that the circumstances warrant such modification.

### 14.2     Effect of Confirmation on Modification.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of votes on the Plan and prior to entry of the Confirmation Order are approved pursuant to Section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 14.3     Revocation or Withdrawal of the Plan.

The Debtor reserves the right to revoke and/or withdraw the Plan any time prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtor

revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by the Plan and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained herein shall: (i) be deemed to constitute a waiver or release of any Claims by or against, or Interests in, the Debtor, the Estate, or any other Entity; (ii) prejudice in any manner the rights of the Debtor, the Estate or any other Person in any further proceedings involving the Debtor; or (iii) be deemed an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity including with respect to the amount or allowability of any Claim or the value of any property of the Estate.

## ARTICLE XV

## JURISDICTION OF BANKRUPTCY COURT

### 15.1    Retention of Jurisdiction.

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall, to the fullest extent permitted by law, retain and have jurisdiction over all matters arising out of and related to the Chapter 11 Case and the Plan, including, among other things, jurisdiction to:

**(a)**    hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims that have been or properly should have been brought in the Bankruptcy Court (other than Trust Claims);

**(b)**    hear and determine any and all claims, causes of action, adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Trust, the Debtor and/or Reorganized UGL after the Effective Date, including any proceedings with respect to any Avoidance Actions (except to the extent that any such Avoidance Action has been released under the Plan or the Confirmation Order) or otherwise to recover assets for the benefit of the Estate or the Trust;

**(c)**    hear and determine all objections to the termination of the Trust;

**(d)**    hear and determine such other matters that may be set forth in or arise in connection with the Plan, the Confirmation Order, the Injunction, or the Trust Agreement;

**(e)**    hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Channeling Injunction;

**(f)**    hear and determine any conflict or other issues that may arise in the Chapter 11 Case and the administration of the Trust;

(g)     enter such orders as are necessary to implement and enforce the injunctions described herein, including, if necessary, in connection with application of the protections afforded by Section 524(g) of the Bankruptcy Code to the Asbestos Protected Parties;

(h)     hear and determine any and all applications pursuant to Section 330 or 503 of the Bankruptcy Code for allowance of any compensation for Professional services rendered and reimbursement of expenses incurred in connection therewith and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(i)     enter such orders authorizing non-material modifications to the Plan as may be necessary to comply with Section 468B of the Internal Revenue Code;

(j)     hear and determine any applications pending on the Effective Date for the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts to which the Debtor is a party, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(k)     consider any technical modifications of the Plan, and remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code; provided, however, that there shall be no modification made at any time that would reduce or eliminate any of the protections provided herein to the Asbestos Protected Parties;

(l)     issue orders in aid of confirmation, consummation and execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code, including but not limited to compelling the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(m)     hear and determine any proposed compromise and settlement of any claim against or cause of action by or against the Debtor that has been or properly should have been brought in the Bankruptcy Court;

(n)     hear and determine any objections to Administrative Expense Claims or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to Allow or Disallow any Disputed Claim, in whole or in part;

(o)     hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(p)     hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with the Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(q)     hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Entity's

obligations hereunder, including, but not limited to, performance of the Debtor's duties under the Plan;

        **(r)**      enforce remedies upon any default under the Plan;

        **(s)**      hear and determine any other matter not inconsistent with the Bankruptcy Code;

        **(t)**      hear and determine any claim that in any way challenges or is related to any provision in the Confirmation Order; and

        **(u)**      enter a final decree closing the Chapter 11 Case.

If and to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction over any of the matters specified above, the reference to the "Bankruptcy Court" in the preamble to this Section 15.1 shall be deemed to be a reference to the "District Court." Notwithstanding anything in this Section 15.1 to the contrary, the Trust Agreement and the Trust Distribution Procedures shall govern the satisfaction of Trust Claims and the forum in which Trust Claims shall be determined.

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

### 16.1    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or a schedule or exhibit hereto or instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the Commonwealth of Pennsylvania without giving effect to the principles of conflicts of law thereof.

### 16.2    Notices.

All notices, requests or demands to or upon the Debtor, the Future Claimants' Representative or the Creditors' Committee under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery services, all charges prepaid, and shall be deemed to have been given when received by the following parties:

-56-

If to the Debtor:

United Gilsonite Laboratories
c/o Thomas R. White
1396 Jefferson Avenue
P.O. Box 70
Scranton, PA 18509-2425

with a copy (which alone will not constitute notice) to:

Mark B. Conlan, Esq.
Karen A. Giannelli, Esq.
Frank J. Vecchione, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

If to the Future Claimants' Representative:

James L. Patton, Jr., Esq.
Young Conaway Stargatt & Taylor, LLP
Rodney Square
100 North King Street
Wilmington, DE 19801

with a copy (which alone will not constitute notice) to:

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
Rodney Square
100 North King Street
Wilmington, DE 19801

If to the Creditors' Committee:

Brian Fitzpatrick
Belluck & Fox LLP
546 Fifth Ave, 4th Floor
New York, NY 10036

with a copy (which alone will constitute notice) to:

Natalie D. Ramsey, Esq.
Laurie A. Krepto, Esq.
Montgomery, McCracken, Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109

### 16.3    Filing of Additional Documents.

Any and all exhibits, lists, or schedules referred to herein or in the Disclosure Statement but not Filed with the Plan shall be Filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to the deadline established by the Bankruptcy Court for the Filing and service of objections to the Plan. Thereafter, the Plan Documents will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours and at an internet site maintained for UGL by the Claims and Balloting Agent, with the web address set forth in the Disclosure Statement.

### 16.4    Controlling Documents.

In the event and to the extent that any provision of the Plan or the Trust Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Agreement, the provisions of the Confirmation Order shall control and take precedence.

### 16.5    Compromises of Controversies.

From and after the Effective Date, Reorganized UGL shall be authorized to compromise controversies not involving the Trust, or Trust Claims, on such terms as Reorganized UGL may determine, in its sole discretion, to be appropriate, without further order of the Bankruptcy Court.

### 16.6    Reservation of Rights.

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Chapter 11 Case are and shall be reserved in full. Any concessions or settlements reflected herein are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concession or settlement. Moreover, if the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including without limitation the representations made in the Plan, the Disclosure Statement or the Confirmation Order.

### 16.7    Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection herewith and Distributions under this Plan, the Debtor (if prior to or on the Effective Date) or Reorganized UGL (if after the Effective Date) shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements. Each holder of an Allowed Claims that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including, withholding and other tax obligations, on account of such

Distribution. Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

**16.8     Expedited Tax Determination.**

Reorganized UGL is authorized to request an expedited determination of taxes under Section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtor after the Petition Date through and including the Effective Date.

**16.9     No Waiver.**

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of any Person to object to any Claim for purposes of voting, the failure of any Person to object to a Claim prior to Confirmation or the Effective Date, the failure of any Person to assert a Cause of Action prior to Confirmation or the Effective Date, the absence of a Proof of Claim having been Filed with respect to a Claim, nor any action or inaction of any Person with respect to a Claim or Cause of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Estate or its successors or representatives, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to (a) object to or examine such Claim, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or enforce any Causes of Action.

**16.10     Tax Exemptions.**

Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities, or the execution, delivery or recording of an instrument of transfer on or after the Effective Date, including the transfer of all Trust Assets to the Trust shall be deemed to be made pursuant to and under the Plan, and shall not be taxed under any law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order and the Plan, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**16.11     Section 346 Injunction.**

In accordance with Section 346 of the Bankruptcy Code, for the purpose of any state and local law imposing a tax, income will not be realized by the Estate, the Debtor or Reorganized UGL by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state and local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtor or Reorganized UGL arising by reason of the forgiveness or discharged or indebtedness under the Plan.

### 16.12  Binding Effect of the Plan.

Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, subject to the occurrence of the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor, the Estate, the Trust and their respective successors or assigns, whether or not the Claim or Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not the holder has Filed a Claim.  The rights, benefits and obligations of any Person named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person (including, but not limited to, any trustee appointed for the Debtor under Chapters 7 or 11 of the Bankruptcy Code).  The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

### 16.13  Severability.

Upon the unanimous agreement of the Debtor or Reorganized UGL, as applicable, the Creditors' Committee, unless such committee has been dissolved, the Trust Advisory Committee but only if the Creditors' Committee has been dissolved, and the Future Claimants' Representative, any provision of the Plan, the Confirmation Order, the Channeling Injunction, or any of the exhibits to the Plan that is determined to be prohibited, unenforceable, or invalid by a court of competent jurisdiction or any other governmental Entity with appropriate jurisdiction may be deemed ineffective as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated to the extent of such prohibition, unenforceability, or invalidation, without invalidating the effectiveness of the remaining provisions of the Plan, the Plan Documents, the Confirmation Order, the Channeling Injunction and the exhibits to the Plan or affecting the validity or enforceability of such provision and such remaining provisions in any other jurisdiction, provided, however, that nothing contained herein shall be construed or interpreted to invalidate any provision of the Plan or the Confirmation Order which is required under Sections 524(g) and 1129 of the Bankruptcy Code.

### 16.14  Further Authorizations.

The Debtor and Reorganized UGL, as applicable, and, after the Effective Date, the Trust, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings as each deems necessary to carry out further the intentions and purposes of, and to give full effect to the provisions of, the Plan.

### 16.15  Payment of Statutory Fees.

All fees due and owing under 28 U.S.C. § 1930 of the United Stated Code shall be paid on or before the Effective Date.  Reorganized UGL shall pay all such fees that arise after the Effective Date but before the closing of the Chapter 11 Case.

**16.16   Effective Date Actions Simultaneous.**

Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. Actions required to be taken after the Effective Date or as soon thereafter as is reasonably practicable shall be deemed to have been made on the Effective Date.

**16.17   Effective Date Notice.**

Reorganized UGL shall file and serve a notice of the Effective Date shortly after the Effective Date.

Dated: September 30, 2014
Scranton, Pennsylvania

Respectfully submitted,

**UNITED GILSONITE LABORATORIES,**
Debtor and Debtor-in-Possession

By:  /s/ Thomas R. White_____

# EXHIBIT A

**List of Identified Asbestos Insurance Policies**

**EXHIBIT A**

**UNITED GILSONITE LABORATORIES**

**ASBESTOS INSURANCE POLICIES**

| Inception | Expiration | Insurer | Policy Number |
|---|---|---|---|
| 01/01/1972 | 01/01/1973 | Commercial Union Insurance Company | EP3407-04 |
| 01/01/1973 | 01/01/1974 | Commercial Union Insurance Company | CP203972 |
| 01/01/1974 | 01/01/1975 | Commercial Union Insurance Company | CP2066-02 |
| 03/28/1974 | 03/28/1975 | Aetna Casualty & Surety Company | 44XS1364WCA |
| 01/01/1975 | 01/01/1976 | Commercial Union Insurance Company | CPD111157 |
| 03/28/1975 | 03/28/1976 | Aetna Casualty & Surety Company | 44XS1643WCA |
| 01/01/1976 | 01/01/1977 | Commercial Union Insurance Company | CLCPD713360 |
| 12/31/1976 | 12/31/1977 | Pennsylvania Manufacturers' Association Insurance Company | 3076009146085 |
| 03/28/1976 | 03/28/1977 | Aetna Casualty & Surety Company | 044XS1896WCA |
| 03/28/1977 | 01/01/1978 | Aetna Casualty & Surety Company | 044XS2558WCA |
| 12/31/1977 | 12/31/1978 | Pennsylvania Manufacturers' Association Insurance Company | 3077009146085 |
| 01/01/1978 | 01/01/1979 | Aetna Casualty & Surety Company | 44XS3051WCA |
| 12/31/1978 | 12/31/1979 | Pennsylvania Manufacturers' Association Insurance Company | 3078009146085 |
| 01/01/1979 | 01/01/1980 | Aetna Casualty & Surety Company | 44XS3875 WCA |
| 12/31/1979 | 12/31/1980 | Pennsylvania Manufacturers' Association Insurance Company | 3079009146085 |
| 01/01/1980 | 01/01/1981 | Hartford Accident and Indemnity Company | 10HU467159 |
| 12/31/1980 | 12/31/1981 | Pennsylvania Manufacturers' Association Insurance Company | 3080009146085 |
| 01/01/1981 | 12/31/1981 | Hartford Accident and Indemnity Company | 10HU468460 |
| 12/31/1981 | 12/31/1982 | Fireman's Fund Insurance Company | 294LA3087812 |
| 12/31/1981 | 12/31/1982 | Hudson Insurance Company | HN00060 |
| 12/31/1982 | 12/31/1983 | Fireman's Fund Insurance Company | LA3248914 |
| 12/31/1982 | 02/28/1983 | Hudson Insurance Company | HN00197 |
| 02/28/1983 | 12/31/1983 | Twin City Fire Insurance Company | TXU107075 |
| 12/31/1983 | 12/31/1984 | Pennsylvania Manufacturers' Association Insurance Company | 3083009146085 |
| 12/31/1983 | 12/31/1984 | Twin City Fire Insurance Company | 98TXU110720 |
| 12/31/1984 | 12/31/1985 | Pennsylvania Manufacturers' Association Insurance Company | 3084009146085 |
| 12/31/1985 | 12/31/1986 | Pennsylvania Manufacturers' Association Insurance Company | 3085009146085 |
| 12/31/1986 | 12/31/1987 | Pennsylvania Manufacturers' Association Insurance Company | 3086009146085 |

**Amended**

# EXHIBIT B

**Settling Insurer and Asbestos Insurance Settlement Agreements**

# Amended Exhibit B

## Settling Insurer and Asbestos Insurance Settlement Agreements

| Settling Insurer[1] | Asbestos Insurance Settlement Agreement |
|---|---|
| Hartford Releasees (as that term is defined in the Settlement Agreement and Release [D.I. 2110]) | Settlement Agreement and Release [D.I. 2110] |
| Pennsylvania Manufacturers' Association Insurance Company | Settlement Agreement and Mutual Release Between UGL and OneBeacon [D.I. 2111]] |
| Hudson Insurance Company | Settlement Agreement and Mutual Release Between UGL and Hudson [D.I. 2118] |
| Fireman's Fund Insurance Company | Settlement Agreement and Mutual Release Between UGL and Fireman's Fund [D.I. 2125] |
| OneBeacon American Insurance Company, f/k/a Commercial Union Insurance Company, as itself and as successor-in-interest to Employers Liability Assurance Company | Settlement Agreement and Mutual Release Between UGL and OneBeacon [D.I. 2128] |
| Travelers Casualty & Surety Company, as itself and as successor-in-interest to Aetna Casualty & Surety Company | Settlement Agreement and Mutual Release Between UGL and Travelers [D.I. 2150] |

---

[1] A Settling Insurer designation is tentative and is subject to satisfaction of all conditions to the relevant Asbestos Insurance Settlement Agreement becoming final and effective, including among other things the execution and approval by final order of the relevant Asbestos Insurance Settlement Agreement.

# EXHIBIT C

**List of Non-Asbestos Insurance Policies**

# EXHIBIT C

## UNITED GILSONITE LABORATORIES

## NON-ASBESTOS INSURANCE POLICIES

| Inception | Expiration | Insurer | Policy Number |
|---|---|---|---|
| 12/31/1984 | 12/31/1985 | International Insurance Company | 5234131467 |
| 12/31/1987 | 12/31/1988 | Pennsylvania Manufacturers' Association Insurance Company | 3087009146085 |
| 12/31/1988 | 12/31/1989 | Pennsylvania Manufacturers' Association Insurance Company | 3088009146085 |
| 12/31/1989 | 12/31/1990 | Pennsylvania Manufacturers' Association Insurance Company | 3089009146085 |
| 12/31/1990 | 12/31/1991 | Pennsylvania Manufacturers' Association Insurance Company | 3090009146085 |
| 12/31/1991 | 12/31/1992 | Pennsylvania Manufacturers' Association Insurance Company | 3091009146085 |
| 12/31/1992 | 12/31/1993 | Pennsylvania Manufacturers' Association Insurance Company | 3092009146085 |
| 12/31/1993 | 12/31/1994 | Aetna Casualty & Surety Company | 074ACM5811952 |
| 01/06/1994 | 12/31/1994 | National Union Fire Insurance Company of Pittsburgh, PA | BE3087514 |
| 12/31/1994 | 12/31/1995 | Aetna Casualty & Surety Company | 074ACM5886730 |
| 12/31/1994 | 12/31/1995 | National Union Fire Insurance Company of Pittsburgh, PA | BE3097816 |
| 12/31/1995 | 12/31/1996 | Aetna Casualty & Surety Company | 074ACM25089343 |
| 12/31/1995 | 12/31/1996 | National Union Fire Insurance Company of Pittsburgh, PA | BE9321057 |
| 12/31/1996 | 12/31/1997 | Diamond State Insurance Company | L7110888 |
| 12/31/1996 | 12/31/1997 | Diamond State Insurance Company | CU36673 |
| 12/31/1997 | 12/31/1998 | Diamond State Insurance Company | L7116552 |
| 12/31/1997 | 12/31/1998 | Diamond State Insurance Company | CU36717 |
| 12/31/1998 | 12/31/1999 | Diamond State Insurance Company | L7125655 |
| 12/31/1998 | 12/31/1999 | Diamond State Insurance Company | CU37091 |
| 12/31/1999 | 12/31/2000 | Hallmark Insurance Company | L7142753 |
| 12/31/1999 | 12/31/2000 | Hallmark Insurance Company | CU37168 |
| 12/31/2000 | 12/31/2001 | Diamond State Insurance Company | L7142819 |
| 12/31/2000 | 12/31/2001 | Diamond State Insurance Company | CU61889 |
| 12/31/2001 | 12/31/2002 | United National Specialty Insurance Co. | L7151430 |
| 12/31/2001 | 12/31/2002 | Diamond State Insurance Company | CU67420 |
| 12/31/2002 | 12/31/2003 | Gulf Underwriters Insurance Company | GU2827352 |
| 12/31/2002 | 12/31/2003 | Arch Specialty Insurance Company | 12ULP1331700 |
| 12/31/2003 | 12/31/2004 | Admiral Insurance Company | CA00000265001 |
| 12/31/2003 | 12/31/2004 | Arch Specialty Insurance Company | 12ULP1331701 |
| 12/31/2004 | 12/31/2005 | Admiral Insurance Company | CA00000265002 |
| 12/31/2004 | 12/31/2005 | Arch Specialty Insurance Company | ULP000353800 |
| 12/31/2005 | 12/31/2006 | Admiral Insurance Company | CA00000265003 |
| 12/31/2005 | 12/31/2006 | Arch Specialty Insurance Company | ULP000353801 |
| 12/31/2006 | 12/31/2007 | Admiral Insurance Company | CA00000265004 |
| 12/31/2006 | 12/31/2007 | Arch Specialty Insurance Company | ULP000353802 |
| 12/31/2007 | 12/31/2008 | Admiral Insurance Company | CA00000265005 |
| 12/31/2007 | 12/31/2008 | Arch Specialty Insurance Company | ULP000353803 |
| 12/31/2008 | 12/31/2009 | Admiral Insurance Company | CA00000265006 |

**EXHIBIT C**

**UNITED GILSONITE LABORATORIES**

**NON-ASBESTOS INSURANCE POLICIES**

| Inception | Expiration | Insurer | Policy Number |
|-----------|-----------|---------|---------------|
| 12/31/2008 | 12/31/2009 | Arch Specialty Insurance Company | ULP000353804 |
| 12/31/2009 | 12/31/2010 | Chartis Specialty Insurance Company | EG14523599 |
| 12/31/2009 | 12/31/2010 | Chartis Specialty Insurance Company | EGU14542496 |
| 12/31/2010 | 12/31/2011 | Chartis Specialty Insurance Company | EG14523599 |
| 12/31/2010 | 12/31/2011 | Chartis Specialty Insurance Company | EGU14542496 |
| 12/31/2011 | 12/31/2012 | Chartis Specialty Insurance Company | EG14523599 |
| 12/31/2011 | 12/31/2012 | Chartis Specialty Insurance Company | EGU14542496 |
| 12/31/2012 | 12/31/2013 | Chartis Specialty Insurance Company | EG14523599 |
| 12/31/2012 | 12/31/2013 | Chartis Specialty Insurance Company | EGU14542496 |
| 12/31/2013 | 12/31/2014 | AIG Specialty Insurance Company | EG14523599 |
| 12/31/2013 | 12/31/2014 | AIG Specialty Insurance Company | EGU14542496 |

This list is not exhaustive and includes only known liability policies issued to the Debtor that were not listed on Exhibit A.  Policies issued to the Debtor that did not provide general liability coverage were not included on this Exhibit C.

# EXHIBIT D

**Form of Pledge Agreement**

**SUBJECT TO FURTHER NEGOTIATION AMONG THE PARTIES AND FINAL APPROVALS BY THE SIGNATORIES THERETO.**

# PLEDGE AND SECURITY AGREEMENT

**dated as of _____, 2014**

**among**

**The Parties Identified on Schedule A Annexed**

**and**

**United Gilsonite Laboratories, a Pennsylvania corporation**

**and**

**United Gilsonite Laboratories Asbestos Personal Injury Trust**

PLEDGE AND SECURITY AGREEMENT dated as of _____, 2014 (this "Agreement") among the parties identified on Schedule A annexed hereto (the "Pledgors"), United Gilsonite Laboratories, a Pennsylvania corporation (together with the successors and assigns thereof, "UGL" or "Obligor"), and United Gilsonite Laboratories Asbestos Personal Injury Trust, a Delaware statutory trust (together with the successors and assigns thereof, the "Secured Party", and together with the Pledgors and UGL, the "Parties").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Pledgors have agreed to pledge and grant a security interest in the Collateral (as defined below) as security for the Obligations (as defined below).

Accordingly, the Parties, intending to be legally bound, herein agree as follows:

**Section 1.**    **Definitions.**

(a)    As used in this Agreement, the terms defined in the preamble hereto have the meanings ascribed therein and the following terms have the meanings ascribed below:

*"Collateral"* means Pledgors' right and title to, and interest in, the Pledged Interests (as defined below), whether now owned or hereafter acquired and whether now existing or hereafter coming into existence.

*"Collateral Event"* has the meaning assigned to such term in Section 5.05.

*"Effective Date"* shall have the meaning ascribed to such term in the Plan.

*"Notes"* means the UGL Promissory Note and the UGL Shareholders' Promissory Note.

*"Obligations"* means any and all principal and other amounts now or hereafter from time to time owing (i) by the Obligor under the UGL Promissory Note ("UGL Obligations"); and (ii) by the Pledgors under the UGL Shareholders' Promissory Note ("Pledgor Obligations").

*"Plan"* means the First Amended Plan of Reorganization of United Gilsonite Laboratories Under Chapter 11 of the Bankruptcy Code, as amended from time to time.

*"Pledged Interests"* means 100% of the equity interests in UGL at all times while any Obligations are outstanding.

*"Proceeds"* has the meaning assigned to such term in the UCC.

*"UCC"* means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania.

*"UGL Shareholders' Agreement"* means that certain Shareholders' Agreement dated March 4, 1987 by and among UGL and the Pledgors as amended from time to time.

*"UGL Promissory Note"* means that certain promissory note delivered by the Obligor to the Secured Party on the Effective Date, as amended or modified from time to time, in the

original principal amount of $7.25 million, payable in quarterly installments over twenty years from the Effective Date in accordance with the terms therein.

"*UGL Shareholders' Promissory Note*" means that certain promissory note delivered by the Pledgors to the Secured Party on the Effective Date, as amended or modified from time to time, in the principal amount of $375,000, payable on the second anniversary of the Effective Date.

In addition, for all purposes hereof, capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms (i) in the Notes; and (ii) if not defined therein, in the UCC.

(b)     The foregoing definitions shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time, amended, restated, supplemented, or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or therein), (ii) references to any law, constitution, statute, treaty, regulation, rule, or ordinance (each a "law") shall refer to that law as amended from time to time and include any successor law, (iii) any reference herein to any person shall be construed to include such person's successors and permitted assigns, (iv) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (v) all references herein to Sections shall be construed to refer to sections of this Agreement, and (vi) the disjunctive shall include the conjunctive.

**Section 2.     <u>Representations and Warranties</u>.** Each of the Pledgors and Obligor, severally, as to itself, represents and warrants to the Secured Party that:

(a)     The Pledgors are the sole beneficial owners of the Collateral in the respective percentage amounts of issued and outstanding shares of stock of UGL as set forth on <u>Schedule A</u> hereto, and no lien, pledge, mortgage, hypothecation, charge, encumbrance, or any security interest exists upon such Collateral other than the liens created hereby.

(b)     The security interest created hereby constitutes a valid and, upon delivery of the certificates representing the Pledged Interests to the Secured Party, perfected first lien security interest in the Collateral, and such perfected security interest in such Collateral is subject to no equal or higher priority lien, security interest, charge or encumbrance.

(c)     As of the date hereof, the exact name and address of the Pledgors are as set forth on <u>Schedule A</u> hereto.

(d)     The execution, delivery, and performance of this Agreement by all of the Pledgors and the Obligor have been, and remain, duly authorized by all necessary action on the part of the Pledgors and the Obligor and do not result in a contravention by the Pledgors or the

3693489y11

Obligor of any provision of law, nor do they result in a breach of any contractual obligation under any agreement to which such Pledgor or the Obligor is a party.

(e)    All consents, authorizations, and approvals of, and registrations and declarations with, any governmental authority necessary for the due execution, delivery, and performance of this Agreement by the Pledgors and the Obligor have been obtained or will, substantially simultaneously with the Effective Date, be obtained and will remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority is required to be made or obtained by the Pledgors or the Obligor in connection with the execution, delivery, or performance of this Agreement by the Pledgors or the Obligor.

(f)    This Agreement constitutes the legal, valid, and binding obligation of the Pledgors and the Obligor enforceable against the Pledgors and the Obligor in accordance with its terms, subject as to enforcement, to bankruptcy, insolvency, reorganization, and other laws of general applicability relating to or affecting creditors' rights, and to general equity principles.

**Section 3.    Covenants.**  The Pledgors and Obligor covenant to the Secured Party that:

(a)    A Pledgor shall notify the Secured Party of any change in address for such Pledgor pursuant to Section 6.01 hereof.

(b)    (i)    The Pledged Interests acquired after the date hereof by the Pledgors and in which a security interest is created hereunder will be duly authorized, validly issued, fully paid, and nonassessable.

(ii)    The Pledged Interests, at all times while any Obligations are outstanding, shall constitute 100% of the equity interests in UGL (whether or not registered in the name of the Pledgors), whether certificated or uncertificated.

(iii)    UGL shall not issue, and the Pledgors shall not vote for the issuance of, any additional equity interests in UGL, including warrants, option, and instruments convertible into equity interests in UGL, without the prior written consent of the Secured Party.

(iv)    The Pledgors shall not transfer all or any portion of the Pledged Interests, or permit to exist any pledge, lien, charge, encumbrance or security interest whatsoever with respect to the Pledged Interests (other than the liens created hereby), without the prior written consent of the Secured Party, except for transfers of existing equity interests in Obligor to (1) another Pledgor, (2) any immediate family members of a Pledgor, or (3) existing or newly created trusts for the benefit of any Pledgor or any member of such Pledgor's immediate family, in each case provided that such transferee becomes a party to this Pledge Agreement.

(c)    The Pledgors and the Obligor shall indemnify, defend, and hold harmless the Secured Party from and against any and all claims, losses, and liabilities resulting from any breach by any of the Pledgors or the Obligor of the representations, warranties, and covenants under this Agreement.

3693489v11

(d)     The Obligor shall provide an annual budget for the succeeding twelve-month period to the Secured Party no later than thirty (30) days before the end of Obligor's fiscal year.

(e)     The Pledgors and the Obligor hereby consent and agree that Secured Party may at any time or from time to time pursuant to the Notes (i) extend or change the time of payment and/or the manner, place or terms of payment of any and all Obligations, (ii) supplement, amend, restate, supersede, or replace the Notes, (iii) renew, extend, or modify the Notes, (iv) settle, compromise or grant releases for any Obligations and/or any person or persons liable for payment of any Obligations, (v) exchange, release, surrender, sell, subordinate or compromise any Collateral of any party now or hereafter securing any of the Obligations and (vi) apply any and all payments received from any source by the Secured Party at any time against the Obligations in any order as the Secured Party may determine (except that payments received on account of any Pledgor or from collateral pledged by Pledgors must be applied first to Pledgor Obligations, and Secured Party may not apply payments received on account of UGL or from collateral pledged by UGL to Pledgor Obligations); all of the foregoing in such manner and upon such terms as the Secured Party may determine and without notice to or further consent from the Pledgors and without impairing or modifying the terms and conditions of this Agreement which shall remain in full force and effect.

**Section 4.     Grant of Security Interest.**  As security for the prompt payment in full when due (whether at stated maturity, by acceleration, or otherwise) of the Obligations, whether now existing or hereafter from time to time arising, the Pledgors hereby pledge, assign, hypothecate, deliver, set over to and grant a first priority security interest to the Secured Party, of all of the Pledgors' right, title, and interest in and to all of the Collateral.

**Section 5.     Further Assurances; Collateral Event; Remedies.**  In furtherance of the pledge and grant of security interest pursuant to Section 4, the Pledgors agree with the Secured Party as follows:

**5.01    Delivery and Other Perfection.**  The Pledgors shall:

(a)     deliver on the date hereof to the Secured Party all certificated Pledged Interests that constitute Collateral, endorsed and/or accompanied by such properly executed instruments of assignment and transfer in such form and substance as the Secured Party may reasonably request, including, without limitation, one or more duly executed stock powers;

(b)     give, execute, deliver, file, record, authorize, or obtain all such financing statements, notices, instructions, memoranda, acknowledgements, instruments, agreements, consents, or other documents as may be necessary in the reasonable judgment of the Secured Party to create, preserve, perfect, or validate the security interest granted pursuant hereto or to enable the Secured Party to exercise and enforce the Secured Party's rights hereunder, under the UCC or under other applicable law with respect to such security interest, including, after the occurrence of a Collateral Event (as hereafter defined) and after all applicable notices and lapse of applicable grace periods, causing any or all of the Pledged Interests that constitute Collateral to be transferred of record into the name of the Secured Party or the Secured Party's nominee; and

-4-

(c)     take such other action as the Secured Party shall reasonably deem necessary to acquire a first priority, perfected lien on the Collateral under the UCC.  The Pledgors shall not permit any other liens on the Collateral.

**5.02     Financing Statement.**  The Pledgors hereby authorize the Secured Party to file one or more financing statements in respect of the Pledgors as debtors in such filing offices in such jurisdictions with which such a filing is (a) required to perfect the security interest granted hereunder by the Pledgors or (b) reasonably desirable (in the Secured Party's sole discretion) to give notice of the security interest granted hereunder by the Pledgors.

**5.03     Other Financing Statements and Control.**  The Pledgors shall not, without the prior written consent of the Secured Party, (a) authorize the filing in any jurisdiction of any financing statement or like instrument with respect to the Collateral in which the Secured Party is not named as the sole secured party; or (b) cause or permit any person other than the Secured Party to acquire "control" (as defined in Section 8-106 of the UCC or as otherwise construed for purposes of Article 8 or 9 of the UCC) over the Collateral.

**5.04     Special Provisions Relating to Pledged Interests.**

(a)     Without limiting or otherwise affecting the security interest granted under Section 4, the Pledgors will, at all times, cause such security interest to be a perfected first priority security interest on no less than 100% of the equity interests in UGL at all times.

(b)     So long as no Collateral Event (as hereafter defined) shall have occurred, the Pledgors shall have the right to exercise all voting, consensual, and other powers of ownership pertaining to the Pledged Interests, and the Secured Party shall execute and deliver to the Pledgors or cause to be executed and delivered to the Pledgors all such proxies, powers of attorney, and all such instruments, without recourse, as the Pledgors may reasonably request for the purpose of enabling the Pledgors to exercise the rights and powers that a Pledgor is entitled to exercise pursuant to this Section 5.04(b).  From and after the occurrence of any Collateral Event (as hereafter defined), the Secured Party shall have the right to exercise all voting, consensual and other powers of ownership pertaining to the Pledged Interests.

(c)     In accordance with the Plan, except for payment of state and federal income taxes, no dividends or other distributions shall be made to any Pledgor in respect of the Pledged Interests unless and until the Obligations are paid in full.  In no event shall distributions to any shareholder of UGL for state and federal income taxes exceed forty percent (40%) of the amount of taxable income estimated by Obligor on a quarterly basis based on its internal quarterly financial statements. Prior to March 31 of each year, UGL will make a final determination of its taxable income for the preceding calendar year ("Taxable Income").  In the event that aggregate tax distributions made to the shareholders of UGL with respect to the prior year's estimated income is less than 40% of Taxable Income, UGL shall promptly make a cash distribution to the shareholders of UGL in an amount equal to such deficiency.  In the event that aggregate tax distributions made to the shareholders of UGL with respect to the prior year's estimated income exceeds 40% of Taxable Income, the next quarterly tax distribution to be made to the shareholders of UGL shall be reduced by such excess amount.

(d)     If any Collateral Event shall have occurred, (i) all dividends and other distributions in respect of the Pledged Interests shall be paid or distributed directly to the Secured Party, (ii) if the Secured Party shall so request in writing, the Pledgors agree to execute and deliver to the Secured Party appropriate additional dividend, distribution and other orders and documents to that end, and (iii) if any dividends or other distributions on the Pledged Interests shall be paid or distributed to, or otherwise received by, the Pledgors, the Pledgors shall hold such dividends or distributions in trust for the benefit of the Secured Party and shall pay over any such dividends or distributions to the Secured Party within three (3) Business Days after receipt thereof by the Pledgors.

**5.05     Collateral Events.**  A Collateral Event shall exist if any of the following shall have occurred:

(a)     Any material representation or warranty made under this Agreement shall prove to have been incorrect in any material respect on or as of the date made; or

(b)     An Event of Default as defined in the UGL Promissory Note shall have occurred; or

(c)     An Event of Default as defined in the UGL Shareholder Note shall have occurred.

**5.06     Remedies Upon a Collateral Event.**  If at any time a Collateral Event shall have occurred:

(a)     The Secured Party may cause the Pledged Interests to be registered, and the Obligor shall register, in the Secured Party's name and thereafter the Secured Party shall have all right, title, and interest in the Pledged Interests, including without limitation, any voting rights to elect or remove the directors of UGL;

(b)     the Secured Party shall have all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by applicable law, to exercise all voting, consensual, and other powers of ownership pertaining to the Collateral as if the Secured Party was the sole and absolute owner thereof (and the Pledgors agree to take all such action as may be appropriate to give effect to such right);

(c)     the Secured Party may, upon at least ten (10) Business Days prior written notice to the Pledgors of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party, sell, assign or otherwise dispose of all or any part of such Collateral at such place or places as the Secured Party deems best and for cash or for credit or for future delivery (without the Secured Party thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived), and the Secured Party or anyone else may be the purchaser, assignee or recipient of any or all of the Collateral so

-6-

disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of the Pledgors, any such demand, notice and right or equity being hereby expressly waived and released. The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place in which the sale may be so adjourned; and

(d)     To the extent the cooperation of the Pledgors is necessary to permit the Secured Party to exercise all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, the Pledgors hereby consent to and grant to the Secured Party an irrevocable power of attorney that shall be coupled with an interest to allow the Secured Party to exercise such rights as set forth herein.

The Pledgors recognize that, by reason of certain prohibitions contained in the Securities Act of 1933 and applicable state securities laws, the Secured Party may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgors acknowledge that any such private sales may be at prices and on terms less favorable to the Secured Party than those obtainable through a public sale without such restrictions and, notwithstanding such circumstances, agree that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit UGL, as issuer thereof, to register any Collateral for public sale.

**5.07     Deficiency; Recourse Against Obligor and Pledgors.**  If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to Section 5.06 are insufficient to cover the costs and expenses of such realization and the payment in full of the Obligations, the Obligor shall remain liable for any deficiency for the UGL Obligations, and the Pledgors shall remain liable for any deficiency for the Pledgor Obligations.

**5.08     Application of Proceeds.**  Upon the occurrence of a Collateral Event, the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied by the Secured Party in the following order of priorities:

(a)     to payment of the Secured Party's expenses of such sale or other realization, and then ratably to pay any other unreimbursed expenses for which the Secured Party is to be reimbursed pursuant to the Notes;

(b)     to the ratable payment of unpaid interest on the Obligations;

(c)     to the ratable payment of unpaid principal of the Obligations;

-7-

(d)    to the ratable payment of all other Obligations, until all Obligations shall have been paid in full; and

(e)    to payment to the Pledgors or their successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

The Secured Party may make distributions hereunder in cash or in kind or, on a ratable basis, in any combination thereof.

**5.09    No Marshalling.**  Upon the occurrence of any Collateral Event, the Secured Party shall not be required to marshal the order of its enforcement of its security interest in any part of the Collateral Event for the benefit of any person.

**Section 6.    Certain Tax Matters**.

**6.01.    S Corporation Status**.  The Parties acknowledge that UGL is an S corporation within the meaning of Internal Revenue Code ("IRC") Sections 1361 and 1362 (an "S corporation").  The Pledgors as shareholders shall not revoke UGL's election to be taxed as an S corporation, and Pledgors shall not take or permit any action to be taken that would result in the termination of UGL's status as a validly electing S corporation.

**6.02.    Section 338(h)(10) Election.**  Upon any transaction with respect to the shares that is treated for tax purposes as a sale of the shares, at Secured Party's request or any buyer's request, UGL and each Pledgor shall join with any buyer in making an election under IRC Section 338(h)(10) (and any corresponding election under state, local or non-US tax law) with respect to the acquisition and disposition of the stock of UGL (a "Section 338(h)(10) Election").  To facilitate a Section 338(h)(10) Election, the buyer will deliver to the Pledgors a completed IRS Form 8023 which the Pledgors shall sign.  The Buyer shall be responsible for filing the Form 8023.  Pledgors shall include any income, gain, loss, deduction or other items resulting from the Section 338(h)(10) Election on their income tax returns to the extent required by applicable law.

**6.03.    Section 336(e) Election**.  If a Section 338(h)(10) Election is not available and an IRC Section 336(e) election is available, at Secured Party's request or any buyer's request, UGL and each Pledgor shall join in the making of an election under IRC Section 336(e) (and any corresponding election under state, local or non-US tax law) (a "Section 336(e) Election") with respect to the acquisition and disposition of the stock of UGL.  Pledgors shall include any income, gain, loss, deduction or other items resulting from the Section 336(e) Election on their income tax returns to the extent required by applicable law.  The obligation to make a Section 336(e) Election shall include UGL and the Pledgors entering into a written binding agreement on or before the due date of the federal income tax return of UGL for the taxable year that includes the disposition of the shares to make a Section 336(e) Election, UGL's retaining a copy of the written agreement and UGL's attaching a Section 336(e) Election statement to its timely filed federal income tax return for the taxable year that includes the disposition of the shares.  To facilitate the making of a Section 336(e) Election, the Secured Party or the buyer, as the case may be, will prepare the written agreement to make the Section 336(e) Election, which the Pledgors will sign, and will prepare the Section 336(e) Election Statement.

3693489v11

**6.04.** __Asset Allocation Statement__.  If either a Section 338(h)(10) Election or a Section 336(e) Election is made, the relevant purchaser of the stock shall promptly deliver to Pledgors a statement setting forth the allocation of the consideration among the assets of UGL (an "Asset Allocation Statement").   Such Asset Allocation Statement shall be binding on UGL and the Pledgors.  The Pledgors and UGL shall file all income tax returns and other forms, including IRS Form 8883, in a manner consistent with the Section 338(h)(10) Election or Section 336(e) Election and the Asset Allocation Statement. For avoidance of doubt, it is acknowledged that Pledgors shall not be entitled to any additional money, by way of reimbursement of additional tax liability or otherwise, as a result of having made a Section 338(h)(10) Election or Section 336(e) Election.

**Section 7.**    __Miscellaneous__.

**7.01** __Notices__.  All notices, responses, consents, waivers, requests, statements, and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, as follows (or as otherwise directed in writing):

        (a)      if to the Pledgors:

                  to each Pledgor at the respective address
                  set forth on Schedule A hereto

            with a copy (which alone will not constitute notice) to:

                  Morton R. Branzburg, Esquire
                  Domenic E. Pacitti, Esquire
                  Klehr Harrison Harvey Branzburg LLP
                  1835 Market Street
                  Suite 1400
                  Philadelphia, PA  19103

        (b)      if to the Secured Party:

                  The UGL Asbestos Personal Injury Trust
                  [TBD]

        (c)      if to the Future Claimants' Representative:

                  James L. Patton, Jr., Esquire
                  Young Conaway Stargatt & Taylor, LLP
                  Rodney Square
                  1000 North King Street
                  Wilmington, DE  19801

3693489v11
Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document     Page 165 of 302

with a copy (which alone will not constitute notice) to:

> Edwin J. Harron, Esquire
> Young Conaway Stargatt & Taylor, LLP
> Rodney Square
> 1000 North King Street
> Wilmington, DE  19801

(d)     if to the Trust Advisory Committee:

> [TBD]

with a copy (which alone will not constitute notice) to:

> Natalie D. Ramsey, Esquire
> Laurie A. Krepto, Esquire
> Montgomery McCracken Walker & Rhoads, LLP
> 123 South Broad Street
> Philadelphia, PA 19109

(e)     if to UGL:

> United Gilsonite Laboratories
> c/o Thomas R. White, President
> P.O. Box 70
> Scranton, PA 18501

with a copy (which alone will not constitute notice) to:

> Karen A. Giannelli, Esquire
> Mark Conlan, Esquire
> Gibbons P.C.
> One Gateway Center
> Newark, NY  07102

**7.02    No Waiver.**  No failure on the part of the Secured Party to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Secured Party of any right, power, or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The remedies herein are cumulative and are not exclusive of any remedies provided by law.

**7.03    Amendments.**  Neither this Agreement nor any provision hereof may be changed, waived, discharged, or (except as provided in Section 6.09) terminated except in writing signed by the Pledgors, the Obligor, and the Secured Party.

**7.04** **Successors and Assigns.** This Agreement is for the benefit of the Secured Party and its successors and permitted assigns, and in the event of an assignment of the Notes, the rights hereunder, to the extent applicable to the indebtedness so assigned, shall be transferred with such indebtedness. This Agreement shall be binding on the Pledgors and the Obligor and their successors and assigns; provided, however, that the Pledgors and the Obligor shall not have the right to assign their rights or obligations hereunder or any interest herein without the prior written consent of the Secured Party.

**7.05** **Counterparts.** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the Parties hereto may execute this Agreement by signing any such counterpart. A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes. `

**7.06** **Governing Law; Jurisdiction.**

(a) **Governing Law.** This Agreement shall be construed in accordance with and governed by the law of the Commonwealth of Pennsylvania.

(b) **Submission to Jurisdiction.** Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its properties, to the nonexclusive jurisdiction of the Supreme Court of the Commonwealth of Pennsylvania, the United States District Court for the Middle District of Pennsylvania, and the United States Bankruptcy Court for the Middle District of Pennsylvania, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the Parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Commonwealth of Pennsylvania or, to the extent permitted by law, in such federal court. Each of the Parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Party may otherwise have to bring any action or proceeding relating to this Agreement against any Party hereto or its properties in the courts of any jurisdiction.

(c) **Waiver of Venue.** Each of the Parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Agreement in any court referred to in Section 6.06(b). Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) **Service of Process.** Each Party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 6.01. Nothing in this Agreement

will affect the right of any Party to this Agreement to serve process in any other manner permitted by law.

      **7.07**    **Captions.**  The captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

      **7.08**    **Severability.**  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Secured Party in order to carry out the intentions of the Parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

      **7.09**    **Termination.**  This Agreement shall terminate upon the earlier to occur of (i) payment in full of the Obligations, and (ii) the transfer of title to the Collateral to the Secured Party; provided, however, that the liabilities of the Pledgors and the Obligor under Section 5.07 hereof shall survive termination of this Agreement.  Upon any such termination as set forth in (i) herein, the Secured Party will, at the expense of the Pledgors, deliver to the Pledgors all certificates and instruments representing or evidencing the Pledged Interests held by the Secured Party hereunder, and will execute and deliver to the Pledgors such documents as the Pledgors shall reasonably request to evidence the termination of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

PLEDGORS:

PATRICIA P. ATKINS

_____
Patricia P. Atkins

KAREN M. LEGAN

_____
Karen M. Legan

DOUGLAS MACKINNON

_____
Douglas MacKinnon

CARTER ATKINS

_____
Carter Atkins

TIMOTHY ATKINS

_____
Timothy Atkins

RICHARD P. YATES

_____
Richard P. Yates

SUSAN Y. KINDELAN TRUST

By:_____
   Name:
   Title:

UNITED GILSONITE LABORATORIES
ASBESTOS PERSONAL INJURY TRUST

By:_____

Name:_____

Title:_____

UNITED GILSONITE LABORATORIES

By:_____

Name: Thomas R. White

Title: President

3693489v11

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O ELIZABETH LEGAN

By:_____
    Name:
    Title:

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O CAROLYN LEGAN

By:_____
    Name:
    Title:

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O KATHERINE LEGAN

By:_____
    Name:
    Title:

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O GRACE LEGAN

By:_____
    Name:
    Title:

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O LAUREN MACKINNON

By:_____
    Name:
    Title:

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O EMILY MACKINNON

By:_____
    Name:
    Title:

3693489v11

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O MATTHEW MACKINNON

By:_____
   Name:
   Title:

MALCOLM C. MACKINNON UGL SHARE
TRUST F/B/O REBECCA MACKINNON

By:_____
   Name:
   Title:

3693489v11

## SCHEDULE A

| Pledgor | Address | Class A Voting Shares | Class B Non-Voting Shares |
|---------|---------|----------------------|---------------------------|

# EXHIBIT E

**Form of UGL Asbestos Trust Agreement and Bylaws**

# EXHIBIT E1

**UGL Asbestos Personal Injury Trust Agreement**

*SUBJECT TO FURTHER NEGOTIATION AMONG THE PARTIES AND FINAL APPROVALS BY THE SIGNATORIES THERETO.*

# UNITED GILSONITE LABORATORIES
# ASBESTOS PERSONAL INJURY TRUST AGREEMENT

# TABLE OF CONTENTS

ARTICLE I        AGREEMENT OF TRUST.....................................................................2

    1.1    Creation and Name ..........................................................................................2

    1.2    Purpose ...........................................................................................................2

    1.3    Transfer of Assets ..........................................................................................2

    1.4    Assumption of Liabilities and Certain Obligations ........................................2

ARTICLE II       POWERS AND TRUST ADMINISTRATION ............................................3

    2.1    Powers .............................................................................................................3

    2.2    General Administration ...................................................................................5

    2.3    Claims Administration ....................................................................................7

ARTICLE III      QUALIFIED SETTLEMENT FUND ...........................................................7

    3.1    Tax Treatment.................................................................................................7

    3.2    No Right to Reversion with respect to Trust Assets .......................................8

    3.3    Obligations of the Trustee ..............................................................................8

    3.4    Obligations of Reorganized UGL....................................................................8

    3.5    No Contravention of Requirements .................................................................8

ARTICLE IV      ACCOUNTS, INVESTMENTS AND PAYMENTS ....................................8

    4.1    Accounts ..........................................................................................................8

    4.2    Investments .....................................................................................................9

    4.3    Source of Payments .......................................................................................11

ARTICLE V       TRUSTEE; DELAWARE TRUSTEE.........................................................11

    5.1    Initial Trustee ...............................................................................................11

    5.2    Term of Service ............................................................................................11

    5.3    Successor Trustee ..........................................................................................12

    5.4    Liability of Trustee, Delaware Trustee, Officers and Employees ........................12

    5.5    Compensation and Expenses of Trustee .......................................................12

    5.6    Indemnification of Trustee and Additional Indemnitees .....................................13

    5.7    Trustee's Lien ...............................................................................................13

    5.8    Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel ........................................................................................................13

    5.9    Trustee's Independence .................................................................................14

    5.10   Bond...............................................................................................................14

    5.11   Delaware Trustee ..........................................................................................14

# TABLE OF CONTENTS

ARTICLE VI  TRUST ADVISORY COMMITTEE ............................................................15

    6.1  Initial Members of the TAC ...............................................................15

    6.2  Duties .................................................................................................15

    6.3  Term of Office ...................................................................................15

    6.4  Successor Members of the TAC .........................................................16

    6.5  TAC's Employment of Professionals .................................................16

    6.6  Compensation and Expenses of TAC .................................................17

    6.7  Procedures for Consultation with and Obtaining the Consent of the TAC ..........17

ARTICLE VII  THE FUTURE CLAIMANTS' REPRESENTATIVE....................................19

    7.1  Appointment of Initial Future Claimants' Representative .....................19

    7.2  Duties .................................................................................................19

    7.3  Term of Office ...................................................................................19

    7.4  Appointment of Successor ..................................................................19

    7.5  FCR's Employment of Professionals .................................................20

    7.6  Compensation and Expenses of the FCR............................................20

    7.7  Procedures for Consultation with and Obtaining the Consent of the FCR...........21

ARTICLE VIII  GENERAL PROVISIONS ........................................................................22

    8.1  Irrevocability......................................................................................22

    8.2  Termination.........................................................................................22

    8.3  Amendments .......................................................................................23

    8.4  Severability .........................................................................................23

    8.5  Notices ...............................................................................................23

    8.6  Successors and Assigns ......................................................................25

    8.7  Limitation on Claim Interests for Securities Laws Purposes................25

    8.8  Entire Agreement; No Waiver ............................................................25

    8.9  Headings ............................................................................................26

    8.10  Governing Law ..................................................................................26

    8.11  Settlor Representative and Cooperation .............................................26

    8.12  Dispute Resolution.............................................................................26

    8.13  Enforcement and Administration........................................................26

    8.14  Effectiveness ......................................................................................26

    8.15  Counterpart Signatures ......................................................................26

3675200v3

# UNITED GILSONITE LABORATORIES
## ASBESTOS PERSONAL INJURY TRUST AGREEMENT

This UNITED GILSONITE LABORATORIES ASBESTOS PERSONAL INJURY TRUST AGREEMENT (the "**Trust Agreement**"), dated as of [_____], 2014, is entered in accordance with the Second Amended Plan of United Gilsonite Laboratories Under Chapter 11 of the Bankruptcy Code (the "**Plan**") filed pursuant to section 1121(a) of the Bankruptcy Code and confirmed by an order of the Bankruptcy Court dated [_____] 2014. This Trust Agreement is made by United Gilsonite Laboratories, a Pennsylvania Corporation (the "**Debtor**" or the "**Settlor**"), who is a debtor and debtor-in-possession in Chapter 11 Case No. 11-02032 (RNO) in the United States Bankruptcy Court for the Middle District of Pennsylvania; the Official Committee of General Unsecured Creditors (the "**Committee**"); the Future Claimants' Representative (the "**FCR**"); the Asbestos PI Trustee of the Trust (the "**Trustee**"); and [_____] (the "**Delaware Trustee**") to establish the United Gilsonite Laboratories Asbestos PI Trust (the "**Asbestos PI Trust**" or "**Trust**").

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan. All terms used but not defined herein or in the Plan but defined in the Bankruptcy Code or Bankruptcy Rules shall have the meanings ascribed to them in the Bankruptcy Code and Bankruptcy Rules, as the case may be.

WHEREAS, at the time of the entry of the order for relief in its Chapter 11 Case, the Debtor was named as a defendant in actions involving Settled Asbestos Personal Injury Claims and Asbestos Personal Injury Claims; and

WHEREAS, pursuant to the Plan, the Trust Assets are being contributed to the Trust; and

WHEREAS, the Plan has been confirmed by order of the Bankruptcy Court and that order has been affirmed by the District Court; and

WHEREAS, the Plan provides, *inter alia*, for the creation of the Trust in accordance with this Trust Agreement; and

WHEREAS, pursuant to the Plan, the Trust is to assume the liability for Settled Asbestos Personal Injury Claims and Asbestos Personal Injury Claims asserted against the Protected Parties (collectively, "**Trust Claims**") and use its assets and income to resolve all Trust Claims; and

WHEREAS, it is the intent of the Trustee, the TAC, and the FCR that the Trust be administered, maintained and operated at all times through mechanisms that provide reasonable assurance that the Trust will satisfy all Trust Claims paid in accordance with the Asbestos Personal Injury Trust Distribution Procedures in substantially the form of Exhibit __ to the Plan (the "**Trust Distribution Procedures**" or "**TDP**") in substantially the same manner and in strict compliance with this Trust Agreement; and

WHEREAS, pursuant to the Plan, the Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "IRC"); and

WHEREAS, the Bankruptcy Court has determined that the Asbestos PI Trust and the Plan satisfy all the prerequisites for an injunction pursuant to section 524(g) of the Bankruptcy Code as it relates to the Protected Parties only and such injunction has been entered in connection with the Confirmation Order;

NOW, THEREFORE, it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

**1.1** **Creation and Name.** The Settlor hereby creates a trust known as the "**United Gilsonite Laboratories Asbestos Personal Injury Trust**," which is the Asbestos PI Trust provided for and referred to in the Plan. The Trustee may transact the business and affairs of the Trust in the name of the Trust. It is the intention of the parties hereto that the Trust created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this document, together with the Asbestos PI Trust Bylaws, constitute the governing instruments of the Asbestos PI Trust. The Trustee and the Delaware Trustee are thereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit A.

**1.2** **Purpose.** The purpose of the Trust is to (a) assume the liability for all Trust Claims asserted against the Protected Parties, (b) preserve, hold, manage and maximize the Trust Assets for use in paying and otherwise satisfying Trust Claims and paying the Trust Expenses, (c) direct the processing, liquidation and payment of all Trust Claims in accordance with the TDP, and (d) otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code, all in accordance with the Plan and this Trust Agreement.

**1.3** **Transfer of Assets.** Pursuant to the Plan, the Trust Assets have been issued or transferred to the Asbestos PI Trust free and clear of any liens, security interests and other Claims or Causes of Action. In furtherance of the purposes of the Asbestos PI Trust, the Trustee, on behalf of the Asbestos PI Trust, hereby expressly accept such issuance and transfer to the Asbestos PI Trust of the Trust Assets.

**1.4** **Assumption of Liabilities and Certain Obligations.**

**(a)** In furtherance of the purpose of the Asbestos PI Trust, the Trustee, on behalf of the Trust, expressly assume all liability and responsibility for (i) all Trust Claims and (ii) the Trust Expenses. The Trustee, on behalf of the Trust, shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that they may reasonably consider necessary, appropriate or desirable to effect such assumption.

**(b)** The Asbestos PI Trust, at its discretion, may advocate in any and all actions and proceedings in which a Trust Claim is brought against any Asbestos Protected Party

3675200v3

that such claims are and have been channeled to the Trust and may, in its sole discretion, cooperate with such Asbestos Protected Party in any and all such actions and proceedings.

(c)     Except as otherwise provided in this Trust Agreement, the TDP, the Plan, and the Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, regarding Trust Claims that the Debtor has under applicable law.  Regardless of the foregoing, however, except as otherwise provided in Section 5.1(a)(2) of the TDP, a claimant must meet otherwise applicable federal, state, and foreign statutes of limitations and repose.

(d)     Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the injunction pursuant to section 524(g) of the Bankruptcy Code issued in connection with the Plan or the Trust's assumption of all liability for Trust Claims asserted against Protected Parties, subject to the provisions of Section 1.4(c) above.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

### 2.1     Powers.

(a)     The Trustee is, and shall act as, the fiduciaries to the Trust in accordance with the provisions of this Trust Agreement, the TDP, and the Plan.  The Trustee shall at all times administer the Trust and the Trust Assets in accordance with the purpose set forth in Section 1.2 above.  Subject to the Plan and this Trust Agreement, the Trustee shall have the power to take any and all actions that they may consider necessary, appropriate or desirable to fulfill the purpose of the Trust, including each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law, the Plan, or this Trust Agreement, the Trustee need not obtain the order or approval of any court to exercise any power or discretion conferred hereunder.

(c)     Subject to and without limiting the generality of Section 2.1 (a) above, and except as limited below, the Trustee shall have the power to:

(i)     receive and hold the Trust Assets and exercise all rights and powers with respect thereto, including voting and dispositive powers with respect thereto;

(ii)     invest the monies held by the Trust;

(iii)     sell, transfer, or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may consider necessary, appropriate, or desirable in fulfilling the purpose of the Trust;

3675200v3
Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document      Page 180 of 302

**(iv)** enter into such leasing and financing agreements with third parties as the Trustee may consider necessary, appropriate, or desirable in fulfilling the purpose of the Trust;

**(v)** pay liabilities and expenses of the Trust, including the Trust Expenses;

**(vi)** establish funds, reserves, and accounts within the Trust estate, as contemplated by Article IV below;

**(vii)** sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding;

**(viii)** establish, supervise, and administer the Trust in accordance with this Trust Agreement and the TDP;

**(ix)** appoint officers, hire employees, and engage legal, financial, accounting, investment, auditing, forecasting, and other advisors, consultants, independent contractors, and agents and, to the extent permitted by the fiduciary duties of the Trustee, delegate to such persons such powers and authorities as the Trustee may consider necessary, appropriate, or desirable in fulfilling the purpose of the Trust;

**(x)** pay reasonable compensation to any officers, employees, legal, financial, accounting, investment, auditing, forecasting, and other advisors, consultants, independent contractors, and agents engaged by the Trust, including those engaged by the Trust in connection with its alternative dispute resolution activities pursuant to Section 8.12 below;

**(xi)** compensate the Trustee, the Delaware Trustee, each member of the TAC, the FCR, and their respective officers, employees, legal, financial, accounting, investment, auditing, forecasting, and other advisors, consultants, independent contractors, and agents, and reimburse the Trustee, each member of the TAC, and the FCR for any out-of-pocket fees and expenses reasonably incurred by or on behalf of him or her in connection with the performance of his or her duties hereunder;

**(xii)** execute and deliver such instruments as the Trustee may consider necessary, appropriate, or desirable in fulfilling the purpose of the Trust;

**(xiii)** enter into such other arrangements with third parties as the Trustee may consider necessary, appropriate, or desirable in fulfilling the purpose of the Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

**(xiv)** in accordance with Section 5.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trustee and the Delaware Trustee, the TAC, the FCR, the officers and employees of the Trust, and any advisors, consultants and agents of the Trust, the TAC, or the FCR (collectively, the "**Additional Indemnitees**"), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, advisors, consultants, and agents;

-4-

**(xv)**  delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable individuals, recognized institutional investment advisors, or investment managers, without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.4 below; and

**(xvi)**  consult with Reorganized UGL, the TAC, or the FCR at such times and with respect to such issues relating to the conduct of the Trust as the Trustee may consider necessary, appropriate, or desirable; and

**(xvii)**  make, pursue (by litigation or otherwise), collect, compromise, or settle, in the name of the Trust, any claim, right, action, or cause of action included in the Trust Assets including, but not limited to, insurance recoveries, before any court of competent jurisdiction.

**(d)**  Notwithstanding anything to the contrary contained herein, the Trustee shall not have the power to guarantee any debt of other persons.

**(e)**  The Trustee shall give the TAC and the FCR prompt notice of any act performed or taken pursuant to Section 2.1(c)(i), (iii), (vii) or (xvi) above and any act proposed to be performed or taken of the type described in Section 2.2(e) below.

## 2.2  <u>General Administration</u>.

**(a)**  The Trustee shall adopt and act in accordance with the Asbestos PI Trust Bylaws. To the extent not inconsistent with this Trust Agreement, the Asbestos PI Trust Bylaws shall govern the affairs of the Trust. In the event of an inconsistency between the Asbestos PI Trust Bylaws and this Trust Agreement, this Trust Agreement shall govern.

**(b)**  The Trustee shall timely account to the Bankruptcy Court as follows:

**(i)**  The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available and in any event within one hundred twenty (120) days following the end of each fiscal year of the Trust, an annual report containing financial statements of the Trust (including a balance sheet of the Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustee and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of Trust Claims and as to the conformity of the financial statements with generally accepted accounting principles. The Trustee shall provide a copy of such report to the TAC, and the FCR when such reports are filed with the Bankruptcy Court.

**(ii)**  Simultaneously with delivery of each set of financial statements referred to in Section 2.2(b)(i) above, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Trust Claims disposed of during the period covered by the financial statements. The Trustee shall provide a copy of such report to the TAC and the FCR when such report is filed.

-5-

**(iii)** All materials required to be filed with the Bankruptcy Court by this Section 2.2(b) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

**(c)** As soon as practicable prior to the commencement of each fiscal year of the Trust, the Trustee shall cause to be prepared a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years. The budget and cash flow projections shall include a determination of the Maximum Annual Payment pursuant to Section 2.4 of the TDP and the Claims Payment Ratio pursuant to Section 2.5 of the TDP. Within ten (10) days of the preparation thereof, the Trustee shall provide a copy of the budget and cash flow projections to the TAC and the FCR.

**(d)** The Trustee shall consult with both the TAC and the FCR on: (i) the general implementation and administration of the Trust, including with respect to any account or reserve established in accordance with Section 4.1 below, (ii) the general implementation and administration of the TDP, and (iii) such other matters as may be required under this Trust Agreement or the TDP.

**(e)** The Trustee shall be required to obtain the consent of both the TAC and the FCR pursuant to the consent processes set forth in Sections 6.7(b) and 7.7(b) below or in the TDP, as the case may be, in addition to any other instances enumerated herein to:

**(i)** change the Claims Payment Ratio as provided in Section 2.5 of the TDP;

**(ii)** change the Disease Levels, Scheduled Values and/or Medical/Exposure Criteria set forth in Section 5.2(a)(3) of the TDP and/or the Maximum Values set forth in Section 5.2 and Section 5.3 of the TDP;

**(iii)** change the Payment Percentage described in Section 2.3 of the TDP as provided in Section 4.2 of the TDP;

**(iv)** establish and/or change the Claims Materials to be provided holders of Trust Claims under Section 6.1 of the TDP;

**(v)** require that claimants provide additional kinds of medical and/or exposure evidence pursuant to Section 5.5 of the TDP;

**(vi)** develop methods for auditing the reliability of medical evidence, as well as the reliability of evidence to exposure to asbestos as provided in Section 5.6 of the TDP;

**(vii)** change the form of release to be provided pursuant to Section 7.8 of the TDP;

**(viii)** terminate the Trust pursuant to Section 8.2 below;

**(ix)** change the compensation of the Trustee, the Delaware Trustee, the members of the TAC, or the FCR, other than to reflect reasonable cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

**(x)** take structural or other actions to minimize any tax on the Trust Assets;

**(xi)** amend any provision of this Trust Agreement in accordance with the terms hereof;

**(xii)** amend any provision of the TDP in accordance with the terms of this Trust Agreement or the TDP;

**(xiii)** adopt the Asbestos PI Trust Bylaws in accordance with Section 2.2(a) above, or thereafter amend the Trust Bylaws in accordance with the terms thereof;

**(xiv)** merge with or acquire an interest in any asbestos claims resolution organization formed by the Trust with another asbestos claims resolution organization that is not specifically created by this Trust Agreement or the TDP, contract with another asbestos claims resolution organization or any other entity that is not specifically created by this Trust Agreement or the TDP, or permit any other party to join in any asbestos claims resolution organization that is formed by the Trust pursuant to this Trust Agreement or the TDP; provided that any such merger, acquisition, contract, or joinder shall not: (a) subject any Protected Party to any risk of having any Asbestos PI Trust Claim asserted against it or (b) otherwise jeopardize the validity or enforceability of the section 524(g) injunction; and provided, further, that the terms of any such merger will require the surviving organization to make decisions about the allowability and value of Trust Claims in accordance with Section V of the TDP.

**(f)** The Trustee shall meet with the TAC and the FCR no less often than quarterly. The Trustee shall meet with the TAC and the FCR between such quarterly meetings at mutually convenient times and locations when so requested by either the TAC or the FCR.

**(g)** The Trustee shall consider issues submitted by either the TAC or the FCR at the Trustees' meetings with the TAC and the FCR, if practicable in view of pending business.

**2.3** **Claims Administration.** The Trustee shall promptly proceed to implement the TDP.

## ARTICLE III

## QUALIFIED SETTLEMENT FUND

**3.1** **Tax Treatment.** The Trust is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" as described within section 1.468B-1 *et seq.* of the Treasury Regulations. Accordingly, for all U.S. federal income tax purposes the transfer of assets to the Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-l(c) of the Treasury Regulations by United Gilsonite Laboratories, as transferor, for distribution to holders of Trust Claims and in complete settlement of such Claims against United

Gilsonite Laboratories. Any income on the assets of the Trust will be treated as subject to tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for taxes and subject to the withholding and reporting requirements set forth in the Plan and this Trust Agreement.

**3.2     No Right to Reversion with respect to Trust Assets.** United Gilsonite Laboratories will have no rights to any refund or reversion with respect to any Trust Assets or any earnings thereon.

**3.3     Obligations of the Trustee.** The Trustee shall be an "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Trust and shall (a) timely file such income tax and other returns and statements and timely pay all taxes required to be paid from the assets in the Trust as required by law and in accordance with the provisions of the Plan and this Trust Agreement, (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations, and (d) take no action that could cause the Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations.

**3.4     Obligations of Reorganized UGL.** Following the funding of the Trust (and in no event later than February 15th of the calendar year following the date of this Trust Agreement), Reorganized UGL shall provide, or cause to be provided, to the Trustee a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of cash or other property to the Trust, the transferor shall provide, or cause to be provided, to the Trustee a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

**3.5     No Contravention of Requirements.** No provision in this Trust Agreement or the TDP shall be construed to mandate any distribution on any Claim or other action that would contravene the Trust's compliance with the requirements of a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

## ARTICLE IV

## ACCOUNTS, INVESTMENTS AND PAYMENTS

**4.1     Accounts.**

**(a)**     The Trustee may from time to time create such accounts and reserves within the Trust estate as they may consider necessary, appropriate or desirable in order to provide for payment, or to make provisions for future payment, of Trust Claims in accordance with the TDP or to provide for payment, or to make provisions for future payment, of Trust Expenses of the Trust in accordance with this Trust Agreement and may, with respect to any such account or reserve, restrict the use of monies therein.

**(b)** The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 4.1 and, with respect to any such account, the transfers made to the account, the proceeds of or earnings on the assets held in each account, and the payments from each account in the annual accounts to be Filed with the Bankruptcy Court and provided to the TAC, and the FCR pursuant to Section 2.2(b)(i) above.

**4.2** **Investments.** Investment of monies held in the Trust shall be administered in the manner in which an individual of ordinary prudence, discretion, and judgment would act in the management of his or her own affairs; provided however that each investment shall not be evaluated on a standalone basis but rather the investment decisions shall be evaluated on a portfolio basis, thereby taking into account the benefits of portfolio diversification, and shall be subject to the following limitations and provisions:

**(a)** For entities other than Reorganized UGL or any successors thereto, the Trust shall not acquire, directly or indirectly, equity in any entity or business enterprise (an "**Equity Investment**") unless the security is listed on a nationally recognized stock exchange. Further, the Trust shall not acquire an Equity Investment if immediately following such acquisition, the Trust would hold more than 3% of the equity in such entity or business enterprise and the Trust shall not hold, directly or indirectly, more than 5% of the equity in any Entity. In the event the Trust finds itself in a position where it holds more than 5% of the equity in any public entity, the Trustee shall immediately file a Form 13G with the U.S. Securities and Exchange Commission and concurrently therewith shall evaluate the disposal of the excess position in an orderly fashion. Because the Equity Investment will be listed on a nationally recognized stock exchange, the disposal may be executed with a broker dealer at the prevailing market price. In the event of a market disruption, the Trustee may review the prevailing market conditions and determine whether to sell this security immediately or hold the security for disposal at a more appropriate time.

**(b)** The Trust shall not acquire or hold any debt securities unless such securities (i) are rated "A3" or higher by Moody's, "A-1" or higher by Standard & Poor's ("**S&P**") or have been given an equivalent investment-grade rating by another nationally recognized credit-rating agency, or (ii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

**(c)** The Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "A3" or higher by Moody's or "A-1" or higher by S&P, or has been given an equivalent rating by another nationally recognized credit-rating agency.

**(d)** Excluding any securities issued by Reorganized UGL or any of its successors, the Trust shall not acquire or hold any preferred stock or securities convertible into common stock unless such preferred stock or convertible securities are rated "A-3" or higher by Moody's or "A-1" or higher by S&P, or have been given an equivalent investment grade rating by another nationally recognized credit-rating agency.

**(e)** The Trust shall not acquire any debt securities or other debt instruments issued by any Entity (other than debt securities or other debt instruments issued or fully

3675200v3

guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate market value of all such securities or instruments issued by such Entity held by the Trust would exceed 2% of the then-current aggregate value of the Trust Assets. The Trust shall not hold any debt securities or other debt instruments issued by any Entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) to the extent that the aggregate market value of all such securities and instruments issued by such Entity held by the Trust would exceed 5% of the then-current aggregate value of the Trust Assets. For purposes of calculating the percentages set forth in this section 4.2(e), the value of the Asbestos PI Trust shall be the value attributed to those assets in the Plan and shall be updated annually based on the financial performance of the Trust Assets and using a valuation approach consistent with the valuation approach used in Plan.

(f)     The Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 4.2(b) above.

(g)     The Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustee, they are adequately collateralized. Eligible collateral securities for repurchase agreements are limited to U.S. treasury and agency securities as long as the agency securities meet the standards in 4.2(b) above. If a ratings downgrade occurs, the downgraded collateral must be replaced within two (2) Business Days with eligible collateral securities. The maximum maturity of repurchase agreements shall be thirty (30) days. The Trustee must create a custody account in the name of the Trust with a bank that meets the standards of 4.2(b) above. An amount of collateral equal to at least 103% of the face value of the repurchase agreement must be pledged. The contract with the custodian organization must require regular reports about the quality and quantity of the collateral to be provided to the Trustee upon request and on the last day of each month.

(h)     The Trust shall not acquire or hold any rights, warrants, options or similar financial instruments.

(i)     In the event the Trust finds itself in a position where it owns securities in violation of any part of this section 4.2, such that an orderly disposal of securities needs to occur, the Trustee shall immediately evaluate options to effectuate an orderly disposal of the excess position(s) such that compliance with this Section is restored. In the event of a downgrade, the Trustee shall review the prevailing market conditions for the downgraded security and determine whether to sell this security immediately or hold the security for disposal at a more appropriate time. When disposing of liquid securities, the Trustee may execute the disposition transaction with a broker dealer at the prevailing market price. In the event that less liquid securities need to be disposed of, the Trustee shall obtain at least three (3) price quotes from reputable trading organizations. The price quotes should reflect comparable terms and conditions such as when the quote is rendered, the settlement date and whether accrued monies such as interest or dividends are reflected in the quote. In the event of a market disruption, the Trustee may review the prevailing market conditions and determine whether to sell securities immediately or hold the securities for disposal at a more appropriate time.

-10-

**(j)**     Without regard to the limitations set forth in subsections (a) - (i) above, the Trust may acquire and hold any securities or instruments issued to it or obtained by it from any Entity or business enterprise as proceeds of litigation, corporate transactions involving Reorganized UGL, or otherwise to resolve disputes.

**4.3     Source of Payments.**

**(a)**     All payments to be made by the Trust, including payments in respect of Trust Claims and the Trust Expenses, shall be payable solely by the Trust out of the Trust Assets. None of the Asbestos Protected Parties, their subsidiaries, or the present or former directors, officers, employees, advisors, shareholders, consultants, or agents of any of them, or the Trustee, the TAC, or the FCR, or the present or former officers, employees, advisors, consultants or agents of any of them, shall be liable for the payment of any Trust Claim, Trust Expense, or other liability of the Trust.  Nothing herein shall be deemed to waive any rights in respect of Trust Claims, Trust Expenses, or any other liability of the Trust.

**(b)**     The Trustee shall include a reasonably detailed description of any payments made in accordance with this Section 4.3 in the accounts to be Filed with the Bankruptcy Court and provided to the TAC and the FCR pursuant to Section 2.2(b) above.

**ARTICLE V**

**TRUSTEE; DELAWARE TRUSTEE**

**5.1     Initial Trustee.**

**(a)**     In addition to the Delaware Trustee appointed pursuant to Section 5.11 hereof, there shall be one (1) Trustee.  The initial Trustee is the individual identified on the signature page hereof. The  initial Trustee shall serve until the earliest of: (i) the end of his or her term pursuant to Section 5.2(a) below, (ii) his or her death, (iii) his or her resignation pursuant to Section 5.2(b) below, (iv) his or her removal pursuant to Section 5.2(c) below, or (v) the termination of the Trust pursuant to Section 8.2 below.

**5.2     Term of Service.**

**(a)**     Subject to the other provisions of this Article V, the Trustee appointed in accordance with Section 5.1 above shall serve for an initial term expiring three-, four-, or five-years from the date on the signature page of this Agreement.  Thereafter, each term of service shall be for five years

**(b)**     The Trustee may resign at any time before the end of his or her term by written notice to the TAC and the FCR.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

**(c)**     The Trustee may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include any substantial

3675200v3

failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or to participate in performing the duties of the Trustee hereunder, or repeated nonattendance of scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**5.3     Successor Trustee.**

(a)     Upon the termination of service of the Trustee, whether as a result of the expiration of his or her term or his or her death, resignation or removal, his or her successor shall be appointed by a majority of the TAC with the consent of the FCR. If the members of the TAC and the FCR cannot agree on the successor Trustee, the Bankruptcy Court shall make the appointment. Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a Trustee for an additional term or terms.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

(c)     Each successor Trustee shall serve until the earliest of: (i) the end of the term of five (5) years for which he or she was appointed if his or her immediate predecessor Trustee completed his or her term pursuant to Section 5.2(a) above, (ii) the end of the term of the Trustee whom he or she replaced if his or her predecessor Trustee did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.2(b) above, (v) his or her removal pursuant to Section 5.2(c) above, or (vi) the termination of the Trust pursuant to Section 8.2 below.

**5.4     Liability of Trustee, Delaware Trustee, Officers and Employees.** The Trustee, the Delaware Trustee, and the individuals identified as Additional Indemnitees in Section 2.1(c)(xiv) above shall not be liable to the Trust, to any individual holding a Trust Claim or to any other person, except for such individual's own breach of trust committed in bad faith or willful misappropriation. In addition, no Trustee, Delaware Trustee, or Additional Indemnitee shall be liable for any act or omission of any other Trustee, Delaware Trustee, or Additional Indemnitee unless such person acted with bad faith in the selection or retention of such other Trustee, Delaware Trustee, or Additional Indemnitee.

**5.5     Compensation and Expenses of Trustee.**

(a)     The Trustee shall receive compensation from the Trust for his or her services as Trustee in the amount of **[$TBD]** per annum, payable in a lump sum at the beginning of each year of service. The Trustee shall also receive compensation in the amount of **[$TBD]** per hour for all time devoted to business of the Trust (except for non-working travel time which will be compensated at **[$TBD]** per hour).

(b)     The per annum compensation does not function as a retainer and hourly items are not charged against the per annum compensation. The per annum compensation payable to the Trustee hereunder shall be reviewed every three (3) years and appropriately

3675200v3

adjusted with the consent of the TAC and the Future Asbestos Claimants' Representatives. The Delaware Trustee shall be paid such compensation as is agreed pursuant to a separate fee agreement.

(c)     The Asbestos PI Trust shall promptly reimburse the Trustee and the Delaware Trustee for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties as a Trustee.

(d)     The Trustee shall include a reasonably detailed description of the amounts paid under this Section 5.5 in the accounts to be filed with the Bankruptcy Court and provided to the TAC and the FCR pursuant to Section 2.2(b)(i) above.

**5.6     Indemnification of Trustee and Additional Indemnitees.**

(a)     The Trust shall indemnify and defend the Trustee and each Additional Indemnitee in the performance of his or her duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend such person against any and all liabilities, expenses, claims, damages or losses incurred by or on behalf of him or her in the performance of his or her duties. Notwithstanding the foregoing, no Trustee or Additional Indemnitee shall be indemnified or defended in any way for any liability, expense, claim, damage or loss for which he or she is ultimately liable under Section 5.4 above.

(b)     Any fees and expenses reasonably incurred by or on behalf of a Trustee or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which he or she is indemnified by the Trust pursuant to Section 5.6(a) above, including out-of-pocket fees and expenses and attorneys' fees and expenses, shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee or Additional Indemnitee, as the case may be, to repay such amount in the event that it shall be determined by a Final Order that such Trustee or Additional Indemnitee is not entitled to be indemnified by the Trust.

(c)     The Trustee may purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was a Trustee or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, a member of the TAC, the FCR, an officer or employee of the Trust, or an advisor, consultant or agent of the Trust, the TAC or the FCR.

**5.7     Trustee's Lien.** The Trustee and the Additional Indemnitees shall have a first priority lien upon the Trust Assets to secure the payment of any amounts payable to them pursuant to Section 5.6 above.

**5.8     Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel.**

(a)     The Trustee may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the Trustee to be qualified as experts on any matter submitted

-13-

to them, and, in the absence of gross negligence, the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to him or her by the Trustee shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

5.9     **Trustee's Independence.**  No Trustee shall, during the term of his or her service: (a) hold a financial interest in, act as attorney or agent for, or serve as any other professional for, Reorganized UGL, or (b) any person who holds a Trust Claim.

5.10     **Bond.**  The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

5.11     **Delaware Trustee.**

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be: (i) a natural person who is at least 21 years of age and a resident of the State of Delaware, or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein.  The Delaware Trustee shall be the Trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to:  (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act.  There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee except these set forth in this paragraph 5.11(b).

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 5.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least 60 days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor

3675200v3

Delaware Trustee shall have been appointed by the Trustee in accordance with the Section 5.11(d) below. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

## ARTICLE VI

## TRUST ADVISORY COMMITTEE

### 6.1     Initial Members of the TAC.

(a)     The TAC shall consist of five (5) individuals. The initial members of the TAC are those individuals selected by the Creditors' Committee, identified on the signature page hereof and confirmed as the initial members of the TAC by the Bankruptcy Court pursuant to the Confirmation Order.

(b)     Each initial member of the TAC shall serve until the earliest of (i) the end of his or her term pursuant to Section 6.3(a) below, (ii) his or her death, (iii) his or her resignation pursuant to Section 6.3(b) below, (iv) his or her removal pursuant to Section 6.3(c) below, or (v) the termination of the Trust pursuant to Section 8.2 below.

### 6.2     Duties.     The members of the TAC shall serve in a fiduciary capacity, representing all of the holders of present Asbestos PI Trust Claims for the purpose of protecting the rights of such persons. The Trustee must consult with the TAC on matters identified in Section 2.2(d) above and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(e) above.

### 6.3     Term of Office.

(a)     The initial members of the TAC appointed in accordance with Section 6.1(a) above shall serve the staggered three-, four-, or five-year terms shown on the signature pages hereof. Thereafter, each term of service shall be five (5) years. Each member of the TAC shall serve until the earliest of (i) the end of his or her term of office, (ii) his or her death, (iii) his or her resignation, (iv) his or her removal, or (v) the termination of the Trust.

3675200v3

**(b)** A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustee, and the FCR. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

**(c)** A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member (such as repeated nonattendance of scheduled meetings) or for other good cause. Such removal shall be made at the recommendation of the other members of the TAC with the approval of the Bankruptcy Court.

### 6.4 Successor Members of the TAC.

**(a)** If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor. If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor. Either a TAC member or his or her law firm may designate such TAC member to serve a successive term. If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 6.3(c) above, his or her successor shall be appointed by a majority of the remaining members of the TAC or, if such members cannot agree on a successor, the Bankruptcy Court. Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term or terms.

**(b)** Each successor member of the TAC shall serve until the earliest of (i) the end of a full term of five (5) years for which he or she was appointed if his or her immediate predecessor member of the TAC completed his or her term pursuant to Section 6.3(a) above, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 6.3(b) above, (v) his or her removal pursuant to Section 6.3(c) above, or (vi) the termination of the Trust pursuant to Section 8.2 below.

### 6.5 TAC's Employment of Professionals.

**(a)** The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on any matter submitted to the TAC (the "**TAC Professionals**"). The TAC and the TAC Professionals shall at all times have complete access to the Trust's officers, employees, and agents, as well as to any counsel, accountants, appraisers, auditors, forecasters, experts, and financial or investment advisors retained by the Trust ("**Trust Professionals**"), and shall also have complete access to all information generated by them or otherwise available to the Trust or the Trustee; provided that in no event shall the TAC, its members, or the TAC Professionals (i) have any role, whether by

3675200v3

consent, consultation, or otherwise, in the Trust's selection of counsel, experts, or other professionals to defend claims against the Trust that are tendered to any insurer for defense or (ii) have any right to consult with or obtain information from the Trust or anyone employed by the Trust concerning the defense of any such claims; and provided, further, that in no event shall the TAC, its members, or the TAC Professionals have any right to consult with counsel to the Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Trust. In the absence of gross negligence, the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by such TAC Professional or Trust Professional.

(b)     The Trust shall promptly reimburse, or pay directly if so instructed, the TAC for any reasonable fees and expenses associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for any reasonable fees and expenses associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the Trust a written request for such reimbursement setting forth the reasons (A) why the TAC desires to employ such TAC Professional and (B) why the TAC cannot rely on Trust Professionals to meet the needs of the TAC for such expertise or advice and (ii) the Trust has approved the TAC's request for reimbursement in writing. If the Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as a Trust Expense. If the Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ such TAC Professional at the expense of the Trust, the TAC and/or the Trustee shall resolve their dispute in accordance with Section 8.12 below.

6.6     **Compensation and Expenses of TAC.** Each member of the TAC shall receive compensation from the Trust for attendance at meetings or other Trust business performed in the form of a reasonable hourly rate set by the Trustee. In addition, the Trust shall promptly reimburse each member of the TAC for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties as a member of the TAC. Such compensation or reimbursement shall be deemed a Trust Expense. The Trustee shall include a reasonably detailed description of the amounts paid under this Section 6.6 in the accounts to be filed with the Bankruptcy Court and provided the TAC and the FCR pursuant to Section 2.2(b)(i) above.

6.7     **Procedures for Consultation with and Obtaining the Consent of the TAC.**

(a)     **Consultation Process.**

(i)     In the event the Trustee is required to consult with the TAC pursuant to Section 2.2(d) above or on other matters as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The

3675200v3

Trustee shall also provide the TAC with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts, or financial or investment advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee; provided that in no event shall the TAC or its members (i) have any role, whether by consent, consultation, or otherwise, in the Trust's selection of counsel, experts, or other professionals to defend claims against the Trust that are tendered to any insurer for defense or (ii) have any right to consult with or obtain information from the Trust or anyone employed by the Trust concerning the defense of any such claims; and provided further, that in no event shall the TAC or its members have any right to consult with counsel to the Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Trust.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.7(a), the Trustee shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

    (b)     **Consent Process.**

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(e) above, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC with as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts, or financial or investment advisors retained by the Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee; provided that in no event shall the TAC or its members (i) have any role, whether by consent, consultation, or otherwise, in the Trust's selection of counsel, experts, or other professionals to defend claims against the Trust that are tendered to any insurer for defense or (ii) have any right to consult with or obtain information from the Trust or anyone employed by the Trust concerning the defense of any such claims; and provided further, that in no event shall the TAC or its members have any right to consult with counsel to the Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Trust.

(ii)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee and must in any event advise the Trustee in writing of its consent or its objection to the proposed action within thirty (30) days of receiving the original

3675200v3

request for consent from the Trustee. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or its objections to the action within thirty (30) days of receiving notice regarding such request, the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and/or the TAC shall resolve their dispute in accordance with Section 8.12 below. However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## ARTICLE VII

## THE FUTURE CLAIMANTS' REPRESENTATIVE

**7.1    Appointment of Initial Future Claimants' Representative.**    As set forth in Section 9.9 of the Plan, the initial FCR for the Trust shall be James L. Patton, Esquire, the individual who was appointed by the Bankruptcy Court as the legal representative to protect the rights of persons who may, subsequent to the Confirmation Date assert "demands," as that term is defined in Section 524(g), for personal injury or wrongful death from alleged exposure to asbestos and asbestos-containing products against the Debtor.

**7.2    Duties.**    The FCR shall serve in a fiduciary capacity, representing the interests of the holders of future Trust Claims for the purpose of protecting the rights of such persons. The Trustee must consult with the FCR on matters identified in Section 2.2(d) above, on certain other matters provided herein, or as otherwise required under the TDP, and must obtain the consent of the FCR on matters identified in Section 2.2(e) above.

**7.3    Term of Office.**

(a)    Each FCR shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) below, (iii) his or her removal pursuant to Section 7.3(c) below, or (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)    The FCR may resign at any time by written notice to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    At the request of the Trustee or the TAC, the FCR may be removed pursuant to an order of the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder or for other good cause.

**7.4    Appointment of Successor.**    If the FCR dies or resigns and, prior to his or her death or the effectiveness of his or her resignation, he or she has designated in writing an individual to succeed him or her as the FCR, then subject to the approval of the Bankruptcy Court, such individual shall be his or her successor. If the FCR is removed in accordance with Section 7.3(c) above, the Trustee, in consultation with the TAC and subject to the approval of the

Bankruptcy Court, shall appoint the FCR's successor. If (a) the FCR dies or resigns and did not designate an individual to succeed him or her prior to such death or resignation as contemplated above or (b) he or she is removed in accordance with Section 7.3(c) above but the Trustee cannot agree on or otherwise do not appoint a successor for such FCR, the Bankruptcy Court shall make such appointment.

**7.5**  **FCR's Employment of Professionals.**

**(a)**  The FCR may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial, and investment advisors and such other parties deemed by the FCR to be qualified as experts on any matter submitted to the FCR (the "**FCR Professionals**"). The FCR and the FCR Professionals shall at all times have complete access to the Trust's officers, employees, and agents, as well as to Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Trust or the Trustee; provided that in no event shall the FCR or the FCR Professionals (i) have any role, whether by consent, consultation, or otherwise, in the Trust's selection of counsel, experts or other professionals to defend claims against the Trust that are tendered to any insurer for defense or (ii) have any right to consult with or obtain information from the Trust or anyone employed by the Trust concerning the defense of any such claims; and provided further, that in no event shall the FCR or the FCR Professionals have any right to consult with counsel to the Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Trust. In the absence of gross negligence, the written opinion of or information provided by any FCR Professional or Trust Professional deemed by the FCR to be qualified as an expert on the particular matter submitted to the FCR shall be full and complete authorization and protection in support of any action taken or not taken by the FCR in good faith and in accordance with the written opinion of or information provided by such FCR Professional or Trust Professional.

**(b)**  The Trust shall promptly reimburse, or pay directly if so instructed, the FCR for any reasonable fees and expenses associated with the FCR's employment of legal counsel pursuant to this provision in connection with the FCR's performance of his or her duties hereunder. The Trust shall also promptly reimburse, or pay directly if so instructed, the FCR for any reasonable fees and expenses associated with the FCR's employment of any other FCR Professional pursuant to this provision in connection with the FCR's performance of his or her duties hereunder; provided, however, that (i) the FCR has first submitted to the Trust a written request for such reimbursement setting forth the reasons (A) why the FCR desires to employ such FCR Professional and (B) why the FCR cannot rely on Trust Professionals to meet the needs of the FCR for such expertise or advice and (ii) the Trust has approved the FCR's request for reimbursement in writing. If the Trust agrees to pay for the FCR Professional, such reimbursement shall be treated as a Trust Expense. If the Trust declines to pay for the FCR Professional, it must set forth its reasons in writing. If the FCR still desires to employ such FCR Professional at the expense of the Trust, the FCR and/or the Trustee shall resolve their dispute pursuant to Section 8.12 below.

**7.6**  **Compensation and Expenses of the FCR.**  The FCR shall receive compensation from the Trust for attendance at meetings or other Trust business performed in the form of the FCR's normal hourly rate for services provided. In addition, the Trust shall promptly reimburse

3675200v3

the FCR for any out-of-pocket fees and expenses reasonably incurred by him or her in connection with the performance of his or her duties as the FCR. Such compensation or reimbursement shall be deemed a Trust Expense. The Trustee shall include a reasonably detailed description of the amounts paid under this Section 7.6 in the accounts to be filed with the Bankruptcy Court and provided to the Debtor, the TAC and the FCR pursuant to Section 2.2(b)(i) above.

### 7.7 Procedures for Consultation with and Obtaining the Consent of the FCR.

#### (a) Consultation Process.

(i) In the event the Trustee is required to consult with the FCR pursuant to Section 2.2(d) above or on any other matters specified herein, the Trustee shall provide the FCR with written advance notice of the matter under consideration and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the FCR with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts, or financial or investment advisor retained by the Asbestos PI Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such matter, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee; provided that in no event shall the FCR have any right to consult with counsel to the Trust or obtain any information in such a manner as would result in the waiver of attorney-client privilege or other applicable privilege belonging to the Trust.

(ii) In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 7.7(a), the Trustee shall take into consideration the time required for the FCR, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the FCR with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the FCR.

#### (b) Consent Process.

(i) In the event the Trustee is required to obtain the consent of the FCR pursuant to Section 2.2(e) above, the Trustee shall provide the FCR with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the FCR as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the FCR with such reasonable access to any counsel, accountants, appraisers, auditors, forecasters, experts, or financial or investment advisors retained by the Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such action, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee; provided that in no event shall the FCR have any right to consult with counsel

3675200v3

to the Trust or obtain any information in such a manner as would result in the waiver of attorney-client or other applicable privilege belonging to the Trust.

(ii)     The FCR must consider in good faith and in a timely fashion any request for his or her consent by the Trustee and must in any event advise the Trustee in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee. The FCR may not withhold his or her consent unreasonably. If the FCR decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the FCR does not advise the Trustee in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustee regarding such consent, the FCR's consent shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 7.7(b), the FCR continues to object to the proposed action and to withhold his or her consent to the proposed action, the Trustee and/or the FCR shall resolve their dispute in accordance with Section 8.12 below. However, the burden of proof with respect to the validity of the FCR's objection and withholding of his or her consent shall be on the FCR.

## ARTICLE VIII

## GENERAL PROVISIONS

**8.1**     **Irrevocability.**  The Trust is irrevocable.

**8.2**     **Termination.**

(a)     The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions this Section 8.2.

(b)     The Trust shall automatically dissolve on the date ("**Dissolution Date**") ninety (90) days after the first to occur of the following:

(i)     the date on which the Trustee decides to dissolve the Trust because (A) the Trustee deems it unlikely that any new Trust Claim will be Filed against the Trust, (B) all Trust Claims duly filed with the Trust have been liquidated and, to the extent possible based upon the funds available to the Trust through the Plan, paid to the extent provided in this Trust Agreement and the TDP or disallowed by a final, non-appealable order, and (C) twelve (12) consecutive months have elapsed during which no new Trust Claim has been filed with the Trust;

(ii)     if the Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses (including Trust Expenses) of the Trust in a manner consistent with this Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order; or

3675200v3

(iii)    to the extent that any rule against perpetuities shall be deemed applicable to the Trust, that date which is twenty-one (21) years less ninety-one (91) days after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)    On the Dissolution Date or as soon as reasonably practicable, after the wind-up of the Trust's affairs by the Trustee and payment of all the Trust's liabilities has been provided for (including Trust Expenses), as required by applicable law, including Section 3808 of the Act, all assets remaining in the Trust estate shall be given to such organization(s) exempt from federal income tax under section 501(c)(3) of the IRC as shall be selected by the Trustee using his or her reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organizations) shall be related to the treatment of, research of or the relief of suffering of individuals with asbestos-related disorders and (ii) the tax-exempt organization(s) shall not bear any relationship to Reorganized UGL within the meaning of section 468B(d)(3) of the IRC.  Notwithstanding any contrary provision of the Plan and related documents, this Section 8.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of the Trust, the Trust shall terminate and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust to be filed in accordance with the Act.  Notwithstanding anything to the contrary contained in this agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**8.3    Amendments.**  The Trustee may modify or amend this Trust Agreement by a writing; provided, however, that any such amendment shall be consistent with the terms of the Asbestos PI Trust Bylaws.  The Trust may modify or amend the TDP by a writing signed by the Trustee; provided, however, that any such amendment shall require the consent of the majority of the TAC as well as the FCR; and provided, further, that no amendment to such procedures shall be inconsistent with the provisions limiting amendments to such procedures provided therein, including the provisions limiting amendment of the Claims Payment Ratio set forth in Section 2.5 of the TDP and of the Payment Percentage set forth in Section 4.2 of the TDP.  Notwithstanding anything contained in this Trust Agreement to the contrary, none of this Trust Agreement, the TDP or the Asbestos PI Trust Bylaws, or any document annexed to the foregoing, shall be modified or amended in any way that could jeopardize, impair or modify the applicability of section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the injunction entered thereunder or the Trust's qualified settlement fund status under section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

**8.4    Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**8.5    Notices.**

(a)    Any notices or other communications required or permitted hereunder to any person asserting a Trust Claim shall be in writing and delivered at the address for such person or, where applicable, such person's legal representative, in each case as provided on such

person's claim form submitted to the Trust with respect to his or her Claim, or mailed by first class mail, postage prepaid, addressed to such address.

(b)     Any notices or other communications required or permitted hereunder to any of the following parties shall be in writing and delivered at the address for such party designated below, mailed by registered or certified mail, return receipt requested, postage prepaid, addressed to such address, or sent by email pursuant to the instructions listed below, in each case or to such other address or addresses or in accordance with such other instructions, as the case may be, as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To Reorganized UGL:

United Gilsonite Laboratories
c/o Thomas R. White, President
P.O. Box 70
Scranton, PA 18501

with a copy to:

Karen A. Giannelli, Esquire
Mark Conlin, Esquire
Gibbons P.C.
One Gateway Center
Newark, NJ 07102
kgiannelli@gibbons.com
mconlin@gibbons.com

To the Trust through the Trustee:

**[TBD]**

with a copy to:

**[TBD]**

To the Delaware Trustee:

**[TBD]**

To the TAC:

**[TBD]**

with a copy to:

Natalie D. Ramsey, Esquire

3675200v3

Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
nramsey@mmwr.com

<u>To the FCR</u>:

James L. Patton, Esquire
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
jpatton@ ycst.com

<u>with a copy to</u>:

Edwin J. Harron
Sharon M. Zieg
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
eharron@ycst.com
szieg@ycst.com

   **(c)**    All notices and communications in accordance with this Section 8.5 shall be effective, if mailed, when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

   **8.6**    <u>**Successors and Assigns**</u>.  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Protected Parties, the Trust, the Trustee, the Delaware Trustee, the TAC, the FCR, and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its rights or obligations under this Trust Agreement except, in the case of the Trust and the Trustee, as contemplated by Section 2.1 above.

   **8.7**    <u>**Limitation on Claim Interests for Securities Laws Purposes**</u>.  No Trust Claim or any interest therein shall (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, (b) be evidenced by a certificate or other instrument, (c) possess any voting rights, or (d) be entitled to receive any dividends or interest; <u>provided</u>, <u>however</u>, that clause (a) of this Section 8.7 shall not apply to the holder of a claim that is subrogated to a Trust Claim as a result of its satisfaction of such claim.

   **8.8**    <u>**Entire Agreement; No Waiver**</u>.  The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to

3675200v3

herein, and this Trust Agreement and the documents referred to herein supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

8.9 **Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement or in any manner affect the construction of the provisions of this Trust Agreement.

8.10 **Governing Law.** This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of law principles.

8.11 **Settlor Representative and Cooperation.** Reorganized UGL is hereby irrevocably designated as the settlor of the Trust and is hereby authorized to take any action required as such in connection with this Trust Agreement. Reorganized UGL agrees to cooperate in implementing the goals and objectives of the Trust.

8.12 **Dispute Resolution.** Any disputes that arise under this Trust Agreement or under the TDP shall be resolved by submission of the matter to an alternative dispute resolution ("**ADR**") process mutually agreeable to the parties involved. Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter. In either case, if the dispute arose pursuant to the consent provision set forth in Section 6.7(b) above or Section 7.7(b) above, the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid. Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court. Notwithstanding anything else herein contained, to the extent any provision of this Trust Agreement is inconsistent with any provision of the TDP or the Plan, the Trust Distribution Procedures or the Plan, as the case may be, shall control.

8.13 **Enforcement and Administration.** The provisions of this Trust Agreement and the TDP shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes hereunder not resolved by ADR in accordance with Section 8.12 above.

8.14 **Effectiveness.** This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

8.15 **Counterpart Signatures.** This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the day and year first written above.

**UNITED GILSONITE LABORATORIES, as settlor of the Trust**

By: _____
Name: Thomas R. White
Title:  President

**TRUSTEE**

_____
Name:
Expiration Date of Initial Term:  _____
anniversary of the date of this Trust Agreement

**MEMBERS OF TRUST ADVISORY COMMITTEE**

_____
Name:
Expiration Date of Initial Term:  _____
anniversary of the date of this Trust Agreement

_____
Name:
Expiration Date of Initial Term:  _____
anniversary of the date of this Trust Agreement

_____
Name:
Expiration Date of Initial Term:  _____
anniversary of the date of this Trust Agreement

-27-

**FUTURE CLAIMANTS' REPRESENTATIVE**

By: _____

Name: James L. Patton

# EXHIBIT A

## Certificate of Trust
## Filed with Delaware Secretary of State

# EXHIBIT E2

**UGL Asbestos Personal Injury Trust Bylaws**

# UNITED GILSONITE LABORATORIES

## ASBESTOS PERSONAL INJURY TRUST BYLAWS

## ARTICLE 1

### OFFICES

Section 1:  **Principal Office**:  The initial principal office of the United Gilsonite Laboratories Asbestos PI Trust[1] shall be at [**Trust Co**.] _____, Delaware _____, or in any other place as the Asbestos PI Trustee shall from time to time select.

Section 2:  **Other Offices**: The Asbestos PI Trust may have other offices at other places as the Asbestos PI Trustee may from time to time determine to be necessary for the efficient and cost-effective administration of the Trust.

## ARTICLE 2

### TRUSTEES

Section 1:  **Control of Property, Business and Affairs**:  The property, business and affairs of the Asbestos PI Trust shall be managed by or under the direction of the Asbestos PI Trustee, provided that certain decisions of the Trustee shall require the consent of the TAC and the FCR, as provided in the Asbestos PI Trust Agreement.

Section 2:  **Number, Resignation and Removal**:  The number of trustees and the provisions governing the resignation and removal of a Trustee and the appointment of a successor Trustee shall be governed by the provisions of Article V of the Asbestos PI Trust Agreement.

Section 3:  **Quorum and Manner of Acting.**  A majority of the Trustees shall constitute a quorum for the transaction of business.  In the absence of a quorum, the Trustees present may adjourn the meeting from time to time until a quorum shall be present.  The vote, at a meeting at which a quorum is present, of a majority of Trustees shall be an act of the Asbestos PI Trustees.

Section 4:  **Delaware Trustee**:  To constitute a Delaware statutory trust as required by the Asbestos PI Trust Agreement, the Asbestos PI Trust Agreement designates [**Trust Co.**] as the Delaware Trustee.  The Delaware Trustee shall be a trustee for the sole and limited purpose of fulfilling the requirements of section 3807 of the Delaware Statutory Trust Act, and shall not be entitled to exercise any prerogatives or powers of, nor have any of the duties and

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan of Reorganization Proposed by United Gilsonite Laboratories, a Pennsylvania Corporation  (as amended, the "Plan") and the Asbestos PI Trust Agreement (the "Asbestos PI Trust Agreement" or "Trust Agreement").  All capitalized terms not defined therein, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code or Bankruptcy Rules, and such definitions are incorporated herein by reference.

responsibilities of, the Asbestos PI Trustees set forth in the Asbestos PI Trust Agreement, the Plan or these Asbestos PI Trust Bylaws.

Section 5: **Consultation with FCR and TAC**: When the Trustee is required or has the discretion, pursuant to the terms of the Asbestos PI Trust Agreement or these Asbestos PI Trust Bylaws, to consult with the FCR or TAC, the Trustee may do so at a regular meeting, special meeting or by written communication, *provided that*, the Trustee shall meet with the FCR and the TAC no less often than once quarterly, which shall be at a regular or special meeting of the Trustee as mutually agreed to by the Trustee, the FCR, and the TAC, to discuss general matters regarding the administration of the Asbestos PI Trust, the review, determination, liquidation, and payment of Trust Claims, the Asbestos Trust Distribution Procedures, and the condition of the Trust Assets.

The attendance of at least a majority of the TAC at a meeting constitutes the attendance of the TAC at that meeting. Each TAC member may designate in writing any person to attend and participate on his or her behalf at any meeting at which the attendance of the TAC is required or permitted. The Trustee shall be deemed to have complied with the requirement of Section 2.2(f) of the Asbestos PI Trust Agreement to meet with the TAC if each member of the TAC has been provided notice of a regular meeting of the Asbestos PI Trustee and a member of the TAC does not attend the meeting. The FCR may designate in writing any person to attend and participate on his or her behalf at any meeting at which the attendance of the FCR is required or permitted. Electronic transmission (e-mail) to the Trustee may be used by each TAC member and the FCR for the written designation.

In the event the consent of the FCR or the TAC on any matter is required pursuant to the terms of the Asbestos PI Trust Agreement, the TDP or these Bylaws, notice of the matter in question shall be provided to the FCR and the TAC and their respective counsel as provided in sections 6.7 and 7.7 of the Asbestos PI Trust Agreement. The consent of a majority of the members of the TAC on a matter, whether by actual voting or by the implied consent of a TAC member who fails to vote within the time prescribed under the Trust Agreement, constitutes the consent of the TAC on that matter. The FCR and each TAC member may designate in writing any person to vote as his or her proxy on any matter on which the consent of the TAC is required or permitted. Electronic transmission (e-mail) to the Trustee may be used for the written designation.

Section 6: **Regular Meetings**: Regular meetings of the Trustee may be held at a time and place as shall from time to time be determined by the Trustee, provided that the Trustee shall hold a meeting at least one time per calendar quarter. For each calendar year, the Trustee shall schedule the year's regular meetings, and deliver the schedule to those entitled to receive notice, as soon as practicable after the Effective Date or each anniversary of the Effective Date, as the case may be.

Notice of a regular meeting shall be in writing and delivered to the TAC and the FCR as provided by Section 8.5 of the Trust Agreement. Notice of a regular meeting to any other person entitled to receive notice shall be in writing, addressed to him or her at the place designated by him or her for receipt of notice, or failing a designation, at his or her residence or usual place of business, by (i) U. S. mail, registered or certified, return receipt requested, postage prepaid, at

-2-

least fifteen days before the date on which the meeting is to be held; (ii) reputable overnight courier, charges prepaid, at least eleven days before the date on which the meeting is to be held; or (iii) hand delivery, facsimile or e-mail transmission by 5:00 p.m. prevailing Eastern time (with a copy of any facsimile or e-mail sent on the same day to the recipient by reputable overnight courier, charges prepaid) at least ten days before the date on which the meeting is to be held. In lieu of the notice to be given as set forth above, a waiver thereof in writing signed by the person entitled to receive the notice, whether signed before or after the meeting, shall be deemed equivalent to adequate notice for purposes of this Section 6. No notice or waiver by any of the Trustees, the FCR, or any member of the TAC with respect to any regular meeting shall be required if that person attends the meeting.

Section 7: **Special Meetings**: Special meetings of the Trustee shall be held whenever called by the Trustee. Notice of a special meeting shall be in writing and delivered to the TAC and the FCR as provided by Section 8.5 of the Trust Agreement. Notice of a special meeting to any other person entitled to receive notice shall be in writing, addressed to him or her at the place designated by him or her for receipt of notice, or failing a designation, at his or her residence or usual place of business, by (i) reputable overnight courier, charges prepaid, at least three days before the date on which the meeting is to be held; (ii) hand delivery, facsimile or e-mail transmission by 5:00 p.m. prevailing Eastern time (with a copy of any facsimile or e-mail sent on the same day to the recipient by reputable overnight courier, charges prepaid) at least two days before the day on which the meeting is to be held. The notice shall state the place, date, and hour of the meeting and the purposes for which it is called. In lieu of the notice to be given as set forth above, a waiver thereof in writing signed by the person entitled to receive the notice, whether signed before or after the meeting, shall be deemed equivalent to adequate notice for purposes of this Section 7. No notice or waiver the Trustee, the FCR, or any member of the TAC with respect to any special meeting shall be required if that person attends the meeting.

Section 8: **Conduct of Business**: To the extent not inconsistent with the terms of the Trust Agreement, these Bylaws shall govern the affairs of the Trust and the Trustee shall act in accordance with these Bylaws. In the event of an inconsistency between these Bylaws and the Trust Agreement, the Trust Agreement shall govern.

At meetings of the Trustee, matters pertaining to the Trust's purposes shall be considered.

Section 9: **Action Without a Meeting**: Any action required or permitted to be taken at any special meeting of the Trustee may be taken without a meeting if the Trustee, after notice to the FCR and the TAC where required by the Trust Agreement, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Trustee. Electronic transmission (e-mail) may be used by the Trustee for the notice and consent provided in this Section 9.

Section 10: **Participation by Telephone**: The Trustee, at his/her sole discretion, may take any action required or permitted to be taken at any meeting by means of conference by telephone, or similar communication equipment, among all attendees. The Trustee, the FCR, and any member of the TAC may participate by telephone in any meeting they are required or permitted to attend. Participation in a meeting pursuant to this section shall constitute attendance in person at the meeting.

3675196v1

# ARTICLE 3

## OFFICERS

Section 1: **Officers**: The Trustee, appointed pursuant to section 5.1 of the Trust Agreement, shall serve as the principal officer of the Trust. Counsel to the Trust shall serve as Secretary. In addition to the principal officer identified in the first sentence of this Section 1 of Article 3, the Trust may have such other subordinate officers as the Trustee determines in his/her discretion is advisable or necessary in order to carry out the terms of, or promote the efficient and cost-effective administration of, the Trust. In the absence of a Secretary at the meeting, the Trustee may appoint any other person (including himself) to act as Secretary for that meeting.

Section 2: **Term of Office**: Each officer of the Asbestos PI Trust shall hold office until his or her successor shall have been duly chosen and qualified or until the earlier of his or her death, resignation, retirement, or removal.

Section 3: **Resignation**: Any officer of the Trust, including the Trustee, may resign from his or her office at any time by giving written notice. The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in the notice and unless otherwise specified therein, the acceptance of the resignation shall not be necessary to make it effective.

Section 4: **Removal:** The Trustee or any other officer may be removed with or without cause, at any time, by resolution adopted by the Trustee or at any special meeting of the Trustee called for that purpose; provided, however, that the consent of the TAC and the FCR shall be required for the removal of the Trustee without cause.

Section 5: **Powers and Duties**: The officers of the Trust shall have the powers and perform the duties as may be conferred upon or assigned to them by the Trustee.

Section 6: **Authority of Trustee**: Notwithstanding anything contained herein, any person, firm or corporation dealing with the Trust shall be entitled to rely upon the signature of the Trustee, on behalf of the Trust, to any document or instrument as having been validly authorized by the Trust.

Section 7: **Agents and Employees**: In addition to the officers who may be appointed pursuant to Section 1 of this Article 3, the Trust may have other agents and employees as the Trustee, in his or her discretion, may deem advisable or necessary to carry out the terms of, or for the efficient and cost-effective administration of, the Trust, and shall hold his or her position or office for such period, have such authority, and perform such duties as the Trustee may from time to time determine. The Trustee may delegate to any officer the power to appoint and to remove any agents or employees.

3675196v1

## ARTICLE 4

## AMENDMENTS

Section 1:  **Amendments**:  These Bylaws of the Asbestos PI Trust may be amended by the Trustee at any meeting of the Trustee, provided that notice of the proposed amendment is contained in the notice of the meeting, and with notice to and consent of the TAC and FCR.

## ARTICLE 5

## EFFECTIVENESS

Section 1:  **Effectiveness**:  These Bylaws shall become effective on the Effective Date of the Plan.

*e  ai  der o   a e   te tio a     e t   a*

-5-

# EXHIBIT F

**Form of UGL Asbestos Trust Distribution Procedures**

*SUBJECT TO FURTHER NEGOTIATION AMONG THE PARTIES AND FINAL
APPROVALS BY THE SIGNATORIES THERETO.*

**FORM OF
UNITED GILSONITE LABORATORIES
ASBESTOS PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

3786050v5

# TABLE OF CONTENTS

SECTION I INTRODUCTION ..................................................................................1

    1.1 Purpose ...........................................................................................................1

    1.2 Interpretation...................................................................................................1

SECTION II OVERVIEW ......................................................................................2

    2.1 Trust Goals......................................................................................................2

    2.2 Claims Liquidation Procedures......................................................................3

    2.3 Application of the Payment Percentage .........................................................5

    2.4 Determination of the Maximum Annual Payment and Maximum Available
            Payment .........................................................................................................5

    2.5 Claims Payment Ratio ....................................................................................8

    2.6 Indirect Trust Claims ....................................................................................11

SECTION III TDP ADMINISTRATION ..............................................................11

    3.1 TAC and FCR ...............................................................................................11

    3.2 Consent and Consultation Procedures ..........................................................11

SECTION IV PAYMENT PERCENTAGE; PERIODIC ESTIMATES ...............12

    4.1 Uncertainty of the Total Personal Injury Asbestos Liabilities.....................12

    4.2 Computation of Payment Percentage ...........................................................12

    4.3 Applicability of the Payment Percentage .....................................................13

SECTION V RESOLUTION OF TRUST CLAIMS ............................................16

    5.1 Ordering, Processing and Payment of Claims ..............................................16

    5.2 Resolution of Unliquidated Trust Claims .....................................................20

    5.3 Categorizing Claims as Extraordinary and/or Exigent ................................32

    5.4 Indirect Trust Claims ....................................................................................34

    5.5 Evidentiary Requirements .............................................................................36

    5.6 Claims Audit Program...................................................................................41

    5.7 Second Disease (Malignancy) Claims ..........................................................42

    5.8 Arbitration.....................................................................................................43

    5.9 Litigation.......................................................................................................45

SECTION VI CLAIMS MATERIALS ..................................................................45

    6.1 Claims Materials...........................................................................................45

-i-

6.2     Content of Claims Materials .................................................................45

6.3     Withdrawal or Deferral of Claims ........................................................46

6.4     Filing Requirements and Fees ..............................................................47

6.5     English Language ..................................................................................47

6.6     Confidentiality of Claimants' Submissions ..........................................47

SECTION VII     GENERAL GUIDELINES FOR LIQUIDATING AND PAYING
                CLAIMS ...................................................................................48

7.1     Showing Required ................................................................................48

7.2     Costs Considered ..................................................................................48

7.3     Discretion to Vary the Order and Amounts of Payments in Event of
        Limited Liquidity..................................................................................49

7.4     Punitive Damages .................................................................................49

7.5     Sequencing Adjustments ......................................................................50

7.6     Suits in the Tort System........................................................................51

7.7     Payment of Judgments for Money Damages ........................................52

7.8     Releases ................................................................................................53

7.9     Third-Party Services .............................................................................53

SECTION VIII     MISCELLANEOUS ................................................................53

8.1     Amendments .........................................................................................53

8.2     Severability............................................................................................54

8.3     Governing Law ......................................................................................54

8.4     Merger of Trust Assets with Other Trusts ...........................................54

3786050v5

# UNITED GILSONITE LABORATORIES

## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The United Gilsonite Laboratories Asbestos Personal Injury Trust Distribution Procedures ("**TDP**") contained herein are established pursuant to the Modified First Amended Plan of United Gilsonite Laboratories Under Chapter 11 of the Bankruptcy Code ("**Plan**") and the United Gilsonite Laboratories Asbestos Personal Injury Trust Agreement ("**Trust Agreement**" or "**Asbestos PI Trust Agreement**"), which establish the United Gilsonite Laboratories Asbestos Personal Injury Trust ("**Trust**" or "**Asbestos PI Trust**"). These TDP provide for the resolution of all Trust Claims for which the Trust has legal responsibility (hereinafter referred to collectively for all purposes of these TDP as "**Trust Claims**").

The Asbestos PI Trustee ("**Trustee**") shall implement and administer these TDP in accordance with the Trust Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the Trust Agreement. For purposes of these TDP, "Trust Claims" shall not include Trust Expenses.

## SECTION I

### INTRODUCTION

 1.1 __Purpose.__ These TDP have been adopted pursuant to the Trust Agreement. They are designed to provide fair, equitable, and substantially similar treatment for all similarly situated Trust Claims that presently exist and may arise in the future.

 1.2 __Interpretation.__ Except as otherwise may be provided below, nothing in these TDP shall be deemed to create a substantive right for any claimant. The rights and benefits, if any, provided herein to holders of Trust Claims shall vest in such holders as of the Effective Date of the Plan.

3786050v5

Case 5:11-bk-02032-RNO Doc 2190 Filed 12/08/14 Entered 12/08/14 13:45:12 Desc
Main Document  Page 217 of 302

# SECTION II

# OVERVIEW

**2.1** **Trust Goals.** The goal of the Trust is to treat all claimants similarly and equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code. These TDP set forth procedures for processing and paying the Debtor's share of the unpaid portion of the liquidated value of all Trust Claims generally on an impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[1] To that end, these TDP establish a schedule of eight asbestos-related diseases ("**Disease Levels I-VIII**"), seven of which have presumptive medical and exposure requirements ("**Medical/Exposure Criteria**"), six of which have specific liquidated values ("**Scheduled Values**"), seven of which have anticipated average values ("**Average Values**"), and seven of which have caps on their liquidated values ("**Maximum Values**").

The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values that are set forth in Section 5.2 below have been selected and derived with the intention of achieving a fair allocation of the Trust funds as among claimants suffering from different diseases in light of the best available information considering the domestic settlement history of the Debtor and the rights that claimants would have in the tort system absent the bankruptcy.

**2.2** **Claims Processing Fee.** The Trust shall impose a non-reimbursable fee of $50.00 in connection with submission of Trust Claims.

---

[1] As used in these TDP, the phrase "**in the tort system**" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of the Bankruptcy Code or any other applicable law.

-2-

3786050v5

**2.3**    **Claims Liquidation Procedures.** Trust Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below. The Trust shall take all reasonable steps to resolve Trust Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration. Those steps may include, in the Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.2(b)(2) below. The Trust shall also make every reasonable effort to resolve each year at least that number of Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

The Trust shall, except as otherwise provided below, liquidate all Trust Claims, except Foreign Claims (as defined in Section 5.2(b)(1) below) that meet the presumptive Medical/Exposure Criteria of Disease Levels II-V, VII and VIII under the Expedited Review Process described in Section 5.2(a) below. Trust Claims involving Disease Levels II-V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Trust's Individual Review Process described in Section 5.2(b) below. In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Trust may offer the claimant an amount up to the Scheduled Value of that Disease Level if the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

In lieu of the Expedited Review Process, a claimant holding a Trust Claim involving Disease Levels IV-V, VII or VIII may seek to establish a liquidated value for the claim that is

3786050v5

greater than its Scheduled Value by electing the Trust's Individual Review Process. However, the liquidated value of a Trust Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value, and in any event shall not exceed the Maximum Value for the Disease Level set forth in Section 5.2(b), unless the claim qualifies as an Extraordinary Claim under Section 5.3(a) below, in which case its liquidated value cannot exceed the extraordinary value specified in that provision for such claims. Disease Level VI (Lung Cancer 2) claims and all Foreign Claims may be liquidated only pursuant to the Trust's Individual Review Process.

Based upon the Debtor's domestic claims settlement history in light of tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.2(b)(3) have been established for each of the Disease Levels IV-V, VII and VIII that are eligible for Individual Review of their liquidated values with the expectation that over time the combination of domestic settlements at the Scheduled Values and those resulting from the Individual Review Process should generally result in the Average Values set forth in Section 5.2(b)(3) for each such Disease Level.

All unresolved disputes over a claimant's medical condition, exposure history and/or the validity or liquidated value of a claim shall be subject to mediation and/or binding or non-binding arbitration pursuant to Section 5.8 below, at the election of the claimant, under the Alternative Dispute Resolution Procedures (the "**ADR Procedures**") to be adopted by the Trust. Trust Claims that are the subject of a dispute with the Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.9 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be

3786050v5

payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in <u>Section 7.7</u> below.

2.4    <u>**Application of the Payment Percentage.**</u>  After the liquidated value of a Trust Claim (other than a claim involving Other Asbestos Disease (Disease Level I) as defined in <u>Section 5.2(a)(3)</u> below) is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, mediation, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on the Payment Percentage described in <u>Section 4</u> below.  The Payment Percentage shall also apply to all sequencing adjustments paid pursuant to <u>Section 7.5</u> below.

The initial Payment Percentage (the "**Initial Payment Percentage**") shall be established by the Trustee, with the consent of the Trust Advisory Committee ("**TAC**") and the Future Claimants' Representative ("**FCR**"), as soon as practicable after the Effective Date. The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Trust, with the consent of the TAC and the FCR, to reflect then-current estimates of the Trust 's assets and liabilities, as well as the then-estimated value of then-pending and future claims.  Any adjustment to the Initial Payment Percentage shall be made only pursuant to <u>Section 4.2</u> below. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under these TDP shall receive additional payments only as provided in <u>Section 4.3</u> below.  Because there is uncertainty in the prediction of both the number and severity of future Trust Claims, and the amount of the Trust's assets, no guarantee can be made of any Payment Percentage that will be applied to Trust Claim's liquidated value.

2.5    <u>**Determination of the Maximum Annual Payment and Maximum Available Payment.**</u>  After calculating the Payment Percentage, the Trust shall estimate or model the

-5-

3786050v5

amount of cash flow, principal, and income year-by-year so that they will be utilized over the entire life of the Trust in a manner that ensures that all present and future holders of Trust Claims are compensated in amounts reflecting the same Payment Percentage. In each year, based upon the model of cash flow, the Trust shall be empowered to pay out the portion of its funds payable for that year according to the model (the "**Maximum Annual Payment**"). The Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment.

The Payment Percentage and the Maximum Annual Payment figures are based on projections over the lifetime of the Trust. As noted in Section 2.3 above, if such long-term projections are revised, the Payment Percentage may be adjusted accordingly, which would result in a new model of the Trust's anticipated cash flow and a new calculation of the Maximum Annual Payment figures. However, year-to-year variations in the Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Trust's long-term projections. If, in a given year, however, asset values, including earnings thereon, are below projections, the Trust may need to distribute less in that year than would otherwise be permitted based on the applicable Maximum Annual Payment. Accordingly, the applicable Maximum Annual Payment for a given year may be temporarily decreased if the present value of the assets of the Trust as measured on a specified date during the year is less than the present value of the assets of the Trust projected for that date by the cash flow model described in the foregoing paragraph. The Trust shall make such a comparison whenever the Trustee becomes aware of any information that suggests that such a comparison should be made and, in any event, no less frequently than once every six months. If the Trust determines that as of the date in question, the present value of the Trust's assets is less than the

-6-

Case 5:11-bk-02032-RNO    Doc 2190    Filed 12/08/14    Entered 12/08/14 13:45:12    Desc
Main Document    Page 222 of 302

projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Trust based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the "**Temporary Maximum Annual Payment**" (additional reductions in the Maximum Annual Payment can occur during the course of that year based upon subsequent calculations). If in any year the Maximum Annual Payment was temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment. As a further safeguard, the Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year. If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the Trust shall first allocate the amount in question to (a) any Trust Claims (i) based on a diagnosis dated prior to the Effective Date and (ii) subsequently filed with the Trust within one (1) year following the date the Trust first accepts for processing the proof-of-claims forms and other materials required to file a claim with the Trust[2], which are liquidated by the Trust ("**Existing Claims**"), and (b) Exigent Hardship Claims that have been liquidated by the Trust.

---

[2] Exceptions to the satisfaction of this one-year filing requirement will be made where a claimant can show an inability to file within the one-year period caused by extraneous factors beyond the claimant's control.

3786050v5

Should the Maximum Annual Payment be insufficient to pay all such claims in full, the available funds shall be paid in proportion to the aggregate value of each group of claims and the available funds allocated to each group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in the FIFO Payment Queue. Claims in any group for which there are insufficient funds shall maintain their place in the FIFO Payment Queue and shall be carried over to the next year. If there is a decrease in the Payment Percentage prior to the payment of such claims, any such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Maximum Annual Payment. The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated Trust Claims, provided, however, that if the Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly. The Trustee, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in return for prompter payment (the "Reduced Payment Option").

      **2.6**    <u>**Claims Payment Ratio.**</u>  Based upon the Debtor's domestic claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been set, as of the Effective Date, at 98% for Disease Level VIII (Category A Claims) that were unliquidated as of the Commencement Date, and 2% for claims in all other Disease Levels (Disease Levels II – VII) (Category B Claims) that were similarly unliquidated as of the Commencement Date. The Claims Payment Ratio shall not apply to any claims involving Other Asbestos Disease (Disease Level I) as these claims will not receive a distribution under these TDPs.

-8-

3786050v5

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 98% of that amount will be available to pay claims in Disease Level VIII and 2% will be available to pay claims in all other Disease Levels (II – VII) placed in the FIFO Payment Queue described in Section 5.l(c) below.  In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue.  Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue.  Except as set forth below, if there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 98%/2% Claims Payment Ratio and its rollover provision shall apply to all Trust Claims (except claims that, pursuant to Section 2.5 above, are not subject to the Claims Payment Ratio).  The Claims Payment Ratio may be amended by the Committee or TAC, as the case may be, and the FCR prior to the date the Trust first accepts for processing proof-of-claim forms and other materials required to file a claim with the Trust.  Thereafter, both the Claims Payment Ratio and its rollover provision may be continued or recalibrated in order to reflect the actual number of Trust Claims that have been paid pursuant to these TDP.

Notwithstanding any other provision herein, if, at the end of a calendar year, there are excess funds in either Category A or Category B and insufficient funds in the other Category to pay such Category's claims, the Trustee may transfer up to a specified amount of excess funds

-9-

3786050v5

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 98% of that amount will be available to pay claims in Disease Level VIII and 2% will be available to pay claims in all other Disease Levels (II – VII) placed in the FIFO Payment Queue described in Section 5.l(c) below.  In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue.  Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue.  Except as set forth below, if there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 98%/2% Claims Payment Ratio and its rollover provision shall apply to all Trust Claims (except claims that, pursuant to Section 2.5 above, are not subject to the Claims Payment Ratio).  The Claims Payment Ratio may be amended by the Committee or TAC, as the case may be, and the FCR prior to the date the Trust first accepts for processing proof-of-claim forms and other materials required to file a claim with the Trust.  Thereafter, both the Claims Payment Ratio and its rollover provision may be continued or recalibrated in order to reflect the actual number of Trust Claims that have been paid pursuant to these TDP.

Notwithstanding any other provision herein, if, at the end of a calendar year, there are excess funds in either Category A or Category B and insufficient funds in the other Category to pay such Category's claims, the Trustee may transfer up to a specified amount of excess funds

-9-

3786050v5

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 98% of that amount will be available to pay claims in Disease Level VIII and 2% will be available to pay claims in all other Disease Levels (II – VII) placed in the FIFO Payment Queue described in Section 5.l(c) below.  In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue.  Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue.  Except as set forth below, if there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 98%/2% Claims Payment Ratio and its rollover provision shall apply to all Trust Claims (except claims that, pursuant to Section 2.5 above, are not subject to the Claims Payment Ratio).  The Claims Payment Ratio may be amended by the Committee or TAC, as the case may be, and the FCR prior to the date the Trust first accepts for processing proof-of-claim forms and other materials required to file a claim with the Trust.  Thereafter, both the Claims Payment Ratio and its rollover provision may be continued or recalibrated in order to reflect the actual number of Trust Claims that have been paid pursuant to these TDP.

Notwithstanding any other provision herein, if, at the end of a calendar year, there are excess funds in either Category A or Category B and insufficient funds in the other Category to pay such Category's claims, the Trustee may transfer up to a specified amount of excess funds

-9-

3786050v5

(the "**Permitted Transfer Amount**" as defined below) to the Category with the shortfall; provided however that the Trustee shall never transfer more than the amount of the receiving Category's shortfall. The "**Permitted Transfer Amount**" shall be determined as follows: (a) the Trustee shall first determine the cumulative amount allocated to the Category with excess funds based on the Claims Payment Ratio since the date the Trust last calculated its Payment Percentage; (b) the Trustee shall then determine the cumulative amount that the Trust estimated would be paid to the Category with excess funds since the date the Trust last calculated its Payment Percentage; (c) the Trustee shall then subtract the amount determined in (b) from the amount determined in (a), and the difference between the two shall be referred to as the "Permitted Transfer Amount." When deciding whether to make a transfer, the Trust shall take into account any artificial failures of the processing queue that may have impacted the amount of funds expended from either Category. The Trustee shall provide the TAC and the FCR with the Permitted Transfer Amount calculation thirty (30) days prior to making a transfer.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustee shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the domestic settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustee should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

In any event, no amendment to the Claims Payment Ratio may be made without the consent of the TAC and the FCR. In the case of any amendments to the Claims Payment Ratio, the consent process set forth in Sections 6.7 and 7.7 of the Trust Agreement shall apply. The

3786050v5

Trustee, with the consent of the TAC and the FCR, may offer a Reduced Payment Option to holders of claims in either Category A or Category B.

2.7     **Indirect Trust Claims.**  As set forth in <u>Section 5.4</u> below, Indirect Trust Claims, if any, shall be subject to the same categorization, evaluation, and payment provisions of these TDP as all other Trust Claims.

**SECTION III**

**<u>TDP ADMINISTRATION</u>**

3.1     **<u>TAC and FCR.</u>**  Pursuant to the Plan and the Trust Agreement, the Trustee shall administer the Trust Agreement and these TDP in consultation with the TAC, which represents the interests of holders of present Trust Claims, and the FCR, who represents the interests of holders of Trust Claims that will be asserted in the future.  The Trustee shall obtain the consent of the TAC and the FCR on any amendments to these TDP pursuant to <u>Section 8.1</u> below, and on such other matters as are otherwise required below and in <u>Section 2.2(e)</u> of the Trust Agreement. The Trustee shall also consult with the TAC and the FCR on such matters as are provided below and in <u>Section 2.2(d)</u> of the Trust Agreement.  The initial Trustee, the initial members of the TAC and the initial FCR are identified in the Trust Agreement.

3.2     **<u>Consent and Consultation Procedures.</u>**  In those circumstances in which consultation or consent is required, the Trustee shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed.  The Trustee shall not implement such amendment or take such action unless and until the parties have engaged in the Consultation Process described in <u>Sections 6.7(a) and 7.7(a)</u>, or the Consent Process described in <u>Sections 6.7(b) and 7.7(b)</u>, of the Trust Agreement, respectively.

-11-

3786050v5

**SECTION IV**

**PAYMENT PERCENTAGE; PERIODIC ESTIMATES**

**4.1**      **Uncertainty of the Total Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding the Debtor's total asbestos-related tort liabilities, as well as the total value of the assets available to the Trust to pay Trust Claims.  Consequently, there is inherent uncertainty regarding the amounts that holders of Trust Claims shall receive.  To ensure substantially equivalent treatment of all present and future Trust Claims, the Trustee must determine from time to time the percentage of full liquidated value that holders of present and future Trust Claims will be likely to receive, i.e., the "**Payment Percentage**" described in Section 2.3 above and Sections 4.2 and 4.3 below.

**4.2**      **Computation of Payment Percentage.**  As provided in Section 2.3 above, the Trustee, with the consent of the TAC and the FCR, shall establish the Initial Payment Percentage after the Plan's Effective Date. The Payment Percentage shall be subject to change pursuant to the terms of these TDP and the Trust Agreement if the Trustee, with the consent of the TAC and the FCR, determines that an adjustment is required.  No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustee shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, if necessary after such reconsideration, change the Payment Percentage with the consent of the TAC and the FCR.  The Trustee shall also reconsider the Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the FCR.

The Trustee must base his or her determination of the Payment Percentage on current estimates of the number, types, and values of present and future Trust Claims, the value of the

-12-

assets then available to the Trust for payment of Trust Claims, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all present and future holders of Trust Claims.  When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors.  The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories of claims shall receive the same Payment Percentage, but the payment may be deferred as needed pursuant to Section 7.3 below, and a Reduced Payment Option may be instituted as described in Section 2.4 above.

        **4.3**      **Applicability of the Payment Percentage.**  Except as provided in this Section 4.3, no holder of a Trust Claim for Disease Levels II-VIII shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment. Except as otherwise provided in (a) Section 5.1(c) for Trust Claims involving deceased or incompetent claimants for which the Trust's offer must be approved by a court or through a probate process and (b) the paragraph below with respect to Released Claims, no holder of any Trust Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustee, in his or her discretion, may cause the Trust to pay a Trust Claim based on the Payment Percentage that was in effect prior to the reduction if such Trust Claim was filed and actionable with the Trust ninety (90) days or more prior to the date the Trustee proposed the new Payment Percentage in writing to the TAC and the FCR (the "**Proposal Date**") and the processing of such claim was unreasonably delayed due to

-13-

circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustee to the TAC and the FCR, but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Trust Claim was liquidated prior to the Proposal Date and who either (a) transmitted[3] an executed release to the Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**"). For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Trust transmits a release electronically, the release shall be deemed to have been received on the date the Trust transmits the offer notification, and (c) if the Trust places the release in the U.S. mail, postage pre-paid, the release

---

[3] For purposes of this sentence, "**transmitted**" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

-14-

shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Sections 2.4 and 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to the Proposal Date, the Trust shall issue a written notice to claimants or claimants' counsel indicating the Trust is reconsidering the Payment Percentage.

**There is uncertainty surrounding the amount of the Trust's future assets and liabilities and the totality of the Trust Claims to be paid over time, as well as the extent to which changes in existing law could affect the Trust's liabilities under these TDP. If the value of the Trust's future assets increases significantly and/or if the value or volume of Trust Claims actually filed with the Trust is significantly lower than originally estimated, the Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.**

**If the Trustee, with the consent of the TAC and the FCR, decides to increase the Payment Percentage due to a material change in the estimates of the Trust's future assets and/or liabilities, the Trustee shall also make supplemental payments to all claimants who previously liquidated their claims against the Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).**

-15-

3786050v5

The Trustee's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00. The amount of the suspended payment shall be added to the amount of any prior supplemental payment(s) that was (were) also suspended because it (they) would have been less than $100.00. The Trustee shall pay any aggregate supplemental payments owed to the claimant when the total exceeds $100.00.

**SECTION V**

**RESOLUTION OF TRUST CLAIMS**

**5.1    Ordering, Processing and Payment of Claims.**

       **(a)    Ordering of Claims.**

            **(1)    Establishment of FIFO Processing Queues.** The Trust shall order all claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**"). For all claims filed on or before the date six (6) months after the date that the Trust first makes available the proof-of-claim forms and other claims materials required to file a claim with the Trust (the "**Initial Claims Filing Date**"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Commencement Date that the specific claim was either filed against the Debtor in the tort system or was actually submitted to the Debtor pursuant to an administrative settlement agreement; (ii) the date before the Commencement Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with the Debtor; (iii) the date after the Commencement Date but before the date that the Trust first makes available the proof-of-claim forms and other claims materials required to file a claim with the Trust that the asbestos claim was filed against another defendant in the tort system; (iv) the date after the Commencement Date but before the Effective

-16-

Date that a proof of claim was filed by the claimant against the Debtor in the Debtor's Chapter 11 cases; or (v) the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Trust, provided such claim is sufficiently complete, as defined in the Trust's claim filing instructions. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

**(2)** **Effect of Statutes of Limitations and Repose.** All unliquidated Trust Claims must meet either: (i) for claims first filed in the tort system against a Debtor prior to the Commencement Date, the statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) for claims not filed against the Debtor in the tort system prior to the Commencement Date, statute of limitations that was in effect at the time of the filing with the Trust. However, the running of the statute of limitations shall be tolled as of the earliest of: (A) the actual filing of the claim against the Debtor prior to the Commencement Date, whether in the tort system or by submission of the claim to the Debtor pursuant to an administrative settlement agreement; (B) the tolling of the claim against the Debtor prior to the Commencement Date by an agreement or otherwise, provided such tolling was still in effect on the Commencement Date; or (C) the Commencement Date.

3786050v5

If a Trust Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the statute of limitations at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Trust within three (3) years after the Initial Claims Filing Date. In addition, any claims that were first diagnosed after the Commencement Date, irrespective of the application of any relevant federal, state, or foreign statute of limitations or repose, may be filed with the Trust within three (3) years after the date upon which the disease upon which the Trust Claim is premised is diagnosed or within three (3) years after the Initial Claims Filing Date, whichever occurs later. However, the processing of any Trust Claim may be deferred at the election of the claimant pursuant to Section 6.3 below.

        **(b)**     **Processing of Claims.** As a general practice, the Trust shall review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

        **(c)**     **Payment of Claims.** Trust Claims that have been liquidated under the provisions of these TDP by the Expedited Review Process as provided in Section 5.2(a) below, by the Individual Review Process as provided in Section 5.2(b) below, by mediation or arbitration as provided in Section 5.8 below, or by litigation in the tort system as provided in Section 5.9 below, shall be paid in FIFO order based on the date their liquidation became final (the "**FIFO Payment Queue**"), all such payments being subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein.

        Where the claimant is deceased or incompetent and the settlement and payment of the claim must be approved by a court of competent jurisdiction or through a probate process prior to

-18-

acceptance of the claim by the claimant's representative, an offer made by the Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Trust has been furnished with evidence that the settlement offer has been submitted to such court or to the probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective claimants' asbestos-related diseases were diagnosed on the same date, the position of those claimants in the FIFO Payment Queue shall be determined based on the dates of the claimants' births, with older claimants given priority over younger claimants.

**5.2** **Resolution of Unliquidated Trust Claims.** Within six (6) months after the establishment of the Trust, the Trustees, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Trust Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking resolution of unliquidated Trust Claims must first file a proof-of-claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1, 6.2, 6.4 and 6.5 below. It is anticipated that the Trust shall provide an initial response to the claimant within six (6) months of receiving the proof-of-claim form.

The proof-of-claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the

-19-

Disease Level alleged on the proof-of-claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as merged into the higher Disease Level for both processing and payment purposes. The proof-of-claim form also shall require the claimant to elect the Expedited Review Process, as described in Section 5.2(a) below, or the Individual Review Process, as described in Section 5.2(b) below, if such election is available under these TDP for the Disease Level alleged by the claimant.

Upon filing of a valid proof-of-claim form with the required supporting documentation, the claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.

      **(a)**      **Expedited Review Process.**

            **(1)**      **In General.** The Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient, and inexpensive method for liquidating all Trust Claims (except those involving Lung Cancer 2 - Disease Level VI and all Foreign Claims (as defined below), which shall only be liquidated pursuant to the Trust's Individual Review Process), including secondary exposure claims, where the claim can easily be verified by the Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level. Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Trust Claims than does the Individual Review Process described in Section 5.2(b) below. Expedited Review is also intended to provide qualifying claimants a fixed and certain claim value.

-20-

3786050v5

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.2(a)(3) below. However, all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio limitations set forth herein. Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the Trust's Individual Review Process set forth in Section 5.2(b) below.

Subject to the provisions of Section 5.1(a)(2) and 5.6, the claimant's eligibility to receive the Scheduled Value for his or her Trust Claim pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

(2)     **Claims Processing Under Expedited Review.** All claimants seeking liquidation of a Trust Claim pursuant to Expedited Review shall file the Trust's proof-of-claim form. If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must establish that the occupationally exposed person would have met the exposure requirements under these TDP that would have been applicable had that person filed a direct claim against the Trust. In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.2(a)(3) above or an asbestos-related disease otherwise compensable under these TDP, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos-containing products or conduct for which United Gilsonite Laboratories has

-21-

legal responsibility, and that such secondary exposure was a substantial contributing factor of the claimed disease.

As a proof-of-claim form is reached in the FIFO Processing Queue, the Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination. If the Medical/Exposure Criteria for a Disease Level are determined to have been met, the Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the Trust. If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

(3) **Disease Levels, Scheduled Values and Medical/Exposure Criteria.** The eight Disease Levels covered by these TDP, together with the Medical/Exposure Criteria for each, and the Scheduled Values for the seven Disease Levels eligible for Expedited Review, are set forth below. These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Trust Claims filed with the Trust on or before the Initial Claims Filing Date provided in Section 5.1 above for which the claimant elects the Expedited Review Process. Thereafter, for purposes of administering the Expedited Review Process and, with the consent of the TAC and the FCR, the Trustee may: add to, change or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values, or Medical/Exposure Criteria; or determine that a novel or exceptional Trust Claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then

-22-

3786050v5

current Disease Levels.  Because claimants seeking to recover from the Trust who fall within Disease Level VI may not undergo Expedited Review and must undergo Individual Review, no Scheduled Value is provided.

| Disease Level | Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $200,000 | (1) Diagnosis[4] of mesothelioma; and (2) Debtor Exposure as defined in Section 5.5(b)(1(B) below |
| Lung Cancer 1 (Level VII) | $21,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos Related Nonmalignant Disease,[5] (2) six months Debtor Exposure prior to May 22, 1980, (3) Significant Occupational Exposure[6] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |

---

[4] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of these TDP are set forth in Section 5.5 below.

[5] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest x-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification.  Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report).  Solely for asbestos claims filed against a Debtor or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels II, III, V and VII.  Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).  For all purposes of these TDP, a "Qualified Physician" is a physician who is board certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.6, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose x-rays and/or CT scan readings are submitted for deceased holders of Trust Claims.

[6] "Significant Occupational Exposure" is defined in Section 5.5(b)(1)(A) below.

3786050v5

| Disease Level | Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Lung Cancer 2 (Level VI) | N/A | (1) Diagnosis of a primary lung cancer; (2) Debtor Exposure prior to May 22, 1980, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer (Level VII) claims. All claims in this Disease Level shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $12,000, with such awards capped at $15,500, unless the claim qualifies for Extra-ordinary Claim treatment (discussed in Section 5.3 below). Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[7] In any event, no presumption of validity shall be available for any claims in this category. |

---

[7] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VII) or Lung Cancer 2 (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer 1 (Level VII), shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

3786050v5

| Disease Level | Scheduled Values | Medical/Exposure Criteria |
|---|---|---|
| Other Cancer (Level V) | $9,000 | (1) Diagnosis of a primary colorectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure prior to May 22, 1980, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $12,000 | (1) Diagnosis of asbestosis with ILO[8] of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Debtor Exposure prior to May 22, 1980, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level III) | $1,500 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Debtor Exposure prior to May 22, 1980, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level II) | $900 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months Debtor Exposure prior to May 22, 1980, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I) | $0 | N/A |

---

[8] If the diagnostic images being interpreted in such regard are digital images, then a written report by a Qualified Physician confirming that the images reviewed are with reasonable medical certainty equivalent to those that would qualify for the required ILO grade shall be acceptable as well.

3786050v5

(b)     **Individual Review Process.**

(1)     **In General.**  Subject to the provisions set forth below, a claimant may elect to have his or her Trust Claim reviewed for purposes of determining whether the claim would be cognizable and valid in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.2(a)(3) above.[9]  In addition or alternatively, a claimant holding a Trust Claim involving Disease Levels II, III, IV, V, VII or VIII may elect to have the claim undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level.  However, except for Disease Level VI and any Foreign Claims, until such time as the Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Trust's Expedited Review Process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under these TDP shall be established only under the Trust's Individual Review Process.  Trust Claims of individuals exposed in Canada who were residents of Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process.  Accordingly, a "**Foreign Claim**" is a Trust Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which the Debtor has legal responsibility, including under theories of alter-ego or similar theories of derivative liability, occurred outside

---

[9] Under this provision, a Trust Claim that does not include evidence of exposure prior to May 22, 1980, as set forth in the Significant Occupational Exposure or Debtor Exposure provisions below, may still undergo the Individual Review Process for purposes of determining whether such claim would be cognizable and valid in the tort system.

-26-

of the United States and its Territories and Possessions and outside of the Provinces and Territories of Canada.[10]

**A.** **Review of Medical/Exposure Criteria.** The Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of a Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels II-V, VII or VIII. In such a case, the Trust shall either deny the claim, or, if the Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

**B.** **Review of Liquidated Value.** Claimants holding claims in Disease Levels IV-VIII shall also be eligible to seek Individual Review of the liquidated value of their Trust Claims, as well as of their medical/exposure evidence. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review. Moreover, the liquidated value for a claim involving Disease Levels IV-V, VII and VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.2(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.3(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in Section 5.3(a) for such claims. Because the detailed examination and valuation process pursuant to Individual Review requires substantial

---

[10] Prior to the Trust's processing of Foreign Claims, and notwithstanding anything in the TDP to the contrary, the Trustee shall implement separate claim valuation, claim form and arbitration criteria, and evidentiary requirements to govern the resolution of Foreign Claims.

3786050v5

time and effort, claimants electing to undergo the Individual Review Process may be paid the liquidated value of their Trust Claim later than would have been the case had the claimant elected the Expedited Review Process. Subject to the provisions of <u>Section 5.6</u>, the Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

        **(2)**    **<u>Valuation Factors to Be Considered in Individual Review.</u>**  The Trust shall liquidate the value of each Trust Claim that undergoes Individual Review based on the historic liquidated values of other similarly-situated claims in the same Disease Level. The Trust shall thus take into consideration all of the factors that affect the severity of damages and values, including, but not limited to, credible evidence of (<u>i</u>) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (<u>ii</u>) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (<u>iii</u>) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which United Gilsonite Laboratories has legal responsibility, prior to May 22, 1980, including under theories of alter-ego (for example, alternative causes, and the strength of documentation of injuries); (<u>iv</u>) the industry of exposure; (<u>v</u>) settlement and verdict histories in the Claimant's Jurisdiction for similarly-situated claims; and (<u>vi</u>) settlements and verdicts of the Claimant's law firm for similarly-situated claims, on the basis of clear and convincing evidence provided to the Trust that the claimant's law firm played a substantial role in the prosecution and resolution of the cases, such as actively participating in court appearances, discovery, and/or trial of the cases, irrespective of whether a second law firm

-28-

3786050v5

was also involved and would also be entitled to include the cases in its "settlement and verdict histories." For the avoidance of doubt, mere referral of a case, without further direct involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case. In liquidating the value of a Trust Claim that undergoes Individual Review, the Trust shall treat a claimant as living if the claimant was alive at the time the initial pre-petition complaint was filed or the proof-of-claim form was filed with the Trust even if the claimant has subsequently died.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against the Debtor in the tort system prior to the Commencement Date. If the claim was not filed against the Debtor in the tort system prior to the Commencement Date, the Claimant's Jurisdiction may be either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the Trust; (ii) a jurisdiction in which the claimant experienced exposure to an asbestos containing product, or to conduct that exposed the claimant to an asbestos containing product, for which United Gilsonite Laboratories has legal liability, including under theories of alter-ego or similar theories of derivative liability; or (iii) in a jurisdiction that describes the claim as one for "exemplary" or "punitive" damages, the Commonwealth of Pennsylvania, in which case the claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles.

(3) **Scheduled, Average and Maximum Values.** The Scheduled, Average and Maximum Values for domestic claims involving Disease Levels I-VIII are the following:

3786050v5

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $200,000 | $225,000 | $400,000 |
| Lung Cancer 1 (Level VII) | $21,000 | $22,500 | $30,000 |
| Lung Cancer 2 (Level VI) | N/A | $10,200 | $10,200 |
| Other Cancer (Level V) | $9,000 | $9,000 | $9,000 |
| Severe Asbestosis (Level IV) | $10,200 | $12,500 | $15,000 |
| Asbestosis/Pleural Disease (Level III) | $1,500 | $1,500 | $1,500 |
| Asbestosis/Pleural Disease (Level II) | $900 | $900 | $900 |
| Other Asbestos Disease (Level I) | $0 | $0 | $0 |

These Scheduled Values, Average Values and Maximum Values shall apply to all domestic Trust Claims filed with the Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above. Thereafter, the Trust, with the consent of the TAC and the FCR pursuant to Sections 6.7(b) and 7.7(b) of the Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

(4) **Claims Processing under Individual Review.** At the conclusion of the Individual Review Process, the Trust shall: (i) determine the liquidated value, if any, of the claim; and (ii) advise the claimant of its determination. If the Trust establishes a liquidated value, it shall tender to the claimant an offer of payment of the aforementioned determined value multiplied by the applicable Payment Percentage, together with a form of release approved by the Trust. If the claimant accepts the offer of payment and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

-30-

**5.3    Categorizing Claims as Extraordinary and/or Exigent.**

(a)    **Extraordinary Claims.** "**Extraordinary Claim**" means a Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels IV-VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a facility of the Debtor during a period in which the Debtor was selling, distributing, processing, manufacturing, or otherwise handling asbestos-containing product at that facility or (ii) was at least 75% the result of exposure to asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which United Gilsonite Laboratories has legal responsibility, including under theories of alter-ego or similar theories of derivative liability, and in either case there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.2(b)(3) for claims qualifying for Disease Levels IV-V, VII and VIII, and five (5) times the Average Value set forth in Section 5.2(b)(3) for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special panel established by the Trust with the consent of the TAC and the FCR (the "**Extraordinary Claims Panel**"). All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review. An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other Trust Claims, except Exigent Claims (as defined in Section 5.3(b) below), based on its date of liquidation and shall be subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio described above.

-31-

3786050v5

      **(b)**    <u>**Exigent Claims**</u>.  At any time the Trust may liquidate and pay Trust Claims that qualify as Exigent Health Claims or Exigent Hardship Claims (together, "**Exigent Claims**") as defined below.  Exigent Claims may be considered separately under the Individual Review Process no matter what the order of processing otherwise would have been under these TDP.  An Exigent Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other Trust Claims and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above.

      **(1)**    <u>**Exigent Health Claims.**</u>  A Trust Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma (Disease Level VIII) and the claimant is living when the claim is filed.  A claim in Disease Levels IV-VII qualifies as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for the disease level, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant asbestos-related disease.

      **(2)**    <u>**Exigent Hardship Claims.**</u>  A Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V-VIII), and the Trust, in its sole discretion, determines (i) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and

-32-

(ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

**5.4** **Indirect Trust Claims.** Indirect Trust Claims asserted against the Trust shall be treated as presumptively valid and paid by the Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and (b) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the Trust would otherwise have had a liability or obligation under these TDP (the "**Direct Claimant**") (and which has not been paid by the Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust and the Protected Parties from all liability to the Direct Claimant and the Indirect Claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related Direct Claimant against the Trust, including any rights with respect to the timing, amount, or manner of payment. In addition, no Indirect Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant in respect of such Direct Claimant's claim for which the Trust would have liability.

To establish a presumptively valid Indirect Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Trust and the Protected Parties) or a Final Order provided that such claim is valid under tort law. In

-33-

any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Trust and the Protected Parties a release in form and substance satisfactory to the Trustee.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Trust and the Protected Parties with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Trust review the Indirect Trust Claim individually to determine whether the Indirect Claimant can establish under law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Trust had to the Direct Claimant as of the Effective Date of these TDP. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these TDP. Further, the liquidated value of any Indirect Trust Claim paid by the Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Trust Claim that might be subsequently asserted by the Direct Claimant against the Trust.

Any dispute between the Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures. If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.9 and 7.6 below.

-34-

3786050v5

The Trustee may develop and approve a separate proof-of-claim form for Indirect Trust Claims as provided in Section 6.1 below.  Indirect Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustee consistent with the provisions of this Section 5.4, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Trust would have afforded the holders of the underlying valid Trust Claims.  Nothing in these TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect Trust Claim against the Trust subject to the requirements set forth herein.

      **5.5**      **Evidentiary Requirements.**

      **(a)**      **Medical Evidence.**

      **(1)**      **In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.[11]

      **A.**      **Disease Levels II-IV.**  Except for asbestos claims filed against the Debtor or any other defendant in the tort system prior to the Commencement Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels II-IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical

---

[11] All diagnoses of Asbestosis/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the Trust may rebut such presumptions.

3786050v5

examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. All living claimants must also provide: (i) for Disease Levels II-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in footnote 6 above), (ii) for Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iii) for Disease Levels III and IV, pulmonary function testing.[12] A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Trust as a diagnosis.

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels II-IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels II-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in footnote 6 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; or (iv) for either Disease Level III or IV, pulmonary function testing.

**B. <u>Disease Levels V-VIII.</u>** All diagnoses of an asbestos-related malignancy (Disease Levels V-VIII) shall be based upon either (i) a physical examination

---

[12] "**Pulmonary function testing**" or "**PFT**" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment that is in material compliance with ATS standards for technical quality and calibration. A PFT performed in a hospital accredited by the Joint Commission (as defined in Section 5.5(a)(l)(B)), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in a Joint Commission-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other party who is qualified to make a certification regarding the PFT, in the form provided by the Trust, certifying that the PFT was conducted in material compliance with ATS standards.

3786050v5

of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission (formerly known as the Joint Commission on Accreditation of Healthcare Organizations).

C. **Exception to the Exception for Certain Pre-Petition Trust Claims.** If the holder of a Trust Claim that was filed against the Debtor or any other defendant in the tort system prior to the Commencement Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Section 5.5(a)(1)(A), or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical evidence to the Trust notwithstanding the exception in Section 5.5(a)(1)(A).

D. **Credibility of Medical Evidence.** Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in

3786050v5

evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to the Debtor to settle for payment similar disease cases prior to the Commencement Date, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge using the same methodology and standard, is presumptively reliable, although the Trust may seek to rebut the presumption. Notwithstanding the foregoing or any other provision of these TDP, any medical evidence submitted by a physician or entity that the Trust has determined, after consulting with the TAC and the FCR, to be unreliable shall not be acceptable as medical evidence in support of any Trust Claim.

In addition, except for Foreign Claims, claimants who otherwise meet the requirements of these TDP for payment of a Trust Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Trust in any Individual Review proceeding conducted pursuant to 5.2(b) or any Extraordinary Claim proceeding conducted pursuant to 5.3(a).

      **(b)**    **Exposure Evidence.**

      **(1)**    **In General.** As set forth above in Section 5.2(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos-containing products of or for which United Gilsonite Laboratories has liability, or to conduct that exposed the claimant to an asbestos-containing product, for which United Gilsonite Laboratories otherwise has legal responsibility. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product sold, distributed, marketed, handled, processed, or

-38-

manufactured by United Gilsonite Laboratories, its predecessor, or its successor are not compensable under these TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.2(a)(3) above, the claimant must show (i) for all Disease Levels, Debtor Exposure as defined in Section 5.5(b)(1)(B) below prior to May 22, 1980; (ii) for Asbestos/Pleural Disease Level II, six (6) months Debtor Exposure prior to May 22, 1980, plus five (5) years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six (6) months of Debtor Exposure prior to May 22, 1980, plus Significant Occupational Exposure to asbestos as defined below. If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her claim based on exposure to asbestos-containing products, or to conduct that exposed the claimant to an asbestos-containing product, for which United Gilsonite Laboratories has legal responsibility.

A. **Significant Occupational Exposure.** "Significant Occupational Exposure" means employment for a cumulative period of at least five (5) years, with a minimum of two (2) years prior to May 22, 1980, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products such that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

-39-

3786050v5

B. **Debtor Exposure.** "**Debtor Exposure**" means the claimant must demonstrate meaningful and credible exposure, which occurred prior to May 22, 1980, (a) to an asbestos-containing product sold, distributed, marketed, handled, processed, or manufactured by United Gilsonite Laboratories or for which it otherwise has legal responsibility ("UGL asbestos product") or (b) to conduct for which United Gilsonite Laboratories has legal responsibility that exposed the claimant to an asbestos-containing product. That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant (based on personal knowledge); an affidavit or sworn statement of a family member (based on personal knowledge); an affidavit or sworn statement of a co-worker (based on personal knowledge); by invoices, employment, construction or similar records; or by other credible evidence. A claimant who asserts exposure that occurred west of Wisconsin or south of Virginia in not eligible to receive the Scheduled Value and must proceed through Individual Review. The specific exposure information required by the Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof-of-claim form to be used by the Trust. The Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary. The Trust shall seek to refrain from applying new or modified exposure criteria to claimants who die (or who have submitted an affidavit of exposure by an affiant who dies) during the pendency of such claimant's claim review.

Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the Trust, not third parties or defendants in the tort system. The Trust has no need for, and therefore claimants are not required to furnish the Trust, with evidence of exposure to specific asbestos products other than those for which United Gilsonite Laboratories has legal responsibility, except to the extent such evidence is required elsewhere in these TDP. Similarly, failure to identify a

-40-

Debtor's products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Trust, provided the claimant satisfies the medical and exposure requirements of these TDP.

**5.6** **Claims Audit Program.** The Trustee, with the consent of the TAC and the FCR, may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including Debtor Exposure, prior to May 22, 1980. In the event that the Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any claimant or claimant's attorney by disallowing a Trust Claim and/or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

**5.7** **Second Disease (Malignancy) Claims.** The holder of a Trust Claim involving a non-malignant asbestos-related disease (Disease Levels II through IV) may assert a new Trust Claim against the Trust for a malignant disease (Disease Levels V-VIII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such

-41-

malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed at the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

**5.8**      **Arbitration.**

(a)      **Establishment of ADR Procedures.**  The Trust, with the consent of the TAC and the FCR, shall develop and adopt ADR Procedures[13], which may provide for pro-bono evaluation, mediation, and binding or non-binding arbitration to resolve disputes concerning whether the Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of these TDP for purposes of categorizing a claim involving Disease Levels II-VIII.  Proceedings under the ADR Procedures shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels II-VIII, as well as disputes over the validity of an Indirect Trust Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.5 above.  In the case of an arbitration involving the liquidated value of a claim involving Disease Levels II-VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.2(b)(2) above.  In order to facilitate the Individual Review Process, the Trust may from time to time develop valuation methodologies and/or matrices that take into account the valuation factors set forth in Section 5.2(b)(2) above that enable the Trust to efficiently make initial liquidated value offers in the Individual Review Process.

---

[13] To the extent there is any ambiguity or conflict between any provision of these TDP and the ADR Procedures, the provisions of these TDP shall control.

3786050v5

With respect to domestic claims, these valuation methodologies and/or matrices are often referred to as the Individual Review model. Except as provided for arbitrations involving Foreign Claims, the Trust shall neither offer into evidence or describe any such methodologies and/or matrices, nor assert that any information generated by the methodologies and/or matrices has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that was used to create the methodologies and/or matrices may be relevant and may be made available to the arbitrator but only if provided to the claimant or the claimant's counsel at least ten (10) days prior to the arbitration proceeding.

With respect to all claims eligible for arbitration, the claimant, but not the Trust, may elect either non-binding or binding arbitration. The ADR Procedures may be modified by the Trust with the consent of the TAC and the FCR. Such amendments may include the establishment of an Extraordinary Claims Panel to review such claims pursuant to Section 5.3(a) above.

(b) **Claims Eligible for Arbitration.** In order to be eligible for arbitration, the claimant must first complete the Individual Review Process set forth in Section 5.2(b) above. Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the Trust, the Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Trust of the rejection in writing. Individual Review will also be treated as completed if the Trust has rejected the claim.

(c) **Limitations on and Payment of Arbitration Awards.** In the case of a non-Extraordinary Claim involving Disease Levels IV-VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section

-43-

5.2(b)(3) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the maximum extraordinary value for such a claim as set forth in Section 5.3(a) above. A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

**5.9** **Litigation.** Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Trust pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Trust's available cash only as provided in Section 7.7 below.

## SECTION VI

## CLAIMS MATERIALS

**6.1** **Claims Materials.** The Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the Trust. The Claims Materials shall include a copy of these TDP, such instructions as the Trustee shall approve, a detailed proof-of-claim form, and a release. A separate claim form for Indirect Trust Claims may also be developed. In developing its claim-filing procedures, the Trust shall make every reasonable effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD. If requested by the claimant, the Trust shall accept information provided electronically.

**6.2** **Content of Claims Materials.** The proof-of-claim form to be submitted to the Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies

-44-

at the time of filing. The proof-of-claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. The proof-of-claim form and release to be used by the Trust shall be developed by the Trust and submitted to the TAC and the FCR for approval; they may be changed by the Trust with the consent of the TAC and the FCR.

**6.3** **Withdrawal or Deferral of Claims.** A claimant can withdraw a Trust Claim at any time upon written notice to the Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her Trust Claim be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's Trust Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Trust's offer is required, or a Trust Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Trust's written offer of payment or rejection of the claim. Upon written request and good cause, the Trust may extend the withdrawal or deferral period for an additional six (6) months.

**6.4** **Filing Requirements and Fees.** The Trustee shall have the discretion to determine, with the consent of the TAC and the FCR, (a) whether a claimant must have

-45-

previously filed an asbestos-related personal injury claim in the tort system to be eligible to file the claim with the Trust and (b) whether a filing fee should be required for any Trust Claims.

      **6.5**    <u>**English Language.**</u> All claims, claim forms, submissions, and evidence submitted to the Trust or in connection with any claim or its liquidation shall be in the English language.

      **6.6**    <u>**Confidentiality of Claimants' Submissions.**</u> All submissions to the Trust by a holder of a Trust Claim, including the proof-of-claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions. The Trust shall preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, (i) with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of the Bankruptcy Code or other applicable law, (ii) to such other persons as authorized by the holder, or (iii) in response to a valid subpoena. Furthermore, the Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served. The Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve any and all privileges.

**SECTION VII**

<u>**GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS**</u>

      **7.1**    <u>**Showing Required.**</u> To establish a valid Trust Claim a claimant must meet the requirements set forth in these TDP. The Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence

-46-

to support or verify a Trust Claim and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable. Nothing in these TDP shall prohibit the Trust from challenging at any time the validity of a claim and/or whether a claim has been paid, satisfied, settled, released, waived, or otherwise discharged.

   **7.2**   **Costs Considered.**   Notwithstanding any provisions of these TDP to the contrary, the Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Trust Claims so that the payment of valid Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a Trust Claim. The Trustee shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Trust so that Trust Claims are not unduly further impaired by the costs of additional investigation. Nothing herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any claim against the Trust whatever the costs, or declining to accept medical evidence from sources that the Trustee has determined to be unreliable pursuant to the Claims Audit Program described in Section 5.6 above.

   **7.3**   **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**   Consistent with the provisions hereof and subject to the FIFO Processing Queue and the FIFO Payment Queue, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustee shall proceed as quickly as possible to liquidate valid Trust Claims, and shall make payments to holders of such claims in accordance with these TDP promptly as funds become available and as claims are liquidated,

3786050v5

while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustee shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Trustee, the purposes of the Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision. In the event that the Trust faces temporary periods of limited liquidity, the Trustee may, with the consent of the TAC and the FCR, suspend the normal order of payment; temporarily limit or suspend payments altogether; and/or offer a Reduced Payment Option as described in <u>Section 2.4</u> above.

**7.4** **<u>Punitive Damages.</u>** Except as provided below for claims asserted by a claimant for compensatory damages that would otherwise satisfy the criteria for payment under these TDP but the claimant is foreclosed from payment because the governing law describes the claim as a claim for "exemplary" or "punitive" damages in determining the value of any liquidated or unliquidated Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Trust in the tort system pursuant to <u>Sections 5.9</u> above and <u>7.6</u> below.

**The only damages that may be awarded pursuant to these TDP to Alabama Claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined**

-48-

pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles.

**7.5** **Sequencing Adjustments.**

(a) **In General.** Except for Trust Claims involving Other Asbestos Disease (Disease Level I ) and subject to the limitations set forth herein, a sequencing adjustment shall be paid on all Trust Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years. The sequencing adjustment factor shall be the one-year U.S. Treasury bill interest rate in effect on January 1 of the year in which the accrual of the sequencing adjustment commences. The rate of the sequencing adjustment shall be adjusted each January 1 to correspond to the one-year Treasury bill interest rate then in effect. The applicable sequencing adjustment shall be calculated based only on the value of the claim specified in Section 7.5(b) below, subject to the Payment Percentage; any accrued but unpaid sequencing adjustment shall not be included in such calculation.

(b) **Unliquidated Trust Claims.** Except as set forth herein, a sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Trust Claim that meets the requirements of Disease Levels II-V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration. No sequencing adjustment shall be paid on any claim involving Disease Level I or on any claim liquidated in the tort system pursuant to Section 5.9 above and Section 7.6 below. The sequencing adjustment on an unliquidated Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim. Sequencing adjustments on all unliquidated claims shall be measured from the date of payment back to the date that is one year after the date on which (a) the claim was filed

-49-

3786050v5

against the Debtor prior to the Commencement Date; (b) the claim was filed against another defendant in the tort system on or after the Commencement Date but before the Initial Claims Filing Date; (c) the claim was filed with the Bankruptcy Court during the pendency of the Chapter 11 Case; or (d) the claim was filed with the Trust after the Effective Date.

7.6     **Suits in the Tort System.**  If the holder of a disputed claim disagrees with the Trust's determination regarding the Disease Level of the claim, the claimant's exposure or medical history, the validity of the claim, or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.8 above, the holder may file a lawsuit in the Claimant's Jurisdiction as defined in Section 5.2(b)(2) above. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Trust, all defenses that could have been asserted by the Debtor) shall be available to both sides at trial; however, the Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or the proof-of-claim form was filed with the Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

7.7     **Payment of Judgments for Money Damages**.  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Trust's last offer to the claimant or (ii) the award that the claimant declined in

-50-

3786050v5

non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system. The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of non-Extraordinary claims involving Disease Levels II-VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.2(b)(3). In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section 5.3 above. Under no circumstances shall the Trust pay (a) sequencing adjustments pursuant to Section 7.5 or (b) interest under any statute on any judgments obtained in the tort system.

**7.8**     **Releases.**  The Trustee shall have the discretion to determine the form and substance of the releases to be provided to the Trust and the Protected Parties in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the Trust or the Protected Parties with respect to the Trust Claim.  As a condition to making any payment to a claimant, the Trust shall obtain, for the benefit of the Trust and the Protected Parties, a general, partial, or limited release as appropriate.   If allowed by applicable law, the endorsing of a check or draft for payment by or on behalf of a claimant may, in the discretion of the Trust, constitute such a release.

**7.9**     **Third-Party Services.**  Nothing in these TDP shall preclude the Trust from contracting with another asbestos claims resolution organization to provide services to the Trust

-51-

3786050v5

so long as decisions about the categorization and liquidated value of Trust Claims are based on the relevant provisions of these TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**SECTION VIII**

**<u>MISCELLANEOUS</u>**

8.1    <u>Amendments.</u>  Except as otherwise provided herein, the Trustee may amend, modify, delete, or add to any provisions of these TDP (including, without limitation, amendments to conform these TDP to advances in scientific or medical knowledge or other changes in circumstances), provided he or she first obtain the consent of the TAC and the FCR pursuant to the consent process set forth in <u>Sections 6.7(b)</u> and <u>7.7(b)</u> of the Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in <u>Section 2.5</u> above, and the right to adjust the Payment Percentage is governed by <u>Section 4.2</u> above.  Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustee, in writing, amendments to these TDP.  Any amendment proposed by the TAC or the FCR shall remain subject to <u>Section 8.3</u> of the Trust Agreement.

8.2    <u>Severability.</u>  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

8.3    <u>Governing Law.</u>  Except for purposes of determining the validity and/or liquidated value of any Trust Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the determination of validity and/or liquidation of Trust Claims in the case of Individual Review,

-52-

mediation, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in <u>Section 5.2(b)(2)</u> above.

**8.4** **<u>Merger of Trust Assets with Other Trusts.</u>** In order to efficiently administer the Trust Assets, the Trustee may determine, with the consent of the TAC and the FCR, to combine or merge the Trust Assets with another trust or trusts established under Section 524(g) of the Bankruptcy Code. In such an event, the Trustee shall be permitted to obtain claims information maintained by such other 524(g) trusts.

3786050v5

# EXHIBIT G

**Form of UGL Twenty-Year Trust
Promissory Note**

**SUBJECT TO FURTHER NEGOTIATION AMONG THE PARTIES
AND FINAL APPROVALS BY THE SIGNATORIES THERETO.**

## SECURED PROMISSORY NOTE

$7,250,000.00                                              _____ ___, [2015][1]

  **FOR VALUE RECEIVED**, UNITED GILSONITE LABORATORIES, a Pennsylvania corporation with an address of _____, Pennsylvania ____ ("Maker"), hereby promises, in accordance with the terms set forth below, to pay to the order of the Asbestos Trust (as defined below) or its assigns on _____ ___, [2035] (the "Stated Maturity Date") or any date prior to the Stated Maturity Date on which this Note (as defined below) becomes due and payable, as the case may be (any such date, together with the Stated Maturity Date, the "Maturity Date"), the principal sum of SEVEN MILLION TWO HUNDRED FIFTY THOUSAND and 00/100 DOLLARS ($7,250,000.00), together with unpaid interest thereon and all other amounts payable hereunder, in the manner provided below.

  **Section 1.**   *e i ed er* . The following terms shall have the meaning specified in this Section, and capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Plan.

    (a)  "Applicable Law" means at any time with reference to any Person or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Authority, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Authority applicable to such Person or its property or in respect of its operations or to any referenced circumstances or events.

    (b)  "Asbestos Trust" means the United Gilsonite Laboratories Asbestos Personal Injury Trust established by the Debtor under section 524(g) of the Bankruptcy Code and in accordance with the United Gilsonite Laboratories Asbestos Personal Injury Trust Agreement annexed as Exhibit [__] to the Plan.

    (c)  "Business Day" means a day other than a Saturday, a Sunday, or any other day in which the commercial banks in Philadelphia, Pennsylvania are required or authorized to close by law or executive order.

    (d)  "Capital Expenditures" means expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacement, substitutions, or additions thereto that have a useful life of more than one year, including any assets acquired pursuant to a Capital Lease.

    (e)  "Capital Lease" means, with respect to any Person, any lease of any property by that Person as lessee that is required to be accounted for as a capital lease on the balance sheet of that Person in accordance with GAAP.

    (f)  "Cash" means the lawful currency of the United States of America.

    (g)  "Debtor" means United Gilsonite Laboratories, a Pennsylvania corporation and its successors or assigns.

    (h)  "Effective Date" has the meaning ascribed to such term in the Plan.

    (i)  "Exit Facility" means the secured revolving credit facility and the secured term

---

[1] Note all dates to be conformed

- 1 -

Case 5:11-bk-02032-RNO  Doc 2190  Filed 12/08/14  Entered 12/08/14 13:45:12  Desc
Main Document  Page 271 of 302

loan described in the Plan to be provided to Maker by the Senior Lender and any renewal or replacement of such facility, provided such renewal or replacement facility is (i) for an amount that is not greater than and (ii) is subject to terms, conditions, and covenants that are no more restrictive than the credit facility that is being renewed or replaced.

(j)     "GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to any circumstances as of the date of determination, consistently applied.

(k)     "Governmental Authority" means the United States of America, a state, commonwealth, district, territory, municipality, or foreign state; or a department, agency, instrumentality, court, or tribunal of the United States of America, a state, a commonwealth, a district, a territory, a municipality, or a foreign state; or other foreign or domestic government, or subdivision thereof.

(l)     "Insolvency Proceeding" means, with respect to any Person, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee, or other officer with similar powers, or any proceeding for the dissolution, liquidation, or other winding up of such Person or all or substantially all of the properties of such Person.

(m)     "Subordination Agreement" means that certain Subordination Agreement dated as of the Effective Date and entered into by and among Senior Lender, the Asbestos Trust, and Maker.

(n)     "Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, encumbrance, security interest, or assignment of any kind or nature in respect of such asset, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

(o)     "Loan Documents" means this Note, the Security Instruments, the Subordination Agreement, and any other document or instrument executed in connection with any of the foregoing.

(p)     "Note" means this promissory note issued by Maker and all other promissory notes issued by Maker in exchange, transfer, or replacement for this Note or such other notes.

(q)     "Noteholder" means (i) the Asbestos Trust during the period in which the Asbestos Trust is a holder of this Note or an interest therein; or (ii) each Person that becomes a holder of this Note by way of assignment, transfer, or negotiation.

(r)     "Person" means an individual, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or subdivision thereof, including the United States Trustee, or any other entity, whether acting in an individual, fiduciary, or other capacity.

(s)     "Plan" means the Modified First Amended Plan of Reorganization of United Gilsonite Laboratories Under Chapter 11 of the Bankruptcy Code, dated as of _____, 2014, including the Plan Documents (as such term is defined in the Plan), as the same may be amended,

modified, or supplemented from time to time in accordance with the terms and provisions thereof.

(t)     "<u>Pledge</u>" means that certain Pledge and Security Agreement dated as of the Effective Date and entered into by and among Maker, the Shareholders, and the Asbestos Trust pursuant to which the Shareholders shall have granted the Asbestos Trust a first priority Lien on all issued and outstanding shares of the common stock of Maker.

(u)     "<u>Sale and Leaseback Transaction</u>" means, with respect to any Person, any arrangement, directly or indirectly, whereby such Person shall sell or transfer any property used or useful in that Person's business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that the Person intends to use for substantially the same purpose or purposes as the property being sold or transferred.

(v)     "<u>Security Agreement</u>" means that certain Subordinated Security Agreement dated as of the Effective Date made by Maker for the benefit of the Asbestos Trust granting Liens in Maker's assets that shall have priority over all other Liens granted by Maker except for liens granted by Maker to the Senior Lender to secure the payment of Maker's obligations under the Exit Facility.

(w)     "<u>Security Instruments</u>" means the Pledge and the Security Agreement.

(x)     "<u>Senior Lender</u>" means [PNC Bank, N.A.], as agent for one or more other lenders under one or more credit facilities made available to Maker for working capital and other corporate purposes and any such other bank or institutional lender that may hereafter succeed [PNC Bank, N.A.] or any successor thereto, as agent.

(y)     "<u>Shareholders</u>" means those Persons set forth on attached <u>Exhibit A</u> who are the holders of all of the issued and outstanding shares of the common stock of Maker on the Effective Date.

(z)     "<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania; <u>provided</u>, <u>however</u>, that in the event that, by reason of mandatory provisions of Applicable Law, any or all of the perfection or priority of, or remedies with respect to, any Collateral (as such term is defined (i) in the Pledge Agreement with respect to any Liens granted in the Pledge Agreement or (ii) in the Security Agreement with respect to any Liens granted in the Security Agreement) is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the Commonwealth of Pennsylvania, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority, or remedies.

**Section 2.**     *tere t.*     Interest shall accrue during the term hereof at a rate equal to seven percent (7.0%) per annum (the "<u>Interest Rate</u>") on the outstanding principal balance of this Note.  All interest charged under this Note shall be computed on the basis of a three hundred sixty (360) day year and charged on the actual number of days elapsed in each calendar year by multiplying the actual number of days the unpaid principal under this Note is outstanding in each calendar year by the applicable rate of interest, computed as aforesaid, and dividing the product by three hundred sixty (360).

**Section 3.**     *a    e t*

(a)     Payment of the principal and interest on this Note shall be made at the office or agency of the Noteholder, or such other place as the Noteholder may from time to time specify in writing, in the lawful currency of the United States of America and in immediately available funds, without

counterclaim, recoupment, setoff, or other defense and free and clear of, and without any deduction or withholding for, any taxes or other payments.

(b)     (i)     Commencing on _____, [2015], and on the corresponding date in each third month thereafter to and through the earlier of (x) the date on which the Note is fully repaid, and (y) _____ __, [2026] (each a "Quarterly Interest Payment Date"), Maker shall make consecutive quarter-annual payments to the Noteholder of interest on the outstanding principal amount that shall be calculated in accordance with Section 2 hereof , subject to adjustment under Section 5(d) below (each a "Quarterly Interest Payment"), it being the intent of the parties that the amount of each Quarterly Interest Payment shall at all times equal the actual amount of accrued and unpaid interest on such Quarterly Interest Payment Date; and

(ii)     Commencing on _____ __, [2026], and on the corresponding date in each third calendar month thereafter to and through _____ ___, [2035] (each a "Quarterly Installment Payment Date"), Maker shall make equal and consecutive quarter-annual principal payments to the Noteholder in the amount of Two Hundred One Thousand Three Hundred Ninety and 00/100 Dollars ($201,390.00), subject to adjustment under Section 5(d) below, together with all accrued interest on the outstanding principal balance (such combined amounts, each a "Quarterly Installment Payment").

(c)     (i)     Each Quarterly Interest Payment shall be allocated first to accrued and unpaid interest on the outstanding principal balance of the Note, and thereafter to any outstanding principal; and

(ii)     each Quarterly Installment Payment shall be allocated first to accrued and unpaid interest with the balance of such payment being allocated to the principal balance amount of this Note outstanding at the beginning of the calendar quarter then ended.

(d)     The entire unpaid principal amount of this Note, together with all accrued and unpaid interest thereon and all other amounts payable hereunder shall be due and payable on the Maturity Date. At such time as any Mandatory Prepayment or Optional Prepayment (as defined below) is made, Quarterly Interest Payments and Quarterly Installment Payments under this Note shall be recalculated as provided under Section 5 hereof.

(e)     To the extent that a payment to the Noteholder on account of this Note that (in whole or in part) is subsequently invalidated, avoided, rescinded, or set aside, or required or agreed to be repaid or returned by the Noteholder for any reason, including any Insolvency Proceeding or other litigation, then, to the extent of the amount of such payment, the portion of the obligations under this Note that has been paid, reduced, or satisfied by such amount shall be reinstated and shall continue in full force and effect as of the time immediately preceding such initial payment, reduction, or satisfaction.

**Section 4.**     *e rit .* Maker's payment and performance of all obligations under this Note are secured by, or is intended to be secured by, the Liens granted under the Security Instruments.

**Section 5.**     *a dator  a d  ptio  a   repa   e t*

(a)     In the event of any one or more sales of any asset or assets by Maker (other than an Excluded Sale (as defined below)) for an aggregate amount in excess of One Hundred Thousand and 00/100 Dollars ($100,000.00) during any [twelve] consecutive month period, Excess Proceeds (as hereinafter defined) shall be used to reduce the outstanding principal balance of this Note on the first Quarterly Payment Date after a determination that Excess Proceeds exist (each a "Mandatory Prepayment").

- 4 -

(b)     For purposes of this Section 5, (i) "Excess Proceeds" shall be defined as the total cash proceeds from the sale by Maker of any assets subject to the Liens granted under the Security Agreement (other than cash proceeds from any Excluded Sale) *e*   the sum of (A) any cash used to satisfy any Lien (other than the Lien granted under the Security Agreement) on the asset sold or that is otherwise required to be paid to the Senior Lender in accordance with the provisions of the Exit Facility, (B) any costs, fees, or commissions payable in connection with the sale of such asset or assets, and (C) if the asset was an asset used in the operation of Maker's business (including real estate), the cash proceeds received from the sale are used by Maker  to  replace the asset sold within the six (6) months immediately following the sale of such asset; provided, however, that any such replacement assets shall be subject to the Lien and priority of the Noteholder granted under the Security Agreement, and (ii) "Excluded Sale" shall be defined as any of the following: (A) the sale of Inventory (as defined in the Exit Facility or, if at any time no such facility is in effect, as defined in the UCC) in the ordinary course of business and (B) the sale of any asset that is permitted to be made under the Exit Facility, whether expressly, by lack of any restriction thereon, or with the waiver or consent of the Senior Lender, but only to the extent that the proceeds of such sale are required to be paid over to the Senior Lender pursuant to the terms of the Exit Facility.

(c)     In addition, provided that the most recent scheduled Quarterly Interest Payment or Quarterly Installment Payment, as applicable, due under this Note has been made, at any time and from time to time, upon notice to the Noteholder accompanying any prepayment, Maker may prepay all or part of the outstanding principal balance of this Note (each an "Optional Prepayment") without penalty or premium; provided, however, that no Optional Prepayment shall be made in an amount less than the lesser of Five Hundred Thousand and 00/100 Dollars ($500,000.00) and the principal amount then due under this Note.

(d)     Upon the payment of any Mandatory Prepayment or Optional Prepayment pursuant to the terms of this Note, (i) the payment schedule under this Note shall be revised to reflect such reduction of principal, (ii) the dollar amount of any remaining Quarterly Interest Payments shall be reduced to reflect the reduction of principal then outstanding, and (iii) the amount of the Mandatory Prepayment or Optional Prepayment shall be applied to the principal portion of any Quarterly Installment Payments in inverse order to the date on which such Quarterly Installment Payments are due and the number of Quarterly Installment Payments shall be reduced accordingly.  The recalculation of the outstanding principal balance under this Note and the revision of the payment schedule thereunder shall not in any way modify the obligations of Maker to make any remaining Quarterly Interest Payments or Quarterly Installment Payments, as applicable, until such time, subject to Section 3(e) above, as all principal outstanding under this Note and interest accrued hereunder has been paid in Cash and in full.

**Section 6.**     *e pe ti      tere t*.  In the event the interest provisions hereof or any exactions provided for herein shall result in an effective rate of interest which, for any period of time, exceeds the limit of any usury or other law applicable to this Note, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied toward repayment of outstanding principal immediately upon receipt of such moneys by the Noteholder with the same force and effect as if Maker had specifically designated such extra sums to be so applied to principal and the Noteholder had agreed to accept such extra payments in repayment of the principal balance hereof.  Notwithstanding the foregoing, however, the Noteholder may at any time, and from time to time, elect, by notice in writing to Maker, to reduce or limit the collection of any interest to such sums which shall not result in any payment of interest in excess of that lawfully collectible.  Maker agrees that in determining whether or not any interest payable under this Note exceeds the highest rate permitted by Applicable Law, any non-principal payment, including late charges, shall be deemed to the extent permitted by law to be an expense, fee, or premium, rather than interest.

- 5 -

**Section 7.**     *ove a t .*  For so long as any obligations remain outstanding under this Note, Maker covenants and agrees that:

(a)     Maker shall not incur any indebtedness other than (i) indebtedness arising under the Exit Facility, (ii) the obligations under this Note, (iii) unsecured trade and operational debt that (A) is incurred in the ordinary course of business, (B) not evidenced by a note, and (C) is, unless being contested in good faith, paid prior to the earlier to occur of the one hundred twentieth (120th) day after the date incurred and the date when due, (iv) amounts constituting wages and other accrued expenses incurred in the ordinary course of business and recourse obligations resulting from endorsement of negotiable instruments for collection in the ordinary course of business, [(v) indebtedness incurred for Capital Expenditures in an amount not in excess of the greater of (x) [$3,000,000] at any one time outstanding and (y) the amount of Capital Expenditures permitted to be incurred under the Exit Facility, and (vi) any other indebtedness that is permitted to be incurred under the Exit Facility][2]; provided, however, that at any time that the principal balance due under this Note is less than Five Million and 00/100 Dollars ($5,000,000.00), Maker may incur additional unsecured indebtedness in an amount that, when added to the principal amount outstanding under this Note, does not exceed Five Million and 00/100 Dollars ($5,000,000.00).

(b)     Maker shall not enter into any Sale and Leaseback Transactions except to the extent permitted by the Exit Facility provided that the proceeds thereof are used to repay amounts due under the Exit Facility.

**Section 8.**     *ve t o  e a  t.*  The following shall constitute an event of default (each, an "Event of Default") under this Note:

(a)     failure to pay either or both principal and interest when due on the due date thereof, whether due on a Quarterly Interest Payment Date, a Quarterly Installment Payment Date, the Stated Maturity Date, or by acceleration or otherwise under this Note, and Maker has not remedied and fully cured such failure to pay within five (5) Business Days after the date on which such payment is due;

(b)     the occurrence of a breach of, a default under, or an event of default under any of the Loan Documents (other than a breach of the Subordination Agreement by the Asbestos Trust), including the Security Instruments, and either (i) such breach, default, or event of default has not been remedied and fully cured within the cure period or time specified in the applicable Loan Document or (ii) if no cure period is specified in the applicable Loan Document with respect to such breach, default, or event of default, such breach, default, or event of default shall have continued for a period of thirty (30)days;

(c)     Maker becomes insolvent, or generally fails to pay, or is generally unable to pay, or admits in writing its inability to pay its debts as they become due or payable;

(d)     Maker applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, liquidator, or other custodian, for a substantial portion of its property, or makes a general assignment for the benefit of creditors;

(e)     an Insolvency Proceeding is commenced by, against, or in respect of Maker; provided, however, that if Maker has not voluntarily commenced or initiated the Insolvency Proceeding, the pendency of such Insolvency Proceeding shall not constitute an Event of Default hereunder until the

---

[2] **NTD:  The Asbestos Trust need to understand what is permitted under the Exit Facility before it can make a determination with respect to clauses (E) and (F).**

earlier of: (i) entry of an order for relief in the Insolvency Proceeding; (ii) entry of an order finding or concluding, *inter alia*, that (A) Maker is generally not paying, or is generally unable to pay, its debts as they become due or payable or (B) the sum of the debts of Maker is greater than the aggregate value of Maker's assets, at fair valuation; and (iii) such Insolvency Proceeding remains pending for more than sixty (60) days;

(f)     a trustee, receiver, liquidator, or other custodian is appointed for Maker, or for a substantial portion of Maker's property;

(g)     (i) invalidity or unenforceability of this Note or any of the other Loan Documents; (ii) the commencement of an action or proceeding by Maker, or any of its successors or assigns, to establish the invalidity or unenforceability of this Note or any of the other Loan Documents; or (iii) Maker's repudiation or denial of any portion of its liability or obligations under this Note or any of the other Loan Documents; or

(h)     any representation or warranty made by Maker herein or in any of the other Loan Documents shall be false or misleading in any material respect as of the date made.

**Section 9.** *Acceleration upon an Event of Default*. Upon an Event of Default, at the option of the Noteholder, all unpaid principal and accrued interest under this Note shall become immediately due and payable, without presentment, demand, protest, or further notice. Upon an Event of Default, the Noteholder shall be entitled to pursue all rights and remedies available to it under the Loan Documents or under Applicable Law against Maker. Notwithstanding the provisions of this Section 9, upon the occurrence of an Event of Default under Section 8(e), all unpaid principal and accrued interest under this Note shall be automatically due and payable without further notice, demand, or other action by the Noteholder.

**Section 10.** *Waiver*

(a)     Except for the notices specified in Section 8 hereof, Maker expressly waives presentment for payment, demand, notice of dishonor, protest, notice of protest, diligence of collection, and any other notice of any kind.

(b)     To the extent permitted by law, Maker hereby waives and releases all errors, defects, and imperfections in any proceedings instituted by the Noteholder under the terms of this Note or any other Loan Document. Maker agrees that any property that may be levied upon pursuant to a judgment obtained by virtue hereof, or upon any writ of execution issued thereon, may be sold upon any such judgment or writ in whole or in part in any order desired by the Noteholder.

**Section 11.** *Negotiation of Note*. This Note is intended to be a negotiable instrument in accordance with Article 3 of the UCC, and may be negotiated to a transferee pursuant to the terms thereof.

**Section 12.** *Amendment and Waiver* Except for the waivers set forth in Section 10 hereof, any amendment or waiver of, or consent with respect to, any provision of this Note shall be effective if and only if the same shall be in writing and approved by the Noteholder and Maker; provided, however, that no such amendment, waiver, or consent shall result in the release of all or a substantial portion of any collateral securing this Note, except as expressly provided in the other Loan Documents. Any such amendment, waiver, or consent shall be effective only in the specific instance and for the specified purpose for which given.

**Section 13.** *Governing Law.* This Note shall in all respects be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws provisions that would require the application of the laws of any other jurisdiction, and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with the laws of the Commonwealth of Pennsylvania.

**Section 14.** *Service of Process and Jurisdiction.*

(a)     Maker by executing this Note (i) hereby irrevocably submits to the nonexclusive jurisdiction of the state and federal courts of the Commonwealth of Pennsylvania (without prejudice to the right of any party to remove to the United States Bankruptcy Court for the Middle District of Pennsylvania) and to the nonexclusive jurisdiction of the United States Bankruptcy Court for the Middle District of Pennsylvania, for the purposes of any suit, action, or other proceeding arising out of this Note or any other Loan Document or the subject matter hereof or thereof, or any of the transactions contemplated hereby or thereby, brought by any of the parties hereto or thereto or their successors or assigns; (ii) hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Pennsylvania court or, to the fullest extent permitted by Applicable Law, in such Bankruptcy Court; and (iii) to the extent permitted by Applicable Law, hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action, or proceeding any claim that it is not personally subject to the jurisdiction of the above-named courts, that the suit, action, or proceeding is brought in an inconvenient forum, that the venue of the suit, action, or proceeding is improper, or that this Note or any other Loan Document, or the subject matter hereof or thereof, may not be enforced in or by such court.  A final judgment (no longer subject to appeal, review, or certiorari proceeding) obtained in respect of any action, suit, or proceeding referred to in this Section 13(a) shall be conclusive and may be enforced in other jurisdictions by suit or judgment or in any manner as provided by Applicable Law.

(b)     *Service of Process.*  Maker by executing this Note hereby consents to service of process by overnight mail, Federal Express, UPS, or similar courier at the address to which notices to Maker are to be given under Section 16 hereof, it being agreed that service in such manner shall constitute valid service upon it or its nominees, successors, or assigns in connection with any proceeding under the Loan Documents only; <u>provided</u>, <u>however</u>, that nothing in this Section 14(b) shall affect the right of any party hereto, or its respective nominees, successors, or assigns, to serve legal process in any other manner permitted by Applicable Law.

**Section 15.** *Waiver of Trial and Confession of Judgment.*

(a)     **WAIVER OF RIGHT TO TRIAL BY JURY**. MAKER HEREBY WAIVES, FOR ITSELF, AND ITS SUCCESSORS AND ASSIGNS, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS.  MAKER (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT NOTEHOLDER HAS BEEN INDUCED TO ACCEPT THIS NOTE BY MAKER'S WAIVERS AND CERTIFICATIONS HEREIN.

(b)     **WARRANT OF ATTORNEY TO CONFESS JUDGMENT.  MAKER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, ANY**

- 8 -

ATTORNEY OR ANY CLERK OF ANY COURT OF RECORD, FOLLOWING THE OCCURRENCE OF A DEFAULT AND SUBSEQUENT TO FIVE (5) BUSINESS DAYS' PRIOR WRITTEN NOTICE TO MAKER, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER FOR SUCH SUMS AS ARE DUE OR MAY BECOME DUE UNDER THIS NOTE, WITH OR WITHOUT DECLARATION, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION, AND ALL REASONABLE ATTORNEYS' FEES FOR COLLECTION. TO THE EXTENT PERMITTED BY LAW, MAKER RELEASES ALL ERRORS IN SUCH PROCEEDINGS. IF A COPY OF THIS NOTE, VERIFIED BY AFFIDAVIT BY OR ON BEHALF OF THE NOTEHOLDER SHALL HAVE BEEN FILED IN SUCH ACTION, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL NOTE AS A WARRANT OF ATTORNEY. THE AUTHORITY AND POWER TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER SHALL NOT BE EXHAUSTED BY THE INITIAL EXERCISE THEREOF AND MAY BE EXERCISED AS OFTEN AS THE NOTEHOLDER SHALL FIND IT NECESSARY AND DESIRABLE AND THIS NOTE SHALL BE A SUFFICIENT WARRANT THEREFORE. THE NOTEHOLDER MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING HEREUNDER, WITHOUT REGARD TO WHETHER JUDGMENT HAS THERETOFORE BEEN CONFESSED ON MORE THAN ONE OCCASION FOR THE SAME AMOUNT; PROVIDED THAT THE FOREGOING SHALL NOT ENTITLE THE NOTEHOLDER TO COLLECT ANY MORE THAN MAY ACTUALLY BE OWED TO NOTEHOLDER HEREUNDER. IN THE EVENT ANY JUDGMENT CONFESSED AGAINST MAKER HEREUNDER IS STRICKEN OR OPENED UPON APPLICATION BY OR ON MAKER'S BEHALF FOR ANY REASON, THE NOTEHOLDER IS HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER FOR ANY PART OR ALL OF THE AMOUNTS OWING UNDER THIS NOTE, AS PROVIDED FOR HEREIN, IF DOING SO WILL CURE ANY ERRORS OR DEFECTS IN SUCH PRIOR PROCEEDINGS.**

       **Section 16.** *Notice.* Any notice, request, or other communication required or permitted to be given under this Note shall be in writing and deemed to have been properly given (a) when delivered in person or when sent by facsimile or other electronic means and electronic confirmation of error free receipt is received; or (b) three (3) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address listed on the attached <u>Exhibit B</u>. Any party may change its address for notices by giving notice of such change to the other parties in the manner set forth in this Section 16.

       **Section 17.** *Construction.*

       (a)    Captions and headings in this Note are for convenience of reference only and in no way define, limit, describe, or otherwise affect the scope or intent of the provisions hereof.

       (b)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, or neuter forms.

       (c)    All terms defined in this Note in the singular form shall have comparable meanings when used in the plural form, and vice-versa.

       (d)    All references herein to "Section" shall be deemed references to sections of this Note unless the context shall otherwise require.

(e)     The words "herein," "hereof," and "hereunder," and words of similar import when used in this Note shall be construed to refer to this Note in its entirety and not to any particular provision thereof.

(f)     Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein).

(g)     For purposes of computation of time periods, whenever this Note provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. In addition, the word "from" means "from and including," "after" means "after and excluding," and "to" and "until" mean "to and including".

(h)     Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law; and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time.

**Section 18.**     *artie o d*. This Note shall inure to the benefit of the Noteholder and each of its nominees, successors, and assigns, and shall be binding on Maker and each of its respective nominees, successors, or assigns.

**Section 19.**     *o hird art e e i iarie*. Notwithstanding anything to the contrary contained herein, no provision of this Note is intended to benefit any party other than the Noteholder, nor shall any such provision be enforceable by any other party.

**Section 20.**     *o i e t or e e atio a er*. Notwithstanding anything to the contrary herein, Maker shall not assign any of its rights or delegate any of its obligations under this Note or any of the other Loan Documents to any Person, and no assignment or delegation of any such right or obligation shall release or discharge Maker therefrom. In addition, no assignment or transfer of property, rights, claims, privileges, duties, or obligations by Maker shall release or discharge Maker from any of Maker's obligations under the Loan Documents.

**Section 21.**     *evera i it*. In the event that any provision hereof shall be deemed to be invalid by reason of the operation of any law or by reason of the interpretation placed thereon by any Governmental Authority, this Note shall be construed as not containing such provision, but only as to such jurisdictions where such law or interpretation is operative, and the invalidity of such provision shall not affect the validity of any remaining provisions hereof, and any and all provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

**Section 22.**     *rre e o i atio*. All sums of money referred to herein are denominated in United States of America dollars.

**Section 23.**     *ep a e e t o ote a d ther oa o e t*. Upon receipt of an affidavit or sworn declaration of the Noteholder as to the loss, theft, destruction, or mutilation of this Note together with an indemnity in a form reasonably satisfactory to Maker for losses arising from such loss, theft,

destruction, or mutilation, Maker will issue in lieu thereof a replacement promissory note in the same principal amount thereof and setting forth the same terms and provisions of this Note.

**Section 24.** *pe e .* Maker shall reimburse the Noteholder promptly upon demand for all out-of-pocket costs and expenses, including all attorneys' fees and expenses of legal counsel, incurred by the Noteholder in connection with the enforcement of any rights or actions of the Noteholder under this Note, but only to the extent the Noteholder succeeds in enforcing this Note.

**Section 25.** *ordi atio ree e t.* The rights and remedies of the Noteholder under this Note shall be subject to the terms of the Subordination Agreement and in the event of any discrepancy between the terms of this Note and the Subordination Agreement, the terms of the Subordination Agreement shall be controlling.

*i at re pa e o o*

**IN WITNESS WHEREOF**, with the intent to be legally bound hereby, Maker has caused this Note to be executed and delivered under seal by Maker's duly authorized officer as of the date first written above.

**MAKER:**

Attest:                                           UNITED GILSONITE LABORATORIES


By:_____            By:   _____
      Name:                                              Name:
      Title:                                               Title:


[CORPORATE SEAL]


COMMONWEALTH OF PENNSYLVANIA     )
                                             ) ss
COUNTY OF _____                 )

      I certify that _____, a person known to me, appeared before me this day, stated (i) that he is the duly elected _____ of United Gilsonite Laboratories ("UGL") and (ii) that pursuant to due authority he has executed the foregoing instrument on behalf of UGL.

      Witness my hand and official seal this _____ day of _____, 2015.


                                 _____
                                             Signature


                                 _____
                                 Printed Name of Notary
Notary Public
Notary Seal

                                 My commission expires:


                                 _____


[SIGNATURE PAGE TO SECURED PROMISSORY NOTE]

<u>Exhibit A</u>

Shareholders

Patricia P. Atkins

Karen M. Legan

Douglas Mackinnon

Carter Atkins

Timothy Atkins

Richard P. Yates

_____, as Trustee of the Susan Y. Kindelan Trust u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Elizabeth Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Carolyn Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Katherine Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Grace Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Lauren Mackinnon u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Emily Mackinnon u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Matthew Mackinnon u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Rebecca Mackinnon u/a dated _____

Exhibit B

Addresses for Notice

01:16089729.2

# EXHIBIT H

**Form of UGL Shareholder Promissory Note**

# SECURED PROMISSORY NOTE

$375,000.00                                    _____ ___, [2015]<sup>1</sup>

 **FOR VALUE RECEIVED**, the undersigned Shareholders (collectively, "Maker"), jointly and severally hereby promise, in accordance with the terms set forth below, to pay to the order of the Asbestos Trust (as defined below) or its assigns on _____ ___, [2017] (the "Stated Maturity Date") or any date prior to the Stated Maturity Date on which this Note (as defined below) becomes due and payable, as the case may be (any such date, together with the Stated Maturity Date, the "Maturity Date"), the principal sum of THREE HUNDRED SEVENTY-FIVE THOUSAND and 00/100 DOLLARS ($375,000.00), together with unpaid interest thereon and all other amounts payable hereunder, in the manner provided below.

 **Section 1.** *Definitions*. The following terms shall have the meaning specified in this Section, and capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Plan.

 (a) "Applicable Law" means at any time with reference to any Person or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Authority, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Authority applicable to such Person or its property or in respect of its operations or to any referenced circumstances or events.

 (b) "Asbestos Trust" means the United Gilsonite Laboratories Asbestos Personal Injury Trust established by the Debtor under section 524(g) of the Bankruptcy Code and in accordance with the United Gilsonite Laboratories Asbestos Personal Injury Trust Agreement annexed as Exhibit [__] to the Plan.

 (c) "Business Day" means a day other than a Saturday, a Sunday, or any other day in which the commercial banks in Philadelphia, Pennsylvania are required or authorized to close by law or executive order.

 (d) "Cash" means the lawful currency of the United States of America.

 (e) "Debtor" means United Gilsonite Laboratories, a Pennsylvania corporation and its successors or assigns.

 (f) "Effective Date" has the meaning ascribed to such term in the Plan.

 (g) "GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to any circumstances as of the date of determination, consistently applied.

---

<sup>1</sup> Note all dates to be conformed

(h)　　"Governmental Authority" means the United States of America, a state, commonwealth, district, territory, municipality, or foreign state; or a department, agency, instrumentality, court, or tribunal of the United States of America, a state, a commonwealth, a district, a territory, a municipality, or a foreign state; or other foreign or domestic government, or subdivision thereof.

(i)　　"Insolvency Proceeding" means, with respect to any Person, any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee, or other officer with similar powers, or any proceeding for the dissolution, liquidation, or other winding up of such Person or all or substantially all of the properties of such Person.

(j)　　"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, encumbrance, security interest, or assignment of any kind or nature in respect of such asset, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

(k)　　"Loan Documents" means this Note, the Security Instruments, and any other document or instrument executed in connection with any of the foregoing.

(l)　　"Note" means this promissory note issued by Maker and all other promissory notes issued by Maker in exchange, transfer, or replacement for this Note or such other notes.

(m)　　"Noteholder" means (i) the Asbestos Trust during the period in which the Asbestos Trust is a holder of this Note or an interest therein; or (ii) each Person that becomes a holder of this Note by way of assignment, transfer, or negotiation.

(n)　　"Person" means an individual, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or subdivision thereof, including the United States Trustee, or any other entity, whether acting in an individual, fiduciary, or other capacity.

(o)　　"Plan" means the Modified First Amended Plan of Reorganization of United Gilsonite Laboratories Under Chapter 11 of the Bankruptcy Code, dated as of _____, 2014, including the Plan Documents (as such term is defined in the Plan), as the same may be amended, modified, or supplemented from time to time in accordance with the terms and provisions thereof.

(p)　　"Pledge" means that certain Pledge and Security Agreement dated as of the Effective Date and entered into by and among UGL, the Shareholders, and the Asbestos Trust pursuant to which the Shareholders shall have granted the Asbestos Trust a first priority Lien on all issued and outstanding shares of the common stock of UGL.

- 2 -

(q)     "Security Instruments" means the Pledge and the Security Agreement.

(r)     "Shareholders" means those Persons set forth on attached Exhibit A who are the holders of all of the issued and outstanding shares of the common stock of UGL on the Effective Date.

(s)     "UCC" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania; provided, however, that in the event that, by reason of mandatory provisions of Applicable Law, any or all of the perfection or priority of, or remedies with respect to, any Collateral (as such term is defined (i) in the Pledge Agreement with respect to any Liens granted in the Pledge Agreement or (ii) in the Security Agreement with respect to any Liens granted in the Security Agreement) is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the Commonwealth of Pennsylvania, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority, or remedies.

(t)     "UGL" means United Gilsonite Laboratories, a Pennsylvania corporation.

**Section 2.**     *tere t*.     Interest shall accrue during the term hereof at a rate equal to seven percent (7.0%) per annum (the "Interest Rate") on the outstanding principal balance of this Note.  All interest charged under this Note shall be computed on the basis of a three hundred sixty (360) day year and charged on the actual number of days elapsed in each calendar year by multiplying the actual number of days the unpaid principal under this Note is outstanding in each calendar year by the applicable rate of interest, computed as aforesaid, and dividing the product by three hundred sixty (360).

**Section 3.**     *a   e t*

(a)     Payment of the principal and interest on this Note shall be made at the office or agency of the Noteholder, or such other place as the Noteholder may from time to time specify in writing, in the lawful currency of the United States of America and in immediately available funds, without counterclaim, recoupment, setoff, or other defense and free and clear of, and without any deduction or withholding for, any taxes or other payments.

(b)     Commencing on _____, [2015], and on the corresponding date in each third month thereafter to and through the earlier of (x) the date on which the Note is fully repaid, and (y) _____ __, [2017] (each a "Quarterly Interest Payment Date"), Maker shall make consecutive quarter-annual payments to the Noteholder of interest on the outstanding principal amount that shall be calculated in accordance with Section 2 hereof, subject to adjustment under Section 5(d) below (each a "Quarterly Interest Payment"), it being the intent of the parties that the amount of each Quarterly Interest Payment shall at all times equal the actual amount of accrued and unpaid interest on such Quarterly Interest Payment Date.

(c)     Each Quarterly Interest Payment shall be allocated first to accrued and unpaid interest on the outstanding principal balance of the Note, and thereafter to any outstanding principal.

(d)     The entire unpaid principal amount of this Note, together with all accrued and unpaid interest thereon and all other amounts payable hereunder shall be due and payable on the Maturity Date.  At such time as any Optional Prepayment (as defined below) is made, Quarterly Interest Payments under this Note shall be recalculated as provided under Section 5 hereof.

(e)     To the extent that a payment to the Noteholder on account of this Note that (in whole or in part) is subsequently invalidated, avoided, rescinded, or set aside, or required or agreed to be repaid or returned by the Noteholder for any reason, including any Insolvency Proceeding or other litigation, then, to the extent of the amount of such payment, the portion of the obligations under this Note that has been paid, reduced, or satisfied by such amount shall be reinstated and shall continue in full force and effect as of the time immediately preceding such initial payment, reduction, or satisfaction.

**Section 4.**     *e   rit* .  Maker's payment and performance of all obligations under this Note are secured by, or is intended to be secured by, the Liens granted under the Security Instruments.

**Section 5.**     *ptio  a   repa   e t* .

(a)     Provided that the most recent scheduled Quarterly Interest Payment due under this Note has been made, at any time and from time to time, upon notice to the Noteholder accompanying any prepayment, Maker may prepay all or part of the outstanding principal balance of this Note (each an "Optional Prepayment") without penalty or premium; provided, however, that no Optional Prepayment shall be made in an amount less than the lesser of [One Hundred Thousand] and 00/100 Dollars ($[100,000].00) and the principal amount then due under this Note.

(b)     Upon the payment of any Optional Prepayment pursuant to the terms of this Note, (i) the payment schedule under this Note shall be revised to reflect such reduction of principal and (ii) the dollar amount of any remaining Quarterly Interest Payments shall be reduced to reflect the reduction of principal then outstanding.  The recalculation of the outstanding principal balance under this Note and the revision of the payment schedule thereunder shall not in any way modify the obligations of Maker to make any remaining Quarterly Interest Payments until such time, subject to Section 3(e) above, as all principal outstanding under this Note and interest accrued hereunder has been paid in Cash and in full.

**Section 6.**     *e pe ti     tere t* .  In the event the interest provisions hereof or any exactions provided for herein shall result in an effective rate of interest which, for any period of time, exceeds the limit of any usury or other law applicable to this Note, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied toward repayment of outstanding principal immediately upon receipt of such moneys by the Noteholder with the same force and effect as if Maker had specifically designated such extra sums to be so applied to principal and the Noteholder had agreed to accept such extra payments in repayment of the principal balance hereof.  Notwithstanding the foregoing, however, the Noteholder may at any time, and from time

- 4 -

to time, elect, by notice in writing to Maker, to reduce or limit the collection of any interest to such sums which shall not result in any payment of interest in excess of that lawfully collectible. Maker agrees that in determining whether or not any interest payable under this Note exceeds the highest rate permitted by Applicable Law, any non-principal payment, including late charges, shall be deemed to the extent permitted by law to be an expense, fee, or premium, rather than interest.

**Section 7.**    *epre e tatio  a d   arra tie* . Each Shareholder executing this Note severally represents and warrants to Noteholder that:

(a)    This Note constitutes the legal, valid, and binding obligation of such Shareholder and is enforceable against such Shareholder in accordance with the terms of this Note;

(b)    The execution, delivery, and performance of this Note by  such Shareholder does not result in a contravention by such Shareholder of any provision of law or any agreement by which Shareholder or Shareholder's assets are bound; and

(c)    In the case of a Shareholder that is not individual, (i) such Shareholder has the power and authority to execute and deliver, and to perform such Shareholder's obligations under, this Note; and (ii) any necessary consents, authorizations, and approvals necessary in connection with such Shareholder's execution and delivery of, and the performance of such Shareholder's obligations under, this Note have been obtained.

**Section 8.**    *ve t  o   e a t*. The following shall constitute an event of default (each, an "<u>Event of Default</u>") under this Note:

(a)    failure to pay either or both principal and interest when due on the due date thereof, whether due on a Quarterly Interest Payment Date the Stated Maturity Date, or by acceleration or otherwise under this Note, and Maker has not remedied and fully cured such failure to pay within five (5) Business Days after the date on which such payment is due;

(b)    the occurrence of a breach of, a default under, or an event of default under any of the Loan Documents and either (i) such breach, default, or event of default has not been remedied and fully cured within the cure period or time specified in the applicable Loan Document or (ii) if no cure period is specified in the applicable Loan Document with respect to such breach, default, or event of default, such breach, default, or event of default shall have continued for a period of thirty (30) days;

(c)    Maker becomes insolvent, or generally fails to pay, or is generally unable to pay, or admits in writing its inability to pay its debts as they become due or payable;

(d)    Maker applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, liquidator, or other custodian, for a substantial portion of its property, or makes a general assignment for the benefit of creditors;

(e)    an Insolvency Proceeding is commenced by, against, or in respect of

- 5 -

Maker; provided, however, that if Maker has not voluntarily commenced or initiated the Insolvency Proceeding, the pendency of such Insolvency Proceeding shall not constitute an Event of Default hereunder until the earlier of: (i) entry of an order for relief in the Insolvency Proceeding; (ii) entry of an order finding or concluding, *i ter a ia*, that (A) Maker is generally not paying, or is generally unable to pay, its debts as they become due or payable or (B) the sum of the debts of Maker is greater than the aggregate value of Maker's assets, at fair valuation; and (iii) such Insolvency Proceeding remains pending for more than sixty (60) days;

(f)     a trustee, receiver, liquidator, or other custodian is appointed for Maker, or for a substantial portion of Maker's property;

(g)     (i) invalidity or unenforceability of this Note or any of the other Loan Documents; (ii) the commencement of an action or proceeding by Maker, or any of its successors or assigns, to establish the invalidity or unenforceability of this Note or any of the other Loan Documents; or (iii) Maker's repudiation or denial of any portion of its liability or obligations under this Note or any of the other Loan Documents; or

(h)     any representation or warranty made by Maker herein or in any of the other Loan Documents shall be false or misleading in any material respect as of the date made.

**Section 9.**     *e eratio   po   e a t  e edie*.  Upon an Event of Default, at the option of the Noteholder, all unpaid principal and accrued interest under this Note shall become immediately due and payable, without presentment, demand, protest, or further notice and interest shall accrue on all unpaid principal at a default rate of seven percent (7%) per annum until all unpaid amounts due under this Note are indefeasibly paid in full.  Upon an Event of Default, the Noteholder shall be entitled to pursue all rights and remedies available to it under the Loan Documents or under Applicable Law against Maker.  Notwithstanding the provisions of this Section 9, upon the occurrence of an Event of Default under Section 8(e), all unpaid principal and accrued interest under this Note shall be automatically due and payable without further notice, demand, or other action by the Noteholder.

**Section 10.**     *aiver*

(a)     Except for the notices specified in Section 8 hereof, Maker expressly waives presentment for payment, demand, notice of dishonor, protest, notice of protest, diligence of collection, and any other notice of any kind.

(b)     To the extent permitted by law, Maker hereby waives and releases all errors, defects, and imperfections in any proceedings instituted by the Noteholder under the terms of this Note or any other Loan Document.  Maker agrees that any property that may be levied upon pursuant to a judgment obtained by virtue hereof, or upon any writ of execution issued thereon, may be sold upon any such judgment or writ in whole or in part in any order desired by the Noteholder.

**Section 11.**     *e otia i it o  ote*.  This Note is intended to be a negotiable instrument in accordance with Article 3 of the UCC, and may be negotiated to a transferee pursuant to the

terms thereof.

**Section 12.**      *e  d  e  t  a  d    aiver*   Except for the waivers set forth in Section 10 hereof, any amendment or waiver of, or consent with respect to, any provision of this Note shall be effective if and only if the same shall be in writing and approved by the Noteholder and Maker; provided, however, that no such amendment, waiver, or consent shall result in the release of all or a substantial portion of any collateral securing this Note, except as expressly provided in the other Loan Documents.  Any such amendment, waiver, or consent shall be effective only in the specific instance and for the specified purpose for which given.

**Section 13.**      *over  i      a* .   This Note shall in all respects be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws provisions that would require the application of the laws of any other jurisdiction, and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with the laws of the Commonwealth of Pennsylvania.

**Section 14.**      *ervi  e o    ro e    a  d    ri  di  tio*

(a)      Maker by executing this Note (i) hereby irrevocably submits to the nonexclusive jurisdiction of the state and federal courts of the Commonwealth of Pennsylvania (without prejudice to the right of any party to remove to the United States Bankruptcy Court for the Middle District of Pennsylvania) and to the nonexclusive jurisdiction of the United States Bankruptcy Court for the Middle District of Pennsylvania, for the purposes of any suit, action, or other proceeding arising out of this Note or any other Loan Document or the subject matter hereof or thereof, or any of the transactions contemplated hereby or thereby, brought by any of the parties hereto or thereto or their successors or assigns; (ii) hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Pennsylvania court or, to the  fullest extent permitted by Applicable Law, in such Bankruptcy Court; and (iii) to the extent permitted by Applicable Law, hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action, or proceeding any claim that it is not personally subject to the jurisdiction of the above-named courts, that the suit, action, or proceeding is brought in an inconvenient forum, that the venue of the suit, action, or proceeding is improper, or that this Note or any other Loan Document, or the subject matter hereof or thereof, may not be enforced in or by such court.  A final judgment (no longer subject to appeal, review, or certiorari proceeding) obtained in respect of any action, suit, or proceeding referred to in this Section 13(a) shall be conclusive and may be enforced in other jurisdictions by suit or judgment or in any manner as provided by Applicable Law.

(b)      *ervi  e o    ro e* .   Maker by executing this Note hereby consents to service of process by overnight mail, Federal Express, UPS, or similar courier at the address to which notices to Maker are to be given under Section 16 hereof, it being agreed that service in such manner shall constitute valid service upon it or its nominees, successors, or assigns in connection with any proceeding under the Loan Documents only; provided, however, that nothing in this Section 14(b) shall affect the right of any party hereto, or its respective nominees, successors, or assigns, to serve legal process in any other manner permitted by Applicable Law.

**Section 15.** *avier o  ria      r a d o e io o   d e t.*

    (a)    **WAIVER OF RIGHT TO TRIAL BY JURY**. MAKER HEREBY WAIVES, FOR ITSELF, AND ITS SUCCESSORS AND ASSIGNS, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS.  MAKER (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT NOTEHOLDER HAS BEEN INDUCED TO ACCEPT THIS NOTE BY MAKER'S WAIVERS AND CERTIFICATIONS HEREIN.

    (b)    **WARRANT OF ATTORNEY TO CONFESS JUDGMENT. MAKER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, ANY ATTORNEY OR ANY CLERK OF ANY COURT OF RECORD, FOLLOWING THE OCCURRENCE OF A DEFAULT AND SUBSEQUENT TO FIVE (5) BUSINESS DAYS' PRIOR WRITTEN NOTICE TO MAKER, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER FOR SUCH SUMS AS ARE DUE OR MAY BECOME DUE UNDER THIS NOTE, WITH OR WITHOUT DECLARATION, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION, AND ALL REASONABLE ATTORNEYS' FEES FOR COLLECTION.  TO THE EXTENT PERMITTED BY LAW, MAKER RELEASES ALL ERRORS IN SUCH PROCEEDINGS.  IF A COPY OF THIS NOTE, VERIFIED BY AFFIDAVIT BY OR ON BEHALF OF THE NOTEHOLDER SHALL HAVE BEEN FILED IN SUCH ACTION, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL NOTE AS A WARRANT OF ATTORNEY.  THE AUTHORITY AND POWER TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER SHALL NOT BE EXHAUSTED BY THE INITIAL EXERCISE THEREOF AND MAY BE EXERCISED AS OFTEN AS THE NOTEHOLDER SHALL FIND IT NECESSARY AND DESIRABLE AND THIS NOTE SHALL BE A SUFFICIENT WARRANT THEREFORE.  THE NOTEHOLDER MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING HEREUNDER, WITHOUT REGARD TO WHETHER JUDGMENT HAS THERETOFORE BEEN CONFESSED ON MORE THAN ONE OCCASION FOR THE SAME AMOUNT; PROVIDED THAT THE FOREGOING SHALL NOT ENTITLE THE NOTEHOLDER TO COLLECT ANY MORE THAN MAY ACTUALLY BE OWED TO NOTEHOLDER HEREUNDER.  IN THE EVENT ANY JUDGMENT CONFESSED AGAINST MAKER HEREUNDER IS STRICKEN OR OPENED UPON APPLICATION BY OR ON MAKER'S BEHALF FOR ANY REASON, THE NOTEHOLDER IS HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER FOR ANY PART OR ALL OF THE AMOUNTS OWING UNDER THIS NOTE, AS PROVIDED FOR HEREIN, IF DOING SO WILL CURE ANY ERRORS OR DEFECTS IN SUCH PRIOR PROCEEDINGS.**

    **Section 16.**    *oti e .*  Any notice, request, or other communication required or

- 8 -

permitted to be given under this Note shall be in writing and deemed to have been properly given (a) when delivered in person or when sent by facsimile or other electronic means and electronic confirmation of error free receipt is received; or (b) three (3) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address listed on the attached Exhibit B. Any party may change its address for notices by giving notice of such change to the other parties in the manner set forth in this Section 16.

**Section 17.**  *e o o tr tio*

(a)  Captions and headings in this Note are for convenience of reference only and in no way define, limit, describe, or otherwise affect the scope or intent of the provisions hereof.

(b)  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, or neuter forms.

(c)  All terms defined in this Note in the singular form shall have comparable meanings when used in the plural form, and vice-versa.

(d)  All references herein to "Section" shall be deemed references to sections of this Note unless the context shall otherwise require.

(e)  The words "herein," "hereof," and "hereunder," and words of similar import when used in this Note shall be construed to refer to this Note in its entirety and not to any particular provision thereof.

(f)  Unless otherwise indicated, (i) the term "including" means "including without limitation," except when used in the computation of time periods, and (ii) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein).

(g)  For purposes of computation of time periods, whenever this Note provides for an event to occur "within" a specified number of days of a preceding event, it shall mean that the latter event shall occur before the close of business on the last of the specified days, and the day on which the preceding event occurs shall not be included in the computation of days elapsed. In addition, the word "from" means "from and including," "after" means "after and excluding," and "to" and "until" mean "to and including".

(h)  Any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law; and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time.

**Section 18.**  *artie o d.* This Note shall inure to the benefit of the Noteholder and each of its nominees, successors, and assigns, and shall be binding on Maker and each of its

- 9 -

respective nominees, successors, or assigns.

**Section 19.** *o hird art e e i iarie .* Notwithstanding anything to the contrary contained herein, no provision of this Note is intended to benefit any party other than the Noteholder, nor shall any such provision be enforceable by any other party.

**Section 20.** *o i e t or e e atio a er.* Notwithstanding anything to the contrary herein, Maker shall not assign any of its rights or delegate any of its obligations under this Note or any of the other Loan Documents to any Person, and no assignment or delegation of any such right or obligation shall release or discharge Maker therefrom. In addition, no assignment or transfer of property, rights, claims, privileges, duties, or obligations by Maker shall release or discharge Maker from any of Maker's obligations under the Loan Documents.

**Section 21.** *evera i it .* In the event that any provision hereof shall be deemed to be invalid by reason of the operation of any law or by reason of the interpretation placed thereon by any Governmental Authority, this Note shall be construed as not containing such provision, but only as to such jurisdictions where such law or interpretation is operative, and the invalidity of such provision shall not affect the validity of any remaining provisions hereof, and any and all provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

**Section 22.** *re e o i atio .* All sums of money referred to herein are denominated in United States of America dollars.

**Section 23.** *ep a e e t o ote a d ther oa o e t .* Upon receipt of an affidavit or sworn declaration of the Noteholder as to the loss, theft, destruction, or mutilation of this Note together with an indemnity in a form reasonably satisfactory to Maker for losses arising from such loss, theft, destruction, or mutilation, Maker will issue in lieu thereof a replacement promissory note in the same principal amount thereof and setting forth the same terms and provisions of this Note.

**Section 24.** *pe e .* Maker shall reimburse the Noteholder promptly upon demand for all out-of-pocket costs and expenses, including all attorneys' fees and expenses of legal counsel, incurred by the Noteholder in connection with the enforcement of any rights or actions of the Noteholder under this Note, but only to the extent the Noteholder succeeds in enforcing this Note.

*i at re pa e o o*

**IN WITNESS WHEREOF**, with the intent to be legally bound hereby, Maker has caused this Note to be executed and delivered under seal as of the date first written above.

**MAKER:**

[SIGNATURE BLOCK TO BE INSERTED FOR EACH SHAREHOLDER]

_____(SEAL)
          Name:

COMMONWEALTH OF PENNSYLVANIA    )
                                      ) ss

COUNTY OF _____           )

On this _____ day of _____, 2014, before me, a Notary Public, in and for the Commonwealth of Pennsylvania, personally appeared the above named _____ and acknowledged the foregoing Secured Promissory Note to be such person's act and deed and desired that the same might be recorded as such.

Witness my hand and official seal this ____ day of _____, 2015.

_____
                    Signature

_____
Printed Name of Notary

Notary Public
Notary Seal

My commission expires:

_____

## Exhibit A

### Shareholders

Patricia P. Atkins

Karen M. Legan

Douglas Mackinnon

Carter Atkins

Timothy Atkins

Richard P. Yates

_____, as Trustee of the Susan Y. Kindelan Trust u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Elizabeth Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Carolyn Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Katherine Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Grace Legan u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Lauren Mackinnon u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Emily Mackinnon u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Matthew Mackinnon u/a dated _____

_____, as Trustee of the Malcolm C. Mackinnon UGL Share Trust f/b/o Rebecca Mackinnon u/a dated _____

## Exhibit B

Addresses for Notice

01:16302039.2

# EXHIBIT I

**List of Executory Contracts To Be Rejected**

NONE

# EXHIBIT J

**List of Settled Asbestos Claims (As Amended)**

**AMENDED EXHIBIT J**

**UNITED GILSONITE LABORATORIES**

**ALLOWED CLASS 3 B CLAIMS (SETTLED ASBESTOS CLAIMS)**

| CLAIMANT | CLAIMANT'S ATTORNEY OF RECORD | JURISDICTION | ALLOWED CLASS 3B CLAIM |
|---|---|---|---|
| Marie Dona Peeler, as Personal Representative of the Estate of Grady L. Peeler | Jonathan Ruckdeschel, Esquire<br>The Ruckdeschel Law Firm, LLC<br>8357 Main Street<br>Ellicott City, MD 21043-4603 | MD, Baltimore City | $ 1,400,000.00 |
| Pauline Conley as Executrix of the Estate of Gene Conley | Simon Greenstone Panatier Bartlett PC<br>3232 McKinney Ave.<br>Suite 610<br>Dallas, Texas 75204 | GA, Fulton State | $ 42,500.00 |
| Charles E. and Theresa Nobles | Weitz & Luxenberg, P.C.<br>700 Broadway<br>New York, NY 10003 | NY, Upstate NY | $ 42,500.00 |
| Ronald Barbier | Weitz & Luxenberg, P.C.<br>700 Broadway<br>New York, NY 10003 | NYCAL | $ 75,000.00 |
| Paul and Marie Coniglio | Weitz & Luxenberg, P.C.<br>700 Broadway<br>New York, NY 10003 | NYCAL | $ 75,000.00 |
| Mark Lonergan | Weitz & Luxenberg, P.C.<br>700 Broadway<br>New York, NY 10003 | NYCAL | $ 230,000.00 |

1

# AMENDED EXHIBIT J

## UNITED GILSONITE LABORATORIES

### ALLOWED CLASS 3 B CLAIMS (SETTLED ASBESTOS CLAIMS)

| CLAIMANT | CLAIMANT'S ATTORNEY OF RECORD | JURISDICTION | | ALLOWED CLASS 3B CLAIM |
|---|---|---|---|---|
| Claimant X | Levy Konigsberg LLP<br>800 Third Ave<br>11 Floor<br>New York, NY 10022 | NY, Upstate NY | $ | 60,000.00 |
| Allen Rabinowitz as Personal Representative for the Estate of Stanley Rabinowitz | The Early Law Firm<br>360 Lexington Avenue, 20th Floor<br>New York, NY 10017 | NYCAL | $ | 50,000.00 |
| William Geist and Betty Geist | Brookman, Rosenberg, Brown & Sandler<br>One Penn Square West<br>30 S. 15th Street, 17th Floor<br>Philadelphia, PA 19102 | PA, Philadelphia | $ | 65,000.00 |
| Patricia DiFazio, Executrix of the Estate of Francis DiFazio | Brookman, Rosenberg, Brown & Sandler<br>One Penn Square West<br>30 S. 15th Street, 17th Floor<br>Philadelphia, PA 19102 | PA, Philadelphia | $ | 135,000.00 |
| | | TOTAL | $ | **2,175,000.00** |

2C

De